**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEXTEL SPECTRUM ACQUISITION
CORPORATION,
2001 Edmund Halley Drive
Reston, VA 20191,

                  Plaintiff,

    v.

HISPANIC INFORMATION AND
TELECOMMUNICATIONS NETWORK,
INC.,
63 Flushing Avenue
Brooklyn, NY 11205-1078,

                  Defendant.

Civil Action No.:

## NOTICE OF REMOVAL OF STATE COURT CIVIL ACTION

Pursuant to 28 U.S.C. §§ 1441 and 1446, Defendant Hispanic Information and

Telecommunications Network, Inc. ("HITN") hereby removes to this Court the state court action

entitled *Nextel Spectrum Acquisition Corporation v. Hispanic Information and*

*Telecommunications Network, Inc.*, Case No. 001249, filed on February 21, 2007 in the Superior

Court of the District of Columbia (the "State Court Civil Action"). Removal is based on

diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), and this Notice of Removal is timely

under 28 U.S.C. § 1446(b). Copies of Plaintiff's Complaint and any other documents

constituting the entire file in the State Court Civil Action are attached hereto as Exhibit A. In

support of this Notice of Removal, HITN states as follows:

    1.      Under 28 U.S.C. § 1441, state court civil actions over which the District Courts of

the United States would have had original jurisdiction may be removed to the District Court of

the United States for the district and division embracing the place where the action is pending.

    2.      The State Court Civil Action is a civil action over which this Court has or would

have had original diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

3.     Diversity jurisdiction exists pursuant to 28 U.S.C. § 1332(a) because the parties to the State Court Civil Action are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interests and costs.

4.     Specifically, contrary to the allegations in Plaintiff's Complaint, Defendant HITN is a citizen of New York because it is (and was at the time Plaintiff's Complaint was filed) a non-profit corporation incorporated in New York with its principal place of business in New York.

5.     According to Plaintiff's Complaint, Plaintiff is a citizen of both Delaware and Virginia because it is (and was at the time Plaintiff's Complaint was filed) a corporation incorporated in Delaware with its principal place of business in Virginia.

6.     Venue is proper under 28 U.S.C. § 1441 because this Court embraces the Superior Court of the District of Columbia, which is the place where the State Court Civil Action that is the subject of this removal is pending.

7.     This Notice of Removal is timely filed as required by 28 U.S.C. § 1446(b). Plaintiff first effected service upon HITN on February 27, 2007. Accordingly, pursuant to 28 U.S.C. § 1446(b), HITN was required to file this Notice of Removal within 30 days after February 27, 2007.

8.     Written notice of filing of this Notice of Removal will be given to Plaintiff, and a true copy will be filed with the Clerk in the Superior Court of the District of Columbia, as required by 28 U.S.C. § 1446(d).

9.     In filing this Notice of Removal, Defendant does not waive any defense that may be available to it. Likewise, in filing this Notice of Removal, Defendant does not waive any right to transfer this action to a more convenient venue, nor does it concede that this venue is convenient.

WHEREFORE, Defendant removes the State Court Civil Action from the

Superior Court of the District of Columbia to the United States District Court for the District of

Columbia.

Dated:  March 19, 2007

_____
Eunnice H. Eun (DC Bar # 500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C. 20005-5793
Telephone:     (202) 879-5000
Facsimile:     (202) 879-5200

William H. Pratt
Joseph Serino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

Rudolph J. Geist (DC Bar # 461064)
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, Maryland 20910
Telephone:     (301) 589-2999
Facsimile:     (301) 589-2644

*Attorneys for Hispanic Information and
Telecommunications Network, Inc.*

# EXHIBIT A

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### CIVIL DIVISION

| | | |
|---|---|---|
| NEXTEL SPECTRUM ACQUISITION CORP.,<br>2001 Edmund Halley Drive<br>Reston, VA  20191<br><br>Plaintiff,<br>v.<br><br>HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.,<br>63 Flushing Avenue<br>Brooklyn, NY 11205 – 1078<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. _____ |

## COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE AND OTHER RELIEF

Plaintiff Nextel Spectrum Acquisition Corp. ("NAC") in support of its Complaint against Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN"), states as follows:

### INTRODUCTION

1.     This case involves NAC's bargained for contractual right to lease valuable spectrum rights in and around Washington, DC.  In early 2005, HITN acquired a Federal Communications Commission ("FCC") license for Educational Broadband Service Station WHG442 (the "License").  At the time HITN acquired the License, it was subject to a lease agreement that provides NAC with a valid right of first refusal ("ROFR") on any bona fide offer(s) the holder of the License receives for certain spectrum rights.  HITN knew of the ROFR when it acquired the License.  However, HITN has committed these same spectrum rights to a third party without informing NAC of the third party's offer, much less affording NAC its contractual right to match that offer.  The spectrum rights at issue are unique, therefore if HITN

is allowed to violate the ROFR and consummate a closing on the accepted, existing third party offer, NAC will suffer irreparable harm that cannot be adequately compensated through money damages. NAC requests that the Court enforce the terms of the ROFR, and order injunctive relief and specific performance.

**PARTIES**

2.    NAC is a Delaware corporation with its principal place of business in Reston, Virginia.

3.    Defendant HITN is a Delaware corporation with its principal place of business in Brooklyn, New York.

**JURISDICTION AND VENUE**

4.    This Court has subject matter jurisdiction over this case pursuant to § 11-921 of the District of Columbia Code. The Court has personal jurisdiction over HITN under § 13-423 of the District of Columbia Code because at all times pertinent to the acts and events that form the basis of this Complaint, Defendant transacted business in and had an interest in an FCC license serving the District of Columbia.

**FACTS**

**A.    BACKGROUND**

5.    As used herein, "spectrum" refers to radio frequencies used for the transmission of sound, data and video. The FCC is responsible for administering and allocating spectrum rights used by the private sector, including individuals (e.g., cellular telephones, wireless Internet, garage door openers and computer modems), private organizations (e.g., radio and telephone broadcasters, including but not limited to not-for-profit entities), and public safety and health officials (e.g., police and emergency technicians).

6.    The FCC rules allow certain spectrum to be used by the general public on a non-exclusive basis pursuant to certain parameters without the need for obtaining a specific license. Such spectrum rights are generally referred to as "unlicensed spectrum."

7.    With respect to other spectrum, the FCC grants a specific party the right to use that spectrum on an exclusive basis within a given geographic area pursuant to parameters established by the FCC. Such spectrum rights are generally referred to as "licensed spectrum."

8.    Providers of telecommunications services prefer to use licensed spectrum in deployment of wireless services because the accompanying exclusivity permits the use of licensed spectrum free from interference from other spectrum users, thereby promoting a reliable wireless service offering.

9.    The spectrum rights at issue in this lawsuit involve the "D Group" channels within the 2.5 GHz band. The "2.5 GHz band" refers to licensed spectrum authorized by the FCC between the frequencies of 2495 MHz and 2690 MHz. The general practice of the FCC is to authorize a maximum of 33 channels in the 2.5 GHz band in any given market. In general, a license for a spectrum in the 2.5 GHz band consists of the right to use one of eight four channel groups, commonly known as the A Group, B Group, C Group, D Group, E Group, F Group and G Group. The remaining five channels are allocated to the H Group (three channels) and to two channels known as BRS1 and BRS2.

10.    The FCC has allocated a portion of the 2.5 GHz band, known as Educational Broadband Service, or "EBS," for licenses issued to educational institutions and certain not-for-profit entities. The remaining portion of the 2.5 GHz band may be licensed to commercial enterprises and is referred to as Broadband Radio Service, or "BRS."

11.    Licensed spectrum is finite within the 2.5 GHz band and the FCC has already licensed nearly all available EBS and BRS spectrum in each market.

12.    Therefore, commercial operators must purchase or lease particular spectrum groupings in a given market to provide wireless services that will be free from interference and otherwise appropriate for commercial operations.

13.    As a consequence, licensed spectrum rights are unique and have significant value to commercial operators.

14.    Commercial operators go to great length and expense in acquiring particular spectrum rights in each market to obtain the optimal mix for providing commercially viable wireless services.

**B.    THE GWU AIRTIME LEASE AGREEMENT**

15.    The License was previously held by George Washington University ("GWU").

16.    On or about February 21, 1995, GWU and Eastern Cable Networks Corporation ("ECNC") entered into an Airtime Lease Agreement (the "GWU Lease"). The GWU Lease allowed ECNC to lease GWU's excess capacity spectrum under certain conditions (the "GWU Spectrum Rights"). NAC eventually succeeded to ECNC's interest in the GWU Spectrum Rights and HITN acquired the License subject to the GWU Lease.

17.    Under Section I.C. of the GWU Lease, the License is subject to a ROFR that extends for two years after the expiration of the GWU Lease.

18.    The GWU Lease expired on February 21, 2005, which means that NAC has a valid and enforceable ROFR through February 21, 2007.

19.    The GWU Lease states in pertinent part as follows:

I.C.    <u>Right of First Refusal</u>.

1.  [NAC] shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter (the "Right of First Refusal").

2.  If [HITN] desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B., [HITN] must provide written notice to [NAC] at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of [NAC]'s Right of First Refusal. Such notice must be given one year prior to expiration of the contract.

3.  Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to [HITN], [HITN] shall serve [NAC] with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating [HITN]'s intent to accept the offer in the event that [NAC] does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. [HITN] shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal. Within thirty (30) days of [NAC]'s receipt of [HITN]'s written notice, [NAC] shall notify [HITN] in writing of its desire to exercise its Right of First Refusal.

4.  In the event that [NAC] refuses to exercise its Right of First Refusal with respect to any offer, and any material term of such offer is subsequently changed, before accepting such changed offer [HITN] must follow the procedures specified in the foregoing subsections, providing [NAC] with notice regarding the revised offer and giving [NAC] the opportunity to exercise its Right of First Refusal with regard thereto.

See GWU Lease, Section I.C., at 2 (Attached as Ex. A).    The ROFR is a material term of the GWU Lease.

## C.    NAC'S ROFR IS TRIGGERED ONCE HITN ACCEPTS A BONA FIDE OFFER FOR THE GWU SPECTRUM RIGHTS

20.    On May 11, 2006, Clearwire filed a Form S-1 preliminary prospectus with the SEC related to a planned initial public offering ("IPO"). Clearwire is one of the largest commercial entities presently acquiring spectrum rights throughout the country. On or about January 8, 2007, Clearwire filed an Amendment to Form S-1 which disclosed a number of previously unavailable documents which are purportedly material to Clearwire's planned IPO.

Among the agreements is the Master Royalty and Use Agreement between Clearwire and HITN dated October 4, 2006 (relevant portions of the "MRUA" are attached as Exhibit B).[1/]

21.    A key component of the MRUA is Clearwire's "exclusive" right of access to all of HITN's licensed spectrum, regardless of whether the spectrum is subject to existing lease rights with third parties. See, e.g., MRUA Recitals at 3 (the parties agree that "in securing a source of spectrum capacity for the future and facilitating the branding of the Clearwire mark through the services provided by Licensee in the non-profit community; … [HITN] desires to make available to Clearwire, and Clearwire desires to have access to, … any additional Commercial Spectrum Capacity of [HITN] that is accepted by Clearwire and made subject to an [Individual Use Agreement] as provided in this Agreement (the "Future Spectrum Capacity"), all in accordance with the terms of this Agreement.")

22.    Under the MRUA, HITN is contractually obligated to provide all of its licensed spectrum to Clearwire, including the GWU Spectrum Rights.  The MRUA states in relevant part as follows:

> (b) Option for Future Spectrum Capacity. Licensee grants Clearwire an option (the "Option") to enter into IUAs with Licensee in respect of any and all spectrum (including, but not limited to, the Commercial Spectrum Capacity, EBS and BRS) ("Spectrum") on FCC Licenses held by Licensee that is Available or **that becomes Available during the Term, at prices to be negotiated in good faith based on the fair market value ("FMV") of such Spectrum at the time the Option is to be exercised, provided, however, that the negotiated price shall not exceed [\*\*\*] per MHz POP.** The Option shall be exercisable in Clearwire's sole discretion each time Spectrum of Licensee or its Affiliates becomes Available during the Term. …

See Ex. B (Large portions of the MRUA have been redacted by Clearwire including the price term per MHz POP) (emphasis added).

---

[1/]    The entire MRUA is located at
<http://www.sec.gov/Archives/edgar/data/1285551/000089102007000003/v25599a1exv10w60.txt>.

23.     The MRUA provides for the GWU Spectrum Rights to be transferred to Clearwire unencumbered.  However, the MRUA directly contradicts the ROFR which states as follows:

> [HITN] shall not accept any offer to lease excess capacity that includes terms or conditions that have the *purpose or the effect of preventing NAC from exercising its Right of First Refusal.*

Ex. A, at 2. (Emphasis added).

24.     Despite HITN's and Clearwire's efforts to draft around NAC's ROFR, the reality is that Clearwire has already made a bona fide "offer" for the GWU Spectrum Rights thereby triggering NAC's ROFR.  For example, the price formula for which Clearwire can purchase the GWU Spectrum Rights has been agreed upon, as have other material terms.  HITN breached the GWU Lease by refusing to provide NAC with all material terms and conditions of the Clearwire's offer.

25.     Once NAC's ROFR expires, Clearwire and HITN are going to close on their pending deal for the GWU Spectrum Rights.  Clearwire's own representative has confirmed this much by declaring that Clearwire is going to "wait out" NAC's ROFR before Clearwire exercises its option for the GWU Spectrum Rights.

26.     To protect NAC's rights and to preserve the status quo, during the pendency of this lawsuit, but in no event longer than 30 days after HITN provides written notice of all material terms and conditions of the Clearwire offer, HITN should be enjoined from closing on the Clearwire offer or otherwise transferring the GWU Spectrum Rights.  This relief is necessary to allow NAC a reasonable amount of time to decide whether to match the Clearwire offer.

27.     This requested injunctive relief would not harm HITN.  Under the MRUA, HITN is obligated to provide the GWU Spectrum Rights to Clearwire and only Clearwire.  Enjoining this transaction for a brief period of time is quite reasonable under the circumstances.  On the other hand, in the absence of an injunction, NAC would suffer irreparable harm because it would

be denied access to a unique asset in violation of the GWU Lease. Furthermore, it would be much more difficult for the parties to unwind the Clearwire transaction after the fact.

## COUNT I—BREACH OF CONTRACT

28.     NAC incorporates paragraphs 1 through 27 as if set forth fully herein.

29.     HITN and NAC are bound by the GWU Lease which allows for HITN to lease the excess spectrum capacity for the D-Group spectrum in the Washington, DC area.

30.     NAC has performed in compliance with the GWU Lease.

31.     Under the GWU Lease, NAC has a ROFR on any bona fide offer HITN receives for the GWU Spectrum Rights.

32.     HITN continues to breach the GWU Lease by, among other things, failing to provide NAC with written notice of all of the material terms and conditions of Clearwire's offer for the GWU Spectrum Rights.

33.     NAC has no adequate remedy at law to address HITN's ongoing and threatened future breaches of its obligations under the GWU Lease.

34.     The actual and threatened harm to NAC is immediate in that HITN intends to transfer the GWU Spectrum Rights to Clearwire in derogation of NAC's ROFR upon the expiration of the ROFR period.

35.     Unless enjoined, the transfer of the GWU Spectrum Rights to Clearwire as provided in the MRUA will cause substantial, immediate and irreparable injury to NAC – including, but not limited to, the lost opportunity to acquire licensed spectrum rights that are unique, finite and have substantial value in the commercial market place.

36.     The MRUA sets forth many of the material terms and conditions of the Clearwire offer and NAC is evaluating whether to match Clearwire's offer. However, HITN should be

required to specifically perform under Section I.C. of the GWU Lease by providing written notice of all of the material terms of Clearwire's offer which would trigger the contractually provided 30 days for NAC to match Clearwire's offer.

WHEREFORE, NAC requests that the Court enter a judgment in its favor on Count I of the Complaint and further requests an Order:

(a)     During the pendency of this lawsuit, but in no event later than 30 days after HITN provides written notice of all material terms and conditions of the Clearwire offer, enjoining, restraining and prohibiting HITN, together with its agents, servants, employees, and those persons in active concert or participation with it, from transferring, leasing, and/or assigning the GWU Spectrum Rights and/or any interest in the GWU Spectrum Rights;

(b)     Requiring HITN to specifically perform under GWU Lease by providing written notice to NAC of all of the material terms and conditions of the Clearwire offer; and

(c)     Awarding NAC, as the prevailing party, all expenses incurred herein, including reasonable attorneys' fees.

Respectfully submitted,

BRYAN CAVE LLP

Rodney F. Page (D.C. Bar #37994)
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C.  20005-3960
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200

Craig S. O'Dear
James D. Lawrence
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone:  (816) 374-3200
Facsimile:  (816) 374-3300

ATTORNEYS FOR PLAINTIFF

# Exhibit A

 **ORIGINAL**

### AIRTIME ROYALTY AGREEMENT

AGREEMENT entered into as of the $2\text{-}1$ day of February 1995 by and between The George Washington University (the "University") and Eastern Cable Networks Corp. ("ENET").

WHEREAS the University has been issued a license (the "License") by the Federal Communications Commission (the "FCC") to construct and operate Instructional Television Fixed Service ("ITFS") station WHG442 (Washington, DC) utilizing the D Group channels (the "D Group Station"); and

WHEREAS the FCC has authorized licensees of Instructional Television Fixed Service ("ITFS") stations to lease excess capacity on their stations for the transmission of commercial programming by wireless cable system operators; and

WHEREAS the University and Hybrid Networks, Inc. ("Hybrid") entered into a Channel Lease Agreement (the "Hybrid Agreement") dated December 31, 1993 which granted Hybrid the right to utilize certain transmission capacity of channel D2; and

WHEREAS the FCC, by letter dated February 28, 1994, found that the 24 hours per day of the programming to be transmitted over channel D2 by Hybrid satisfies the ITFS programming requirements set forth in section 74.931(e) of the FCC's Rules; and

WHEREAS ENET owns and operates the sole wireless cable system providing video programming and other communications services within the Washington, DC metropolitan area and is agreeable to providing the University with access to transmission equipment, operational support and royalties in exchange for access to certain excess capacity on the University's system upon the issuance to the University of a license authorizing the University to relocate the D Group Station to ENET's wireless cable headend in Bethesda, MD with the same technical configuration as the other facilities comprising ENET's wireless cable system; and

WHEREAS the University has determined that excess capacity exists on the D Group Station and is desirous of providing ENET with access to such excess capacity in exchange for access to transmission equipment, operational support and royalties;

NOW, THEREFORE, in consideration of the mutual promises set forth herein, the University and ENET do hereby agree to the following terms and conditions:

I.    TERM.

A.    <u>Initial Term</u>. The initial term of this Agreement shall commence upon the date hereof and shall extend until August 29, 1998.

B.    Automatic Renewal Terms.

1.    Provided that this Agreement has not been otherwise terminated pursuant to Section XI and that the University shall have filed an application for renewal of the License, this Agreement shall automatically renew for an additional term ending upon the earlier of: (i) the date that is ten years from the date hereof; or (ii) such date, if any, that the FCC denies the application of the University for renewal of the License, unless ENET provides to the University at least ninety days notice prior to the expiration of the initial term that it does not intend to renew this Agreement.

C.    Right of First Refusal.

1.    ENET shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from the University during any or all of the period from the expiration of the automatic renewal term under Section I.B through two years thereafter (the "Right of First Refusal").

2.    If the University desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B, the University must provide written notice to ENET at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of ENET's Right of First Refusal.  Such notice must be given one year prior to expiration of the contract.

3.    Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to the University, the University shall serve ENET with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating the University's intent to accept the offer in the event that ENET does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. The University shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing ENET from exercising its Right of First Refusal.  Within thirty (30) days of ENET's receipt of the University's written notice, ENET shall notify the University in writing of its desire to exercise its Right of First Refusal.

4.    In the event that ENET refuses to exercise its Right of First Refusal with respect to any offer, and any material term of such offer is subsequently changed, before accepting such changed offer the University must follow the procedures specified in the foregoing subsections, providing ENET with notice regarding the revised offer and giving ENET the opportunity to exercise its Right of First Refusal with regard thereto.

II.    THE APPLICATIONS.

- 2 -

A.    Preparation and Filing.

1.   Within ninety (90) days from the date hereof, ENET shall provide the University with: (i) an application for modification of the License for the D Group Station that would permit the construction and operation by the University of the D Group Station at ENET's wireless cable headend site in Bethesda proposing the same system design as ENET employs for the other stations located at such headend site (the "Modification Application"); (ii) an application for authority to modify the University's existing E Group studio-to-transmitter link (the "STL Link") that would permit the relocation of the receive point of such link to ENET's wireless cable headend site in Bethesda and make such other changes (including changes in transmitter frequency and the addition of multiple hops) as ENET believes necessary (the "STL Modification Application"); and (iii) an application for authority to construct a one channel point-to-point link between the University and its Leesburg campus (the "PTP Link") designed for two-way capability, which PTP Link may consist of multiple hops, if necessary (the "PTP Application"). Upon grant by the FCC of the FCC Applications, the authorized facilities shall become the "D Group Station," the "STL Link" and the "PTP Link" for purposes of this Agreement.

2.   The facilities proposed in the Modification Application shall be designed by ENET to transmit signals of a quality and reliability at least equal to that of the University's current D Group Station. The facilities proposed in the STL Modification Application shall be designed by ENET to transmit signals of a quality and reliability equal to that of the University's current E Group STL Link. The facilities proposed in the PTP Application shall be designed by ENET to transmit signals of a quality and reliability at least equal to RS 250B. Prior to such time as ENET submits the Modification Application, the STL Modification Application and the PTP Application (collectively, the "FCC Applications"), it will also submit to the University a written plan specifying such changes in the existing facilities of the University and the lessee of excess capacity of channel D2 as ENET believes necessary to accomplish such goals (the "Modification Plan"). The University shall promptly review the FCC Applications and the Modification Plan, and, within thirty (30) days of receipt, either file the FCC Applications with the FCC (which filing shall evidence agreement that implementation of the proposals set forth in the FCC Applications and the Modification Plan will accomplish the goals set forth in this paragraph) or commence good faith negotiations with ENET to make such revisions to the FCC Applications or the Modification Plan as the University shall reasonably require to accomplish the goals set forth in this paragraph. If the parties are unable to reach agreement after good faith negotiations, this Agreement shall terminate and the University shall refund to ENET the Commitment Fee (as such term is defined in Paragraph V.A.), less the University's reasonable costs in negotiating this Agreement and complying with its obligations thereunder prior to such termination.

- 3 -

B.    Prosecution of Applications.  The parties shall promptly and diligently file and expeditiously prosecute all necessary amendments to the FCC Applications, briefs, pleadings, waiver requests, requests for special temporary authority, documents and supporting data, and take all such actions and give all such notices as may be required or requested by the FCC or as may be appropriate in any effort to expedite the grant of the FCC Applications.  The parties recognize that the FCC may return or dismiss the FCC Applications.  In such event, the parties agree to utilize their best efforts, at ENET's reasonable cost and expense, to submit a replacement for the FCC Applications (along with any necessary requests for waiver or special temporary authority) at such time as ENET reasonably determines to be provident. Such replacement applications shall become the "FCC Applications" for purposes of this Agreement.  In the event any person petitions the FCC to deny one or more of the FCC Applications or otherwise opposes one or more of the FCC Applications before the FCC, or in the event the FCC enters an order granting an FCC Application and any person petitions for reconsideration or review of such order before the FCC or appeals or applies for review in any judicial proceeding, then ENET and the University agree to oppose such petition before the FCC or defend such order of the FCC diligently and in absolute good faith, at ENET's cost and expense, to the end that the transactions contemplated by this Agreement may be finally consummated.  Notwithstanding the foregoing sentence, if ENET's counsel provides a good faith written estimate that the legal fees associated with opposing any challenge to one or both of the FCC Applications or any order granting one or more of the FCC Applications will exceed Fifteen Thousand Dollars ($15,000), ENET may notify the University and afford the University a period of five (5) business days to agree to share jointly in all reasonable and necessary legal fees in excess of Fifteen Thousand Dollars ($15,000).  The University may elect not to share jointly in such fees without incurring any liability to ENET hereunder whatsoever.  If the University does not notify ENET within such period that it agrees to provide such funding, ENET shall not be obligated to expend more than such amount in opposing any challenge to one or both of the FCC Applications or any order granting one or more of the FCC Applications and may cease its opposition to the challenge or its defense of the FCC Applications without liability.

C.    Amendment of Applications.

1.    The University and ENET acknowledge the possibility that as a result of currently unforeseen events, advances in technology, filings by third parties or changes in the FCC's rules and policies, the technical configuration of the D Group Station and the STL Link may prevent ENET from optimizing its business throughout the term of this Agreement. The University therefore agrees that if at any time and from time to time ENET so requests, the University shall use its best efforts to further amend the FCC Applications as may be necessary to modify the proposed D Group Station, STL Link and PTP Link (including, without limiting the generality of the foregoing, to increase transmitted power, to increase antenna height, to modify the transmission and antenna systems, to utilize compression or frequency reuse technology, to change channel assignments, or to relocate the D Group

- 4 -

Station) to meet the reasonable requirements of ENET, provided that such modification (i) will not have an adverse effect on the ability of the University to serve its then-existing receive sites and any specific future receive sites which the University has notified ENET it intends to install and (ii) will not cause the University to breach its obligations under the Hybrid Agreement. ENET shall bear all reasonable costs associated with such amendment, including engineering and construction, and all reasonable costs associated with obtaining FCC approval thereof, provided that such costs are approved by ENET in advance in writing. Upon the filing of such amendment, the amended FCC Applications shall become the "FCC Applications" for purposes of this Agreement.

D. Denial of Applications.

1. The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order (as such term is defined in Paragraph XIII.T) denying the Modification Application. In such event, the University shall retain the commitment fee as such term is defined in Paragraph V.A, and this Service Agreement shall terminate without further liability between the parties.

2. The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order denying the STL Modification Application or the PTP Application. In such event, ENET shall use its best efforts to seek an alternative transmission source. In the event that an alternative transmission source cannot be utilized by ENET, the University may terminate this Agreement without further liability between the parties in its sole discretion by giving notice to ENET within ten (10) days of such order becoming a Final Order. In the event the University does not give such notice, this Agreement shall continue in full force and effect except that ENET's obligations with respect to the STL Link and/or the PTP Link as the case may be, shall be excused.

E. Grant of Applications with Conditions.

1. The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order granting the Modification Application with conditions materially adverse to ENET. In such event, ENET may terminate this Agreement without further liability between the parties in its sole discretion by giving notice to the University within ten (10) days of such order becoming a Final Order.

2. The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order granting the STL Modification Application or the PTP Application with conditions materially adverse to ENET. In such event, ENET may terminate this Agreement without further liability between the parties in its sole discretion by giving the University notice within ten (10) days of such order becoming a Final Order. Within ten (10) days of receipt of such notice, the University may rescind

- 5 -

such termination by providing ENET notice that the Agreement shall continue in full force and effect except that ENET's obligations with respect to the STL Link and/or the PTP Link, as the case may be, shall be excused.

      3. The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order granting one or more of the FCC Applications with conditions materially adverse to the University. Within ten (10) days of such event, the University may terminate this Agreement by notifying ENET, in which case ENET within ten (10) days may offer to provide the University with an indemnification against any and all losses, damages, injuries or other liabilities the University incurs or may during the term of this Agreement incur as a result of such conditions. The University may accept or reject such offer at its reasonable discretion.

    F. <u>Expenses</u>. All reasonable costs and expenses, including legal and engineering, in connection with the preparation of this Agreement and the preparation, review, filing and prosecution of all of the University's applications required by this Agreement shall be borne by ENET.

## III.   FACILITIES.

    A. <u>Construction of Modified D Group Station, STL Link and PTP Link</u>. As soon as reasonably possible, and in no event more than three (3) months after the FCC shall have granted the Modification Application, the STL Modification Application, and the PTP Application and such grants shall have become Final Orders, ENET shall secure the requisite space (except for space for the PTP Link and the origination portion of the STL Link, which shall be supplied at no cost to ENET by the University) and order state-of-the-art equipment for the D Group Station, the PTP Link and, if necessary to accomplish the goals set forth in Paragraph II.A.2, the STL Link, consistent with the terms of the University's FCC authorizations, of the FCC's rules, of the Modification Plan and of this Agreement. Such equipment shall be installed by ENET subject to such supervision and control by the University as shall be required under the FCC's rules within ninety (90) days of receipt of all such equipment. Subsequently, throughout the term of this Agreement, ENET shall provide the University and Hybrid Networks, Inc. access to appropriate space (except for space for the PTP Link and the origination portion of the STL Link, which shall be supplied at no cost to ENET by the University), complete with utilities and necessary environmental controls, transmitters, waveguide, antennas and associated combiners, jumpers and connectors for the D Group Station and the STL Link (which equipment may be shared with other stations), in exchange for the University's faithful performance of its obligations hereunder. Upon expiration of this Agreement or nonrenewal of this Agreement for reasons other than the exercise by ENET of its rights under Section XI.B.(2), the University shall be afforded an opportunity for a period of thirty (30) days after such expiration or nonrenewal to purchase from ENET the transmission equipment referenced in the immediately preceding sentence

(other than that equipment which is shared with other stations) for an amount equal to the then-current market value of such used equipment. In the event that this Agreement is terminated pursuant to Paragraph XI.A: (i) the University shall be afforded an opportunity for a period of thirty (30) days after such termination to purchase from ENET the transmission equipment referenced above (other than that equipment which is shared with other stations) for ONE DOLLAR ($1.00); and (ii) ENET shall permit the University to utilize that equipment which is shared with other stations and maintain the D Group Station and the STL Link at the transmission site until the date that is ten years from the date hereon.

B.    Reception Equipment. Prior to the Start Date, ENET shall, at its sole cost, reorient all of the reception antennas mounted on the receive sites of the University and the lessee of excess capacity on channel D2 listed on Schedule A so as to optimize their ability to receive programming from the modified D Group Station in accordance with the Modification Plan. The University shall cooperate, and shall use its best efforts to cause the lessee of excess capacity on channel D2 to cooperate, in providing ENET access to such reception antennas.

C.    Start Date. For purposes of this Agreement, the Start Date shall be the first date of the calendar month after ENET shall have completed construction of the D Group Station, the STL Link and the PTP Link and implemented the Modification Plan in accordance with the provisions of Paragraph III.A and begun broadcasting the D Group.

D.    Operation and Maintenance. During the term of this Agreement, ENET, at its own cost and expense, shall retain technically qualified personnel to operate, repair, and maintain the D Group Station under the technical direction, supervision and control of the University to assure continued operation of the D Group Station in accordance with the License and the FCC's rules and regulations. Such personnel shall transmit over the D Group Station all programming submitted by the University for transmission during the University Capacity, provided that such programming is provided by the University in the form of a continuous feed (i.e. ENET shall not be responsible for playing individual tapes, video disks, or other discrete program sources, but shall be responsible for interconnecting the STL Link or any other terrestrial microwave receiver supplied by the University). Except for the repair of damages caused by the intentional actions or gross negligence of the University or as otherwise provided herein, ENET shall bear all costs and expenses associated with operating and maintaining the D Group Station, the STL Link and the PTP Link. ENET shall make available to the University upon reasonable request records of all services, repairs and maintenance activities.

E.    Modification of Transmission Facilities.

1.    The University and ENET acknowledge the possibility that as a result of currently unforeseen events, advances in technology or changes in the FCC's rules and

- 7 -

policies, the technical configuration of the D Group Station and the STL Link may prevent ENET from optimizing its business throughout the term of this Agreement. The University therefore agrees that if at any time and from time to time ENET so requests, the University shall use its best efforts to apply to the FCC for such authority as may be necessary to modify the transmission facilities (including, without limiting the generality of the foregoing, to increase transmitted power, to increase antenna height, to modify the transmission and antenna systems, to utilize digital compression or frequency reuse technology, to change channel assignment, or to relocate the D Group Station and the STL Link) to meet the reasonable requirements of ENET, provided that such modification (i) will not have an adverse effect on the ability of the University to serve its then-existing receive sites and any specific future receive sites which the University has notified ENET it intends to install and (ii) will not cause the University to breach its obligations under the Hybrid Agreement. ENET shall bear all reasonable costs associated with such modifications, including engineering and construction, and all reasonable costs associated with obtaining FCC approval thereof, provided that such costs are approved by ENET in advance in writing. Upon the completion of such modifications, the modified facilities shall become the "D Group Station" or the "STL Link" for purposes of this Agreement.

2.    Commencing no later than twelve (12) months after the FCC shall have adopted rules and policies to govern the use of digital compression technology in wireless cable systems and one or more equipment manufacturers have available for immediate purchase reliable and cost-effective digital compression and decompression equipment capable of providing a minimum of four video programs and associated audio signals over a 6 MHz channel with no material degradation in quality and at the University's request, ENET shall, if possible consistent with the FCC's then-existing rules and policies, prepare an application for modification of the License to permit the use of digital compression technology on channel D1. The University shall use its best efforts to secure such modifications to the FCC authorizations for the D Group Station and the STL Link as are necessary to implement digital compression technology. ENET shall bear all reasonable costs associated with such applications, including all reasonable costs associated with obtaining FCC approval thereof, and implementing the authorized modifications, provided that such costs are approved by ENET in advance in writing. However, in the event of an emergency, such costs may be approved verbally by an executive of ENET. Upon the completion of such modifications, the modified facilities shall become the "D Group Station" or the "STL Link" for purposes of this Agreement.

3.    Because the location and configuration of the D Group Station is critical to ENET's business, the University shall not attempt to amend the FCC Applications or modify any authorization issued by the FCC to relocate or reconfigure the D Group Station without the prior written consent of ENET, which consent shall not be unreasonably withheld.

- 8 -

IV.    USE OF EXCESS CAPACITY.  Consistent with the rules and policies adopted by the FCC in *Report and Order*, FCC 94-147, MM Docket No. 93-106 (rel. July 6, 1994), the University agrees to make available to ENET the entire 6 MHz transmission capacity of the channels designated as D3 and D4 ("ENET Capacity") for use by ENET for any legal purpose, without any restriction on the substance, format or type of information or signal to be transmitted thereover except as required by law or this Agreement.  The University shall also have the right to recapture, on six (6) months advance notice to ENET, simultaneous use of the channels comprising ENET Capacity from Monday through Friday between the hours of 9:00 am and 11:00 am and Saturday from 8:00 am to 6:00 p.m.  All capacity that is not ENET Capacity shall be deemed "University Capacity."  Implementation of digital technology pursuant to Paragraphs III.E.1 or III.E.2, shall not affect the allocation of the capacity of the D Group Station between the University and ENET, except that the capacity available for recapture by the University on channels D3 and D4 shall be reduced so that the University shall have available to it the ability to transmit the minimum number of video programs and associated audio signals permitted by the FCC's then-existing rules and policies.  Upon the implementation of digital technology, each party shall retain the ability to designate the compression ratio for its capacity if the equipment purchased and installed by ENET permits dynamic allocation.

V.    ROYALTIES.

    A.    Commitment Fee.  Concurrent with the execution of this agreement, ENET shall pay to the University a commitment fee (the "Commitment Fee") of Forty Thousand Dollars ($40,000).

    B.    Royalty.  In consideration of the airtime to be provided hereunder by the University, ENET agrees to pay to the University a monthly royalty equal to the greater of: Two Thousand Five Hundred Dollars ($2,500.00) or (ii) Twenty Cents ($0.20) for each subscriber to ENET's wireless cable service.

        1.    Computation of Royalty.  For purposes of computing the Royalty due for any month, the number of subscribers to ENET's wireless cable system shall be calculated as the number of such subscribers to ENET's wireless cable business as of the first day of the month.  In those situations where programming is sold in bulk for viewing at isolated locations in the same facility (that is, where a number of viewing units are grouped for billing purposes such as may be the case with hotels and condominiums) and ENET's rates therefore are less than its prevailing monthly rate for the sale of ENET's service to individual subscribers in the system, the number of subscribers from such bulk billing points shall be determined by dividing the total monthly revenues derived from the sale of ENET's programming in said bulk billing divided by ENET's then prevailing monthly rate for the sale of programming to individual subscribers.

- 9 -

C.    Required Certificate and Payment Dates.  The first Royalty payment shall be due on the twentieth day of the first full calendar month after the D Group Station has been constructed and is broadcasting at ENET's wireless cable headend and all following payments shall be paid to the University on twentieth day of each subsequent month.  ENET shall mail each Royalty payment to the University by first class United States mail, postage prepaid, together with a certificate signed by an employee or agent of ENET showing the number of subscribers served during each month of such period.

D.    Right to Audit.  ENET shall, for a period of eighteen (18) months after their creation, keep, maintain and preserve complete and accurate records and accounts, including all invoices, correspondence, ledgers, financial and other records pertaining to the University's royalties hereunder and such records and accounts shall be available for inspection and audit at ENET's office at any time or times during the time service is being provided to ENET hereunder or within ninety (90) days thereafter, during reasonable business hours, by the University or its nominee (who must be a Certified Public Accountant).  The University shall be entitled each calendar year to undertake one audit of ENET's records and accounts.  The University shall provide ENET with thirty (30) business days' advance written notice of its intent to audit said records and accounts prior to being allowed to do so.

E.    Subscriber Contracts.  The University shall not interfere with the right of ENET to lawfully modify, waive, rescind, terminate or cancel any and all services or contracts with subscribers.  In case any such services or contracts are modified, waived, rescinded, terminated or cancelled, the University shall not be entitled to any participation in revenues or claims whatsoever with respect to the unperformed portion of any such contract.

F.    Proration of Fees.  In the event that this Agreement shall be terminated on a date other than the last day of a calendar month, then the Royalty for such month shall be proportionately reduced.

G.    Taxes.  The Royalty provided for in this Agreement is the gross charge to ENET.  If federal, state, or local taxes or fees (other than taxes on the income of ENET) are applicable, or become applicable, it will be the responsibility of the University to pay such taxes or fees.

VI.    INSURANCE

A.    Policies Required.  ENET shall, at its own cost, maintain with sound and financially reputable insurers, insurance with respect to the D Group Station and ENET's utilization of the D Group Station against casualty and other losses of the kinds customarily insured against by firms of established reputations engaged in the same or a similar line of business, of such types and in such amounts as are customarily carried under similar circumstances by such firms, including, without limitation:

- 10 -

1. "All-risk" property insurance covering the D Group Station to the extent of one hundred percent (100%) of its full replacement value without deduction for depreciation; and

2. Comprehensive general public liability insurance covering liability resulting from ENET's operation of the D Group Station on an occurrence basis having minimum limits of liability in an amount of not less than One Million Dollars ($1,000,000) for bodily injury, personal injury or death to any person or persons in any one occurrence, and not less than Two Million Dollars ($2,000,000) in the aggregate for all such losses during each policy year, and not less than One Million Dollars ($1,000,000) with respect to damage to property

B.    Insurance Policy Forms. All policies of insurance required by this Section shall, as appropriate, designate the University as either the insured party or as an additional insured, shall be written as primary policies, not contributory with and not in excess of any coverage which the University shall carry, and shall contain a provision that the issuer shall give to the University thirty (30) days prior written notice of any cancellation or lapse of such insurance or of any change in the coverage thereof. ENET shall provide the University with copies of all policies, riders and modifications necessary to demonstrate compliance with the requirements of this Section prior to commencing operation of the D Group Station, and shall provide the University with copies of any modifications to those documents prior to the effective date of such modifications.

VII.    CONTROL OVER PROGRAMMING. ENET may utilize ENET Capacity to transmit one or more of the programming networks identified on Schedule A hereto, to transmit any sports programming network, to retransmit the signal of any television broadcast station, to transmit any motion picture given a rating of G, PG, PG-13 or any similar rating by the Motion Picture Association of America, or an other programming agreed to by the University. No other programming or other service shall be transmitted by ENET over the D Group Station without the express prior approval of the University, which consent shall not be unreasonably withheld. Moreover, the University reserves the absolute right to deny ENET the right to transmit over the D Group Station any program which is obscene as defined by the laws of the United States, the District of Columbia, the State of Maryland, or the Commonwealth of Virginia or which would violate the rules and regulations of the FCC.

VIII.    MAINTENANCE OF FCC AUTHORIZATION.

A.    Through the term of this Agreement, the University shall utilize its best efforts to take all actions reasonably required to secure and preserve an authorization for the D Group Station and to permit ENET to use excess capacity thereon pursuant to the terms and conditions of this Agreement. The University shall obtain and maintain in force all licenses, permits and authorizations required or desired in connection with the use of the D Group

- 11 -

Station. Except as set forth in Section VIII.B, the University shall take all necessary steps to renew the licenses for the D Group Station and shall not commit any act or engage in any activity which could reasonably be expected to cause the FCC to impair, restrict, revoke, cancel, suspend or refuse to renew the license for the D Group Station. The University shall take all reasonable steps to comply with the Communications Act of 1934, as amended and the rules and regulations of the FCC, and shall timely file all reports, schedules and/or forms required by the FCC to be filed by the University. All reasonable expenses, including attorneys fees and filing fees, incurred in preparing and filing such reports, schedules and/or forms required by the FCC shall be paid by ENET.

B. During the Term of this Agreement or at anytime within two years after the expiration of the last automatic renewal term under Section I.B, the University may return its license for the D Group Station to the FCC for cancellation or elect not to renew its license, provided that the University gives one (1) year's prior written notice to ENET. Upon written request of ENET during such one (1) year period, the University shall assign at no cost its license to such eligible entity as ENET shall designate that is willing to assume all remaining obligations and benefits of the University under this Agreement, subject to FCC consent. The parties shall promptly and diligently prepare and file, and expeditiously prosecute any necessary assignment application (the "Assignment Application"), and take all such actions and give all such notices as may be required or requested by the FCC or as may be appropriate in any effort to expedite the authorization of such assignment. Until such time as the FCC issues a Final Order disposing of the Assignment Application, the University shall take no action that would jeopardize ENET's rights under this Agreement. In the event any person petitions the FCC to deny the Assignment Application or otherwise opposes the Assignment Application before the FCC, or in the event the FCC enters an order granting the Assignment Application and any person petitions for reconsideration or review of such order before the FCC or appeals or applies for review in any judicial proceeding, then ENET and the University agree to oppose such petition before the FCC or defend such order of the FCC diligently and in absolute good faith, at ENET's cost and expense, to the end that the transactions contemplated by this Agreement may be finally consummated.

IX. **INDEMNIFICATION.**

A. Indemnification by ENET. ENET hereby covenants and agrees to, and shall, indemnify, defend and save harmless the University, its officers, employees and agents (the "Indemnitees") from and against and shall reimburse any Indemnitee on demand for any and all liabilities, losses, damages, claims, demands, actions, costs and expenses (including without limitations, reasonable court costs and attorneys' fees) of whatsoever kind or nature, which any of the Indemnitees may suffer, sustain, incur, pay, expend or lay out by reason, by virtue or as a result of (i) each and every breach or default by ENET of any of its covenants, agreements, duties or obligations hereunder, (ii) each and every breach or default of, or inaccuracy or omission in, any representation or warranty of ENET contained herein,

- 12 -

## X.     REPRESENTATIONS, WARRANTIES AND COVENANTS.

### A.     Representations, Warranties and Covenants of ENET.

1.     Organization.  ENET is a corporation duly organized and existing under the laws of the State of Delaware and has full power and authority to carry out all of the transactions contemplated hereby.  Throughout the term of this Agreement, ENET shall remain duly organized and existing under the laws of the State of Delaware and qualified to do business and shall retain full power and authority to carry out all of the transactions contemplated hereby.

2.     Compliance with Agreements and Law.  ENET has complied and throughout the term of this Agreement shall comply with all laws, rules and regulations governing its business and the ITFS facilities.  Neither the execution and delivery of this Agreement nor the performance of the transactions contemplated hereby constitutes or will constitute a violation of, be in conflict with, constitute a default under, or be ultra vires as to, any term or provision of any agreement or commitment to which ENET is bound, or any statute, law, judgement, decree, order, regulation or rule of any court or governmental authority with jurisdiction over ENET.  Except for the consent of the FCC, no consent, approval or authorization by or filing with any governmental authorities on the part of ENET is required in connection with the transactions contemplated herein.

3.     Requisite Authority.  All requisite resolutions and other authorizations necessary for the execution, delivery, performance and satisfaction of this Agreement by ENET have been duly adopted and complied with.

4.     Litigation.  There is no action, suit, proceeding or investigation pending or, to ENET's best knowledge, threatened against it before any court, administrative agency or other governmental body relating in any way to the transactions contemplated by this Agreement, and ENET does not know of any valid basis for the commencement of any such action, proceeding or investigation.  ENET has not been charged with and, to its best knowledge, has not been under investigation with respect to any charge concerning any material violation of any provision of any federal, state, or local law or of any administrative regulation.  No unsatisfied judgement, order, writ, injunction, decree or assessment of any court or of any federal, state, local or other governmental department, commission, board, bureau, agency or instrumentality relating in any way to this Agreement has been entered against and served upon it.  There is no action, proceeding or investigation pending or, to its best knowledge, threatened against ENET, nor are there pending any inquiries or challenges that otherwise seek to prevent the consummation or performance of this Agreement.

5.     Financial Ability.  ENET has reasonable assurance of the funding necessary to comply with its obligations to the University under this Agreement.

- 14 -

B.    Representations, Warranties and Covenants of the University.

1.    Organization.  The University is duly organized and existing under the laws of the District of Columbia and has full power and authority and is eligible to hold the License for the D Group Station and to carry out all of the transactions contemplated hereby. Throughout the term of this Agreement, the University shall remain duly organized and existing under the laws of the District of Columbia and shall retain full power and authority and eligibility to hold the License for the D Group Station and to carry out all of the transactions contemplated hereby.

2.    Compliance with Agreements and Law.  The University has complied and throughout the term of this Agreement shall comply in all material respects with all laws, rules and regulations governing the ownership and operation of the D Group Station, including those of the FCC.  Neither the execution and delivery of this Agreement nor the performance of the transactions contemplated hereby constitutes or will constitute a violation of, be in conflict with, constitute a default under, or be ultra vires as to, any term or provision of any agreement or commitment to which it is bound, or any statute, law, judgement, decree, order, regulation or rule of any court or governmental authority with jurisdiction over the University.  Except for the consent of the FCC, no consent, approval or authorization by or filing with any governmental authorities on the part of the University is required in connection with the transactions contemplated herein.

3.    Requisite Authority.  All requisite resolutions and other authorizations necessary for the execution, delivery, performance and satisfaction of this Agreement by the University have been duly adopted and complied with.

4.    Litigation.  There is no action, suit, proceeding or investigation pending or, to the University's best knowledge, threatened against it before any court, administrative agency or other governmental body relating in any way to the transactions contemplated by this Agreement, and the University does not know of any valid basis for the commencement of any such action, proceeding or investigation.  The University has not been charged with and, to its best knowledge, has not been under investigation with respect to any charge concerning any material violation of any provision of any federal, state, or local law or of any administrative regulation which would have an adverse impact on the University's obligations under this Agreement.  No unsatisfied judgement, order, writ, injunction, decree or assessment of any court or of any federal, state, local or other governmental department, commission, board, bureau, agency or instrumentality relating in any way to this Agreement has been entered against and served upon it.  There is no action, proceeding or investigation pending or, to its best knowledge, threatened against the University nor are there pending any inquiries or challenges that otherwise seek to prevent the consummation or performance of this Agreement.

- 15 -

5.    Receive Sites.  Schedule B accurately identifies the site and receive antenna located at the current receive sites of the University and the lessee of channel D2.

C.    Survival of Representations and Warranties.  The representations and warranties contained in this Agreement shall not in any respect be limited or diminished by any past or future inspection, examination or possession on the part of the parties or their representatives of any records, documents, information or properties.  Such warranties and representations shall be deemed to be continuing during the term of this Agreement, and each party shall have the duty promptly to notify the other of any event or circumstance which might reasonably be deemed to constitute a breach of or lead to a breach of its warranties or representations hereunder.

XI.    TERMINATION.

A.    Termination by the University.  The University shall have the right to terminate this Agreement, without further liability to ENET, in the event: (1) the University's authority to operate the D Group Station in accordance herewith is terminated by the FCC (unless such termination is due to a breach by the University of its obligations hereunder); or (2) ENET breaches any of its material obligations hereunder, and either (a) ENET has not cured such breach within thirty (30) days of receiving notice thereof, or (b) (if the breach is other than for the payment of money) ENET has not undertaken material or substantive measures to cure such breach within thirty (30) days of receiving such notice.

B.    Termination by ENET.  ENET shall have the right to terminate this Agreement, without further liability to the University in the event: (1) the University's authority to operate the D Group Station in accordance herewith is terminated by the FCC (unless such termination is due to a breach by ENET of its obligations hereunder); (2) the University breaches any of its material obligations hereunder, and such breach either is not cured within thirty (30) days of receiving notice thereof or the University has not undertaken material or substantive measures to cure such breach within thirty (30) days of receiving such notice; or (3) if ENET ceases to provide wireless cable service within the Washington, DC metropolitan area.

C.    Effect of Termination  Termination by either party pursuant to the preceding Sections shall not affect the ability of the terminating party to seek damages in a court of law against the other arising out of any breach of this Agreement.

XII.    PROSECUTION OF APPLICATIONS AND PETITIONS.

A.    FCC Filings.  Both parties hereto shall diligently prepare, file and prosecute before the FCC all necessary or desirable petitions, waivers, applications and other related documents subject to the approval of the University, which approval shall not be unreasonably

- 16 -

withheld, conditioned or delayed, required to secure FCC approval of the matters addressed herein. Notwithstanding anything herein to the contrary, it is understood that no filing shall be made with the FCC with respect to the subject matter hereof unless both parties hereto shall have reviewed said document and the University shall have consented in advance to its submission.

      B.    Further Efforts. While this Agreement is in effect, the University shall use its best reasonable efforts to obtain and maintain in force all licenses, permits and authorizations required in connection with ENET's use of the D Group Station hereunder. The University shall also file such reasonable protests or other petitions to deny against applications of third parties for licenses as may be requested by ENET. The University, if requested by ENET and to the extent requested, shall use its reasonable best efforts to prevent any unauthorized individual or entity from receiving the signals transmitted over the D Group Station, provided that all costs and expenses in connection therewith are paid by ENET. The University shall promptly notify ENET of any event which may affect the licenses, permits or authorizations for the D Group Station. The University shall fully cooperate with all reasonable requests of ENET for assistance in the construction, operation and maintenance of any additional facilities which ENET may desire in order to optimize its business within the Washington/Baltimore area, provided that ENET shall reimburse the University for all reasonable expenses incurred by the University in providing such assistance.

      C.    Reimbursement of Expenses. In addition to any other obligations ENET may have under this Agreement, ENET shall reimburse all reasonable costs and expenses incurred by the University (including reasonable attorney and engineering fees) incurred by the University in satisfaction of its obligations under this Section XII.

XIII.  MISCELLANEOUS

      A.    Assignments The University may assign any authorization it receives from the FCC for ITFS channels in the Washington, DC area during the term hereof, provided that the FCC grants its prior consent and that the assignee of such authorization assume all remaining obligations and benefits of the University under this Agreement. Subject to the foregoing provisions, the University may assign its authorization to an entity that does not agree to assume all remaining obligations and benefits of the University under this Agreement, provided that the University gives one (1) year's prior written notice to ENET. Upon written request of ENET during such one (1) year period, the University shall assign at no cost its license to such eligible entity as ENET shall designate that is willing to assume all remaining obligations and benefits of the University under this Agreement, subject to FCC consent. The parties shall promptly and diligently prepare and file, and expeditiously prosecute any necessary assignment application (the "Assignment Application"), and take all such actions and give all such notices as may be required or requested by the FCC or as may be appropriate in any effort to expedite the authorization of such assignment. Until such time

- 17 -

as the FCC issues a Final Order disposing of the Assignment Application, the University shall take no action that would jeopardize ENET's rights under this Agreement. In the event any person petitions the FCC to deny the Assignment Application or otherwise opposes the Assignment Application before the FCC, or in the event the FCC enters an order granting the Assignment Application and any person petitions for reconsideration or review of such order before the FCC or appeals or applies for review in any judicial proceeding, then ENET and the University agree to oppose such petition before the FCC or defend such order of the FCC diligently and in absolute good faith, at ENET's cost and expense, to the end that the transactions contemplated by this Agreement may be finally consummated. Notwithstanding the foregoing sentence, if ENET's counsel provides a good faith written estimate that the legal fees associated with opposing any challenge to the Assignment Application or any order granting the Assignment Application will exceed Fifteen Thousand Dollars ($15,000), ENET shall notify the University and afford the University a period of five (5) business days to agree to share jointly in all reasonable and necessary legal fees in excess of Fifteen Thousand Dollars ($15,000). The University may elect not to share jointly in such fees without incurring any liability to ENET hereunder whatsoever. If the University does not notify ENET within such period that it agrees to provide such funding, ENET shall not be obligated to expend more than such amount in opposing any challenge to the Assignment Application or any order granting the Assignment Application and may cease its opposition to the challenge or its defense of the Assignment Application without liability.

B.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the parties hereto shall have duly executed this Agreement.

C.     Distance Learning Program.  It is the intention of the University to develop a distance learning program through which the D Group Station will be used to transmit college courses to students at their residences. ENET shall assist in the development of such program and shall make its addressing facilities available to the University to control access to distance learning programs. In addition, at such time as ENET produces a local program guide for distribution to its subscribers in the Washington metropolitan area, ENET shall include a listing of the University's programming (which may be integrated with the listings of other educational programming), provided that the University shall provide ENET with its program schedule sufficiently in advance so as to permit inclusion in the program guide without alteration in ENET's production schedule for such guide.

D.     Entire Agreement.  This Agreement states the entire agreement as of this date between the parties with respect to the subject matter and supersedes all pre-existing oral or written agreements or commitments with respect thereto. This Agreement may be modified only by an agreement in writing executed by all of the parties.

- 18 -

E.  **Executory Agreement.** Both parties acknowledge this Agreement is executory in nature, requiring the continuing performance of obligations by each party to the other.

F.  **Force Majeure.** Notwithstanding anything contained in this Agreement to the contrary, neither party shall be liable to the other for failure to perform any obligation under this Agreement (nor shall any charges or payments be made in respect thereof) if prevented from doing so by reason of fires, strikes, labor unrest, embargoes, civil commotion, rationing, or other orders or requirements, acts of civil or military authorities, acts of God or other contingencies beyond the reasonable control of the parties, and all requirements as to notice and other performance required hereunder within a specified period shall be automatically extended to accommodate the period of dependency of any such contingency which shall interfere with such performance.

G.  **Further Action.** From time to time after the date of execution, the parties shall utilize their best efforts to take such further action and execute such further documents, assurances and certificates as either party may reasonably request of the other in order to effectuate the purpose of this Agreement. In addition, each party agrees that it will not take any action which would adversely affect the rights granted by it to the other party hereunder.

H.  **Governing Law.** This Agreement shall be governed by, and construed and enforced in accordance with the Communications Act of 1934, as amended, the FCC's Rules and the laws of the District of Columbia.

I.  **Headings.** The headings herein are inserted for convenience only and shall not constitute a part hereof.

J.  **Interpretation.** In the event that this agreement requires interpretation or construction, this agreement shall not be interpreted or construed more strictly against any one party by reason of any rule of interpretation or construction under which a document is to be construed more strictly against the drafting party.

K.  **Jurisdiction and Venue.** In the event of any dispute between the parties regarding the rights and obligations of any party hereunder, any party shall have the right to sue the other party in District of Columbia courts. For any and all such purposes, the parties hereto hereby irrevocably submit to the jurisdiction of such courts, waive all objections thereto (on the grounds of improper venue, forum non conveniens or otherwise), and agree that service of process upon each as provided in the section concerning Notices herein shall be effective to establish personal jurisdiction over it in such courts.

L.  **Notices.** Except as set forth above concerning the payment of Royalties, all notices and documentation given under this Agreement shall be in writing and shall be deemed given the first weekday (excluding Federal holidays) after being sent by United States

- 19 -

Express Mail, return receipt requested, or by Federal Express, signature required, to the other party at the following address:

If to ENET:

Eastern Cable Networks Corp.
700 Canal Street, Third Floor
Stamford, CT 06902
Attn: Rick Perrone

With a copy to:

Paul J. Sinderbrand, Esq.
Sinderbrand & Alexander
888 Sixteenth Street, N.W.
Fifth Floor
Washington, DC 20006-4103

If to the University:

Mr. Ted Christensen
Assistant Vice President for GW Television
801 22nd Street, N.W., Suite T-306
Washington, DC 20052

or to such other address as any written notice to the other party designates.

M.    Option.  If at any time during the term hereof the University's existing lease of the transmission capacity of channel D2 for data services shall terminate or expire, the University shall provide ENET notice within ten (10) days.  ENET shall have the exclusive right to lease the capacity of channel D2 for the duration of this Agreement, which option ENET may exercise by providing the University with notice within twenty one (21) days of receiving notice of the availability of such channel.   Should ENET exercise its option hereunder, channel D2 shall be added to ENET Capacity and ENET shall thereafter pay an additional monthly royalty equal to the greater of Two Thousand Five Hundred Dollars ($2,500) or Ten Cents ($.10) per each subscriber to ENET's wireless cable service.

N.    Reimbursement of Expenses.  Notwithstanding anything to the contrary contained herein, ENET shall reimburse the University for all reasonable costs and expenses incurred by the University in negotiating this Agreement (including reasonable legal and engineering fees not to exceed $15,000.00), operating and maintaining the D Group Station, the STL Link and the PTP Link, and otherwise complying with the terms of this Agreement.

- 20 -

Reimbursement for a reimbursable expense shall be made by ENET within thirty (30) days of receiving an appropriate invoice from the University and such supporting documentation as ENET reasonably requires in order to establish that the University is entitled to reimbursement of such expense hereunder.

O.     Relationship of Parties.  The University and ENET by the provisions of this Agreement will enter into an airtime use relationship and not a joint venture and both parties will carry out this Agreement to preserve that intent.  Neither party shall present itself as the other party, nor as having any relationship with one another, except as set forth under the terms of this Agreement.

P.     Reformation.

1.     If Congress, the FCC, any court or any other governmental authority with jurisdiction over the subject matter hereof should amend, interpret or clarify the law, rules, regulations or policies applicable to this Agreement in a manner that would adversely affect the ability of the parties to perform their obligations under this Agreement, then the parties hereto shall promptly negotiate in good faith to reform and amend this Agreement so as to permit as nearly as reasonably possible the performance of their obligations hereunder. Neither party shall take any action that contributes to such adverse amendment, clarification or interpretation without the prior written consent of the other party.

2.     The parties acknowledge pursuant to Paragraph 29 of the FCC's *Report and Order*, MM Docket No. 93-106 (rel. July 9, 1994) that the allocation of the capacity of the D Group Station is subject to future changes in the FCC's rule governing the leasing of excess ITFS capacity.

Q.     Rights of ENET Subordinate.  Notwithstanding anything to the contrary contained herein, ENET expressly recognizes that the University previously has granted rights to Hybrid to utilize certain capacity on channel D2, pursuant to the Hybrid Agreement, and that the obligation of the University to take any action required hereunder shall be read to conform to such other obligations that the University may owe to Hybrid under the Hybrid Agreement.  The University shall use its best efforts to negotiate with Hybrid and ENET to resolve any conflicts between the two agreements, provided, however, that no action shall be taken hereunder if the effect of such action, in the reasonable judgment of the University after consultation with Hybrid, would have an adverse effect on the rights of Hybrid under the Hybrid Agreement.

R.     Time of Essence.  Whenever this Agreement shall set forth any time for the performance of an act, such time shall be deemed of the essence.

- 21 -

S.    Waiver.  The express or implied waiver by either party of any breach of any representation or warranty or any failure to fulfill any condition, covenant or other obligation or liability under this Agreement shall not constitute a waiver of any other representation or warranty or of any other failure in the future or in the past by the other party to fulfill such representation, warranty, condition, covenant, obligation or liability hereunder.

T.    Word Meanings.  As used in this Agreement, the term "including" shall be deemed to mean "including, without limitation."  All pronouns and any variations therefore shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require.  A "Final Order" means a written action or order issued by the FCC: (a) which has not been reversed, stayed, enjoined, set aside, annulled or suspended; and (b) with respect to which (i) no requests have been filed for administrative or judicial review, reconsideration, appeal or stay and the time for filing any such requests, and the time for the FCC to set aside the action on its own motion, has expired, or (ii) in the event of review, reconsideration or appeal, the action or order has been affirmed and the time for further review, reconsideration or appeal has expired.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE GEORGE WASHINGTON UNIVERSITY


An Officer



EASTERN CABLE NETWORKS CORP.


An Officer

g:\docs\cas01\dc\gwu.k5

- 22 -

SCHEDULE A

## REPRESENTATIVE PROGRAMMING SERVICE

The following are representative types of programming that Eastern intends to transmit over the leased channels, pursuant to Subparagraph 3 (C).

Home Box Office
Cinemax
Showtime
The Movie Channel
American Movie Classics
Bravo
Black Entertainment Network
MTV
USA
TNT
WWOR
WGN
CNN
CNN Headline News
CNBC
WTBS
Arts & Entertainment
ESPN
Nickelodeon
Family Channel
Nashville Network
Weather Channel
Disney Channel
Learning Channel
Lifetime Channel
Programming from broadcast television stations licensed to operate in the United States or Canada
Digital Radio
Sega Channel

- 23 -

LICENSED ITFS RECEIVE SITES

SCHEDULE B

R1        Omitted

R2        Computer Science Corp.
          8728 Colesville Road
          Silver Spring, MD  20910
          38-59-55N 77-01-39W EL:350' + Building @ 50'

R3        National Security Agency
          9800 Savage Road
          Ft. Meade, MD  20755
          39-06-30N 76-46-19W  EL:160

R4        Intelsat
          3400 International Drive, NW
          Washington, DC  20008
          38-56-32N 77-03-51W  EL:310' + Building @ 40'

R5        Pyramid Video
          14th & F Streets, NW
          Washington, DC  20045
          38-53-48N 77-01-54W  Building 100+'

R6        Omitted

R7        GWU - Rice Hall
          2121 I Street, NW
          Washington, DC  20052
          38-54-03N  77-02-50W  EL:70'

R8        GWU-TV
          801 - 22nd Street, NW
          Washington, DC  20052
          38-54-01N 77-02-55W  EL:157'

R9        Naval Research Laboratory #1
          4555 Overlook Ave., SW
          Washington, DC  20375
          38-49-23N 77-01-06W  EL:60'

R10       Omitted

R11       Office of Navy Civ. Pers. Mgt. and Mine
          Safety Offices
          4015 Wilson Blvd.
          Arlington, VA  22203
          38-52-48N 77-06-30W  EL:270' + 130'

Licensed ITFS Receive Sites
Page 2

R12        Media General
           4600 West Ox Road
           Fairfax, VA  22030
           38-51-17N 77-22-28W  EL:430' + 146' tower

R13        Mitre Corporation
           1820 Dolley Madison Blvd.
           McLean, VA  22102
           38-55-36N 77-12-21W  EL:390

R14        Omitted

R15        Watkins-Johnson Company
           700 Quince Orchard Road
           Gaithersburg, MD  20502
           39-08-34N 77-13-33W  EL:500'

R16        National Institutes of Health
           9000 Rockville Pike #1
           Rockville, MD
           38-59-53N 77-06-18W  EL:318' + 174'

R17        Naval Research Laboratory #2
           4555 Overlook Avenue, SW
           Washington, DC  20375
           38-49-23N 77-01-19W

           Antenna side-mounted on existing tower at 70'
           lev. + EL:27'

R18        Palmer Park Media Center
           8437 Landover Road
           Landover, MD  20785
           38-55-04N 76-51-47W

           Antenna side-mounted on new 49' guyed mast
           above building roof level.  EL:202' + 22' +
           49'

           Notification has been submitted to FAA

R19        GWU - No. Virginia Campus
           20101 Academic Way
           Ashburn, VA  22011
           39-03-44N 77-26-44W  EL:360' + 50' Building

Licensed ITFS Receive Sites
Page 3                                                          Schedule B

R20        The American University
           Mass. & Neb. Aves., NW
           Washington, DC  20016
           38-56-11N 77-05-33W  EL:365' + 20'

R21        The University of Maryland
           Hornbake Library
           College Park, MD  20742
           38-59-17N 76-56-31W  EL:471' + 4th Floor

R22        University of The District of Columbia
           4200 Connecticut Ave., NW
           Washington, DC  20008
           38-56-37N 77-03-59W  EL:290'

R23        The Catholic University of America
           620 Michigan Avenue, NE
           Washington, DC  20064
           38-56-05N 76-59-58W  EL:160' + 30'

R24        Trinity College
           125 Michigan Ave., NE
           Washington, DC  20017
           38-55-37N 77-00-16W  EL:180' + 30'

R25        Howard University
           2400 6th Street, NW
           Washington, DC  20059
           38-55-14N 77-01-11W  EL:120' + 4th Floor +
           50' tower

R26        Gallaudet University
           800 Florida Ave., NE
           Washington, DC  20002
           38-54-36N 76-59-26W EL:130' + 30' Building

R27        Georgetown University
           204 Healy Building
           37th and O St., NW
           Washington, DC  20057
           38-54-22N 77-04-20W  EL:120' + 40'

R28        Mount Vernon College
           2100 Foxhall Road, NW
           Washington, DC  20007
           38-55-05N 77-05-22W EL:275' + 50'

Licensed ITFS Receive Sites
Page 4                                              Schedule B


R29        Marymount University
           2807 North Glebe Road
           Arlington, VA  22207
           38-54-23N 77-07-44W EL:410' + 901'

R30        George Mason University
           4400 University Drive
           Fairfax, VA  22030
           38-49-51N 77-18-25W  EL:440' + 615' Tower

R31        David Taylor Research Center DTNET
           Building 17W Carderock Lab
           Bethesda, MD  20084-5000
           38-58-25N 77-11-26W  EL:170'

R32        George Geesey Residence
           GW Television Chief Eng.
           3612 Faircastle Drive
           Chevy Chase, MD  20815
           39-00-18N 77-04-25W  EL:370'

R33        GWU-Crystal City Ed Center
           Buidling H
           2231 Crystal Drive
           Arlington, VA  22202
           38-51-16N 77-03-01W  EL:230'

R34        Fairfax County School Media Center
           VIA Media General Cable
           2917 Eskridge Road
           Fairfax, VA  22031
           38-52-22N 77-13-52W  EL:580'

R35        Defense Language Institute
           Suite 507
           1111 Jefferson Davis Hwy
           Arlington, VA  22202
           38-51-40N 77-03-03W  EL:90'

R36        DC Schools Gordon Center
           Room 302
           35th and T Streets, NW
           Washington, DC  20007
           38-54-56N 77-04-08W  EL:285'

Licensed ITFS Receive Sites
Page 5

R37          The World Bank
             801 19th Street, NW
             Washington, DC  20433
             38-54-02N 77-02-36W   EL:200'

R38          The Brookings Institute
             1775 Mass. Ave., NW
             Washington, DC  20036
             38-54-29N 77-02-25W   EL:140'

R39          Mont. County School Board of Education
             850 Hungerford Drive
             Rockville, MD 20850
             39-05-42N 77-09-27W   EL:480'

R40          U.S. Geological Survey
             12201 Sunrise Valley Drive
             Reston, VA  22092
             38-56-50N 77-22-04W   EL:510'

R41          Johns Hopkins Un. SAIS
             Room 330
             1619 Mass. Avenue, NW
             Washington, DC  20783
             38-54-28N 77-02-16W   EL:165'

R42          WNVC-TV
             8101A Lee Highway
             Falls Church, VA  22042
             38-52-28N 77-13-24W   EL:535'

R43          FBI Buzzard Point
             1900 Half Street, SW
             Washington, DC  20535
             38-51-59N 77-00-37W   EL:125'

## CONSENT TO ASSIGNMENT


GEORGE WASHINGTON UNIVERSITY ("GWU") is the Lessor of a certain ITFS D Group Channels AIRTIME ROYALTY AGREEMENT dated February 21, 1995 (the "Agreement", of which EASTERN CABLE NETWORKS CORP. and its wholly owned subsidiary, EASTERN CABLE NETWORKS OF WASHINGTON, INC., (together "ECNW") is the current Lessee. ECNW has agreed to assign the Agreement to CAI WIRELESS SYSTEMS, INC. or its designated subsidiary (together "CAI") pursuant to an Assignment and Assumption Agreement between CAI and ECNW.

GWU hereby consents to the assignment of the Agreement by ECNW to CAI and to the subsequent assignment of the Agreement, if it occurs, by CAI to its designated subsidiary.

1.  GWU agrees to send a copy of any notices under the Agreement to CAI until the Assignment and Assumption Agreement has been signed at the following address:

> Mr. Tim Santora, Senior Vice President
> CAI Wireless Systems, Inc.
> 12 Corporate Woods Boulevard
> Albany, NY  12211

2.  The under signed is authorized to sign this Consent to Assignment on behalf of GWU and by this agreement intends to bind GWU, its successors and assigns.

GEORGE WASHINGTON UNIVERSITY

Date: ___July 13, 1995___

By: _____

Name:  Louis H. Katz

Title:   Vice President and Treasurer

TOTAL P.02

TOTAL P.02

# Exhibit B

```
<DOCUMENT>
<TYPE>EX-10.60
<SEQUENCE>28
<FILENAME>v25599a1exv10w60.txt
<DESCRIPTION>MASTER ROYALTY AND USE AGREEMENT
<TEXT>
<PAGE>
```

Exhibit 10.60

MASTER ROYALTY AND USE AGREEMENT

by and among

CLEARWIRE SPECTRUM HOLDINGS II LLC

and

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.

Dated as of October 4, 2006

```
<PAGE>
```

TABLE OF CONTENTS

```
<TABLE>
<CAPTION>
```

|  |  | Page |
|---|---|---|
| `<S>` |  | `<C>` |
| ARTICLE I. RELATIONSHIP SUMMARY..................................... | | 6 |
| Section 1.01. | Overview............................................ | 6 |
| Section 1.02. | Overview of Mechanics and Structure of Agreements...... | 6 |
| Section 1.03. | Scope and Nature of Clearwire Group.................... | 8 |
| ARTICLE II. ECONOMIC ROYALTIES..................................... | | 10 |
| Section 2.01. | Aggregate EBS Spectrum Capacity Economic Royalties..... | 10 |
| ARTICLE III. ACCESS RIGHT ROYALTIES................................ | | 10 |
| Section 3.01. | Access Right Royalties.............................. | 10 |
| Section 3.02. | Cost-Free Educational Accounts...................... | 10 |
| Section 3.03. | Educational Reservation Basic Cost-Free Education Accounts............................................ | 11 |
| Section 3.04. | Additional Cost-Free Educational Accounts............. | 11 |
| Section 3.05. | Licensee MVNO....................................... | 12 |
| Section 3.06. | Access to Educational End User Devices................ | 13 |
| Section 3.07. | Sharing of Features and Service Sets.................. | 13 |
| Section 3.08. | Preferred Content Provider........................... | 13 |
| Section 3.09. | [***]............................................... | 14 |
| ARTICLE IV. CLOSING MECHANICS; ESCROW.............................. | | 14 |
| Section 4.01. | Deliveries at Execution of this Agreement............. | 14 |
| Section 4.03. | EBS Spectrum Capacity 1UA Closing(s).................. | 15 |
| Section 4.04. | Closing Site/Mechanics.............................. | 16 |
| Section 4.05. | Further Assurances.................................. | 16 |
| ARTICLE V. REPRESENTATIONS AND WARRANTIES OF LICENSEE.............. | | 17 |
| Section 5.01. | Organization and Good Standing....................... | 17 |
| Section 5.02. | Authorization of Agreement........................... | 17 |
| Section 5.03. | No Conflict......................................... | 17 |
| Section 5.04. | Litigation.......................................... | 18 |
| Section 5.05. | Compliance with Laws; Permits........................ | 18 |
| Section 5.07. | Brokers............................................. | 18 |

```
    Section 5.08.  Knowledge...............................................  18
ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF CLEARWIRE................  19
    Section 6.01.  Organization and Good Standing.........................  19
    Section 6.02.  Authorization of Agreement............................  19
    Section 6.05.  No Conflict...........................................  19
    Section 6.06.  Litigation............................................  20
```
</TABLE>

[*** Confidential Treatment Requested]


                                    A-2


<PAGE>


<TABLE>
<S>                                                                    <C>
```
    Section 6.07.  Compliance with Laws; Permits.........................  20
    Section 6.08.  Brokers...............................................  20
ARTICLE VII. COVENANTS................................................  20
    Section 7.01.  Consents and Approvals................................  20
    Section 7.02.  Notice of Breach......................................  21
    Section 7.04.  Maintenance of FCC Qualifications.....................  21
    Section 7.05.  Assignment of FCC Licenses............................  22
    Section 7.06.  Other FCC Requirements................................  22
    Section 7.08.  Fees and Taxes........................................  22
    Section 7.09.  Best Efforts for Duration of Relationship.............  22
ARTICLE IX. INDEMNIFICATION...........................................  22
    Section 9.01.  Indemnification.......................................  22
    Section 9.02.  Determination of Damages..............................  23
    Section 9.03.  Limitations on Indemnification for Breaches of
                   Representations and Warranties........................  24
    Section 9.04.  Indemnification Procedures............................  24
ARTICLE X. TERMINATION................................................  25
    Section 10.01. Expiration; Termination...............................  25
    Section 10.02. Defaults..............................................  25
ARTICLE XI. GENERAL PROVISIONS........................................  26
    Section 11.01. Payment of Sales, Use or Similar Taxes................  26
    Section 11.02. Survival of Representations and Warranties............  26
    Section 11.04. Entire Agreement; Amendments and Waivers..............  26
    Section 11.05. Governing Law.........................................  27
    Section 11.06. Table of Contents and Headings........................  27
    Section 11.07. Notices...............................................  27
    Section 11.08. Publicity.............................................  28
    Section 11.09. Severability..........................................  28
    Section 11.10. Binding Effect; Assignment............................  28
    Section 11.11. Remedies..............................................  28
    Section 11.12. Dispute Resolution Procedure..........................  28
    Section 11.13. Counterparts..........................................  31
    Section 11.14. Confidentiality.......................................  31
    Section 11.15. Non-Disclosure of Shared Information..................  31
```
</TABLE>


                                    -2-


<PAGE>

                              LIST OF EXHIBITS

I.    Definitions and Interpretation

II.   Form of IUA

III.  Form of Stock Pledge Agreement

IV.   Form of Clearwire Certificate

V.    Form of Licensee Certificate

                        LIST OF SCHEDULES

A.    Schedule of all Licenses, Licensee's data, applicable Geographic Markets
      and GSAs, existing use agreements and Initial Spectrum Capacity

B.    Licensee Schedule

-3-

<PAGE>

                    MASTER ROYALTY AND USE AGREEMENT

     MASTER ROYALTY AND USE AGREEMENT ("Agreement"), dated as of October 4, 2006
(the "Effective Date") by and among Hispanic Information and Telecommunications
Network, Inc. ("Licensee"), and Clearwire Spectrum Holdings II LLC, a Nevada
limited liability company ("Clearwire"). (Each of the foregoing is referred to
as a "Party" and both of the foregoing are referred to collectively as the
"Parties".) Certain defined terms used in this Agreement, and rules of
interpretation applicable to this Agreement, are contained in Exhibit I hereto.

                              RECITALS:

     WHEREAS, the Licensee has been granted certain licenses (as they may be
modified and renewed, the "FCC Licenses") by the Federal Communications
Commission (the "FCC") authorizing it to engineer and operate specified
Educational Broadband Service ("EBS") channels (including any associated J- and
K-Group channels, the "Channels") in the Geographic Markets and covering an area
having the population determined on the basis of 2000 census data, and providing
the number of megahertz of total capacity (measured post-transition, excluding J
and K block spectrum) multiplied by this population number ("MHzPops"), all as
identified on Schedule A;

     WHEREAS, subject to the Communications Act of 1934, as amended (the
"Communications Act"), and FCC rules, regulations and policies (the "FCC
Rules"), an EBS station's excess capacity may be used for commercial purposes
(the "Commercial Spectrum Capacity");

     WHEREAS, Licensee's ability to provide services to the non-profit community
will be enhanced by expanding the geographic reach of its platform through
making the commercial capacity associated with agreed FCC Licenses available to
Clearwire, and providing services to the non-profit community on Clearwire's
broadband network;

     WHEREAS, Clearwire believes that entering into a relationship with Licensee
has several benefits to Clearwire, in securing a source of spectrum capacity for
the future and facilitating the branding of the Clearwire mark through the
services provided by Licensee in the non-profit community;

WHEREAS, Licensee desires to make available to Clearwire, and Clearwire desires to have access to, the Commercial Spectrum Capacity that is identified on Schedule A (the "Initial Spectrum Capacity"), and any additional Commercial Spectrum Capacity of Licensee that is accepted by Clearwire and made subject to an IUA as provided in this Agreement (the "Future Spectrum Capacity"), all in accordance with the terms of this Agreement;

-4-

<PAGE>

WHEREAS, under this Agreement Licensee receives consideration to facilitate the transmission of instructional programming to schools and public organizations and to facilitate instructional broadband spectrum development for its educational instruction network;

WHEREAS, the bundle of value comprised of the EBS Economic Royalties and the Access Right Royalties (collectively referred to as the "Total Consideration") is central to Licensee's efforts to advance the transmission of its programming and to develop an instructional broadband spectrum network, in each case utilizing the Clearwire National Platform, including the ability to use Clearwire as a single source access vendor under the IUAs, and the IUAs and this Agreement would not have been executed but for all of the elements of the Total Consideration;

WHEREAS, Clearwire desires to have access to the Commercial Spectrum Capacity to the extent permitted by FCC Rules and the terms of this Agreement, for the operation of its business, and the Parties recognize that the success of Clearwire's business plan depends on its access to the Commercial Spectrum Capacity (among other factors), and the Licensee desires Clearwire to have full access rights to the Commercial Spectrum Capacity permitted under FCC Rules and the terms of this Agreement, to enhance Clearwire's business for the benefit of Licensee as a shareholder of Clearwire Corporation ("Clearwire Parent"); and

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants, and agreements set forth in this Agreement and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereto, intending legally to be bound, agree as follows:

-5-

<PAGE>

ARTICLE I.

RELATIONSHIP TERMS

Section 1.01. Overview.

(a) This Agreement, the Individual Use Agreements entered into pursuant to this Agreement, and the Collateral Documents entered into by the Parties in connection herewith, describe the arrangement through which Clearwire and its Affiliates will obtain access to the Initial Spectrum Capacity authorized by the FCC Licenses identified on Schedule A hereto and any Future Spectrum Capacity (collectively, when under IUA hereunder, the "EBS Spectrum Capacity") to be delivered to Clearwire under the terms of this Agreement.

    (b) Clearwire is making an initial payment under this Agreement that exceeds the value of the Initial Spectrum Capacity, but that includes additional consideration for the Option and the ROFR granted to Clearwire in this Agreement, and that also constitutes an advance payment toward Future Spectrum Capacity.

    (c) In addition to the Economic Royalties detailed in ARTICLE II, central to Licensee's grant of access to the Commercial Spectrum Capacity to Clearwire under an IUA is Clearwire's agreement and covenant to provide the Access Right Royalties and other benefits as detailed in ARTICLE III and as provided for in each IUA, which consists of, among other items (i) access to the Educational Reservation Basic Cost-Free Educational Accounts; (ii) access to the Additional Cost-Free Educational Accounts; (iii) the Limited Reciprocity rights; and (iv) the Preferred Content Provider rights, together with technology, facilities, equipment and other functionality from Clearwire and its Affiliates all as more specifically set forth in this Agreement and in the IUAs related thereto.

    Section 1.02. Overview of Mechanics and Structure of Agreements.

    (a) IUAs for Initial Spectrum Capacity. In exchange for access to the Initial Spectrum Capacity made available to Clearwire pursuant to Individual Use Agreements in the form attached as Exhibit II hereto (individually, an "IUA") executed and delivered as of the Effective Date in accordance with the applicable closing procedure set forth in ARTICLE IV. Clearwire will provide at the times and in the manner set forth in each IUA and hereunder, the Economic Royalties set forth in ARTICLE II, together with the commitment to provide the bundle of rights and services set forth in ARTICLE III (identified collectively as the "Access Right Royalties").

    (b) Option for Future Spectrum Capacity. Licensee grants Clearwire an option (the "Option") to enter into IUAs with Licensee in respect of any and all spectrum (including, but not limited to, the Commercial Spectrum Capacity, EBS and BRS) ("Spectrum") on FCC Licenses held by Licensee that is Available or that becomes Available during the Term, at prices

-6-

<PAGE>
to be negotiated in good faith based on the fair market value ("FMV") of such Spectrum at the time the Option is to be exercised, provided, however, that the negotiated price shall not exceed [***] per MHz POP. The Option shall be exercisable in Clearwire's sole discretion each time Spectrum of Licensee or its Affiliates becomes Available during the Term. When Spectrum is acquired by Licensee or its Affiliates, or becomes Available for use by Clearwire under an IUA as Future Spectrum Capacity, Licensee shall immediately provide a written proposal (an "Option Notice") to Clearwire with the same information with respect to such proposed Commercial Spectrum Capacity as is set forth on Schedule A for the Initial Spectrum Capacity. Licensee shall also promptly provide such additional information with respect to the proposal as may be reasonably requested by Clearwire. If Clearwire is interested in negotiating the IUA with respect to such proposed Spectrum, Clearwire shall inform Licensee and the parties shall commence good faith negotiations within ten (10) days after Licensee's receipt of such notice and shall continue to negotiate in good faith for a period of not less than [***] provided that Clearwire may terminate the negotiations at any time during such [***] period before the execution of the IUA. The negotiations shall include negotiations regarding the applicable FMV (which shall not, in any case, exceed [***] per MHz POP). If the Parties do not reach agreement on the FMV for such proposed Spectrum within such thirty-day

period, Clearwire's Option with respect to the specific Spectrum in question will terminate, but the provisions in Section 1.04 shall still apply with respect to such Spectrum in accordance with the terms of Section 1.04. Clearwire has no obligation to accept any proposed Spectrum other than the Initial Spectrum Capacity, except as provided in Section 1.02(c) with regard to Other [***] Transactions. If the Parties reach agreement on the terms of the IUA for Future Spectrum Capacity, the payment required under such IUA shall reduce the then remaining unapplied Prepaid Royalties Balance. If any IUA for Future Spectrum Capacity requires a payment that exceeds the then-current balance of the Prepaid Royalties Balance, Clearwire shall pay the difference to Licensee in cash at the applicable Subsequent Closing.

          (c) [***] Option. With respect to Commercial Spectrum Capacity of the Licensee in [***] ("Licensee [***] Spectrum"), if Clearwire exercises the Option for any of Licensee's spectrum that is Available in [***] Licensee shall have the right to require that all of Licensee [***] Spectrum that is Available be included in the IUA as long as the price offered to Clearwire for such spectrum by Licensee is [***] per MHz POP or less; provided that, during the Term, and for [***] after the Term, if Clearwire enters into any lease (based on a [***] lease) or purchase transaction for any other BRS or EBS spectrum in the same or a "Substantially Similar" (as defined below) GSA in [***] (an "Other [***] Transaction"), or has already entered into or has any such Other [***] Transaction, Clearwire shall provide the terms of such transaction to Licensee within seven (7) days of consummation of the transaction, and Licensee shall have the option to accept the per MHzPOP price in such Other [***] Transaction if the Other [***] Transaction is for EBS spectrum, or the per MHzPOP price less [***] for BRS spectrum, and require that Clearwire execute IUAs for any of Licensee's Available [***] Spectrum in that GSA at that per MHzPOP price (the "Higher Price"); and further provided if the Other [***] Transaction

[*** Confidential Treatment Requested]

                                   -7-

<PAGE>

occurs after Licensee and Clearwire have executed IUAs for the Licensee [***] Spectrum, and the price per MHzPOP paid in the Other [***] Transaction is higher than that paid to Licensee under the [***] Spectrum IUAs, then Clearwire shall promptly pay Licensee the difference between that paid to Licensee for the executed IUAs and that paid pursuant to the Other [***] Transaction for the Licensee [***] Spectrum in that GSA (the "[***] MFN Right"). In no event will Licensee be obligated to enter into IUAs for any of Licensee's [***] channels at the price per MHz Pop of less than [***] For purposes of this paragraph, a Substantially Similar" GSA means a GSA the covers the same metropolitan are in [***] In the event of an Other [***] Transaction for any [***] GSA, Licensee shall receive the Higher price for all MHzPOPs included in License's Substantially Similar GSA and any overlapping GSAs, provided that Licensee shall not be entitled to receive the Higher Price for a greater number of MHzPOPs than contained in the [***] GSA that is the subject of the Other [***] Transaction. (for example, if Clearwire acquires the [***] group that covers [***] people ("POPs"), Licensee would be entitled to receive the Higher Price for the same number of POPs times MHz for which Licensee holds FCC licenses on the "B" channel Group covering the [***] GSA, plus that number of MHz POPs for any other adjacent "B" channel groups that overlap the [***] group, not to exceed the total number of MHz POPs covered by the [***] Group.)

          (d) The Option shall be exercisable for any Licensee Spectrum in Clearwire's sole discretion each time such Licensee Spectrum becomes Available

during the Term; provided that Clearwire's Option to acquire IUAs for Licensee
[***] Spectrum shall remain available to Clearwire and subject to the [***] MFN
Right for not less than [***] without regard to the earlier expiration of the
Term. Any outstanding Options shall lapse automatically upon the expiration of
the Term, except to the extent that Clearwire has previously notified Licensee
of its intention to exercise its Option with respect to such Spectrum prior to
the expiration of the Term.

        Section 1.03. Service Affiliates. Clearwire covenants and agrees to cause
the entity providing each of the Access Right Royalties to the Licensee (each a
"Service Affiliate"') to assume the obligations of Clearwire hereunder with
respect to the Access Right Royalties and to be jointly and severally liable
therefore for the purpose of providing a direct contractual relationship between
the Licensee and the Service Affiliates, including any other entity that over
time becomes a Service Affiliate. The Service Affiliate and the Licensee shall
execute such additional agreements as may be required to effectuate the
provision of the applicable Access Right Royalty or other service, consistent
with the terms hereof and the applicable IUA (any such agreement, a "Collateral
Document"). Nothing in this Section 1.03 shall be construed to limit the primary
obligation of Clearwire to provide the Access Right Royalties.

        Section 1.04. Right of First Refusal on IUAs. The terms of this Section
1.04 shall apply to all Spectrum held by Licensee or any of its
Affiliates during the Term, unless (1) Licensee has complied with the Section
1.02(b) Option Notice with respect to such Spectrum, and (2) the ROFR Offer (as
defined below) does not call for payment of a lower price, or other terms that

[*** Confidential Treatment Requested]

                                      -8-


<PAGE>

are more favorable to the third party, than those offered to Clearwire in
connection with the Option referred to in Section 1.02(b). During the Term of
this Agreement (the "ROFR Period"), Clearwire shall have a right of first
refusal to use the Spectrum as set forth in this Section 1.04 and in Section
1.02(b). Upon the receipt by Licensee of any bonafide written offer (a "ROFR
Offer") to purchase, lease, use or otherwise gain any access rights with respect
to any of Licensee's Spectrum that Licensee desires to accept, Licensee shall
transmit a written notice of the ROFR Offer to Clearwire (the "ROFR Offer
Notice"). The ROFR Offer Notice (i) shall contain the name and address of the
Person making the ROFR Offer, the payment structure therefore and a summary of
all material terms of such ROFR Offer, and (ii) shall offer to Clearwire the
option to enter into an IUA upon the terms and subject to the conditions of the
proposed third party use or lease agreement as set forth in the ROFR Offer
Notice. Clearwire shall then have the right for [***] to accept such ROFR Offer.
If Clearwire accepts such ROFR Offer, Clearwire and Licensee shall enter into an
IUA on such terms and conditions. If after such [***] period or upon earlier
written notice Clearwire does not accept such ROFR Offer, its rights hereunder
as to such ROFR Offer shall terminate and Licensee may for a period of [***]
following the expiration of such thirty (30) day period enter into an agreement
with the original offering party on the same terms and conditions as were
offered to Clearwire. If after such [***] period, Licensee does not enter such
an agreement with the original offering party the Clearwire right of first
refusal described in this Section shall again apply for such timing remaining in
the ROFR Period. If the ROFR Offer Notice provides that any consideration is to
be paid by the third person in whole or in part in a form other than cash,
Clearwire accepts the ROFR Offer, and Clearwire is able to provide or procure

comparable non-cash consideration using commercially reasonable efforts, Clearwire will so provide or procure such non-cash consideration. In the event Clearwire is unable to provide or procure comparable non-cash consideration, Clearwire may substitute, in whole or in part, for non-cash consideration an amount in cash fairly equivalent to the then fair market value of the non-cash consideration payable by the third person. The ROFR Offer acceptance must specify the amount of any such substitute cash consideration and the non-cash consideration for which it is intended to substitute. If Licensee disputes that the substitute cash consideration specified by Clearwire is in an amount fairly equivalent to the fair market value of the non-cash consideration payable by the third person, Licensee must within [***] after the receipt of the ROFR Offer acceptance provide Clearwire with written notice specifying the amount Licensee considers to be fairly equivalent to the fair market value of the non-cash consideration payable by the third person (the "Counter Offer"). The question of fair market value of the non-cash consideration will be resolved pursuant to arbitration under this Agreement unless Clearwire gives Licensee written notice within [***] after its receipt of the Counter-Offer that Clearwire agrees to enter into an agreement containing the fair market value set forth in the Counter-Offer.

[*** Confidential Treatment Requested]

-9-

<PAGE>

## ARTICLE II.

### ECONOMIC ROYALTIES

Section 2.01. EBS Spectrum Capacity Economic Royalties. Clearwire shall cause to be paid to the Licensee the amount of [***] (the "Prepaid Royalties") upon execution of this Agreement. The Prepaid Royalties shall be applied as provided in Section 1.02(b), against amounts otherwise due from Clearwire to Licensee with respect to IUAs for Initial Spectrum Capacity and Future Spectrum Capacity.

Section 2.02. Refunding of Prepaid Royalties. Within five calendar days after the expiration or termination of the Term of this Agreement for any cause, Licensee shall refund Clearwire the full balance of Prepaid Royalties less any portion of the Prepaid Royalties that has been applied against royalties due under fully executed IUAs for Initial Spectrum Capacity and Future Spectrum Capacity (at any time the "Prepaid Royalties Balance"); provided that the Term shall not be deemed to have expired for this purpose during a period that the Option periods described in Section 1.02(b) have not terminated. Clearwire has the right, in its sole discretion, to extend the date on which the Prepaid Royalties Balance must be refunded. If Clearwire decides to grant such an extension, the Term of this Agreement shall be extended accordingly and the terms of this Agreement shall continue in full force and effect.

### ARTICLE III.

### ACCESS RIGHT ROYALTIES

Section 3.01. Access Right Royalties. Clearwire shall provide the Access Right Royalties described in this ARTICLE III from and after the Commencement Date of an IUA hereunder. The Access Right Royalties will be provided in a manner consistent with the way the Access Right Royalties are provided by Clearwire to third parties under agreements that provide for Access Right

Royalties similar to the Access Right Royalties provided in this Agreement. Notwithstanding the preceding sentence, the Parties acknowledge that Licensee currently provides, and intends to provide, a variety of digital educational services utilizing the spectrum in [***] a market of special importance to Licensee, and if the Option is exercised with respect to Licensee [***] Spectrum, Clearwire agrees to (in good faith) consider and use its commercially reasonable best efforts to enter into a joint venture with Licensee in the development and delivery of Licensee's services in [***] to Educational End Users, which services may be different from services provided in other markets, if such joint venture involves the purchase of services from Clearwire at greater than Clearwire's lowest wholesale price in the market for such services.

Section 3.02. Cost-Free Educational Accounts.

[*** Confidential Treatment Requested]

-10-

<PAGE>

(a) Included in the Access Right Royalties provided to Licensee, Licensee shall be entitled to Cost-Free Educational Accounts as provided in this Section 3.02, Section 3.03, and Section 3.04.

(b) "Cost-Free Educational Account" means a wireless broadband connection that Clearwire provides to Licensee without charge or expense to Licensee. Cost-Free Educational Accounts shall have the same capacity and characteristics as the highest level of premium mass market retail service provided on Clearwire's network in a given Market Area. Multiple individuals that are associated with an Educational End User at the time may share the same Cost-Free Educational Account through Wi-Fi hotspots, local area networks, and other means. To the extent not inconsistent with the terms of this Agreement and the applicable IUA, the Cost-Free Educational Accounts shall be subject to the terms of Clearwire's then generally applicable Acceptable Use Policy. The Cost-Free Educational Accounts shall be fully portable anywhere within the Clearwire National Platform to the extent that Clearwire offers such portability to any customer.

Section 3.03. Educational Reservation Basic Cost-Free Education Accounts.

(a) In respect of Licensee's educational reservation covering the five percent (5%) educational spectrum capacity currently required by the FCC Rules pertaining to the FCC Licenses (the "Educational Reservation"), Licensee shall be permitted to utilize the Educational Reservation in such locations served by the Clearwire National Platform on a full time basis as Licensee desires for its operations. Clearwire and Licensee shall at all times comply with applicable FCC Rules. Clearwire may not use the Educational Reservation. In the event that the Parties cannot agree on the application of any new rule or interpretation regarding the Educational Reservation in their circumstances, the Parties shall jointly approach the FCC for clarification in a timely fashion and, to the extent the matter remains unresolved thereafter, shall settle the matter applying the Dispute Resolution Procedure.

(b) Initially, Clearwire shall provide Licensee [***] Cost-Free Educational Account per Cell Site per Market Area each a "Basic Cost-Free Education Account"). The number of Cost-Free Educational Accounts shall be adjusted upward every [***] proportionate to the growth of the overall data capacity of Clearwire's network in the Market Area where the EBS system is located. The growth (if any) in the overall data capacity shall be determined as

measured by its average throughput. The average throughput measurement shall be made in such fashion as shall be agreed by the Parties, or (if the Parties fail to reach agreement with respect to such measurement) as determined by arbitration, using metrics that are as consistent as possible with those utilized at the time of the immediately prior average throughput measurement.

Section 3.04. Additional Cost-Free Educational Accounts. In addition to, and not in lieu of, the Cost-Free Educational Accounts provided to Licensee by Clearwire pursuant to the Educational Reservation as set forth in Section 3.03, Clearwire shall provide Licensee with

[*** Confidential Treatment Requested]


-11-

<PAGE>

additional Cost-Free Educational Accounts in the number computed in accordance with this Section 3.04 (the "Additional Cost-Free Educational Accounts").

(a) Number and Periodic Adjustment. Licensee will have access to additional spectrum capacity on Clearwire's network in Licensee's Market Area in the form of Cost-Free Educational Accounts for use on the Clearwire National Platform equal to the greater of (X) [***] Cost-Free Educational Accounts per Sector in the Market Area where Licensee holds an FCC License to operate an EBS system and (Y) the quantity of Cost-Free Educational Accounts determined by applying the Formula Quantity. The number of Additional Cost Free Educational Accounts that Clearwire is obligated to provide to Licensee shall be recalculated and revised [***]

(i) The "Formula Quantity" as of any date, is equal to the product obtained by multiplying: (a) the Local Channel Ratio by (b) [***] by (c) the number of subscribers served by Clearwire in the Market Area as of the end of the previous calendar year. In the event that this product is a fraction, it shall be rounded up or down to the nearest whole number, where the "Local Channel Ratio" is the fraction obtained by dividing the number of EBS channels provided to Clearwire by Licensee under IUA in a given Market Area as of the date of the calculation by the total number of EBS and BRS channels with substantially overlapping GSAs then used to provide service in such Market Area licensed to or under a use agreement with Clearwire (including those of Licensee) as of that date.

(ii) Educational End Users. Cost-Free Educational Accounts shall be exclusively for Educational End Users and not for resale, assignment or transfer by Licensee outside of its Educational End User environment or to persons who cease to be officially associated with such Educational End User. (By way of example, a university may resell the service to its students, faculty, administrators and staff, while such persons are involved with the university, but shall cease to provide the service if a member of the faculty terminates employment or a student graduates and ceases to be involved in university matters.)

(b) Time of Delivery. The Additional Cost-Free Educational Accounts shall be provided by Clearwire to Licensee pursuant to this Section 3.04(b) upon the commercial launch of Clearwire's broadband wireless service in any Market Area where Licensee has an EBS Spectrum Capacity IUA in place with Clearwire, or the applicable Commencement Date thereof if later.

Section 3.05. Licensee MVNO.

(a) In addition to the right to Cost-Free Educational Accounts, Licensee shall have the right to resell the Clearwire service in the form of MVNO Educational Accounts to additional Educational End Users in each Market Area for use on the Clearwire National Platform. An "MVNO Educational Account" shall have the identical characteristics as a Cost-Free Educational Account under Section 3.02(b). except that there shall be a charge to Licensee

[*** Confidential Treatment Requested]

-12-

<PAGE>

as determined pursuant to this Section 3.05. Clearwire shall sell to Licensee such services, at a cost equal to the [***] provided by Clearwire to an arms-length third party in such Market Area or other comparable market pursuant to any applicable agreement. However, the number of MVNO Educational Accounts is limited in each Market Area to [***] the number of Cost-Free Educational Accounts for that Market Area.

(b) Mechanics. The resale of Clearwire's services pursuant to this Section 3.05 shall be accomplished pursuant to a standard Clearwire wholesale agreement form drafted in a manner consistent with the terms of this Agreement and the applicable IUA, which will be provided to any Licensee requesting the right to resell an MVNO Educational Account to an Educational End User. Such arrangement shall be executed not later than thirty (30) days after the availability of such services.

Section 3.06. Access to Educational End User Devices. Clearwire shall also make any end-user equipment used in the Clearwire National Platform available for purchase by Licensee at [***] above Clearwire's cost to acquire such end-user equipment. Equipment provided to Licensee pursuant to this section shall be used solely by Educational End Users and not for resale.

Section 3.07. Sharing of Features and Service Sets. Licensee shall have access to, and full use of, system capabilities, services and feature sets that are generally provided to Clearwire's retail customers or wholesalers to mass market customers. Licensee shall have access to reasonably necessary support made available to Clearwire's commercial customers generally, and that is reasonably necessary for the Licensee to offer services to its Educational End Users as contemplated by their agreement. The Licensee shall have access to new capabilities, features and service sets within six months of the time that Clearwire makes them available to customers generally, but not earlier than the Commencement Date with respect to any particular IUA.

Section 3.08. Preferred Content Provider.

(a) Scope. In the event that Clearwire provides third party content to customers over its network in any Market Area where Licensee is a party to an EBS Spectrum Capacity IUA, Licensee shall be a "Preferred Content Provider" over such network in that Market Area. As a Preferred Content Provider, Licensee shall have the same degree of access to, and use of, any system capability, service or feature set that is provided to premium third party content providers.

(b) Service Sets and Features. [***] Licensee agrees that the programming that Licensee supplies to customers through Clearwire's network

[*** Confidential Treatment Requested]

-13-

<PAGE>

will be educational in nature. Licensee agrees not to resell Clearwire's network access, features and/or service sets to third parties, except in accordance with Sections 3.04(a)(i) and 3.05.

(c) Capacity Constraints. Clearwire reserves the right to restrict the use of the capabilities and services made available to the Licensee as a Preferred Content Provider under this Section 3.08 if such use is no longer commercially and technically feasible due to limitations in network capabilities. Clearwire shall comply with the provisions of ARTICLE III to ensure timely access to information about capacity usage and permit Licensee a reasonable opportunity to secure alternative access.

SECTION3.09. [***]

ARTICLE IV.

CLOSING MECHANICS; ESCROW

Section 4.01. Deliveries at Execution of this Agreement. On the Effective Date of this Agreement, Clearwire and the Licensee shall take the following actions required of it by subsections (a) through (c) hereof.

(a) Licensee. Licensee shall deliver or cause to be delivered to Clearwire each of the following, duly executed by an authorized representative of Licensee: (i) one IUA completed in accordance with this Agreement with respect to each Market comprising the Initial Spectrum Capacity; (ii) the Stock Pledge Agreement attached to this Agreement as Exhibit III, and all additional documents required under the Stock Pledge Agreement; and (iii) the certificate(s) of Licensee described in Section 4.01(c) Licensee shall have specified on Schedule 4.01 attached hereto its wire account (each a "Wire Account"), which Wire Account shall be included in the applicable IUA. Absent notice of different instructions, all cash payments to be made as provided on Schedule A, and as otherwise reflected in the applicable IUA or this Agreement to be paid to Licensee, shall be to such Wire Account in immediately available funds.

[*** Confidential Treatment Requested]

-14-

<PAGE>

(b) Clearwire. Clearwire shall deliver or cause to be delivered to the Licensee each of the following, duly executed by an authorized representative of Clearwire: (i) one IUA completed in accordance with this Agreement with respect to each Market comprising the Initial Spectrum Capacity; (ii) its certificate described in Section 4.01(c); and (iii) the Upfront Royalty provided for in the applicable EBS Spectrum Capacity IUA as reflected on Schedule A.

(c) Officers Certificates. In connection with the execution of this Agreement, each Party shall deliver to each other Party, in each case certified as of the Effective Date of this Agreement by an authorized officer of the

delivering Party, (A) a copy of the resolutions of the board of directors of the delivering Party authorizing the execution, delivery and performance of this Agreement and (B) a certificate of incumbency, with signatures of the officers of such Party authorized to execute and deliver this Agreement.

Section 4.02. EBS Spectrum Capacity IUA Closing(s).

(a) Initial Closing. Subject to the terms and conditions set forth in this Agreement, the closing of the transactions provided in this Agreement, including with respect to IUAs for the Initial Spectrum Capacity that are executed on the date hereof (each an "Initial Closing"), shall take place on the Effective Date of this Agreement (the "Initial Closing Date").

(b) Subsequent Closings. Subject to the terms and conditions set forth in this Agreement, the closing of IUAs for Future Spectrum Capacity as provided in this Agreement shall take place as specified in the applicable IUAs when the Parties reach agreement on the pricing of such Future Spectrum Capacity IUAs, at which time an EBS Spectrum Capacity IUA shall be executed (each a "Subsequent Closing"), which date shall be the Effective Date for that IUA (the "Subsequent Closing Date").

(c) Closing Conditions.

(i) Conditions to Each Party's Obligations at a Closing. The respective obligations of each Party to effect execution and closing of an EBS Spectrum Capacity IUA at the Initial Closing or at any Subsequent Closing shall be subject to the satisfaction on or prior to the applicable Closing Date of the following condition with respect to that EBS Spectrum Capacity IUA.

(1) No Injunctions or Restraints. No temporary restraining order, preliminary or permanent injunction or other order issued by any court or other Government Agency of competent jurisdiction preventing the consummation of the transactions contemplated in the applicable IUA or under this Agreement as it relates to such IUA; provided, however, that prior to invoking this condition, each Party hereto shall use all commercially reasonable efforts to have any such injunction or other order vacated.

-15-

<PAGE>

(ii) Conditions to the Obligations of Clearwire. The obligations of Clearwire to effect any Closing of an IUA hereunder shall be subject to the satisfaction at or prior to the applicable Closing Date of such IUA of each of the following conditions, any of which may be waived, solely in writing, and exclusively by Clearwire:

(1) Representations and Warranties. The representations and warranties of the Licensee contained in the IUA shall be true and correct in all material respects as of the Effective Date of such IUA.

(2) Officer Certificates. Clearwire shall have received copies, in each case certified as of the applicable Closing Date by an authorized officer of Licensee, of (i) the resolutions of the board of directors of the Licensee, authorizing the execution, delivery and performance of the IUA, (ii) the signature and incumbency of the officers of the Licensee authorized to execute and deliver the IUA, and (iii) certifying that the representations and warranties of the Party to be made under the IUA are true and correct.

(iii) Conditions to Obligations of Licensee. The obligations of Licensee to effect any Closing of an EBS Spectrum Capacity IUA hereunder shall be subject to the satisfaction at or prior to the applicable Closing Date of such IUA of each of the following conditions, any of which may be waived, solely in writing, and exclusively by Licensee:

(1) Representations and Warranties. The representations and warranties of Clearwire contained in the IUA shall be true and correct in all material respects as of the Effective Date of such IUA.

(2) Officer Certificates. Licensee shall have received copies, in each case certified as of the applicable Closing Date by an authorized officer of Clearwire, of (i) the resolutions of the board of directors of Clearwire and each Clearwire Affiliate that is a Party hereto, authorizing the execution, delivery and performance of the IUA, (ii) the signature and incumbency of the officers of Clearwire authorized to execute and deliver the IUA, and (iii) certifying that the representations and warranties of the Party to be made under the IUA are true and correct.

Section 4.03. Closing Site/Mechanics. Each of the Closings will occur by electronic delivery procedure agreed by the Parties, provided that the Initial Closing shall take place at the offices of Davis Wright Tremaine LLP, Seattle, Washington.

Section 4.04. Further Assurances. Upon the terms and subject to the conditions of this Agreement, each of the Parties hereto shall use its reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective in the most expeditious manner practicable the Closing of each IUA and compliance with the obligations therein and herein in respect of each such IUA.

-16-

<PAGE>

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF LICENSEE

Licensee hereby represents and warrants to Clearwire and Clearwire Parent that:

Section 5.01. Organization and Good Standing. It is a nonprofit corporation duly organized, validly existing and in good standing under the laws of its state of organization and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted. Except as disclosed in Schedule 5.01, it is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property or FCC Licenses and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing does not have and would not reasonably be expected to have a Licensee Material Adverse Effect.

Section 5.02. Authorization of Agreement. It has all requisite corporate power and authority (i) to enter into, deliver and carry out the transactions contemplated by this Agreement (the 'Transactions") and each other agreement,

document, or instrument or certificate contemplated by this Agreement to be delivered on the date thereof, (ii) to enter into and deliver all documents required or necessary to be executed by it in connection with the consummation of the Transactions on the date hereof (collectively the "Licensee Documents"), and (iii) to consummate the Transactions taking place on the date hereof. This Agreement has been and the Licensee Documents when delivered will be duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes and the Licensee Documents will constitute when delivered the legal, valid and binding obligations of Licensee, enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.03. No Conflict. Except as set forth on Schedule 5.03:

(a) Neither the execution and delivery by Licensee of this Agreement or the Licensee Documents, nor compliance by Licensee with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the Governing Documents of Licensee, (ii) conflict with, violate, result in the breach of, constitute (with or without due notice, lapse of time or both) a default under, result in the acceleration of, create in any Party the rights to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any note, bond, mortgage, indenture, license, agreement or other obligation to which Licensee is a party or by which Licensee or any of its properties or assets is bound or (iii) violate any statute,

-17-

<PAGE>

rule, regulation, order or decree of any Government Agency or authority by which Licensee is bound, except in the cases of clauses (ii) and (iii) for such violations, breaches or defaults as would not, individually or in the aggregate, have a Licensee Material Adverse Effect.

(b) No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Government Agency is required on the part of Licensee in connection with the execution and delivery of this Agreement or the Licensee Documents or the compliance by Licensee with any of the provisions hereof or thereof, except as contemplated herein or therein.

Section 5.04. Litigation. Except as set forth on Schedule 5.04 and other than Proceedings of general applicability and those related to market transitions ("FCC Proceedings"), there is no Proceeding now in progress or pending or, to the knowledge of Licensee, threatened against Licensee or the assets (including the intellectual property rights) or the business of Licensee, nor to the knowledge of Licensee, does there exist any basis therefore, except for immaterial claims brought against Licensee in the ordinary course of business.

Section 5.05. Compliance with Laws; Permits. Excepting the markets listed on Schedule 5.05 and only to the best knowledge of the Licensee, assuming compliance in all material respects with the Communications Act and FCC Rules by other parties to a Third Party Agreement where and during the time access to the Commercial Spectrum Capacity has been governed by such Third Party

Agreement, in respect of all licenses, including those otherwise subject to Third Party Agreements, Licensee (a) has complied in all respects with all federal, state, and local laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Licensee Material Adverse Effect and (b) has all federal, state, and local governmental Permits necessary in the conduct of its business as currently conducted and to own and use its assets in the manner in which such assets are currently owned and used other than where the failure to possess such Permits would not, individually or in the aggregate, reasonably be expected to have a Licensee Material Adverse Effect, such Permits are in full force and effect, and no violations have been recorded in respect of any such Permit, and no proceeding is pending or, to the best knowledge of Licensee, threatened to revoke or limit any such Permit.

Section 5.06. Brokers. Neither Licensee nor any of its directors, officers, employees, or representatives has employed any broker or finder in connection with the Transactions.

Section 5.07. Knowledge. Any representation, warranty, covenant, obligation, or part thereof that states that it is made to the best knowledge of Licensee is made to its best knowledge after commercially reasonable investigation and includes all facts which it knew or should have known as a result of such investigation, including the best knowledge of Licensee's executive officers and legal counsel after commercially reasonable investigation.

-18-

<PAGE>

ARTICLE VI.

REPRESENTATIONS AND WARRANTIES OF CLEARWIRE

Clearwire hereby represents and warrants to Licensee that:

Section 6.01. Organization and Good Standing. Clearwire Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and Clearwire is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada. Each has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted. Clearwire is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing does not have and would not reasonably be expected to have a Clearwire Material Adverse Effect.

Section 6.02. Authorization of Agreement. Each of Clearwire Parent and Clearwire has all requisite corporate power and authority (i) to enter into, deliver and carry out the Transactions, each IUA and each other agreement, document, or instrument or certificate contemplated by this Agreement, (ii) to enter into and deliver all documents required or necessary to be executed by it in connection with the consummation of the Transactions (collectively the "Clearwire Documents"), and (iii) to consummate the Transactions. This Agreement

has been and the Clearwire Documents will be when delivered duly and validly executed and delivered by Clearwire and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes and the Clearwire Documents will constitute when delivered the legal, valid and binding obligations of Clearwire, enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.03. No Conflict.

(a) Neither of the execution and delivery by Clearwire of this Agreement and of the Clearwire Documents, nor the compliance by Clearwire with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the Governing Documents of Clearwire, (ii) conflict with, violate, result in the breach of, or constitute (with or without due notice, lapse of time or both) a default under, result in the acceleration of, create in any Party the rights to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any note, bond, mortgage, indenture, license, agreement or other obligation to which Clearwire is a party or by which Clearwire or any of its properties or assets are bound or

-19-

<PAGE>

(iii) violate any statute, rule, regulation, order or decree of any Government Agency by which Clearwire is bound, except, in the case of clauses (ii) and (iii), for such violations, breaches or defaults as would not, individually or in the aggregate, have a Clearwire Material Adverse Effect.

(b) No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Government Agency is required on the part of Clearwire in connection with the execution and delivery of this Agreement or the Clearwire Documents or the compliance by Clearwire with any of the provisions hereof or thereof, except that in connection with the execution of the IUAs executed pursuant to this Agreement, Clearwire will prepare and file spectrum lease applications for approval by the FCC.

Section 6.04. Litigation. Except as would not reasonably be expected to have a materially adverse effect on the ability of Clearwire to close hereunder or as set forth on Schedule 6.04, (a) there is no Proceeding now in progress or pending or, to the knowledge of Clearwire, threatened against Clearwire or the assets or the business of Clearwire and (b) Clearwire is not subject to any order, writ, injunction or decree of any court or other Government Agency.

Section 6.05. Compliance with Laws; Permits. Clearwire (a) has complied in all respects with all federal, state, and local laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Clearwire Material Adverse Effect and (b) has all federal, state, and local governmental Permits necessary in the conduct of its business as currently conducted and to own and use its assets in the manner in which such assets are currently owned and used other than where the failure to possess such

Permits would not, individually or in the aggregate, reasonably be expected to have a Clearwire Material Adverse Effect, such Permits are in full force and effect, and no violations have been recorded in respect of any such Permit, and no proceeding is pending or, to the best knowledge of Clearwire, threatened to revoke or limit any such Permit, except that in connection with the execution of the IUAs executed pursuant to this Agreement, Clearwire will prepare and file spectrum lease applications for approval by the FCC.

Section 6.06. Brokers. Neither Clearwire nor any of its directors, officers, employees or representatives has employed any broker or finder in connection with the Transactions.

ARTICLE VII.

COVENANTS

Section 7.01. Consents and Approvals. Clearwire shall use its commercially reasonable efforts to obtain, and shall cooperate with Licensee and assist Licensee in obtaining, all consents, waivers, amendments, modifications, approvals, authorizations, permits and licenses which are

-20-

<PAGE>

required to be obtained by Clearwire and the Licensee to effectuate this Agreement. Licensee shall use its respective commercially reasonable efforts to obtain, and shall cooperate with Clearwire and assist Clearwire in obtaining, all consents, waivers, amendments, modifications, approvals, authorizations, permits and licenses which are required to be obtained by Clearwire and/or Licensee to effectuate this Agreement.

Section 7.02. Notice of Breach. Licensee shall promptly give Clearwire written notice of any matter that becomes known to Licensee which Licensee determines is reasonably likely to constitute a breach of any representation, warranty, agreement or covenant of Licensee contained in this Agreement. Clearwire and Clearwire Parent shall promptly give the Licensee written notice of any matter that becomes known to them which Clearwire or Clearwire Parent determines is reasonably likely to constitute a breach of any representation, warranty, agreement or covenant of Clearwire or Clearwire Parent contained in this Agreement.

Section 7.03. Maintenance of FCC Qualifications. The provisions of this Section 7.03 apply only to spectrum that has not been subject to an IUA. Except as such qualifications may be affected by this Agreement or one or more IUAs entered into pursuant to this Agreement, Licensee hereby covenants and agrees that it shall maintain all necessary qualifications to hold and to obtain renewal in the ordinary course of any FCC License, subject to Clearwire's obligation to cause Licensee's FCC License to timely meet the substantial service requirement and to comply with FCC Rules in its use and access to the licensed spectrum, as such qualifications may be amended or modified from time to time (individually an "FCC Qualification" and collectively referred to as the "FCC Qualifications"), and further covenants that it shall not knowingly or negligently take any action, or fail to take any action, which action or failure to act creates a material risk that Licensee shall lose any FCC Qualification; provided, that in the event that the FCC or any other legal authority shall at any time specify new or different qualifications or conditions for the maintenance of any FCC Qualification or shall issue a pronouncement offering a new interpretation of an FCC Qualification, Clearwire shall reimburse on demand

Licensee's reasonable expenses of taking such action as are required for Licensee to bring itself and its operations into compliance with such new or different qualifications or conditions; provided, further, that it shall not be deemed a breach of this sentence if Licensee loses an FCC Qualification as a result, in whole or in part, of an act or omission of Clearwire or any failure of Clearwire to perform its obligations under this Agreement or any IUA. If, at any time, Licensee fails, or it appears to said Licensee more likely than not that it will fail, to maintain any one or more of its FCC Qualifications with respect to any of its FCC Licenses or its operations pursuant thereto, Licensee shall give written notice to Clearwire within five (5) days after Licensee becomes actually aware that (i) it no longer maintains such FCC Qualifications or (ii) with the passage of time or upon the occurrence of a future event it will no longer maintain such FCC Qualifications (referred to as a "Disqualification Event"). Licensee shall cooperate with reasonable requests of Clearwire made from time to time for the purpose of verifying, at Clearwire's expense, that Licensee maintains its FCC Qualifications. Upon the occurrence of a Disqualification Event, the affected Licensee shall, at Clearwire's expense, promptly undertake all reasonable actions to obtain, to the extent

-21-

<PAGE>

permitted by applicable law, a waiver from the FCC regarding the circumstances giving rise to such Disqualification Event or to cure the circumstances giving rise to such Disqualification Event.

Section 7.04. Assignment of FCC Licenses. The provisions of this Section 7.04 apply only to spectrum that has not been subject to an IUA. Licensee may assign the FCC License to any entity that is eligible under FCC Rules to hold the FCC License, who is reasonably acceptable to Clearwire and who assumes Licensee's prospective obligations under this Agreement, whereupon Licensee shall be forever relieved of such prospective obligations. Clearwire and Licensee agree that it is reasonable for Clearwire to reject a proposed assignee where the proposed assignee or its affiliate competes with Clearwire's offering over EBS or BRS spectrum. In the event that Licensee desires to assign its FCC License to another entity, Licensee shall inform Clearwire in writing of the identity of such entity and within twenty (20) days of such notice Clearwire shall inform Licensee in writing of whether Clearwire consents to such assignment or refuses to consent to such assignment and, if it refuses, the reason(s) it is relying upon for such refusal. Notwithstanding the foregoing, Licensee may, without the prior consent of Clearwire, sell, assign, sublease, delegate or transfer this Agreement or any of its rights or obligations hereunder to any of Licensee's affiliates controlled by or under common control with Licensee.

Section 7.05. Other FCC Requirements. In carrying out this Agreement, the Parties will comply at all times with applicable laws, as well as rules and policies of the FCC. The Parties believe that the provisions of this Agreement comply with all current FCC rules and policies, and agree not to express any contrary view to regulatory agencies or the general public.

Section 7.06. Fees and Taxes. Until the end of the term of the IUA that is the last to expire, Clearwire shall pay all fees and taxes (now existing or hereafter arising) imposed on Licensee as a result of the licensing, regulation or use of Licensee's EBS Spectrum by Clearwire or Licensee, including, without limitation, any Federal spectrum, USF and/or regulatory fees that maybe imposed on EBS Spectrum in the future.

Section 7.07. Best Efforts for Duration of Relationship. The Parties acknowledge that there will be many changes in the course of the term of the IUAs in technology, capabilities, and regulatory environment and other relevant areas, and the Parties covenant and agree to act in a cooperative manner to preserve the intent of the relationships reflected in this Agreement to their mutual advantage and to use their commercially reasonable best efforts to maintain that mutual advantage in accordance with the initial intent of the Parties.

ARTICLE VIII.

INDEMNIFICATION

Section 8.01. Indemnification

-22-

<PAGE>

(a) Licensee shall indemnify Clearwire, its Affiliates, and each of their respective stockholders (other than Licensee), directors, officers, employees, agents, successors and assigns (collectively, the "Clearwire Indemnified Parties") and hold each of the Clearwire Indemnified Parties harmless from and against any and all Damages based upon, attributable to or resulting from:

(i) The failure of any representation or warranty of Licensee set forth in ARTICLE V hereof, or any representation or warranty contained in any certificate delivered by or on behalf of Licensee pursuant to this Agreement, to be true and correct as of the dates made; and

(ii) The breach of any covenant or other agreement on the part of Licensee under this Agreement.

(b) Clearwire shall indemnify the Licensee, its Affiliates, and each of its agents, successors and assigns (collectively, the "Licensee Indemnified Parties") and hold the Licensee Indemnified Parties harmless from and against any and all Damages based upon, attributable to or resulting from:

(i) The failure of any representation or warranty of Clearwire set forth in ARTICLE VI hereof, or any representation or warranty contained in any certificate delivered by or on behalf of Clearwire pursuant to this Agreement, to be true and correct as of the dates made;

(ii) The breach of any covenant or other agreement on the part of Clearwire under this Agreement; and

(iii) The operation of equipment by, the provision of service by or otherwise related to the activities of Clearwire, any of its Affiliates or any of its sublicensees or resellers including, without limitation, damage to health.

Section 8.02. Determination of Damages. As used herein, "Damages" means any and all losses, claims, demands, liabilities, obligations, actions, suits, orders, statutory or regulatory compliance requirements, or proceedings asserted by any Person, and all damages, costs, expenses, assessments, judgments, recoveries and deficiencies, including interest, penalties, investigatory expenses, consultants' fees, and reasonable attorneys' fees and costs, of every kind and description, contingent or otherwise. For purposes of the above, the

amount of Damages in respect of any breach of a representation or warranty shall be determined without regard to any limitation or qualification as to materiality, Licensee(s) Material Adverse Effect, Clearwire Material Adverse Effect, knowledge or similar language set forth in such representation or warranty.

-23-

<PAGE>

Section 8.03. Limitations on Indemnification for Breaches of Representations and Warranties. An indemnifying Party shall not have any liability under Section 8.01(a)(i) or Section 8.01(b)(i) hereof unless the aggregate amount of Damages to the indemnified Parties finally determined to arise thereunder based upon, attributable to or resulting from the failure of any representation or warranty to be true and correct or the breach of any covenant, exceeds [***] in the aggregate (the "Deductible") and, in such event, the indemnifying Party shall be required to pay the amount of such Damages including those used to compute the Deductible.

Section 8.04. Indemnification Procedures

(a) In the event that any claim shall be asserted by any Person in respect of which payment may be sought under Section 8.01 hereof (regardless of the Deductible referred to above) (each, a "Claim"), the indemnified Party shall reasonably and promptly cause written notice (a "Claim Notice") of the assertion of any Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying Party. The indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder. If the indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder, it shall within five (5) days of the delivery of the Claim Notice (or sooner, if the nature of the Claim so requires) notify the indemnified Party of its intent to do so. If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder, fails to notify the indemnified Party of its election as herein provided or contests its obligation to indemnify the indemnified Party for such Damages under this Agreement, the indemnified Party may defend against, negotiate, settle or otherwise deal with such Claim. If the indemnified Party defends any Claim, then the indemnifying Party shall reimburse the indemnified Party for the expenses of defending such Claim upon submission of periodic bills. If the indemnifying Party shall assume the defense of any Claim, the indemnified Party may participate, at his or its own expense, in the defense of such Claim; provided, however, that such indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying Party if, so requested by the indemnifying Party to participate or in the reasonable opinion of counsel to the indemnified Party, a conflict or potential conflict exists between the indemnified Party and the indemnifying Party that would make such separate representation advisable; and provided, further, that the indemnifying Party shall not be required to pay for more than one such counsel for all indemnified Parties in connection with any Claim. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation, or settlement of any such Claim.

(b) After any final judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction and

the expiration of the time in which to appeal therefrom, or a settlement shall
have been consummated, or the indemnified Party and the indemnifying Party shall
have arrived at a mutually binding agreement

[*** Confidential Treatment Requested]

-24-

<PAGE>

with respect to a Claim hereunder, the indemnified Party shall forward to the
indemnifying Party notice of any sums due and owing by the indemnifying Party
pursuant to this Agreement with respect to such matter.

      (c) The failure of the indemnified Party to give reasonably prompt
notice of any Claim shall not release, waive or otherwise affect the
indemnifying Party's obligations with respect thereto except to the extent that
the indemnifying Party can demonstrate actual loss and prejudice as a result of
such failure.

ARTICLE IX.

TERM AND TERMINATION

      Section 9.01. Term; Termination. The term of this Agreement (the "Term")
will commence on the Effective Date and will continue until the earlier of (1)
eighteen (18) months after the Effective Date, (2) the date on which Clearwire
has used all of the Prepaid Royalties for accessing Future Spectrum Capacity
pursuant to this agreement, or (3) the date on which Licensee has returned to
Clearwire (in cash) the entire amount of the Prepaid Royalties that has not been
used for accessing Future Spectrum Capacity pursuant to this Agreement.
Clearwire shall have the right, in its sole discretion, to extend the Term at
any time prior to its expiration under clause (1) above; provided, that the Term
shall not extend beyond the first to occur of the events described in clauses
(2) or (3) above except as it pertains to [***]. This Agreement may be
terminated prior to expiration of the Term under any of the following
circumstances: (i) by mutual written agreement of the parties; (ii) by
Clearwire, upon giving written notice to Licensee in the Event of Default;
provided that such Event of Default is not cured (if it is capable of being
cured) within [***] following such notice; (iii) by Licensee, upon giving
written notice to Clearwire in the Event of Default; provided that with respect
to an Event of Default that is a payment default, it is not cured in [***]
following such notice, and with respect to all other Events of Default (that are
of a type capable of being cured) such Event of Default is not cured within
[***] thereof; or (iv) by Clearwire upon written notice to Licensee and to the
extent allowed under law, if Licensee files a petition pursuant to Title 7 or 11
of the United States Bankruptcy Code or is adjudged a debtor after the filing of
an involuntary bankruptcy petition against Licensee, or if Licensee files a
petition for relief pursuant to any state insolvency laws. Upon termination of
this Agreement for any cause, the Prepaid Royalties Balance shall be refunded to
Clearwire, as provided in Section 2.02.

      Section 9.02. Defaults. It shall be an "Event of Default" hereunder if
either party fails to perform a material obligation or breaches a material
representation and warranty contained in this Agreement in circumstances where
such failure results in the inability of the other party to exercise its full
rights under this Agreement. In the event of a Loss (as defined in the
applicable IUA), the Parties shall cooperate in seeking special temporary
authority from the FCC to allow Clearwire to continue operating on the Channels

until such time as it can transition its users to other spectrum and minimize service disruption to its business and other activities.

[*** Confidential Treatment Requested]

-25-

<PAGE>

Section 9.03. Survival. The obligations of the parties under this Agreement that by their nature would continue beyond expiration or termination of this Agreement shall survive any expiration or termination of this Agreement. Without limiting the generality of the foregoing, any rights of Clearwire with respect to any Options or any rights of first refusal shall survive the expiration or termination of this Agreement if the notice or other event triggering such Option or right of first refusal occurs (or would have occurred, if Licensee complied in full with the requirements of this Agreement) prior to expiration or termination of this Agreement.

ARTICLE X.

GENERAL PROVISIONS

Section 10.01. Payment of Sales, Use or Similar Taxes. Clearwire shall be liable for and shall pay (and shall indemnify and hold harmless the Licensee(s) Indemnified Parties against) all sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, registration, duty or similar fees or taxes or governmental charges (together with any interest of penalty, addition to tax or additional amount imposed) as levied by any taxing authority in connection with the Transactions.

Section 10.02. Survival of Representations and Warranties. The representations and warranties contained in this Agreement or in any certificate, document or instrument delivered in connection herewith, shall survive each of the Closings hereunder for a period of [***] from the Initial Closing Date or Subsequent Closing Date with respect to the EBS spectrum that is subject to such Initial Closing or Subsequent Closing, as applicable, regardless of any investigation made by the Parties hereto. All agreements and covenants contained herein shall survive indefinitely until, by their respective terms, they are no longer operative.

Section 10.03. Entire Agreement; Amendments and Waivers. This Agreement (including the schedules and exhibits hereto), represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought. No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

[*** Confidential Treatment Requested]

-26-

<PAGE>

Section 10.04. Governing Law. The validity, meaning and effect of this Agreement shall be determined in accordance with the laws of the State of New York applicable to contracts made and to be performed in that state, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 10.05. Table of Contents and Headings. The table of contents and section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

Section 10.06. Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or by overnight courier, or mailed by certified mail, return receipt requested, to the Parties (and shall also be transmitted by facsimile to the Persons receiving copies thereof) at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

```
If to Clearwire, to:   Clearwire Spectrum Holdings II LLC
                       5808 Lake Washington Blvd. N.E., Suite 300
                       Kirkland, WA 98033
                       ATTENTION: [***]
                       FACSIMILE NO [***]

With a copy to:        Clearwire Corporation
                       5808 Lake Washington Blvd. N.E., Suite 300
                       Kirkland, WA 98033
                       Attention: [***]
                       Facsimile No. [***]

And a copy to:         Davis Wright Tremaine LLP
                       2600 Century Square
                       1501 Fourth Avenue
                       Seattle, WA98101- 1688
                       Attention: [***]
                       Facsimile No.: [***]

If to Licensee, to:    Hispanic Information and
                       Telecommunications Network, Inc.
                       63 Flushing Avenue, Unit 281
                       Brooklyn, NY 11205
                       Attention: [***]
                       FAX: [***]
```

[*** Confidential Treatment Requested]

-27-

<PAGE>

```
With a copy to:        Day, Berry & Howard LLP
```

875 Third Avenue
New York, NY 10022
Attention: [***]
Fax: [***]

And a copy to:          RJGLaw LLC
                        1010 Wayne Avenue, Suite 950
                        Silver Spring, MD 20910
                        ATTENTION: [***]
                        Fax: [***]

Section 10.07. Publicity. No public release, announcement or other form of publicity concerning this Agreement or the transactions described in this Agreement, shall be issued by either Party without the prior consent of the other Party, except as such release or announcement may be required by law, regulation or the rules or regulations of any securities exchange, in which case the Party required to make the release or announcement shall, to the extent possible, allow the other Party reasonable time to comment on such release or announcement in advance of such issuance. The Parties shall use reasonable efforts to consult in good faith with each other with a view to agreeing upon any press release or public announcement relating to the transactions contemplated hereby prior to the consummation thereof.

Section 10.08. Severability. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect.

Section 10.09. Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 10.10. Remedies. The Parties recognize that, in the event that a Party should refuse to perform any provisions of this Agreement, monetary damages alone will not be adequate. The non-defaulting Party shall therefore be entitled, in addition to any other remedies which may be available, including money damages, to obtain specific performance of the terms of this Agreement. Notwithstanding any other provision herein, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies by a Party shall not constitute a waiver of the right to pursue other available remedies at any time.

Section 10.11. Dispute Resolution Procedure.

(a) General. The Parties desire to resolve disputes arising out of this Agreement without litigation. Accordingly, the Parties agree to use the dispute resolution procedures set forth in this Section 10.11 (the "Dispute Resolution Procedures") as their sole means of

[*** Confidential Treatment Requested]

-28-

<PAGE>

adjudication with respect to any controversy or claim arising out of or relating to this Agreement or its breach.

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Nextel Spectrum Acquisition Corporation

**DEFENDANTS**

Hispanic Information and Telecommunications Network, Inc.

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCA___ 'E TRACT OF
LAND INVOLVED

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
**(EXCEPT IN U.S. PLAINTIFF CASES)**

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Rodney Page (DC Bar# 37994)
Bryan Cave LLP
700 Thirteenth Street NW - Suite 700
Washington, DC 20005
(202) 508-6000

Case: 1:07-cv-00543
Assigned To : Collyer, Rosemary M.
Assign. Date : 3/19/2007
Description: NEXTEL V. HISPANIC INFO

**II. BASIS OF JURISDICTION**

(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
   Plaintiff

○ 3 Federal Question
   (U.S. Government Not a Party)

○ 2 U.S. Government
   Defendant

◉ 4 Diversity
   (Indicate Citizenship of
   Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ◉ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

○ **A. Antitrust**

☐ 410 Antitrust

○ **B. Personal Injury/Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

○ **C. Administrative Agency Review**

☐ 151 Medicare Act

Social Security:
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

Other Statutes
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If
    Administrative Agency is Involved)

○ **D. Temporary Restraining Order/Preliminary Injunction**

**Any nature of suit from any category may be selected for this category of case assignment.**

***(If Antitrust, then A governs)***

○ **E. General Civil (Other)**     **OR**     ○ **F. Pro Se General Civil**

Real Property
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

Personal Property
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

Bankruptcy
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

Property Rights
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

Federal Tax Suits
☐ 870 Taxes (US plaintiff or
    defendant
☐ 871 IRS-Third Party 26
    USC 7609

Forfeiture/Penalty
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure
    of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational
    Safety/Health
☐ 690 Other

Other Statutes
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC
    Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced &
    Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/
    Exchange
☐ 875 Customer Challenge 12 USC
    3410
☐ 900 Appeal of fee determination
    under equal access to Justice
☐ 950 Constitutionality of State
    Statutes
☐ 890 Other Statutory Actions (if
    not administrative agency
    review or Privacy Act

| ○ **G. *Habeas Corpus/ 2255*** | ○ **H. *Employment Discrimination*** | ○ **I. *FOIA/PRIVACY ACT*** | ○ **J. *Student Loan*** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. *Labor/ERISA (non-employment)*** | ○ **L. *Other Civil Rights (non-employment)*** | ⊙ **M. *Contract*** | ○ **N. *Three-Judge Court*** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

○ 1 Original Proceeding  ⊙ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

**VII. REQUESTED IN COMPLAINT**  ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ >$75,000   Check YES only if demanded in complaint

JURY DEMAND:  YES ☐  NO ☒

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE **Mar. 19, 2007**   SIGNATURE OF ATTORNEY OF RECORD *[signature]*

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.     COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed <u>only</u> if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the <u>primary</u> cause of action found in your complaint. You may select only <u>one</u> category. You <u>must</u> also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

**PROOF OF SERVICE**

I hereby certify that a true and correct copy of Hispanic Information and

Telecommunications Network, Inc.'s Notice of Removal of State Court Civil Action was served

on the following individuals via First-Class Mail on this 19th day of March 2007.


Rodney Page (DC Bar# 37994)          Craig S. O'Dear
Bryan Cave LLP                       James D. Lawrence
700 Thirteenth Street NW - Suite 700 3500 One Kansas City Place
Washington, DC 20005                 1200 Main Street
                                     Kansas City, MO 64105


_____
Eunnice H. Eun