## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEXTEL SPECTRUM ACQUISITION CORP., | ) ) |
| Plaintiff, | ) Civil Action No. 1:07-CV-00543-RMC ) ) Judge Rosemary M. Collyer |
| vs. | ) ) ORAL ARGUMENT REQUESTED |
| HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC., | ) ) ) ) |
| Defendant. | ) ) |

### DEFENDANT HITN'S MOTION TO DISMISS

Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN") respectfully moves this Court to dismiss Nextel's complaint with prejudice for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6).  Under the plain language of the agreements at issue, there has been no breach of contract, as alleged by Plaintiff, and thus the complaint fails to state a claim upon which relief may be granted.

Furthermore, pursuant to Local Civil Rule 7(f), HITN respectfully requests an oral hearing.

Dated: March 26, 2007

Respectfully submitted,

Eunnice H. Eun (D.C. Bar #500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
Telephone:    (202) 879-5000
Facsimile:    (202) 879-5200

William H. Pratt
Joseph Serino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

Rudolph J. Geist (D.C. Bar # 461064)
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD  20910
Telephone:   (301) 589-2999
Facsimile:   (301) 589-2644

*Attorneys for Defendant Hispanic
Information and Telecommunications
Network, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NEXTEL SPECTRUM ACQUISITION CORP., | Civil Action No. 1:07-CV-00543-RMC |
| Plaintiff, | Judge Rosemary M. Collyer |
| vs. | ORAL ARGUMENT REQUESTED |
| HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC., | |
| Defendant. | |

## DEFENDANT HITN's MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN") respectfully moves this Court to dismiss with prejudice the complaint of Nextel Spectrum Acquisition, Corp. ("Nextel") for failure to state a claim.

## PRELIMINARY STATEMENT

This case involves two independent agreements, both of which are attached to and incorporated in the complaint. The first agreement, which is called the Airtime Royalty Agreement, is dated February 21, 1995 and is between HITN and Nextel, the parties here. Pursuant to this Agreement, HITN leased to Nextel certain spectrum space in the Washington, D.C. area through February 21, 2005. The Agreement also provided that for a period of two years thereafter, Nextel had a right of first refusal should HITN desire to lease that same spectrum to a third party.

The second agreement, which is called the Master Royalty and Use Agreement, is dated October 4, 2006 and is between HITN and third-party Clearwire Spectrum Holdings II LLC. It does not involve Nextel. Pursuant to this Agreement, HITN leases to Clearwire

spectrum that is located in various parts of the country, but, importantly, *not* in the Washington, D.C. area. This Agreement also gives Clearwire the option to lease additional HITN-controlled spectrum as it becomes available in the future.

The fatal defect in Nextel's complaint is that it assumes, mistakenly, that the Master Royalty and Use Agreement involves the same Washington, D.C. area spectrum that is the subject of the Airtime Royalty Agreement, and that the signing of the former agreement on October 4, 2006 triggered Nextel's right of first refusal under its Airtime Royalty Agreement with HITN. That is plainly not so, as the straightforward language of the Master Royalty and Use Agreement unequivocally establishes. Not only does that Agreement set forth the specific geographic areas of spectrum that are covered there, which pointedly does not include the Washington, D.C. area, the Agreement also *specifically excludes* spectrum in other areas that is "encumbered by any . . . right of first refusal, or other contractual obligation of" HITN. As Nextel's complaint alleges, however, the Washington, D.C. area spectrum that it leased under the Airtime Royalty Agreement with HITN was covered by a right of first refusal and, accordingly, could not have been the subject of the Master Royalty and Use Agreement at the time when that Agreement was consummated. (*See* Compl. ¶ 17.)

In summary, Nextel's complaint is built entirely on a flawed premise. The purported ground on which the complaint is based — that the Master Royalty and Use Agreement somehow constitutes an offer to lease the Washington D.C. area spectrum at issue under the Airtime Royalty Agreement — simply does not exist. Accordingly, Nextel's one-count complaint should be dismissed with prejudice for failure to state a claim.

## BACKGROUND

### HITN

HITN is a New York private non-profit organization with headquarters in Brooklyn, New York. HITN was established in 1983 to create a network of non-commercial telecommunications facilities to advance the educational, social, cultural and economic aspirations of Hispanics.

In connection with this mission, HITN has been granted certain licenses by the Federal Communications Commission ("FCC") authorizing it to engineer and operate specified Educational Broadband Service ("EBS") channels in certain geographic areas of the United States. (*See* Ex. A to Mar. 26, 2007 Declaration of Eunnice H. Eun ("Eun Dec."), Recitals.) Subject to the Communications Act of 1934, as amended, and FCC rules, regulations, and policies, an EBS licensee such as HITN is permitted by law to use its excess spectrum capacity for commercial purposes. *See id.*

### The Airtime Royalty Agreement

The original parties to the Airtime Royalty Agreement dated February 21, 1995 were Eastern Cable Networks Corporation and George Washington University. (*See* Ex. B to Eun Dec.) Over time, Nextel succeeded to the interests of Eastern Cable Networks and HITN agreed to assume the rights and any remaining obligations of George Washington University under the Agreement. (*See* Compl. ¶ 16.) Pursuant to the Airtime Royalty Agreement, HITN leased to Nextel certain EBS D channels in the Washington, D.C. area (the "Washington D Channels").[1] The term of the Airtime Royalty Agreement, with all automatic renewals, expired on February 21, 2005. (*See* Compl. ¶ 18; *see also* Ex. B to Eun Dec. at I.B.1.) This Agreement is governed by the laws of the District of Columbia. (*See* Ex. B to Eun Dec. at § XIII.H.)

---

[1]    The complaint refers to the Washington D Channels as the GWU Spectrum Rights.

3

Nextel alleges that pursuant to Section I.C. of the Airtime Royalty Agreement, it was given a two-year right of first refusal with regard to the Washington D Channels that were the subject of the Airtime Royalty Agreement. (*See* Compl. ¶ 17.) More specifically, Nextel claims that it had the "exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B through two years thereafter." (*See id.* ¶ 19; Ex. B to Eun Dec. at § I.C.1.) Thus, according to Nextel, this right of first refusal, which is the entire focus of its lawsuit, runs from February 21, 2005 through February 21, 2007. (*See* Compl. ¶ 18.) Importantly, Section I.C.2. specifically states that this right applies only to offers regarding leases "that would *commence* anytime" during that two year period. *See* Ex. B to Eun Dec. at § I.C.2.

**The Master Royalty and Use Agreement**

Entirely separate from the Airtime Royalty Agreement, HITN entered into the Master Royalty and Use Agreement with Clearwire on October 4, 2006. Pursuant to this Agreement, which is governed by New York law (*see* Ex. A to Eun Dec. at § 10.04), HITN leases or grants an option to lease certain spectrum to Clearwire. In return, Clearwire pays royalties to HITN that HITN can use in providing instructional programming to schools and public organizations and in furthering the broadband development of its education instruction network. (*See* Ex. A to Eun Dec., Recitals.)

More specifically, the Master Royalty and Use Agreement provides Clearwire with access to two types of HITN-controlled spectrum — Initial Spectrum Capacity and Future Spectrum Capacity. *Id.* The Initial Spectrum Capacity refers to HITN-controlled spectrum that was unencumbered at the time the Agreement was consummated and thus could be leased immediately to Clearwire. That spectrum, which is identified in Schedule A of the Master Royalty and Use Agreement, consists of channels located in Garden City, KS, Yuma,

4

AZ, Islamorada, FL, San Diego, CA, and Shaw Butte, AZ. (*See* Ex. A to Eun Dec., Schedule A.) The Washington D Channels that are the subject of the Airtime Royalty Agreement do *not* appear on Schedule A and, therefore, are not part of the Initial Spectrum Capacity under the Master Royalty and Use Agreement.

The Future Spectrum Capacity channels were not specified in the Master Royalty and Use Agreement, or, indeed, even known at the time the Agreement was consummated. Rather, the Future Spectrum Capacity referred to Clearwire's option to use or lease "FCC Licenses held by [HITN] that is Available or that becomes Available during" the term of the Agreement. (*See* Ex. A to Eun Dec. at § 1.02(b).) Significantly, the term "Available" is defined as referring to spectrum that:

> *is not encumbered by* any Lien, including, but not limited to, any purchase option, *right of first refusal*, or other contractual obligation of [HITN].

(*See* Ex. A to Eun Dec., at Exhibit I, subpart (b) "Definitions" (emphasis added).) Since the Washington D Channels were subject to Nextel's right of first refusal under the Airtime Royalty Agreement, those channels, by definition, did not qualify as Future Spectrum Capacity under the Master Royalty and Use Agreement between HITN and Clearwire when that Agreement was consummated.

## Nextel's Action

On February 21, 2007, the last day of the right of refusal period under the Airtime Royalty Agreement, Nextel commenced the instant action against HITN in the Superior Court of the District of Columbia, Civil Division. On March 19, 2007, HITN removed the action to this Court based on diversity jurisdiction.

In its complaint, Nextel alleges that it learned about the Master Royalty and Use Agreement through public filings on January 8, 2007 (Compl. ¶ 20), but that the complete terms of the Agreement were not made available to the public (*Id.* ¶ 22). The sole basis for

the complaint is Nextel's contention that the Master Royalty and Use Agreement constitutes a "bona fide offer" by Clearwire to HITN to lease the Washington D Channels that are the subject of the Airtime Royalty Agreement, thereby triggering Nextel's right of first refusal. (*See* Compl. ¶ 24.) Nextel claims that by failing to provide it with "all material terms and conditions of [sic] Clearwire's offer," HITN has breached the right of first refusal provision under the Airtime Royalty Agreement. *Id.*

Nextel asks the Court to (1) force HITN to provide "written notice to [Nextel] of all of the material terms and conditions of the Clearwire offer"; (2) enjoin HITN and Clearwire during the pendency of the lawsuit (or in no event later than 30 days after HITN provides the requested written notice) from "transferring, leasing, and/or assigning" the Washington D Channels; and (3) order reimbursement for fees and expenses. (Compl. ¶ 36(a) - (c).) For the reasons set forth below, Nextel's complaint fails and should be dismissed with prejudice.

## ARGUMENT

A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of the complaint." *ACLU Found. of S. Cal. v. Barr,* 952 F.2d 457, 472 (D.C. Cir. 1991). Although the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the non-movant's favor, *see Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C. Cir. 1983), the Court need not accept as true plaintiff's legal conclusions. *See Papasan v. Allain,* 478 U.S. 265, 286 (1986). In addition, the Court is permitted to take into consideration any "documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao,* 226 F. Supp. 2d 191, 196 (D.D.C. 2002). Here, this would include the terms and conditions of the Airtime Royalty Agreement and Master Royalty and Use Agreement, both of which are referenced in and attached to Nextel's complaint. Finally, the Court must not "accept as true the

complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice." *Kaempe v. Myers,* 367 F.3d 958, 963 (D.C. Cir. 2004).

As discussed below, the complaint fails to state a claim and should be dismissed with prejudice for two reasons. First, Nextel's right of first refusal pertains only to an offer to lease the Washington D Channels, and the Master Royalty and Use Agreement does not constitute an offer to lease those channels. Second, there is no possibility that the Washington D Channels could become Future Spectrum Capacity that Clearwire could lease under the Master Royalty and Use Agreement unless and until any and all rights of first refusal with respect to those channels, including Nextel's rights, have expired.

**The Master Royalty and Use Agreement**
**<u>Is Not An Offer To Lease The Washington D Channels.</u>**

By its plain and unambiguous terms, Nextel's right of first refusal under the Airtime Royalty Agreement applies only to bona fide offers to lease the same Washington D Channels that are the subject of that Agreement. (*See* Ex. B to Eun Dec. at § I.C.) But, as is made clear by its express terms, the Master Royalty and Use Agreement does ***not*** constitute an offer to lease those same Washington D Channels.

To be sure, the Master Royalty and Use Agreement constitutes an offer to lease the Initial Spectrum Capacity that is listed in Schedule A. As Schedule A makes clear, however, that capacity consists entirely of spectrum channels located in Garden City, KS, Yuma, AZ, Islamorada, FL, San Diego, CA, and Shaw Butte, AZ. (*See* Ex. A to Eun Dec., Schedule A.) It does not refer to or include the Washington D Channels that are the subject of the Airtime Royalty Agreement and, thus, does not in any way implicate or trigger Nextel's right of first refusal thereunder.

The only other spectrum at issue under the Master Royalty and Use Agreement is the Future Spectrum Capacity. As discussed above, however, no specific channels, let alone the Washington D Channels, have yet been leased to Clearwire under this provision in the Master

7

Royalty and Use Agreement.  More importantly, the express terms of the Master Royalty and Use Agreement make clear that Clearwire's option to lease Future Spectrum Capacity could not possibly include the right to lease the Washington D Channels during the time that those channels were subject to Nextel's right of first refusal under the Airtime Royalty Agreement. This is so because the Future Spectrum Capacity under the Master Royalty and Use Agreement is specifically limited to spectrum that is "Available," which is defined as spectrum that "is not encumbered by any . . . purchase option, right of first refusal, or other contractual obligation of" HITN.  (*See* Ex. A to Eun Dec. at Exhibit I, subpart (b) "Definitions.")  Thus, the Future Spectrum Capacity under the Master Royalty and Use Agreement expressly ***excluded*** the Washington D Channels so long as they were subject to Nextel's right of first refusal.

## CONCLUSION

For the foregoing reasons, Nextel has failed to state a claim for relief against HITN and its complaint should be dismissed under Rule 12(b)(6).  Because the deficiencies in Nextel's cause of action cannot be cured, the dismissal should be with prejudice and any request by Nextel to replead should be denied as futile.

Dated: March 26, 2007

Respectfully submitted,

Eunnice H. Eun (DC Bar #500203)
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005-5793
Telephone:   (202) 879-5000
Facsimile:   (202) 879-5200

William H. Pratt
Joseph Serino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022
Telephone:   (212) 446-4800
Facsimile:   (212) 446-4900

Rudolph J. Geist (DC Bar # 461064)
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD 20910
Telephone:   (301) 589-2999
Facsimile:   (301) 589-2644

*Attorneys for Defendant Hispanic Information and Telecommunications Network, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NEXTEL SPECTRUM ACQUISITION CORP., | ) <br> ) |
| Plaintiff, | ) Civil Action No. 1:07-CV-00543-RMC <br> ) <br> ) Judge Rosemary M. Collyer |
| vs. | ) <br> ) |
| HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC., | ) <br> ) <br> ) |
| Defendant. | ) <br> ) <br> ) |

### DECLARATION IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS

EUNNICE H. EUN declares, pursuant to 28 U.S.C. § 1746, as follows:

1. I am an associate at the law firm of Kirkland & Ellis LLP, counsel for Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN"). I offer this declaration in support of HITN's Motion to Dismiss the complaint against it. In particular, I submit this declaration to place before the Court true and correct copies of two agreements that are referred to in, and are the subject of, the complaint against HITN.

2. Attached hereto as Exhibit A is a true and correct copy of the Master Royalty and Use Agreement, dated October 4, 2006, referred to and incorporated in Plaintiff's complaint against HITN.

3. Attached hereto as Exhibit B is a true and correct copy of the Airtime Royalty Agreement, dated February 21, 1995, referred to and incorporated in Plaintiff's complaint against HITN.

Dated: March 26, 2007

Eunnice H. Eun (D.C. Bar # 500203)

**IN UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| NEXTEL SPECTRUM ACQUISITION CORP., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-CV-00543-RMC |
| | ) | |
| | ) | Judge Rosemary M. Collyer |
| vs. | ) | |
| | ) | |
| HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## [PROPOSED] ORDER ON DEFENDANT'S MOTION TO DISMISS

Upon consideration of Defendant HITN's Motion to Dismiss for Failure to State a Claim, and having duly considered the arguments of all parties concerned, it is hereby ORDERED that the Motion to Dismiss is GRANTED and Plaintiff's complaint is dismissed with prejudice.


So Ordered this _____ day of _____, 2007.




_____
U.S. District Judge Rosemary M. Collyer

## CERTIFICATE OF SERVICE

I, Eunnice H. Eun, certify that I am employed in Washington, D.C. at 655 Fifteenth Street, N.W. by KIRKLAND & ELLIS LLP and that on March 26, 2007 I caused to be served the foregoing Defendant's Motion to Dismiss, Defendant's Memorandum in Support of Its Motion to Dismiss, its accompanying Declaration and Exhibits, and Proposed Order upon the following counsel via hand delivery.

Eunnice H. Eun

Rodney F. Page, Esq.
Bryan Cave LLP
700 Thirteenth Street, NW
Suite 700
Washington, DC 20005

# EXHIBIT A

MASTER ROYALTY AND USE AGREEMENT

by and among

CLEARWIRE SPECTRUM HOLDINGS II LLC

and

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.

Dated as of October 4, 2006

71361919.3

# TABLE OF CONTENTS

Page

ARTICLE I.       RELATIONSHIP SUMMARY ...................................................... 6
    Section 1.01.       Overview.................................................................................... 6
    Section 1.02.       Overview of Mechanics and Structure of Agreements ...................... 6
    Section 1.03.       Scope and Nature of Clearwire Group.......................................... 8
ARTICLE II.      ECONOMIC ROYALTIES ........................................................ 10
    Section 2.01.       Aggregate EBS Spectrum Capacity Economic Royalties.................. 10
ARTICLE III.     ACCESS RIGHT ROYALTIES .................................................. 10
    Section 3.01.       Access Right Royalties ............................................................ 10
    Section 3.02.       Cost-Free Educational Accounts.............................................. 10
    Section 3.03.       Educational Reservation Basic Cost-Free Education Accounts ........ 11
    Section 3.04.       Additional Cost-Free Educational Accounts ................................ 11
    Section 3.05.       Licensee MVNO. ...................................................................... 12
    Section 3.06.       Access to Educational End User Devices .................................... 13
    Section 3.07.       Sharing of Features and Service Sets.......................................... 13
    Section 3.08.       Preferred Content Provider ...................................................... 13
    Section 3.09.       Limited Reciprocity Access ...................................................... 14
ARTICLE IV.      CLOSING MECHANICS; ESCROW .......................................... 14
    Section 4.01.       Deliveries at Execution of this Agreement ................................ 14
    Section 4.03.       EBS Spectrum Capacity IUA Closing(s ...................................... 15
    Section 4.04.       Closing Site/Mechanics .......................................................... 16
    Section 4.05.       Further Assurances.................................................................. 16
ARTICLE V.       REPRESENTATIONS AND WARRANTIES OF LICENSEE.................. 17
    Section 5.01.       Organization and Good Standing................................................ 17
    Section 5.02.       Authorization of Agreement ...................................................... 17
    Section 5.03.       No Conflict............................................................................ 17
    Section 5.04.       Litigation................................................................................ 18
    Section 5.05.       Compliance with Laws; Permits ................................................ 18
    Section 5.07.       Brokers.................................................................................. 18
    Section 5.08.       Knowledge ............................................................................ 18
ARTICLE VI.      REPRESENTATIONS AND WARRANTIES OF CLEARWIRE............ 19
    Section 6.01.       Organization and Good Standing................................................ 19
    Section 6.02.       Authorization of Agreement ...................................................... 19
    Section 6.05.       No Conflict............................................................................ 19
    Section 6.06.       Litigation................................................................................ 20

A-2

Section 6.07.    Compliance with Laws; Permits ........................................................ 20
Section 6.08.    Brokers ............................................................................................. 20
ARTICLE VII.    COVENANTS ................................................................................. 20
Section 7.01.    Consents and Approvals .................................................................. 20
Section 7.02.    Notice of Breach .............................................................................. 21
Section 7.04.    Maintenance of FCC Qualifications ................................................ 21
Section 7.05.    Assignment of FCC Licenses ........................................................... 22
Section 7.06.    Other FCC Requirements ................................................................. 22
Section 7.08.    Fees and Taxes ................................................................................. 22
Section 7.09.    Best Efforts for Duration of Relationship ........................................ 22
ARTICLE IX.     INDEMNIFICATION ..................................................................... 22
Section 9.01.    Indemnification ............................................................................... 22
Section 9.02.    Determination of Damages .............................................................. 23
Section 9.03.    Limitations on Indemnification for Breaches of
                 Representations and Warranties ....................................................... 24
Section 9.04.    Indemnification Procedures ............................................................. 24
ARTICLE X.      TERMINATION .............................................................................. 25
Section 10.01.   Expiration; Termination ................................................................... 25
Section 10.02.   Defaults ............................................................................................ 25
ARTICLE XI.     GENERAL PROVISIONS ................................................................ 26
Section 11.01.   Payment of Sales, Use or Similar Taxes .......................................... 26
Section 11.02.   Survival of Representations and Warranties ..................................... 26
Section 11.04.   Entire Agreement; Amendments and Waivers .................................. 26
Section 11.05.   Governing Law ................................................................................. 27
Section 11.06.   Table of Contents and Headings ....................................................... 27
Section 11.07.   Notices ............................................................................................. 27
Section 11.08.   Publicity ........................................................................................... 28
Section 11.09.   Severability ...................................................................................... 28
Section 11.10.   Binding Effect; Assignment ............................................................. 28
Section 11.11.   Remedies .......................................................................................... 28
Section 11.12.   Dispute Resolution Procedure .......................................................... 28
Section 11.13.   Counterparts ..................................................................................... 31
Section 11.14.   Confidentiality ................................................................................. 31
Section 11.15.   Non-Disclosure of Shared Information ............................................. 31

71361919.3

## LIST OF EXHIBITS

I.      Definitions and Interpretation

II.     Form of IUA

III.    Form of Stock Pledge Agreement

IV.     Form of Clearwire Certificate

V.      Form of Licensee Certificate

## LIST OF SCHEDULES

A.      Schedule of all Licenses, Licensee's data, applicable Geographic Markets and GSAs, existing use agreements and Initial Spectrum Capacity

B.      Licensee Schedule

-3-

# MASTER ROYALTY AND USE AGREEMENT

MASTER ROYALTY AND USE AGREEMENT ("Agreement"), dated as of October 4, 2006 (the "Effective Date") by and among Hispanic Information and Telecommunications Network, Inc. ("Licensee"), and Clearwire Spectrum Holdings II LLC, a Nevada limited liability company ("Clearwire"). (Each of the foregoing is referred to as a "Party" and both of the foregoing are referred to collectively as the "Parties".) Certain defined terms used in this Agreement, and rules of interpretation applicable to this Agreement, are contained in Exhibit I hereto.

## RECITALS:

WHEREAS, the Licensee has been granted certain licenses (as they may be modified and renewed, the "FCC Licenses") by the Federal Communications Commission (the "FCC") authorizing it to engineer and operate specified Educational Broadband Service ("EBS") channels (including any associated J- and K-Group channels, the "Channels") in the Geographic Markets and covering an area having the population determined on the basis of 2000 census data, and providing the number of megahertz of total capacity (measured post-transition, excluding J and K block spectrum) multiplied by this population number ("MHzPops"), all as identified on Schedule A;

WHEREAS, subject to the Communications Act of 1934, as amended (the "Communications Act"), and FCC rules, regulations and policies (the "FCC Rules"), an EBS station's excess capacity may be used for commercial purposes (the "Commercial Spectrum Capacity");

WHEREAS, Licensee's ability to provide services to the non-profit community will be enhanced by expanding the geographic reach of its platform through making the commercial capacity associated with agreed FCC Licenses available to Clearwire, and providing services to the non-profit community on Clearwire's broadband network;

WHEREAS, Clearwire believes that entering into a relationship with Licensee has several benefits to Clearwire, in securing a source of spectrum capacity for the future and facilitating the branding of the Clearwire mark through the services provided by Licensee in the non-profit community;

WHEREAS, Licensee desires to make available to Clearwire, and Clearwire desires to have access to, the Commercial Spectrum Capacity that is identified on Schedule A (the "Initial Spectrum Capacity"), and any additional Commercial Spectrum Capacity of Licensee that is accepted by Clearwire and made subject to an IUA as provided in this Agreement (the "Future Spectrum Capacity"), all in accordance with the terms of this Agreement;

-4-

WHEREAS, under this Agreement Licensee receives consideration to facilitate the transmission of instructional programming to schools and public organizations and to facilitate instructional broadband spectrum development for its educational instruction network;

WHEREAS, the bundle of value comprised of the EBS Economic Royalties and the Access Right Royalties (collectively referred to as the "Total Consideration") is central to Licensee's efforts to advance the transmission of its programming and to develop an instructional broadband spectrum network, in each case utilizing the Clearwire National Platform, including the ability to use Clearwire as a single source access vendor under the IUAs, and the IUAs and this Agreement would not have been executed but for all of the elements of the Total Consideration;

WHEREAS, Clearwire desires to have access to the Commercial Spectrum Capacity to the extent permitted by FCC Rules and the terms of this Agreement, for the operation of its business, and the Parties recognize that the success of Clearwire's business plan depends on its access to the Commercial Spectrum Capacity (among other factors), and the Licensee desires Clearwire to have full access rights to the Commercial Spectrum Capacity permitted under FCC Rules and the terms of this Agreement, to enhance Clearwire's business for the benefit of Licensee as a shareholder of Clearwire Corporation ("Clearwire Parent"); and

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants, and agreements set forth in this Agreement and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties hereto, intending legally to be bound, agree as follows:

-5-

71361919.3

## ARTICLE I.

## RELATIONSHIP TERMS

Section 1.01.  Overview.

(a)    This Agreement, the Individual Use Agreements entered into pursuant to this Agreement, and the Collateral Documents entered into by the Parties in connection herewith, describe the arrangement through which Clearwire and its Affiliates will obtain access to the Initial Spectrum Capacity authorized by the FCC Licenses identified on Schedule A hereto and any Future Spectrum Capacity (collectively, when under IUA hereunder, the "EBS Spectrum Capacity") to be delivered to Clearwire under the terms of this Agreement.

(b)    Clearwire is making an initial payment under this Agreement that exceeds the value of the Initial Spectrum Capacity, but that includes additional consideration for the Option and the ROFR granted to Clearwire in this Agreement, and that also constitutes an advance payment toward Future Spectrum Capacity.

(c)    In addition to the Economic Royalties detailed in ARTICLE II, central to Licensee's grant of access to the Commercial Spectrum Capacity to Clearwire under an IUA is Clearwire's agreement and covenant to provide the Access Right Royalties and other benefits as detailed in ARTICLE III and as provided for in each IUA, which consists of, among other items (i) access to the Educational Reservation Basic Cost-Free Educational Accounts; (ii) access to the Additional Cost-Free Educational Accounts; (iii) the Limited Reciprocity rights; and (iv) the Preferred Content Provider rights, together with technology, facilities, equipment and other functionality from Clearwire and its Affiliates all as more specifically set forth in this Agreement and in the IUAs related thereto.

Section 1.02.  Overview of Mechanics and Structure of Agreements.

(a)    IUAs for Initial Spectrum Capacity.  In exchange for access to the Initial Spectrum Capacity made available to Clearwire pursuant to Individual Use Agreements in the form attached as Exhibit II hereto (individually, an "IUA") executed and delivered as of the Effective Date in accordance with the applicable closing procedure set forth in ARTICLE IV, Clearwire will provide at the times and in the manner set forth in each IUA and hereunder, the Economic Royalties set forth in ARTICLE II, together with the commitment to provide the bundle of rights and services set forth in ARTICLE III (identified collectively as the "Access Right Royalties").

(b)    Option for Future Spectrum Capacity.  Licensee grants Clearwire an option (the "Option") to enter into IUAs with Licensee in respect of any and all spectrum (including, but not limited to, the Commercial Spectrum Capacity, EBS and BRS) ("Spectrum") on FCC Licenses held by Licensee that is Available or that becomes Available during the Term, at prices

-6-

to be negotiated in good faith based on the fair market value ("FMV") of such Spectrum at the time the Option is to be exercised, provided, however, that the negotiated price shall not exceed $0.15 per MHz POP. The Option shall be exercisable in Clearwire's sole discretion each time Spectrum of Licensee or its Affiliates becomes Available during the Term. When Spectrum is acquired by Licensee or its Affiliates, or becomes Available for use by Clearwire under an IUA as Future Spectrum Capacity, Licensee shall immediately provide a written proposal (an "Option Notice") to Clearwire with the same information with respect to such proposed Commercial Spectrum Capacity as is set forth on Schedule A for the Initial Spectrum Capacity. Licensee shall also promptly provide such additional information with respect to the proposal as may be reasonably requested by Clearwire. If Clearwire is interested in negotiating the IUA with respect to such proposed Spectrum, Clearwire shall inform Licensee and the parties shall commence good faith negotiations within ten (10) days after Licensee's receipt of such notice and shall continue to negotiate in good faith for a period of not less than thirty (30) days; provided that Clearwire may terminate the negotiations at any time during such thirty-day period before the execution of the IUA. The negotiations shall include negotiations regarding the applicable FMV (which shall not, in any case, exceed $0.15 per MHz POP) . If the Parties do not reach agreement on the FMV for such proposed Spectrum within such thirty-day period, Clearwire's Option with respect to the specific Spectrum in question will terminate, but the provisions in Section 1.04 shall still apply with respect to such Spectrum in accordance with the terms of Section 1.04. Clearwire has no obligation to accept any proposed Spectrum other than the Initial Spectrum Capacity, except as provided in Section 1.02(c) with regard to Other Puerto Rico Transactions. If the Parties reach agreement on the terms of the IUA for Future Spectrum Capacity, the payment required under such IUA shall reduce the then remaining unapplied Prepaid Royalties Balance. If any IUA for Future Spectrum Capacity requires a payment that exceeds the then-current balance of the Prepaid Royalties Balance, Clearwire shall pay the difference to Licensee in cash at the applicable Subsequent Closing.

(c)    Puerto Rico Option. With respect to Commercial Spectrum Capacity of the Licensee in Puerto Rico ("Licensee PR Spectrum"), if Clearwire exercises the Option for any of Licensee's spectrum that is Available in Puerto Rico, Licensee shall have the right to require that all of Licensee PR Spectrum that is Available be included in the IUA as long as the price offered to Clearwire for such spectrum by Licensee is $0.15 per MHz POP or less; provided that, during the Term, and for twelve (12) months after the Term, if Clearwire enters into any lease (based on a 30 year lease) or purchase transaction for any other BRS or EBS  spectrum in the same or a "Substantially Similar" (as defined below) GSA in Puerto Rico (an "Other Puerto Rico Transaction"), or has already entered into or has any such Other Puerto Rico Transaction, Clearwire shall provide the terms of such transaction to Licensee within seven (7) days of consummation of the transaction, and Licensee shall have the option to accept the per MHzPOP price in such Other Puerto Rico Transaction if the Other Puerto Rico Transaction is for EBS spectrum, or the per MHzPOP price less 10% for BRS spectrum, and require that Clearwire execute IUAs for any of Licensee's Available Puerto Rico Spectrum in that GSA at that per MHzPOP price (the "Higher Price"); and further provided if the Other Puerto Rico Transaction

-7-

occurs after Licensee and Clearwire have executed IUAs for the Licensee PR Spectrum, and the price per MHzPOP paid in the Other Puerto Rico Transaction is higher than that paid to Licensee under the Puerto Rico Spectrum IUAs, then Clearwire shall promptly pay Licensee the difference between that paid to Licensee for the executed IUAs and that paid pursuant to the Other Puerto Rico Transaction for the Licensee Puerto Rico Spectrum in that GSA (the "Puerto Rico MFN Right"). In no event will Licensee be obligated to enter into IUAs for any of Licensee's Puerto Rico channels at the price per MHz Pop of less than $0.10. For purposes of this paragraph, a "Substantially Similar" GSA means a GSA the covers the same metropolitan are in Puerto Rico. In the event of an Other Puerto Rico Transaction for any San Juan, Puerto Rico GSA, Licensee shall receive the Higher Price for all MHzPOPs included in Licensee's Substantially Similar GSA and any overlapping GSAs, provided that Licensee shall not be entitled to receive the Higher Price for a greater number of MHzPOPs than contained in the San Juan, Puerto Rico GSA that is the subject of the Other Puerto Rico Transaction. (for example, if Clearwire acquires the San Juan, PR "F" group that covers 2,700,000 people ("POPs"), Licensee would be entitled to receive the Higher Price for the same number of POPs times MHz for which Licensee holds FCC licenses on the "B" channel Group covering the San Juan GSA, plus that number of MHz POPs for any other adjacent "B" channel groups that overlap the San Juan, PR "F" group, not to exceed the total number of MHz POPs covered by the San Juan, PR "F" Group.)

(d)     The Option shall be exercisable for any Licensee Spectrum in Clearwire's sole discretion each time such Licensee Spectrum becomes Available during the Term; provided that Clearwire's Option to acquire IUAs for Licensee PR Spectrum shall remain available to Clearwire and subject to the Puerto Rico MFN Right for not less than twelve (12) months without regard to the earlier expiration of the Term. Any outstanding Options shall lapse automatically upon the expiration of the Term, except to the extent that Clearwire has previously notified Licensee of its intention to exercise its Option with respect to such Spectrum prior to the expiration of the Term.

Section 1.03.   Service Affiliates.  Clearwire covenants and agrees to cause the entity providing each of the Access Right Royalties to the Licensee (each a "Service Affiliate") to assume the obligations of Clearwire hereunder with respect to the Access Right Royalties and to be jointly and severally liable therefore for the purpose of providing a direct contractual relationship between the Licensee and the Service Affiliates, including any other entity that over time becomes a Service Affiliate. The Service Affiliate and the Licensee shall execute such additional agreements as may be required to effectuate the provision of the applicable Access Right Royalty or other service, consistent with the terms hereof and the applicable IUA (any such agreement, a "Collateral Document"). Nothing in this Section 1.03 shall be construed to limit the primary obligation of Clearwire to provide the Access Right Royalties.

Section 1.04.   Right of First Refusal on IUAs.  The terms of this Section 1.04 shall apply to all Spectrum held by Licensee or any of its Affiliates during the Term, unless (1) Licensee has complied with the Section 1.02(b) Option Notice with respect to such Spectrum, and (2) the ROFR Offer (as defined below) does not call for payment of a lower price, or other  terms that

-8-

are more favorable to the third party, than those offered to Clearwire in connection with the Option referred to in Section 1.02(b). During the Term of this Agreement (the "ROFR Period"), Clearwire shall have a right of first refusal to use the Spectrum as set forth in this Section 1.04 and in Section 1.02(b). Upon the receipt by Licensee of any *bona fide* written offer (a "ROFR Offer") to purchase, lease, use or otherwise gain any access rights with respect to any of Licensee's Spectrum that Licensee desires to accept, Licensee shall transmit a written notice of the ROFR Offer to Clearwire (the "ROFR Offer Notice"). The ROFR Offer Notice (i) shall contain the name and address of the Person making the ROFR Offer, the payment structure therefore and a summary of all material terms of such ROFR Offer, and (ii) shall offer to Clearwire the option to enter into an IUA upon the terms and subject to the conditions of the proposed third party use or lease agreement as set forth in the ROFR Offer Notice. Clearwire shall then have the right for thirty (30) days to accept such ROFR Offer. If Clearwire accepts such ROFR Offer, Clearwire and Licensee shall enter into an IUA on such terms and conditions. If after such thirty (30) day period or upon earlier written notice Clearwire does not accept such ROFR Offer, its rights hereunder as to such ROFR Offer shall terminate and Licensee may for a period of sixty (60) days following the expiration of such thirty (30) day period enter into an agreement with the original offering party on the same terms and conditions as were offered to Clearwire. If after such sixty (60) day period, Licensee does not enter such an agreement with the original offering party, the Clearwire right of first refusal described in this Section shall again apply for such timing remaining in the ROFR Period. If the ROFR Offer Notice provides that any consideration is to be paid by the third person in whole or in part in a form other than cash, Clearwire accepts the ROFR Offer, and Clearwire is able to provide or procure comparable non-cash consideration using commercially reasonable efforts, Clearwire will so provide or procure such non-cash consideration. In the event Clearwire is unable to provide or procure comparable non-cash consideration, Clearwire may substitute, in whole or in part, for non-cash consideration an amount in cash fairly equivalent to the then fair market value of the non-cash consideration payable by the third person. The ROFR Offer acceptance must specify the amount of any such substitute cash consideration and the non-cash consideration for which it is intended to substitute. If Licensee disputes that the substitute cash consideration specified by Clearwire is in an amount fairly equivalent to the fair market value of the non-cash consideration payable by the third person, Licensee must within fifteen (15) days after the receipt of the ROFR Offer acceptance provide Clearwire with written notice specifying the amount Licensee considers to be fairly equivalent to the fair market value of the non-cash consideration payable by the third person (the "Counter Offer"). The question of fair market value of the non-cash consideration will be resolved pursuant to arbitration under this Agreement unless Clearwire gives Licensee written notice within fifteen (15) days after its receipt of the Counter-Offer that Clearwire agrees to enter into an agreement containing the fair market value set forth in the Counter-Offer.

## ARTICLE II.

## ECONOMIC ROYALTIES

Section 2.01.  EBS Spectrum Capacity Economic Royalties.  Clearwire shall cause to be paid to the Licensee the amount of Twenty Three Million Dollars ($23,000,000.00) (the "Prepaid Royalties") upon execution of this Agreement.  The Prepaid Royalties shall be applied as provided in Section 1.02(b), against amounts otherwise due from Clearwire to Licensee with respect to IUAs for Initial Spectrum Capacity and Future Spectrum Capacity.

Section 2.02.  Refunding of Prepaid Royalties. Within five calendar  days after the expiration or termination of the Term of this Agreement for any cause, Licensee shall refund Clearwire the full balance of Prepaid Royalties less any portion of the Prepaid Royalties that has been applied against royalties due under fully executed IUAs for Initial Spectrum Capacity and Future Spectrum Capacity (at any time the "Prepaid Royalties Balance"); provided that the Term shall not be deemed to have expired for this purpose during a period that the Option periods described in Section 1.02(b) have not terminated.  Clearwire has the right, in its sole discretion, to extend the date on which the Prepaid Royalties Balance must be refunded. If Clearwire decides to grant such an extension, the Term of this Agreement shall be extended accordingly and the terms of this Agreement shall continue in full force and effect.

## ARTICLE III.

## ACCESS RIGHT ROYALTIES

Section 3.01.  Access Right Royalties.  Clearwire shall provide the Access Right Royalties described in this ARTICLE III from and after the Commencement Date of an IUA hereunder.   The Access Right Royalties will be provided in a manner consistent with the way the Access Right Royalties are provided by Clearwire to third parties under agreements that provide for Access Right Royalties similar to the Access Right Royalties provided in this Agreement. Notwithstanding the preceding sentence, the Parties acknowledge that Licensee currently provides, and intends to provide, a variety of digital educational services utilizing the spectrum in Puerto Rico, a market of special importance to Licensee, and if the Option is exercised with respect to Licensee PR Spectrum, Clearwire agrees to (in good faith) consider and use its commercially reasonable best efforts to enter into a joint venture with Licensee in the development and delivery of Licensee's services in Puerto Rico to Educational End Users, which services may be different from services provided in other markets, if such joint venture involves the purchase of services from Clearwire at greater than Clearwire's lowest wholesale price in the market for such services.

Section 3.02.  Cost-Free Educational Accounts.

-10-

71361919.3

(a)    Included in the Access Right Royalties provided to Licensee, Licensee shall be entitled to Cost-Free Educational Accounts as provided in this <u>Section 3.02</u>, <u>Section 3.03</u>, and <u>Section 3.04</u>.

(b)    "<u>Cost-Free Educational Account</u>" means a wireless broadband connection that Clearwire provides to Licensee without charge or expense to Licensee.  Cost-Free Educational Accounts shall have the same capacity and characteristics as the highest level of premium mass market retail service provided on Clearwire's network in a given Market Area.  Multiple individuals that are associated with an Educational End User at the time may share the same Cost-Free Educational Account through Wi-Fi hotspots, local area networks, and other means.  To the extent not inconsistent with the terms of this Agreement and the applicable IUA, the Cost-Free Educational Accounts shall be subject to the terms of Clearwire's then generally applicable Acceptable Use Policy.  The Cost-Free Educational Accounts shall be fully portable anywhere within the Clearwire National Platform to the extent that Clearwire offers such portability to any customer.

Section 3.03.   <u>Educational Reservation Basic Cost-Free Education Accounts</u>.

(a)    In respect of Licensee's educational reservation covering the five percent (5%) educational spectrum capacity currently required by the FCC Rules pertaining to the FCC Licenses (the "<u>Educational Reservation</u>"), Licensee shall be permitted to utilize the Educational Reservation in such locations served by the Clearwire National Platform on a full time basis as Licensee desires for its operations.  Clearwire and Licensee shall at all times comply with applicable FCC Rules.  Clearwire may not use the Educational Reservation.  In the event that the Parties cannot agree on the application of any new rule or interpretation regarding the Educational Reservation in their circumstances, the Parties shall jointly approach the FCC for clarification in a timely fashion and, to the extent the matter remains unresolved thereafter, shall settle the matter applying the Dispute Resolution Procedure.

(b)    Initially, Clearwire shall provide Licensee one (1) Cost-Free Educational Account per Cell Site per Market Area (each a "<u>Basic Cost-Free Education Account</u>").  The number of Cost-Free Educational Accounts shall be adjusted upward every five years proportionate to the growth of the overall data capacity of Clearwire's network in the Market Area where the EBS system is located.  The growth (if any) in the overall data capacity shall be determined as measured by its average throughput.  The average throughput measurement shall be made in such fashion as shall be agreed by the Parties, or (if the Parties fail to reach agreement with respect to such measurement) as determined by arbitration, using metrics that are as consistent as possible with those utilized at the time of the immediately prior average throughput measurement.

Section 3.04.   <u>Additional Cost-Free Educational Accounts</u>.  In addition to, and not in lieu of, the Cost-Free Educational Accounts provided to Licensee by Clearwire pursuant to the Educational Reservation as set forth in <u>Section 3.03</u>, Clearwire shall provide Licensee with

-11-

additional Cost-Free Educational Accounts in the number computed in accordance with this Section 3.04 (the "Additional Cost-Free Educational Accounts").

(a)     Number and Periodic Adjustment.   Licensee will have access to additional spectrum capacity on Clearwire's network in Licensee's Market Area in the form of Cost-Free Educational Accounts for use on the Clearwire National Platform equal to the greater of (X) two (2) Cost-Free Educational Accounts per Sector in the Market Area where Licensee holds an FCC License to operate an EBS system and (Y) the quantity of Cost-Free Educational Accounts determined by applying the Formula Quantity.  The number of Additional Cost Free Educational Accounts that Clearwire is obligated to provide to Licensee shall be recalculated and revised annually as of January 31 of each calendar year.

(i)     The "Formula Quantity" as of any date, is equal to the product obtained by multiplying: (a) the Local Channel Ratio by (b) 0.05, by (c) the number of subscribers served by Clearwire in the Market Area as of the end of the previous calendar year. In the event that this product is a fraction, it shall be rounded up or down to the nearest whole number, where the "Local Channel Ratio" is the fraction obtained by dividing the number of EBS channels provided to Clearwire by Licensee under IUA in a given Market Area as of the date of the calculation by the total number of EBS and BRS channels with substantially overlapping GSAs then used to provide service in such Market Area licensed to or under a use agreement with Clearwire (including those of Licensee) as of that date.

(ii)     Educational End Users.  Cost-Free Educational Accounts shall be exclusively for Educational End Users and not for resale, assignment or transfer by Licensee outside of its Educational End User environment or to persons who cease to be officially associated with such Educational End User. (By way of example, a university may resell the service to its students, faculty, administrators and staff, while such persons are involved with the university, but shall cease to provide the service if a member of the faculty terminates employment or a student graduates and ceases to be involved in university matters.)

(b)     Time of Delivery.  The Additional Cost-Free Educational Accounts shall be provided by Clearwire to Licensee pursuant to this Section 3.04(b) upon the commercial launch of Clearwire's broadband wireless service in any Market Area where Licensee has an EBS Spectrum Capacity IUA in place with Clearwire, or the applicable Commencement Date thereof if later.

Section 3.05.   Licensee MVNO.

(a)     In addition to the right to Cost-Free Educational Accounts, Licensee shall have the right to resell the Clearwire service in the form of MVNO Educational Accounts to additional Educational End Users in each Market Area for use on the Clearwire National Platform.  An "MVNO Educational Account" shall have the identical characteristics as a Cost-Free Educational Account under Section 3.02(b), except that there shall be a charge to Licensee

713619193

as determined pursuant to this <u>Section 3.05</u>. Clearwire shall sell to Licensee such services, at a cost equal to the lowest wholesale rate provided by Clearwire to an arms-length third party in such Market Area or other comparable market pursuant to any applicable agreement. However, the number of MVNO Educational Accounts is limited in each Market Area to twice the number of Cost-Free Educational Accounts for that Market Area.

(b)    <u>Mechanics</u>. The resale of Clearwire's services pursuant to this <u>Section 3.05</u> shall be accomplished pursuant to a standard Clearwire wholesale agreement form drafted in a manner consistent with the terms of this Agreement and the applicable IUA, which will be provided to any Licensee requesting the right to resell an MVNO Educational Account to an Educational End User. Such arrangement shall be executed not later than thirty (30) days after the availability of such services.

Section 3.06.    <u>Access to Educational End User Devices</u>. Clearwire shall also make any end-user equipment used in the Clearwire National Platform available for purchase by Licensee at 10% above Clearwire's cost to acquire such end-user equipment. Equipment provided to Licensee pursuant to this section shall be used solely by Educational End Users and not for resale.

Section 3.07.    <u>Sharing of Features and Service Sets</u>. Licensee shall have access to, and full use of, system capabilities, services and feature sets that are generally provided to Clearwire's retail customers or wholesalers to mass market customers. Licensee shall have access to reasonably necessary support made available to Clearwire's commercial customers generally, and that is reasonably necessary for the Licensee to offer services to its Educational End Users as contemplated by their agreement. The Licensee shall have access to new capabilities, features and service sets within six months of the time that Clearwire makes them available to customers generally, but not earlier than the Commencement Date with respect to any particular IUA.

Section 3.08.    <u>Preferred Content Provider</u>.

(a)    <u>Scope</u>. In the event that Clearwire provides third party content to customers over its network in any Market Area where Licensee is a party to an EBS Spectrum Capacity IUA, Licensee shall be a "<u>Preferred Content Provider</u>" over such network in that Market Area. As a Preferred Content Provider, Licensee shall have the same degree of access to, and use of, any system capability, service or feature set that is provided to premium third party content providers.

(b)    <u>Service Sets and Features.</u> To the extent that Clearwire's most favored program suppliers pay for features and/or service sets, Licensee shall pay an equal amount for equal features and/or service sets to the extent that Licensee elects to utilize them. Licensee agrees that the programming that Licensee supplies to customers through Clearwire's network

-13-

will be educational in nature. Licensee agrees not to resell Clearwire's network access, features and/or service sets to third parties, except in accordance with Sections 3.04(a)(ii) and 3.05.

(c)     Capacity Constraints. Clearwire reserves the right to restrict the use of the capabilities and services made available to the Licensee as a Preferred Content Provider under this Section 3.08 if such use is no longer commercially and technically feasible due to limitations in network capabilities. Clearwire shall comply with the provisions of ARTICLE III to ensure timely access to information about capacity usage and permit Licensee a reasonable opportunity to secure alternative access.

Section 3.09.    Limited Reciprocity Access. Clearwire shall use its commercially reasonable best efforts to secure for Licensee, in the event that Clearwire enters into a relationship with a video/audio content distribution entity (e.g., DirecTV), that Licensee is accorded reciprocity with carriage of one ordinary unpaid channel carried on such entity's basic tier ("Limited Reciprocity"). Licensee will not be paid any royalty or other consideration for providing such content to such distribution entity's subscriber base. Any incremental out-of-pocket costs Clearwire incurs exclusively for the benefit of Licensee that are related to developing a relationship with such video/audio content distribution entity for Licensee (and excluding its administrative and legal costs) will be passed along to Licensee, and Licensee will have the option of paying such costs and taking the reciprocity.


ARTICLE IV.

CLOSING MECHANICS; ESCROW

Section 4.01.    Deliveries at Execution of this Agreement. On the Effective Date of this Agreement, Clearwire and the Licensee shall take the following actions required of it by subsections (a) through (c) hereof.

(a)     Licensee. Licensee shall deliver or cause to be delivered to Clearwire each of the following, duly executed by an authorized representative of Licensee: (i) one IUA completed in accordance with this Agreement with respect to each Market comprising the Initial Spectrum Capacity; (ii) the Stock Pledge Agreement attached to this Agreement as Exhibit III, and all additional documents required under the Stock Pledge Agreement; and (iii) the certificate(s) of Licensee described in Section 4.01(c). Licensee shall have specified on Schedule 4.01 attached hereto its wire account (each a "Wire Account"), which Wire Account shall be included in the applicable IUA. Absent notice of different instructions, all cash payments to be made as provided on Schedule A, and as otherwise reflected in the applicable IUA or this Agreement to be paid to Licensee, shall be to such Wire Account in immediately available funds.

-14-

(b)    Clearwire.  Clearwire shall deliver or cause to be delivered to the Licensee each of the following, duly executed by an authorized representative of Clearwire: (i) one IUA completed in accordance with this Agreement with respect to each Market comprising the Initial Spectrum Capacity; (ii) its certificate described in Section 4.01(c); and (iii) the Upfront Royalty provided for in the applicable EBS Spectrum Capacity IUA as reflected on Schedule A.

(c)    Officers Certificates.  In connection with the execution of this Agreement, each Party shall deliver to each other Party, in each case certified as of the Effective Date of this Agreement by an authorized officer of the delivering Party, (A) a copy of the resolutions of the board of directors of the delivering Party authorizing the execution, delivery and performance of this Agreement and (B) a certificate of incumbency, with signatures of the officers of such Party authorized to execute and deliver this Agreement.

Section 4.02.    EBS Spectrum Capacity IUA Closing(s).

(a)    Initial Closing.  Subject to the terms and conditions set forth in this Agreement, the closing of the transactions provided in this Agreement, including with respect to IUAs for the Initial Spectrum Capacity that are executed on the date hereof (each an "Initial Closing"), shall take place on the Effective Date of this Agreement (the "Initial Closing Date").

(b)    Subsequent Closings.  Subject to the terms and conditions set forth in this Agreement, the closing of IUAs for Future Spectrum Capacity as provided in this Agreement shall take place as specified in the applicable IUAs when the Parties reach agreement on the pricing of such Future Spectrum Capacity IUAs, at which time an EBS Spectrum Capacity IUA shall be executed (each a "Subsequent Closing"), which date shall be the Effective Date for that IUA (the "Subsequent Closing Date").

(c)    Closing Conditions.

(i)    Conditions to Each Party's Obligations at a Closing.  The respective obligations of each Party to effect execution and closing of an EBS Spectrum Capacity IUA at the Initial Closing or at any Subsequent Closing shall be subject to the satisfaction on or prior to the applicable Closing Date of the following condition with respect to that EBS Spectrum Capacity IUA.

(1)    No Injunctions or Restraints.  No temporary restraining order, preliminary or permanent injunction or other order issued by any court or other Government Agency of competent jurisdiction preventing the consummation of the transactions contemplated in the applicable IUA or under this Agreement as it relates to such IUA; provided, however, that prior to invoking this condition, each Party hereto shall use all commercially reasonable efforts to have any such injunction or other order vacated.

-15-

(ii)    <u>Conditions to the Obligations of Clearwire</u>.  The obligations of Clearwire to effect any Closing of an IUA hereunder shall be subject to the satisfaction at or prior to the applicable Closing Date of such IUA of each of the following conditions, any of which may be waived, solely in writing, and exclusively by Clearwire:

(1)    <u>Representations and Warranties</u>.  The representations and warranties of the Licensee contained in the IUA shall be true and correct in all material respects as of the Effective Date of such IUA.

(2)    <u>Officer Certificates</u>.  Clearwire shall have received copies, in each case certified as of the applicable Closing Date by an authorized officer of Licensee, of (i) the resolutions of the board of directors of the Licensee, authorizing the execution, delivery and performance of the IUA, (ii) the signature and incumbency of the officers of the Licensee authorized to execute and deliver the IUA, and (iii) certifying that the representations and warranties of the Party to be made under the IUA are true and correct.

(iii)    <u>Conditions to Obligations of Licensee</u>.  The obligations of Licensee to effect any Closing of an EBS Spectrum Capacity IUA hereunder shall be subject to the satisfaction at or prior to the applicable Closing Date of such IUA of each of the following conditions, any of which may be waived, solely in writing, and exclusively by Licensee:

(1)    <u>Representations and Warranties</u>.  The representations and warranties of Clearwire contained in the IUA shall be true and correct in all material respects as of the Effective Date of such IUA.

(2)    <u>Officer Certificates</u>.  Licensee shall have received copies, in each case certified as of the applicable Closing Date by an authorized officer of Clearwire, of (i) the resolutions of the board of directors of Clearwire and each Clearwire Affiliate that is a Party hereto, authorizing the execution, delivery and performance of the IUA, (ii) the signature and incumbency of the officers of Clearwire authorized to execute and deliver the IUA, and (iii) certifying that the representations and warranties of the Party to be made under the IUA are true and correct.

Section 4.03.    <u>Closing Site/Mechanics</u>.  Each of the Closings will occur by electronic delivery procedure agreed by the Parties, provided that the Initial Closing shall take place at the offices of Davis Wright Tremaine LLP, Seattle, Washington.

Section 4.04.    <u>Further Assurances</u>.  Upon the terms and subject to the conditions of this Agreement, each of the Parties hereto shall use its reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable consistent with applicable law to consummate and make effective in the most expeditious manner practicable the Closing of each IUA and compliance with the obligations therein and herein in respect of each such IUA.

-16-

ARTICLE V.

REPRESENTATIONS AND WARRANTIES OF LICENSEE

Licensee hereby represents and warrants to Clearwire and Clearwire Parent that:

Section 5.01.  <u>Organization and Good Standing</u>.  It is a nonprofit corporation duly organized, validly existing and in good standing under the laws of its state of organization and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.  Except as disclosed in <u>Schedule 5.01</u>, it is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property or FCC Licenses and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing does not have and would not reasonably be expected to have a Licensee Material Adverse Effect.

Section 5.02.  <u>Authorization of Agreement</u>.  It has all requisite corporate power and authority (i) to enter into, deliver and carry out the transactions contemplated by this Agreement (the "<u>Transactions</u>") and each other agreement, document, or instrument or certificate contemplated by this Agreement to be delivered on the date thereof, (ii) to enter into and deliver all documents required or necessary to be executed by it in connection with the consummation of the Transactions on the date hereof (collectively the "<u>Licensee Documents</u>"), and (iii) to consummate the Transactions taking place on the date hereof.  This Agreement has been and the Licensee Documents when delivered will be duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes and the Licensee Documents will constitute when delivered the legal, valid and binding obligations of Licensee, enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.03.  <u>No Conflict</u>.  Except as set forth on <u>Schedule 5.03</u>:

(a)    Neither the execution and delivery by Licensee of this Agreement or the Licensee Documents, nor compliance by Licensee with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the Governing Documents of Licensee, (ii) conflict with, violate, result in the breach of, constitute (with or without due notice, lapse of time or both) a default under, result in the acceleration of, create in any Party the rights to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any note, bond, mortgage, indenture, license, agreement or other obligation to which Licensee is a party or by which Licensee or any of its properties or assets is bound or (iii) violate any statute,

-17-

rule, regulation, order or decree of any Government Agency or authority by which Licensee is bound, except in the cases of clauses (ii) and (iii) for such violations, breaches or defaults as would not, individually or in the aggregate, have a Licensee Material Adverse Effect.

(b)     No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Government Agency is required on the part of Licensee in connection with the execution and delivery of this Agreement or the Licensee Documents or the compliance by Licensee with any of the provisions hereof or thereof, except as contemplated herein or therein.

Section 5.04.  <u>Litigation</u>.  Except as set forth on <u>Schedule 5.04</u> and other than Proceedings of general applicability and those related to market transitions ("<u>FCC Proceedings</u>"), there is no Proceeding now in progress or pending or, to the knowledge of Licensee, threatened against Licensee or the assets (including the intellectual property rights) or the business of Licensee, nor to the knowledge of Licensee, does there exist any basis therefore, except for immaterial claims brought against Licensee in the ordinary course of business.

Section 5.05.  <u>Compliance with Laws; Permits</u>.  Excepting the markets listed on <u>Schedule 5.05</u> and only to the best knowledge of the Licensee, assuming compliance in all material respects with the Communications Act and FCC Rules by other parties to a Third Party Agreement where and during the time access to the Commercial Spectrum Capacity has been governed by such Third Party Agreement, in respect of all licenses, including those otherwise subject to Third Party Agreements, Licensee (a) has complied in all respects with all federal, state, and local laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Licensee Material Adverse Effect and (b) has all federal, state, and local governmental Permits necessary in the conduct of its business as currently conducted and to own and use its assets in the manner in which such assets are currently owned and used other than where the failure to possess such Permits would not, individually or in the aggregate, reasonably be expected to have a Licensee Material Adverse Effect, such Permits are in full force and effect, and no violations have been recorded in respect of any such Permit, and no proceeding is pending or, to the best knowledge of Licensee, threatened to revoke or limit any such Permit.

Section 5.06.  <u>Brokers</u>.  Neither Licensee nor any of its directors, officers, employees, or representatives has employed any broker or finder in connection with the Transactions.

Section 5.07.  <u>Knowledge</u>.  Any representation, warranty, covenant, obligation, or part thereof that states that it is made to the best knowledge of Licensee is made to its best knowledge after commercially reasonable investigation and includes all facts which it knew or should have known as a result of such investigation, including the best knowledge of Licensee's executive officers and legal counsel after commercially reasonable investigation.

-18-

ARTICLE VI.

REPRESENTATIONS AND WARRANTIES OF CLEARWIRE

Clearwire hereby represents and warrants to Licensee that:

Section 6.01.   Organization and Good Standing.  Clearwire Parent is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and Clearwire is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada.  Each has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Clearwire is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing does not have and would not reasonably be expected to have a Clearwire Material Adverse Effect.

Section 6.02.   Authorization of Agreement.  Each of Clearwire Parent and Clearwire has all requisite corporate power and authority (i) to enter into, deliver and carry out the Transactions, each IUA and each other agreement, document, or instrument or certificate contemplated by this Agreement, (ii) to enter into and deliver all documents required or necessary to be executed by it in connection with the consummation of the Transactions (collectively the "Clearwire Documents"), and (iii) to consummate the Transactions.  This Agreement has been and the Clearwire Documents will be when delivered duly and validly executed and delivered by Clearwire and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes and the Clearwire Documents will constitute when delivered the legal, valid and binding obligations of Clearwire, enforceable against it in accordance with their terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.03.   No Conflict.

(a)      Neither of the execution and delivery by Clearwire of this Agreement and of the Clearwire Documents, nor the compliance by Clearwire with any of the provisions hereof or thereof will (i) conflict with, or result in the breach of, any provision of the Governing Documents of Clearwire, (ii) conflict with, violate, result in the breach of, or constitute (with or without due notice, lapse of time or both) a default under, result in the acceleration of, create in any Party the rights to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any note, bond, mortgage, indenture, license, agreement or other obligation to which Clearwire is a party or by which Clearwire or any of its properties or assets are bound or

-19-

(iii) violate any statute, rule, regulation, order or decree of any Government Agency by which Clearwire is bound, except, in the case of clauses (ii) and (iii), for such violations, breaches or defaults as would not, individually or in the aggregate, have a Clearwire Material Adverse Effect.

(b)    No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any Person or Government Agency is required on the part of Clearwire in connection with the execution and delivery of this Agreement or the Clearwire Documents or the compliance by Clearwire with any of the provisions hereof or thereof, except that in connection with the execution of the IUAs executed pursuant to this Agreement, Clearwire will prepare and file spectrum lease applications for approval by the FCC.

Section 6.04.    Litigation.    Except as would not reasonably be expected to have a materially adverse effect on the ability of Clearwire to close hereunder or as set forth on Schedule 6.04, (a) there is no Proceeding now in progress or pending or, to the knowledge of Clearwire, threatened against Clearwire or the assets or the business of Clearwire and (b) Clearwire is not subject to any order, writ, injunction or decree of any court or other Government Agency.

Section 6.05.    Compliance with Laws; Permits.    Clearwire (a) has complied in all respects with all federal, state, and local laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Clearwire Material Adverse Effect and (b) has all federal, state, and local governmental Permits necessary in the conduct of its business as currently conducted and to own and use its assets in the manner in which such assets are currently owned and used other than where the failure to possess such Permits would not, individually or in the aggregate, reasonably be expected to have a Clearwire Material Adverse Effect, such Permits are in full force and effect, and no violations have been recorded in respect of any such Permit, and no proceeding is pending or, to the best knowledge of Clearwire, threatened to revoke or limit any such Permit, , except that in connection with the execution of the IUAs executed pursuant to this Agreement, Clearwire will prepare and file spectrum lease applications for approval by the FCC.

Section 6.06.    Brokers.    Neither Clearwire nor any of its directors, officers, employees or representatives has employed any broker or finder in connection with the Transactions.

ARTICLE VII.

COVENANTS

Section 7.01.    Consents and Approvals.    Clearwire shall use its  commercially reasonable efforts to obtain, and shall cooperate with Licensee and assist Licensee in obtaining, all consents, waivers, amendments, modifications, approvals, authorizations, permits and licenses which are

-20-

required to be obtained by Clearwire and the Licensee to effectuate this Agreement. Licensee shall use its respective commercially reasonable efforts to obtain, and shall cooperate with Clearwire and assist Clearwire in obtaining, all consents, waivers, amendments, modifications, approvals, authorizations, permits and licenses which are required to be obtained by Clearwire and/or Licensee to effectuate this Agreement.

Section 7.02. <u>Notice of Breach</u>. Licensee shall promptly give Clearwire written notice of any matter that becomes known to Licensee which Licensee determines is reasonably likely to constitute a breach of any representation, warranty, agreement or covenant of Licensee contained in this Agreement. Clearwire and Clearwire Parent shall promptly give the Licensee written notice of any matter that becomes known to them which Clearwire or Clearwire Parent determines is reasonably likely to constitute a breach of any representation, warranty, agreement or covenant of Clearwire or Clearwire Parent contained in this Agreement.

Section 7.03. <u>Maintenance of FCC Qualifications</u>. The provisions of this <u>Section 7.03</u> apply only to spectrum that has not been subject to an IUA. Except as such qualifications may be affected by this Agreement or one or more IUAs entered into pursuant to this Agreement, Licensee hereby covenants and agrees that it shall maintain all necessary qualifications to hold and to obtain renewal in the ordinary course of any FCC License, subject to Clearwire's obligation to cause Licensee's FCC License to timely meet the substantial service requirement and to comply with FCC Rules in its use and access to the licensed spectrum, as such qualifications may be amended or modified from time to time (individually an "<u>FCC Qualification</u>" and collectively referred to as the "<u>FCC Qualifications</u>"), and further covenants that it shall not knowingly or negligently take any action, or fail to take any action, which action or failure to act creates a material risk that Licensee shall lose any FCC Qualification; *provided, that* in the event that the FCC or any other legal authority shall at any time specify new or different qualifications or conditions for the maintenance of any FCC Qualification or shall issue a pronouncement offering a new interpretation of an FCC Qualification, Clearwire shall reimburse on demand Licensee's reasonable expenses of taking such action as are required for Licensee to bring itself and its operations into compliance with such new or different qualifications or conditions; *provided, further,* that it shall not be deemed a breach of this sentence if Licensee loses an FCC Qualification as a result, in whole or in part, of an act or omission of Clearwire or any failure of Clearwire to perform its obligations under this Agreement or any IUA. If, at any time, Licensee fails, or it appears to said Licensee more likely than not that it will fail, to maintain any one or more of its FCC Qualifications with respect to any of its FCC Licenses or its operations pursuant thereto, Licensee shall give written notice to Clearwire within five (5) days after Licensee becomes actually aware that (i) it no longer maintains such FCC Qualifications or (ii) with the passage of time or upon the occurrence of a future event it will no longer maintain such FCC Qualifications (referred to as a "<u>Disqualification Event</u>"). Licensee shall cooperate with reasonable requests of Clearwire made from time to time for the purpose of verifying, at Clearwire's expense, that Licensee maintains its FCC Qualifications. Upon the occurrence of a Disqualification Event, the affected Licensee shall, at Clearwire's expense, promptly undertake all reasonable actions to obtain, to the extent

-21-

permitted by applicable law, a waiver from the FCC regarding the circumstances giving rise to such Disqualification Event or to cure the circumstances giving rise to such Disqualification Event.

Section 7.04.   <u>Assignment of FCC Licenses</u>. The provisions of this <u>Section 7.04</u> apply only to spectrum that has not been subject to an IUA.  Licensee may assign the FCC License to any entity that is eligible under FCC Rules to hold the FCC License, who is reasonably acceptable to Clearwire and who assumes Licensee's prospective obligations under this Agreement, whereupon Licensee shall be forever relieved of such prospective obligations. Clearwire and Licensee agree that it is reasonable for Clearwire to reject a proposed assignee where the proposed assignee or its affiliate competes with Clearwire's offering over EBS or BRS spectrum.  In the event that Licensee desires to assign its FCC License to another entity, Licensee shall inform Clearwire in writing of the identity of such entity and within twenty (20) days of such notice Clearwire shall inform Licensee in writing of whether Clearwire consents to such assignment or refuses to consent to such assignment and, if it refuses, the reason(s) it is relying upon for such refusal.  Notwithstanding the foregoing, Licensee may, without the prior consent of Clearwire, sell, assign, sublease, delegate or transfer this Agreement or any of its rights or obligations hereunder to any of Licensee's affiliates controlled by or under common control with Licensee.

Section 7.05.   <u>Other FCC Requirements</u>.  In carrying out this Agreement, the Parties will comply at all times with applicable laws, as well as rules and policies of the FCC.  The Parties believe that the provisions of this Agreement comply with all current FCC rules and policies, and agree not to express any contrary view to regulatory agencies or the general public.

Section 7.06.   <u>Fees and Taxes</u>.  Until the end of the term of the IUA that is the last to expire, Clearwire shall pay all fees and taxes (now existing or hereafter arising) imposed on Licensee as a result of the licensing, regulation or use of Licensee's EBS Spectrum by Clearwire or Licensee, including, without limitation, any Federal spectrum, USF and/or regulatory fees that may be imposed on EBS Spectrum in the future.

Section 7.07.   <u>Best Efforts for Duration of Relationship</u>.  The Parties acknowledge that there will be many changes in the course of the term of the IUAs in technology, capabilities, and regulatory environment and other relevant areas, and the Parties covenant and agree to act in a cooperative manner to preserve the intent of the relationships reflected in this Agreement to their mutual advantage and to use their commercially reasonable best efforts to maintain that mutual advantage in accordance with the initial intent of the Parties.

ARTICLE VIII.

INDEMNIFICATION

Section 8.01.   <u>Indemnification</u>

-22-

      (a)     Licensee shall indemnify Clearwire, its Affiliates, and each of their respective stockholders (other than Licensee), directors, officers, employees, agents, successors and assigns (collectively, the "Clearwire Indemnified Parties") and hold each of the Clearwire Indemnified Parties harmless from and against any and all Damages based upon, attributable to or resulting from:

           (i)     The failure of any representation or warranty of Licensee set forth in ARTICLE V hereof, or any representation or warranty contained in any certificate delivered by or on behalf of Licensee pursuant to this Agreement, to be true and correct as of the dates made; and

           (ii)     The breach of any covenant or other agreement on the part of Licensee under this Agreement.

      (b)     Clearwire shall indemnify the Licensee, its Affiliates, and each of its agents, successors and assigns (collectively, the "Licensee Indemnified Parties") and hold the Licensee Indemnified Parties harmless from and against any and all Damages based upon, attributable to or resulting from:

           (i)     The failure of any representation or warranty of Clearwire set forth in ARTICLE VI hereof, or any representation or warranty contained in any certificate delivered by or on behalf of Clearwire pursuant to this Agreement, to be true and correct as of the dates made;

           (ii)     The breach of any covenant or other agreement on the part of Clearwire under this Agreement; and

           (iii)     The operation of equipment by, the provision of service by or otherwise related to the activities of Clearwire, any of its Affiliates or any of its sublicensees or resellers including, without limitation, damage to health.

      Section 8.02.   Determination of Damages.  As used herein, "Damages" means any and all losses, claims, demands, liabilities, obligations, actions, suits, orders, statutory or regulatory compliance requirements, or proceedings asserted by any Person, and all damages, costs, expenses, assessments, judgments, recoveries and deficiencies, including interest, penalties, investigatory expenses, consultants' fees, and reasonable attorneys' fees and costs, of every kind and description, contingent or otherwise.  For purposes of the above, the amount of Damages in respect of any breach of a representation or warranty shall be determined without regard to any limitation or qualification as to materiality, Licensee(s) Material Adverse Effect, Clearwire Material Adverse Effect, knowledge or similar language set forth in such representation or warranty.

Section 8.03.  Limitations on Indemnification for Breaches of Representations and Warranties.  An indemnifying Party shall not have any liability under Section 8.01(a)(i) or Section 8.01(b)(i) hereof unless the aggregate amount of Damages to the indemnified Parties finally determined to arise thereunder based upon, attributable to or resulting from the failure of any representation or warranty to be true and correct or the breach of any covenant, exceeds $10,000 in the aggregate (the "Deductible") and, in such event, the indemnifying Party shall be required to pay the amount of such Damages including those used to compute the Deductible.

Section 8.04.  Indemnification Procedures

(a)     In the event that any claim shall be asserted by any Person in respect of which payment may be sought under Section 8.01 hereof (regardless of the Deductible referred to above) (each, a "Claim"), the indemnified Party shall reasonably and promptly cause written notice (a "Claim Notice") of the assertion of any Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying Party.  The indemnifying Party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified Party, and to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder.  If the indemnifying Party elects to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder, it shall within five (5) days of the delivery of the Claim Notice (or sooner, if the nature of the Claim so requires) notify the indemnified Party of its intent to do so.  If the indemnifying Party elects not to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder, fails to notify the indemnified Party of its election as herein provided or contests its obligation to indemnify the indemnified Party for such Damages under this Agreement, the indemnified Party may defend against, negotiate, settle or otherwise deal with such Claim.  If the indemnified Party defends any Claim, then the indemnifying Party shall reimburse the indemnified Party for the expenses of defending such Claim upon submission of periodic bills.  If the indemnifying Party shall assume the defense of any Claim, the indemnified Party may participate, at his or its own expense, in the defense of such Claim; *provided, however*, that such indemnified Party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying Party if, so requested by the indemnifying Party to participate or in the reasonable opinion of counsel to the indemnified Party, a conflict or potential conflict exists between the indemnified Party and the indemnifying Party that would make such separate representation advisable; and *provided, further*, that the indemnifying Party shall not be required to pay for more than one such counsel for all indemnified Parties in connection with any Claim.  The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation, or settlement of any such Claim.

(b)     After any final judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified Party and the indemnifying Party shall have arrived at a mutually binding agreement

-24-

with respect to a Claim hereunder, the indemnified Party shall forward to the indemnifying Party notice of any sums due and owing by the indemnifying Party pursuant to this Agreement with respect to such matter.

(c)    The failure of the indemnified Party to give reasonably prompt notice of any Claim shall not release, waive or otherwise affect the indemnifying Party's obligations with respect thereto except to the extent that the indemnifying Party can demonstrate actual loss and prejudice as a result of such failure.

## ARTICLE IX.

## TERM AND TERMINATION

Section 9.01.  Term; Termination.  The term of this Agreement (the "Term") will commence on the Effective Date and will continue until the earlier of (1) eighteen (18) months after the Effective Date, (2) the date on which Clearwire has used all of the Prepaid Royalties for accessing Future Spectrum Capacity pursuant to this agreement, or (3) the date on which Licensee has returned to Clearwire (in cash) the entire amount of the Prepaid Royalties that has not been used for accessing Future Spectrum Capacity pursuant to this Agreement. Clearwire shall have the right, in its sole discretion, to extend the Term at any time prior to its expiration under clause (1) above; provided, that the Term shall not extend beyond the first to occur of the events described in clauses (2) or (3) above except as it pertains to Puerto Rico . This Agreement may be terminated prior to expiration of the Term under any of the following circumstances: (i) by mutual written agreement of the parties; (ii) by Clearwire, upon giving written notice to Licensee in the Event of Default; provided that such Event of Default is not cured (if it is capable of being cured) within thirty (30) days following such notice; (iii) by Licensee, upon giving written notice to Clearwire in the Event of Default; provided that with respect to an Event of Default that is a payment default, it is not cured in thirty (30) days following such notice, and with respect to all other Events of Default (that are of a type capable of being cured) such Event of Default is not cured within one hundred eighty (180) days thereof; or (iv) by Clearwire upon written notice to Licensee and to the extent allowed under law, if Licensee files a petition pursuant to Title 7 or 11 of the United States Bankruptcy Code or is adjudged a debtor after the filing of an involuntary bankruptcy petition against Licensee, or if Licensee files a petition for relief pursuant to any state insolvency laws.  Upon termination of this Agreement for any cause, the Prepaid Royalties Balance shall be refunded to Clearwire, as provided in Section 2.02.

Section 9.02.  Defaults.  It shall be an "Event of Default" hereunder if either party fails to perform a material obligation or breaches a material representation and warranty contained in this Agreement in circumstances where such failure results in the inability of the other party to exercise its full rights under this Agreement.  In the event of a Loss (as defined in the applicable IUA), the Parties shall cooperate in seeking special temporary authority from the FCC to allow Clearwire to continue operating on the Channels until such time as it can transition its users to other spectrum and minimize service disruption to its business and other activities.

-25-

Section 9.03.   Survival. The obligations of the parties under this Agreement that by their nature would continue beyond expiration or termination of this Agreement shall survive any expiration or termination of this Agreement.  Without limiting the generality of the foregoing, any rights of Clearwire with respect to any Options or any rights of first refusal shall survive the expiration or termination of this Agreement if the notice or other event triggering such Option or right of first refusal occurs (or would have occurred, if Licensee complied in full with the requirements of this Agreement) prior to expiration or termination of this Agreement.

ARTICLE X.

GENERAL PROVISIONS

Section 10.01. Payment of Sales, Use or Similar Taxes.  Clearwire shall be liable for and shall pay (and shall indemnify and hold harmless the Licensee(s) Indemnified Parties against) all sales, use, stamp, documentary, filing, recording, transfer, real estate transfer, registration, duty or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any taxing authority in connection with the Transactions.

Section 10.02. Survival of Representations and Warranties.  The representations and warranties contained in this Agreement or in any certificate, document or instrument delivered in connection herewith, shall survive each of the Closings hereunder for a period of one (1) year from the Initial Closing Date or Subsequent Closing Date with respect to the EBS Spectrum that is subject to such Initial Closing or Subsequent Closing, as applicable, regardless of any investigation made by the Parties hereto.  All agreements and covenants contained herein shall survive indefinitely until, by their respective terms, they are no longer operative.

Section 10.03. Entire Agreement; Amendments and Waivers.  This Agreement (including the schedules and exhibits hereto), represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof and can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant, or agreement contained herein.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power, or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power, or remedy.

-26-

Section 10.04. <u>Governing Law</u>.  The validity, meaning and effect of this Agreement shall be determined in accordance with the laws of the State of New York applicable to contracts made and to be performed in that state, regardless of the laws that might otherwise govern under applicable principles of conflicts of laws thereof.

Section 10.05. <u>Table of Contents and Headings</u>.  The table of contents and section headings of this Agreement are for reference purposes only and are to be given no effect in the construction or interpretation of this Agreement.

Section 10.06. <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or by overnight courier, or mailed by certified mail, return receipt requested, to the Parties (and shall also be transmitted by facsimile to the Persons receiving copies thereof) at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

| | |
|---|---|
| If to Clearwire, to: | Clearwire Spectrum Holdings II LLC<br>5808 Lake Washington Blvd. N.E., Suite 300<br>Kirkland, WA 98033<br>Attention:  Chief Executive Officer<br>Facsimile No.: (415) 216-7776 |
| With a copy to: | Clearwire Corporation<br>5808 Lake Washington Blvd. N.E., Suite 300<br>Kirkland, WA 98033<br>Attention: Legal Department<br>Facsimile No.: (415) 216-7776 |
| And a copy to: | Davis Wright Tremaine LLP<br>2600 Century Square<br>1501 Fourth Avenue<br>Seattle, WA 98101-1688<br>Attention: Julie Weston<br>Facsimile No.: (206) 628-7699 |
| If to Licensee, to: | Hispanic Information and<br>Telecommunications Network, Inc.<br>63 Flushing Avenue, Unit 281<br>Brooklyn, NY 11205<br>Attention:  Jose Luis Rodriguez<br>Fax:  (718) 797-2546 |
| With a copy to: | Day, Berry & Howard LLP |

-27-

875 Third Avenue
New York, NY 10022
Attention: Sabino Rodriguez
Fax: (212) 829-3601

And a copy to:       RJGLaw LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD 20910
Attention: Rudolph J. Geist
Fax: (301) 589-2644

Section 10.07. Publicity. No public release, announcement or other form of publicity concerning this Agreement or the transactions described in this Agreement, shall be issued by either Party without the prior consent of the other Party, except as such release or announcement may be required by law, regulation or the rules or regulations of any securities exchange, in which case the Party required to make the release or announcement shall, to the extent possible, allow the other Party reasonable time to comment on such release or announcement in advance of such issuance. The Parties shall use reasonable efforts to consult in good faith with each other with a view to agreeing upon any press release or public announcement relating to the transactions contemplated hereby prior to the consummation thereof.

Section 10.08. Severability. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect.

Section 10.09. Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

Section 10.10. Remedies. The Parties recognize that, in the event that a Party should refuse to perform any provisions of this Agreement, monetary damages alone will not be adequate. The non-defaulting Party shall therefore be entitled, in addition to any other remedies which may be available, including money damages, to obtain specific performance of the terms of this Agreement. Notwithstanding any other provision herein, no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. The election of any one or more remedies by a Party shall not constitute a waiver of the right to pursue other available remedies at any time.

Section 10.11. Dispute Resolution Procedure.

(a)      General. The Parties desire to resolve disputes arising out of this Agreement without litigation. Accordingly, the Parties agree to use the dispute resolution procedures set forth in this Section 10.11 (the "Dispute Resolution Procedures") as their sole means of

-28-

adjudication with respect to any controversy or claim arising out of or relating to this Agreement or its breach.

(b)     Dispute Notice.  At the written request of any party (a "Dispute Notice"), the Parties to the dispute will within seven business days of the Dispute Notice, appoint knowledgeable, responsible representatives to meet and negotiate in good faith to resolve any dispute arising under this Agreement.  The Parties intend that these negotiations be conducted by business representatives, including at least one senior executive of each party to the dispute. The representatives shall meet and confer, in person or by teleconference, not later than such seventh business day after the date of the Dispute Notice.   The location, format, frequency, duration and conclusion of these discussions shall be left to the discretion of the representatives; provided that the duration shall not exceed 45 days from the date of the Dispute Notice (an "Action Date") unless extended by mutual written agreement of the Parties setting forth a new Action Date. The Dispute Notice and any extension shall specify the Action Date.  The Dispute Notice shall set forth the nature of the dispute, in reasonable detail.  Discussion and correspondence among the representatives for purposes of these negotiations shall be treated as confidential information developed for purposes of settlement, exempt from discovery and production, and shall not be admissible in the arbitration described below.  Documents identified in or provided with such communications, which are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted in evidence in the arbitration. If the Parties are unable to resolve any disputes arising under or relating to this Agreement (each a "Dispute") using the process described in this Section 10.11(b) within the time period provided, including without limitation disputes regarding a breach or default under this Agreement, the Parties shall arbitrate such dispute pursuant to the arbitration provisions set forth in Section 10.11(c).

(c)     Arbitration.  Any Dispute that has not be resolved within the time period provided for in Section 10.11(b) shall be resolved by a panel of three Arbitrators. The Dispute Notice shall automatically serve as a written notice of a request to submit the Dispute for arbitration if there has not been a resolution of the Dispute by the Action Date, and the Parties agree to submit the Dispute to a panel of three Arbitrators who shall be appointed within 30 days of the Action Date (the "Submission Period").  During the Submission Period, the Parties shall appoint the Arbitrators in accordance with the Commercial Arbitration Rules (then in effect) of the American Arbitration Authority ("AAA"), as modified below.  No punitive damages (or any other amount awarded for the purpose of imposing a penalty) will be awarded for a breach of this Agreement.

(i)     During the Submission Period, the Parties may submit a request for discovery to the Arbitrators, who shall determine whether the scope of the requested discovery is appropriate or useful for the resolution of the Dispute and order the discovery in their discretion; provided that such discovery process shall be concluded not later than 30 days following the submission date (the "Discovery Close Date").

-29-

713361919.3

(ii)     The arbitration hearing shall be fixed by the Arbitrators to be not sooner than 20 days nor later than 45 days after the Discovery Close Date (the "Hearing Date"). The hearing shall be located in a neutral site as mutually agreed by the Parties, or if the Parties cannot so agree, then the location of the arbitration shall be Washington, D.C. The Federal Rules of Evidence shall apply to the arbitration hearing. The party bringing a particular claim or asserting an affirmative defense will have the burden of proof with respect thereto. Each party shall bear the burden of persuasion with respect to its proposal for resolution of the matter. The arbitration proceedings and all testimony, filings, documents and information relating to or presented during the arbitration proceedings shall be deemed to be information subject to the confidentiality provisions of this Agreement. The Arbitrators will have no power or authority, pursuant to the rules of the AAA or otherwise, to relieve the Parties from their agreement hereunder to arbitrate or otherwise to amend or disregard any provision of this Agreement, including without limitation the provisions of this Section.

(iii)     Each party shall be permitted to submit a pre-hearing brief not to exceed 25 pages and such technical supporting material as is necessary or useful, to be submitted to the Arbitrators and the other party not later than 5 days before the Hearing Date, and each party may issue a response thereto not later than 2 days before the Hearing Date. Following the arbitration hearing, each party shall be permitted to submit a post-hearing brief not to exceed 25 pages within 5 days following the Hearing Date and a reply brief within 2 days thereafter (the "Pleading Close Date"). Should an Arbitrator refuse or be unable to proceed with arbitration proceedings as called for by this Section, the Arbitrator shall be replaced pursuant to the rules of the AAA. If an Arbitrator is replaced after the arbitration hearing has commenced, then a rehearing shall take place in accordance with this Section and the rules of the AAA.

(iv)     Within fifteen (15) days after the Pleading Close Date, the Arbitrators will prepare and distribute to the Parties a writing setting forth the Arbitration Panel's reasons for the its determination. The findings and conclusions and the award, if any, shall be deemed to be confidential information of the Parties. Neither party may disclose such information to any third party other than their professional advisors or as required by law or regulations, except in connection with an action to enforce the award.

(v)     The Arbitrators are instructed to schedule promptly all discovery and other procedural steps and otherwise to assume case management initiative and control to effect an efficient and expeditious resolution of the Dispute. The Arbitrators are authorized to issue monetary sanctions against either party if, upon a showing of good cause, such party is unreasonably delaying the proceeding.

(vi)     Any award rendered by the Arbitrators will be final, conclusive, and binding upon the Parties and any judgment thereon may be entered and enforced in any court of competent jurisdiction.

(vii)    The non-prevailing party to an arbitration shall pay its own expenses, the fees of each Arbitrator, the administrative fee of the AAA, and the expenses, including without limitation, reasonable attorneys' fees and costs, and expert and witness fees and costs, incurred by the other party to the arbitration. In the case of a decision which partially favors each party, expenses shall be paid as determined by the Arbitrators. In connection with any judicial proceeding to compel arbitration pursuant to this Agreement or to confirm, vacate or enforce any award rendered by the Arbitrators, the prevailing party in such a proceeding shall be entitled to recover reasonable attorney's fees and expenses incurred in connection with such proceedings, in addition to any other relief to which it may be entitled.

(viii)    Notwithstanding anything to the contrary in this Agreement, neither party shall have any obligation to arbitrate claims for injunctive relief, specific performance, or other equitable relief or for the use or unauthorized disclosure of confidential information, as to which either party shall be entitled to seek and obtain relief exclusively from the state or federal courts sitting in New York, New York, and each party hereby irrevocably submits to the jurisdiction of any such court; provided that, any and all claims for damages shall remain subject to arbitration.

Section 10.12. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 10.13. <u>Confidentiality</u>. The terms of this Agreement that are not otherwise required to be disclosed to the FCC in support of the *De facto* Transfer Application, requests for renewal thereof or notices submitted to the FCC, or as required to be disclosed in filings with the Securities and Exchange Commission or state securities agencies, will be kept strictly confidential by the Parties and their agents, which confidentiality obligation will survive the termination or expiration of this Agreement for a period of two (2) years. The Parties may make disclosures as required by law, and to employees, shareholders, agents, attorneys and accountants (collectively, "<u>Agents</u>") as required to perform obligations under the Agreement, provided, however, that the Parties will cause all Agents to honor the provisions of this section. In addition, either Party may disclose this Agreement to its Affiliates, strategic partners, actual or potential investors, lenders, acquirers, merger partners, and others whom it deems in good faith to have a need to know such information for purposes of pursuing a transaction or business relationship with it, so long as it secures an enforceable obligation from such third party to limit the use and disclosure of this Agreement as provided herein. The Parties will submit a confidentiality request to the FCC in the event the FCC seeks from the Parties a copy of this Agreement or any other confidential information regarding its terms.

Section 10.14. <u>Non-Disclosure of Shared Information</u>. As used herein, the term "<u>Confidential Information</u>" shall mean all non-public information disclosed hereunder, whether written or oral, that is designated as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, is plainly confidential or by the Parties' practices

-31-

should be understood to be confidential. The term Confidential Information does not include information which: (1) has been or becomes published or is now, or in the future, in the public domain without breach of this Agreement or breach of a similar agreement by a third party; (2) prior to disclosure hereunder, is property within the legitimate possession of the receiving Party; (3) is lawfully received from a third party having rights therein without restriction of third party's or the receiving Party's rights to disseminate the information and without notice of any restriction against its further disclosure; or (4) is independently developed by the receiving Party through persons who have not had, either directly or indirectly, access to or knowledge of such Confidential Information. During the Term, the Parties may supply and/or disclose to each other Confidential Information relating to the business of the other Party. Each item of Confidential Information will be kept confidential by the Parties during the Term and for a period of three (3) years thereafter, but may be disclosed in the enforcement or seeking of damages with respect to a Party's rights under this Agreement. The receiving Party will be responsible for any improper use of the Confidential Information by it or any of its Agents. Without the prior written consent of the disclosing Party, the receiving Party will not disclose to any entity or person the Confidential Information, or the fact that the Confidential Information has been made available to it, except for disclosures required by law, disclosures authorized by the Party owning the Confidential Information and disclosures made in the context of the enforcement or seeking of damages with respect to a Party's rights under this Agreement. Each person to whom Confidential Information is disclosed must be advised of its confidential nature and must agree to abide by the terms of this section. The provisions of this Section 10.14 and of the confidentiality provisions of the IUA represent the entire understanding and agreement of the Parties with respect to the subject matter hereof and thereof and supercede all prior oral or written agreements between the Parties with respect to such subject matter, including, without limitation, all non-disclosure agreements.

*[THE REMAINDER OF THE PAGE IS INTENTIONALLY LEFT BLANK.]*

71361919.3

Each Party has caused this Master Royalty and Use Agreement to be duly executed by its duly authorized officer or representative on the date first above written.

CLEARWIRE SPECTRUM HOLDINGS II LLC

By: _____
       Name: R. GERARD SALEMME
       Title: E. VP

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.

By: _____
       Name:
       Title:

-33-

71361919.3

Each Party has caused this Master Royalty and Use Agreement to be duly executed by its duly authorized officer or representative on the date first above written.

CLEARWIRE SPECTRUM HOLDINGS II LLC

By: _____

      Name:

      Title:

HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.

By: _____

      Name: Jose Luis Rodriguez

      Title: President and CEO

-33-

713619193

## EXHIBIT I

### DEFINITIONS AND INTERPRETATIONS

(a)    Index of Definitions. Meanings to the following terms are located at the following sections with this Agreement:

AAA ........................................................................................................ *Section 11.12(c)*
Access Right Royalties ........................................................................ *Section 1.02(a)*
Action Date ............................................................................................ *Section 11.12(b)*
Additional Cost Free Educational Accounts .................................... *Section 3.04*
Affiliate ..................................................................................................*Definitions*
Agents ...................................................................................................*Section 11.14*
Agreement ............................................................................................*Preamble*
Available ..............................................................................................*Section 1.02(b)*
Basic Cost-Free Education Account .................................................. *Section 3.03(b)*
Basic Trading Area ............................................................................*Definitions*
Calculation of Time Period ..............................................................*Definitions*
Cell Site ...............................................................................................*Definitions*
Channels .............................................................................................. *Recitals*
Claim .................................................................................................... *Section 9.04(a)*
Class A Common Stock ...................................................................... *Section 6.03(a)*
Class B Common Stock ...................................................................... *Section 6.03(a)*
Clearwire .............................................................................................*Preamble*
Clearwire Documents ........................................................................*Section 6.02*
Clearwire Indemnified Parties ......................................................... *Section 9.01(a)*
Clearwire Material Adverse Effect .................................................. *Definitions*
Clearwire National Platform ...........................................................*Definitions*
Clearwire Parent ................................................................................ *Recitals*
Closing Date(s) ...................................................................................*Definitions*
Collateral Document ..........................................................................*Section 1.03*
Commencement Date .........................................................................*Section 1.02(a)(i)*
Commercial Spectrum Capacity ...................................................... *Recitals*
Communications Act .......................................................................... *Recitals*
Confidential Information ...................................................................*Section 11.15*
Cost-Free Educational Account ........................................................*Section 3.02(b)*
Cost-Free Educational Accounts.......................................................*Section 3.02*
Damages...............................................................................................*Section 9.02*
*De facto* Transfer Application ...........................................................*Definitions*
Deductible ...........................................................................................*Section 9.03*
Default Interest Rate .........................................................................*Definitions*

Discovery Close Date .................................................................... Section 11.12(c)(i)
Dispute ........................................................................................ Section 11.12(b)
Dispute Notice ............................................................................ Section 11.12(b)
Dispute Resolution Procedures .................................................. Section 11.12(a)
Disqualification Event ................................................................ Section 7.04
EBS ............................................................................................. Recitals
EBS Spectrum Capacity .............................................................. Section 1.01(a)
Educational End User ................................................................. Section 3.02(c)
Educational Reservation ............................................................ Section 3.03(a)
Effective Date ............................................................................. Preamble
Exhibits/Schedules ..................................................................... Definitions
Expert ......................................................................................... Section 11.12(d)(i)
FCC ............................................................................................. Recitals
FCC IUA Approval ...................................................................... Definitions
FCC Licenses .............................................................................. Recitals
FCC Proceedings ........................................................................ Section 5.04
FCC Qualifications ..................................................................... Section 7.04
FCC Rules ................................................................................... Recitals
Formula Quantity ....................................................................... Section 3.04(a)(i)
Future Spectrum Capacity .......................................................... Recitals
Gender and Number .................................................................... Definitions
Geographic Market ..................................................................... Section 1.05(b)(ii)
Governing Documents ................................................................ Definitions
Government Agency .................................................................... Definitions
GSA ............................................................................................. Definitions
Hearing Date ............................................................................... Section 11.12(c)(ii)
Herein ......................................................................................... Definitions
Including ..................................................................................... Definitions
Initial Closing ............................................................................. Section 4.03(a)
Initial Closing Date .................................................................... Section 4.03(a)
Initial Proposal ........................................................................... Section 11.12(d)(ii)
Initial Spectrum Capacity ........................................................... Recitals
IUA .............................................................................................. Section 1.02(a)
Law ............................................................................................. Definitions
LBS/UBS Spectrum .................................................................... Definitions
Licensee ...................................................................................... Preamble
Licensee Documents ................................................................... Section 5.02
Licensee PR Spectrum ................................................................ Section 1.02(c)
Licensee(s) Indemnified Parties ................................................. Section 9.01(b)
Licensee(s) Material Adverse Effect .......................................... Definitions
Licensee(s) Schedule .................................................................. Section 5.04
Lien ............................................................................................. Definitions

-2-

Limited CPI Adjustment ................................................................................*Definitions*
Limited Reciprocity ...........................................................................*Section 3.09(a)*
Local Channel Ratio .......................................................................*Section 3.04(a)(i)*
Market Area ....................................................................................*Section 3.02(c)*
MHzPops................................................................................................. *Recitals*
Monthly Royalties.......................................................................................*Definitions*
MVNO Educational Account...........................................................*Section 3.05(a)*
Option ....................................................................................................*Section 1.02*
Option Notice........................................................................................*Section 1.02*
Other Definitional and Interpretive Matters ...................................................*Definitions*
Other Puerto Rico Transaction.......................................................*Section 1.02(c)*
Party ........................................................................................................*Preamble*
Payment Default............................................................................................*Definitions*
Permit ...........................................................................................................*Definitions*
Person...........................................................................................................*Definitions*
Pleading Close Date ...............................................................*Section 11.12(c)(iii)*
Preferred Content Provider ..........................................................*Section 3.08(a)*
Preferred Stock..............................................................................*Section 6.03(a)*
Prepaid Royalties .........................................................................*Section 2.02*
Prime Rate......................................................................................*Section 10.02(a)*
Proceeding.....................................................................................................*Definitions*
ROFR .............................................................................................*Section 1.02(c)*
Sector ......................................................................*Section 3.02(c), Section 3.02(c)*
Securities Act ...............................................................................................*Definitions*
Service Affiliate ............................................................................*Section 1.03(a)*
Spectrum ........................................................................................*Section 1.02(b)*
Submission Period ........................................................................*Section 11.12(c)*
Subsequent Closing.........................................................................*Section 4.03(b)*
Subsequent Closing Date ...............................................................*Section 4.03(b)*
Third Party Agreement ...................................................................*Section 1.02(b)*
Total Consideration.................................................................................. *Recitals*
Upfront Royalty .........................................................................*Definitions, Definitions*
Wire Account ..................................................................................*Section 4.01(a)*

71361919.3

(b)    <u>Definitions</u>.  The following terms have the following meanings throughout this Agreement:

"<u>Affiliate</u>" means, with respect to any entity, any other entity that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first entity, but does not include any entity that directly or indirectly, or through one or more intermediaries, controls Clearwire Parent, or any entity that directly or indirectly, or through one or more intermediaries, is under common control with Clearwire Parent but is not a direct or indirect subsidiary of Clearwire Parent.  As used in this definition, "control" (including, with correlative meanings, "controlled by" and "under common control with") shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

"<u>Available</u>" with respect to Commercial Spectrum Capacity means that (A) the Commercial Spectrum Capacity on the Channels in the Market Area in question is not encumbered by any Lien, including, but not limited to, any purchase option, right of first refusal, or other contractual obligation of Licensee (each a "<u>Third Party Agreement</u>") (excluding interference consents, interference agreements or similar agreements pertaining to the technical operation of the Channels granted or entered into prior to the Effective Date of the IUA) and (B) the Licensee is able to make all of the representations and warranties contained in the IUA and to perform the applicable covenants in the IUA.

"<u>Basic Trading Area</u>" has the meaning given in the FCC Rules for BRS.

"<u>Cell Site</u>" means a tower, building or other outdoor structure equipped with one or more antennas to serve the surrounding area.

"<u>Clearwire Material Adverse Effect</u>" means a material adverse effect on the business, operations, properties, assets, condition (financial or other) or results of operations of Clearwire, taken as a whole, other than changes affecting the broadband wireless business generally.

"<u>Clearwire National Platform</u>" means the sum of all Market Areas and all other areas within the United States where Clearwire and its Affiliates provide comparable services.

"<u>Closing Date(s)</u>" means the Initial Closing Date or each Subsequent Closing Date.

"<u>Commencement Date</u>" means the "Commencement Date" under the applicable IUA entered into pursuant to this Agreement.

"<u>De facto</u> <u>Transfer Application</u>" has the meaning set forth in the IUA.

"Economic Royalty" means the total royalty set forth on Schedule A.

"Educational End Users" or "EEU" shall be only non-profit and/or educational entities and/or Social Welfare Agencies that use the services for their own purposes, provided that Licensee shall not provide such services pursuant to an RFP or other substantially similar commercially competitive opportunities (except in Puerto Rico, where Licensee shall be permitted to do so), and Licensee shall not provide such services to any entity if such entity already has an existing business relationship with Clearwire. For this purpose, "Social Welfare Agencies" (for all locations other than Puerto Rico) includes only those governmental and quasi-governmental agencies and departments that provide as their primary service public welfare assistance services (such as low-income housing, food stamps, or domestic violence services) to the public. For all IUAs for service in Puerto Rico, "Social Welfare Agencies" shall include any local and Puerto Rico Territorial governmental sector agency. "Social Welfare Agencies" shall specifically exclude treasury and revenue services departments, law enforcement agencies, legislatures, office of the mayor and the military; provided that, with respect to Puerto Rico there shall be permitted to provide  services to any local and Puerto Rico Territorial governmental sector agency.

"FCC IUA Approval"  means the grant of de facto transfer of an IUA by the FCC.

"Geographic Market" means the larger of (A) the area covered by the GSA of an EBS system that is listed on Schedule A as amended from time to time, without regard to any subsequent swap affecting such EBS system after the Effective Date, or (B) the area described in clause (A) above combined with the area(s) covered by the substantially overlapping GSA(s) of EBS and/or BRS systems which  Clearwire or its Affiliates have the right to use in that same market.

"Governing Documents" means articles of incorporation, certificate of incorporation, bylaws, certificate of formation, limited liability company agreement, or similar governing documents of an entity.

"Government Agency"  means any Federal, state or local government or any foreign, national, provincial, or local government, or any governmental, regulatory, legislative, executive, or administrative authority, agency or commission, or any court, tribunal, or judicial body.

"GSA" shall have the meaning set forth in the IUA.

"Law" means the common law and any federal, provincial, state, local, or foreign statute, law, ordinance, code, rule, regulation, or other requirement or rule of law.

"LBS/UBS Spectrum" means lower and/or upper band EBS or BRS spectrum, post-transition, and channels numbered 1, 2 or 3, pre-transition, as defined by the FCC Rules.

-2-

71361919.3

"Licensee Material Adverse Effect" means a material adverse effect on the business, operations, properties, assets, condition (financial or other) or results of operations of Licensee(s), taken as a whole, other than changes affecting EBS licensees or the broadband wireless business generally.

"Lien" means any lien, pledge, mortgage, deed of trust, security interest, lease, option, right of first refusal, easement, or encumbrance.

"Limited CPI Adjustment" shall have the meaning set forth in the IUA.

"Market Area" means the network coverage footprint of the network of Clearwire Parent and its Affiliates which includes all or part of the GSA(s) of the Channels in the Geographic Market, based on its buildout engineered for services from time to time once it has commenced commercial operation.

"Monthly Royalties" shall have the meaning set forth in the IUA.

"Payment Default" means the failure to pay an amount due under this Agreement.

"Permit" means all permits, licenses, franchises, consents, variances, exemptions, Authorizations and the like issued by Governmental Authorities to or for the benefit of a Party to the Agreement (as the case may be).

"Person," whether or not such term is capitalized, means any individual, partnership, firm, corporation, limited liability licensee(s), association, trust, unincorporated organization, or other entity.

"Proceeding" means any action, suit, litigation, arbitration proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving any court or other Government Agency or any arbitrator or arbitration panel.

"Securities Act" means the Securities Act of 1933, as amended.

"Sector" means a directional antenna located at a cell site that serves a portion of a Cell Site area.

"Upfront Royalty" shall have the meaning set forth in the IUA.

(c)    Other Definitional and Interpretive Matters.    Unless otherwise expressly provided, for purposes of the Agreement, the following rules of interpretation shall apply:

(1)    Calculation of Time Period.    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant

-3-

to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

(2)     Exhibits/Schedules.   The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

(3)     Gender and Number.   Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(4)     Herein.   The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(5)     Including.   The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(d)     The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

-4-

**EXHIBIT II**

# EDUCATIONAL BROADBAND SERVICE
## LONG TERM *DE FACTO* TRANSFER
### INDIVIDUAL USE AGREEMENT

THIS Educational Broadband Service Long Term *De facto* Transfer Individual Use Agreement (the "**Agreement**") is entered into as of [_____], 2006 (the "**Effective Date**"), by and between Hispanic Information and Telecommunications Network, Inc., a New York not-for-profit corporation (the "**Licensee**"), and Clearwire Spectrum Holdings II LLC, a Nevada limited liability company ("**Clearwire**") (with each of Licensee and Clearwire sometimes referred to individually as a "**Party**" and collectively as "**Parties**").

## RECITALS:

WHEREAS the Licensee is authorized by the Federal Communications Commission ("**FCC**") under the rules, regulations and published policies of the FCC (as they may be amended, "**FCC Rules**") to engineer and operate Educational Broadband Service ("**EBS**") channels _____ (including any associated J- or K-Group channels and any channels exchanged for the listed channels, the "**Channels**") under call sign _____ (the "**FCC License**") in the _____ area (the "**Basic Trading Area**"); and

WHEREAS the Parties have agreed to enter into this Agreement for Licensee to provide Clearwire with access to the capacity on the Channels, which pursuant to the FCC Rules, can be made available for commercial use, in accordance with the terms and conditions below, and subject to FCC approval.

THEN, in consideration of the premises and covenants set forth in this Agreement, and for good and valuable consideration, the sufficiency of which is acknowledged by the Parties' signatures, the Parties agree as follows:

1.   **TERM**

    **(a)**   **Term.**  Subject to Section 1(b), the term of this Agreement begins on the Effective Date and ends on [__, ___], 2036 (the "**Term**"), unless this Agreement is terminated earlier in accordance with Section 11. Prior to the Commencement Date (as defined below), the provisions of this Agreement which are expressly ineffective before the Commencement Date as well as Sections 3, 4, 7 and 8 shall be ineffective until the Commencement Date, at which time all provisions of this Agreement shall be fully effective. The other provisions in this Agreement shall be effective from the Effective Date and until the termination or expiration of this Agreement. The "**Commencement Date**" is the day that the FCC's grant of the *De facto* Transfer Application appears on Public Notice.

    **(b)**   **Renewal of FCC License and Extension of Agreement.**  In the event that the FCC License expires during the Term, this Agreement will also expire at such time unless the FCC License is renewed and FCC authorization for this Agreement is extended. Licensee and Clearwire will cooperate to timely file a renewal application for the FCC License,

in conjunction with a request for renewal of the *De facto* Transfer Authorization for the next FCC License term. Subject to Section 11, this Agreement will continue to apply unless the FCC denies by Final Order any application for renewal of the FCC License or the *De facto* Transfer Authorization, or the FCC requires the expiration of this Agreement at an earlier time. "Final Order" means an order issued by the FCC that can no longer be appealed.

## 2.    ROYALTY COMPENSATION

**(a)    Upfront Royalty.** On the Commencement Date, the Upfront Royalty of [_____] shall be deemed to be paid in full and the remaining amount of the Additional Cash Payment previously made by Clearwire pursuant to that Master Royalty and Use Agreement dated September 20, 2006 entered into between Licensee and Clearwire ("MRUA") shall be reduced by the amount of the Upfront Royalty specified above.

**(b)    Monthly Royalties.** No monthly royalties are due under this Agreement at any time.

**(c)    Payment Receipt Address.** Absent notice of different instructions from Licensee, all cash payments to be paid to Licensee shall be paid by check mailed to the following address, which address may be changed by Licensee by notice to Clearwire:

> Hispanic Information and Telecommunications Network, Inc.
> 63 Flushing Avenue
> Unit 281
> Brooklyn, New York 11205
> Attention: Jose Luis Rodriguez

**(d)    W-9.** Within ten (10) days following the execution of this Agreement, Licensee shall deliver a completed IRS Form W-9 to Clearwire.

## 3.    EXCLUSIVE NEGOTIATION PERIOD

From a time period beginning two (2) years prior to the end of the Term and ending one (1) year prior to the end of the Term, Licensee will negotiate in good faith exclusively with Clearwire about a possible renewal of this Agreement. During such period, Licensee and its agents and advisors will not discuss or solicit other opportunities to enable third parties to make use of the Spectrum subject to such exclusive negotiating period.

## 4.    FREQUENCY BAND TRANSITION

The Channels covered by this Agreement either have been or will be subject to relocation to different frequencies and/or to different technical characteristics in accordance with a transition plan adopted in accordance with the FCC Rules promulgated in WT Docket No. 03-66 (the "**Transition**"). In the event that the Transition is not complete on the Commencement Date, the remaining provisions of this Section 4 shall be effective and, otherwise, shall be ineffective. Clearwire and Licensee will cooperate in the Transition in accordance with FCC Rules, to

facilitate Clearwire's and Licensee's use of the Channels, consistent with this Agreement. To the extent that, after the Commencement Date, the FCC allows Licensee to participate in selecting the entity initiating and/or overseeing the Transition of the Channels (the "**Proponent**"), then Licensee will designate and otherwise reasonably promote Clearwire or its designee as Proponent or co-Proponent and otherwise support Clearwire's interests in the means and outcome of the Transition to the extent permitted by FCC Rules and consistent with Licensee's Transition rights thereunder and interests hereunder and after expiration or termination of this Agreement; *provided, however,* if Licensee is obligated by any other agreement relating to other channels in the market to promote some other party as Proponent or co-Proponent, Licensee's equally qualified support for both Clearwire and such other party shall fully satisfy Licensee's obligations in this sentence. Licensee will consult with Clearwire before adopting, consenting to, or otherwise agreeing to any change of frequencies or characteristics of the Channels after the Commencement Date other than those changes specified by FCC Rules. After the Commencement Date, Licensee will use its commercially reasonable efforts to make Clearwire aware of and to seek the permission of meeting participants to allow Clearwire to participate in its scheduled meetings with the Proponent to the extent they concern Transition of the Channels to channel plans required or allowed as an outcome of the FCC's transition proceedings, provided that Licensee is aware sufficiently in advance of the meeting that it will involve that subject matter. In any event, Licensee will provide Clearwire with a summary report of any meetings or discussions with such third persons occurring after the Commencement Date in which Clearwire was not invited to participate. In the event that neither Clearwire nor any third party initiates and/or completes the Transition of the Channels within the time frames specified by the FCC, Licensee may, at its sole option, avail itself of any "self-transition" rights made available pursuant to FCC Rules. Licensee's reasonable costs of such self-transition will be paid and/or reimbursed by Clearwire in their entirety.

5.    **CAPACITY REQUIREMENTS AND USES; CERTAIN LICENSEE ACCESS RIGHT ROYALTIES**

(a)    **Clearwire Capacity**. On and after the Commencement Date, subject to FCC Rules and the restrictions imposed thereby, Clearwire will have the right to use all of the capacity of the Channels other than Licensee's Reserved Capacity, the Access Right Royalties and Licensee's other rights and benefits granted by this Agreement (**"Clearwire Capacity"**) and, subject to FCC Rules and the power of the FCC to control the radio frequency spectrum, Licensee shall not use Clearwire Capacity or enter into any agreement to allow any third party to use Clearwire Capacity other than as may be contemplated by this Agreement.

(b)    **Licensee's Reserved Capacity**. As used in this Agreement, **"Licensee's Reserved Capacity"** means:

(i)    Prior to the Commencement Date, all of the Capacity of the Channels.

(ii)    From the Commencement Date until sixty (60) days after Licensee receives a notice from Clearwire that Clearwire intends to utilize the capacity of the Channels, the lesser of one Channel and that number of Channels Licensee used during the last regular school session immediately preceding the Effective Date (the **"Legacy**

Reservation"), which Licensee may use to provide services that further the educational mission of accredited schools (**"Licensee's Capacity"**). Licensee's operations pursuant to Section 5(b)(i) and (ii) are solely in furtherance of Licensee's educational charter and are not intended for the benefit of Clearwire or conducted in exchange for any royalties or other consideration.

(iii)    After the later of the Commencement Date and the date that any one or more of the Channels is engineered to operate in any digital modulation (the **"Legacy Stop Date"**), in respect of Licensee's educational reservation covering the five percent (5%) educational spectrum capacity currently required by the FCC Rules pertaining to the FCC Licenses (the **"Educational Reservation"**), Licensee shall be permitted to utilize the Educational Reservation in such locations served by the Clearwire National Platform on a full time basis as Licensee desires for its operations. Clearwire and Licensee shall at all times comply with applicable FCC Rules. Clearwire may not use the Educational Reservation. In the event that the Parties cannot agree on the application of any new rule or interpretation regarding the Educational Reservation in their circumstances, the Parties shall jointly approach the FCC for clarification in a timely fashion and, to the extent the matter remains unresolved thereafter, shall settle the matter by applying the Dispute Resolution Procedures.

(c)    **Permitted Use of Capacity.**    The permitted uses of the Clearwire Capacity are one-way or two-way voice, video and/or data communications services (the **"Permitted Uses"**). Licensee covenants and agrees that so long as Clearwire is not in breach of this Agreement, Clearwire may peaceably and quietly enjoy the Clearwire Capacity, subject at all times to the terms and conditions of this Agreement. In furtherance of the foregoing, Licensee shall not take or fail to take any action inconsistent with this Agreement that may have a material adverse effect on Clearwire's right to possession and peaceable enjoyment of the Clearwire Capacity. If, pursuant to changes in FCC Rules, the Parties have additional flexibility in implementing Clearwire's use of Clearwire Capacity, then Licensee and Clearwire agree to implement such flexibility and, subject to negotiation of revisions to this Agreement which will be mutually beneficial to both Parties, so as to permit Clearwire to maximize the availability of airtime on the Channels for Clearwire's use.

(d)    **Section 27.1214(e) Amendments.**    To the extent required under Section 27.1214(e) of FCC Rules, on the date that is fifteen (15) years after the Effective Date and every five (5) years thereafter during the Term, Licensee shall have a period of sixty (60) days to request a review of its minimum educational use requirements, in which event and at which time the Parties shall negotiate in good faith an amendment to this Agreement that accommodates any *bona fide* changes in educational needs, technology and other relevant factors. Any such amendment shall provide, among other terms and conditions agreed to by the Parties: (i) with respect to Licensee and any Educational End Users (defined below) for whom Clearwire has provided an Educational Account, Clearwire shall make available any equipment, services or software upgrades that Clearwire makes generally available to Clearwire's retail customers subscribing to the same tier of service in the Market Area over Broadband Radio Service or EBS facilities; (ii) to the extent such amendment materially increases Clearwire's monthly costs either to operate its leased capacity or to meet Licensee's changed educational use requirements, whether or not such costs will be offset by a reduction in the Monthly Royalties for the

4

remainder of the Term, a refund in an amount to be agreed upon by both Parties, or both; (iii) Clearwire may accommodate changes in Licensee's Reserved Capacity through any reasonable means available so as to avoid disruption to the advanced wireless services provided by Clearwire; and (iv) Clearwire shall not be required to accommodate changes in Licensee's Reserved Capacity in a manner that has a negative economic impact on Clearwire or Clearwire's commercial operations under the Agreement. The adjustments set forth in this subsection shall be in addition to, and not in lieu of, adjustments set forth in other portions of this Agreement. Neither Party shall have any obligation to enter into any amendment pursuant to this Section.

(e)     **Channel Swapping; Costs.**  With the consent of Licensee, which consent will not be unreasonably withheld, conditioned, or delayed, Clearwire may require Licensee to enter into agreements to swap some or all of its Channels for other channels in the Market (the "Swapped Channels"), and in connection therewith file any necessary FCC applications to accomplish the swap, so long as there is no material difference in the geographic service area (or equivalent service area) ("GSA") and FCC authorized uses of the Swapped Channels as compared to Licensee's previous Channels, taking into account any overlap(s) of GSAs of such Channels and Swapped Channels with co-channel GSAs in other markets. Clearwire agrees to bear all costs and expenses associated with the implementation of channel swapping, channel loading (as discussed in this Agreement), and channel shifting (as discussed in this Agreement), including the reasonable out-of-pocket costs of Licensee's engineering consultants and attorneys.

6.     **EQUIPMENT; CONTINUATION OF ACCESS RIGHT ROYALTIES; CONTROL OF OPERATIONS**

(a)     **Operation and Maintenance of Equipment.**  Subject to the last sentence of this Section 6(a), prior to the Legacy Stop Date (as defined in Section 5(b)(iii)), Licensee may operate the legacy video transmission equipment currently in place, if any (including replacements thereto), for the Channels (the **"EBS Equipment"**) at each transmission site (including substituted and additional sites), it being understood that Licensee's operations under this Section 6(a) are solely for Licensee's educational purposes. If Licensee chooses not to operate the transmission equipment currently in place or replacements thereto, then Licensee and Clearwire will cooperate in filing all necessary applications and notices with the FCC to "go dark" and not transmit on the Channels for an allowed period of time or notify the FCC that Licensee has ceased operation. If Clearwire or any of its Affiliates has EBS and/or BRS spectrum operations in the Market Area of the Channels, then Clearwire will operate legacy video for Licensee at Clearwire's expense until the earlier of the Legacy Stop Date and the end of the Transition.

(b)     **Maintenance of Legacy Equipment.**  Subject to the last sentence of Section 6(a), while operating a video system for Licensee's educational purposes under Section 6(a), it is Licensee's responsibility to operate and maintain its video equipment.

(c)     **Equipment Purchase or Lease Option; Tail Services and Equipment.**

(i)     Subject to subsection (ii) below, in the event this Agreement expires or is terminated for any reason other than a default by Licensee, Licensee shall have the option, upon giving notice to Clearwire within thirty (30) days of such expiration or

termination (the **"Purchase Option Period"**), to purchase the whole or any part, as determined by Licensee, of transmission and reception equipment (not including any tower rights) then in operation that is used to transmit Licensee's Reserved Capacity on the Channels, whether such equipment is dedicated entirely to Licensee's Reserved Capacity or shared (the **"Licensee's Specified Equipment"**), or equivalent equipment. The price for such equipment shall be equal to the lesser of the (x) fair market value of the Licensee's Specified Equipment or, if equivalent equipment is provided, Clearwire's reasonable cost of obtaining such equipment, and the (y) MFN Price (as defined below). In the event that Clearwire or any of its Affiliates (as defined below) has granted or grants to any EBS licensee one or more times any rights to buy equipment at a lower price than provided herein, Clearwire shall provide Licensee with a copy of that agreement and allow Licensee to buy the Licensee's Specified Equipment at a price established as though the equipment price terms of such other agreement (each, a **"Third Party Agreement"**) were an alternative set forth herein (each a **"MFN Price"**). Within thirty (30) days of each request by Licensee delivered to Clearwire, Clearwire shall inform Licensee in writing (a **"Price Notice"**) of the price for such selected equipment, including whether the price is the fair market value, Clearwire's cost of obtaining such equipment or the MFN Price (and, if so, a copy of the agreement establishing the MFN Price and, if not, an officer's certification that no MFN Price applies). In the event that Licensee buys the Licensee's Specified Equipment, Clearwire shall sell it along with a license to use any related software and/or other features necessary to properly operate and enjoy the features and functions of the Licensee's Specified Equipment, and a right to receive updates and patches at no cost to Licensee (collectively, the **"Additional Equipment-Related Features"**). Licensee's Specified Equipment and Additional Equipment-Related Features shall be delivered to Licensee at Licensee's selected domestic location, along with a bill of sale, at Clearwire's expense within twenty (20) days of the date that Licensee pays Clearwire the purchase price. In the event that Licensee wishes to purchase Licensee's Specified Equipment and Additional Equipment-Related Features, it shall so notify Clearwire in writing of those items it wishes to purchase within thirty (30) days of the later of Licensee's receipt of the Third Party Agreement and the Price Notice. As used herein, **"Affiliate"** means, with respect to any entity, any other entity that directly, or through one or more intermediaries, controls or is controlled by or is under common control with such first entity, but does not include any entity that directly or indirectly, or through one or more intermediaries, controls Clearwire Corporation, and does not include any entity that directly or indirectly, or through one or more intermediaries, is under common control with Clearwire but is not a direct or indirect subsidiary of Clearwire Corporation. As used in this definition, **"control"** (including, with correlative meanings, **"controlled by"** and **"under common control with"**) shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies (whether through ownership of securities or partnership or other ownership interests, by contract or otherwise).

(ii)    If Licensee notifies Clearwire of its desire to acquire Licensee's Specified Equipment and Additional Equipment-Related Features, in lieu of selling the Licensee's Specified Equipment and Additional Equipment-Related Features to Licensee as specified in subsection (i) above, Clearwire shall have the option instead to lease such to Licensee for an initial term of one year, renewable annually at the option of Licensee for as many as nine (9) one-year renewal terms. During the period of such lease, Clearwire shall

6

have the right to share the use of Licensee's Specified Equipment and Additional Equipment-Related Features, so long as such sharing does not diminish the utility to Licensee. The monthly amount payable by Licensee to Clearwire to lease these items shall be the lesser of: (x) 0.8% of fair market value of the Licensee's Specified Equipment and Additional Equipment-Related Features at the commencement of the initial lease term, and (y) Clearwire's marginal cost of leasing Licensee's Specified Equipment and Additional Equipment-Related Features to Licensee.

(iii)     For the purposes of this Section 6(c), determinations of fair market value shall be made by an independent engineering firm selected by Licensee and subject to approval by Clearwire, and the cost of reaching such determination shall be shared equally by the Parties.

(iv)     For a period of twelve (12) months after the expiration or termination of this Agreement, unless termination resulted from Licensee's breach of this Agreement, Licensee shall have the right to continue to receive the same in-kind facilities, services and benefits Licensee received during the Term, including each of the Access Right Royalties under Section 7, on the most favorable terms and conditions, including price, as Clearwire or any of its Affiliates offers such Access Right Royalties, or services and equipment substantially similar thereto. When Clearwire provides Licensee with the price and other terms for the Access Right Royalties under this paragraph, Clearwire will also provide an officer's certificate certifying that such pricing and other terms meet the requirements of this Section 6(c) and are the MFN Price. The provisions of this Section 6(c) shall survive the expiration or termination of this Agreement for any cause, unless termination is caused by Licensee's breach of this Agreement.

**(d)     Operation of Facilities on the Channels to Meet Substantial Service Requirements.** In addition to the foregoing, Clearwire, at its expense, prior to the FCC-mandated deadline, but in no event later than December 31, 2009, will construct, operate and maintain facilities for the Channels that provide operating transmission and coverage capability sufficient to satisfy minimum build-out, operational, service or performance requirements applicable to the Channels or which must be satisfied to avoid a reduction in Channels or their capacity, including substantial service standards, all as required or prescribed under then-applicable FCC Rules. In the event Clearwire does not satisfy this requirement by such date, Licensee shall have the right to either terminate this Agreement pursuant to Section 11, or construct such facilities as qualify for a "safe harbor," and Clearwire shall reimburse Licensee's costs of such construction.

**(e)     Control Over Operations.** On and after the Commencement Date, Clearwire shall exercise such day-to-day operational control over operations on the Channels as permitted by FCC Rules pertaining to *de facto* transfer agreements under its secondary markets rules; *provided, however,* that Licensee shall retain such powers of oversight and control as are needed to ensure compliance with standards of conduct for which Licensee remains accountable to the FCC or as otherwise reserved by this Agreement. In the event (A) Licensee becomes aware of an on-going violation or repeated violations by Clearwire of the Communications Act or the FCC Rules governing its use or Licensee's use of the Channels (collectively, the "Governing Rules"), or any other violation of the Governing Rules that might adversely affect

7

Licensee's rights in the License, might impose unreimbursed liability on Licensee as licensee of the Channels or might cause the FCC to revoke, cancel, rescind or materially adversely modify the *De facto* Transfer Authorization and (B) after Licensee gives notice to Clearwire of such violation(s), Clearwire does not immediately, in the case of an on-going violation, begin to cure such violation and fully effect such cure within thirty (30) days or such period that the FCC may specifically impose, and in the case of repeated violations, take steps to prevent such violations in the future and fully effect such steps within thirty (30) days or such period that the FCC may specifically impose, such that the violation does not re-occur, Licensee shall be entitled to take action to force Clearwire to immediately cease such violation(s), immediately comply with the Governing Rules and take such preventative steps, all at Clearwire's expense, and including the right to immediately seek injunctive relief, and in each case without first giving Clearwire any further notice or awaiting any further cure period.

## 7.    ACCESS RIGHT ROYALTIES

Clearwire shall provide the access right royalties described in this Section 7 (the **"Access Right Royalties"**) from and after the later of the Commencement Date and the first commercial launch by Clearwire of its wireless services on the Channels or other EBS or BRS channels in the Geographic Market of the Channels. The Access Right Royalties will be provided in a manner consistent with the way the Access Right Royalties are provided by Clearwire to third parties under agreements that provide for Access Right Royalties similar to the Access Right Royalties provided in this Agreement.

(a)    **Cost-Free Educational Accounts.**    Included in the Access Right Royalties provided to Licensee, Licensee shall be entitled to Cost-Free Educational Accounts in respect of the Educational Reservation and the Additional Cost-Free Educational Accounts as provided in this Section 7.

(i)    Educational Reservation Basic Cost-Free Educational Accounts.

a.    In respect of Licensee's educational reservation covering the five percent (5%) educational spectrum capacity currently required by the FCC Rules pertaining to the FCC Licenses (the **"Educational Reservation"**), Licensee shall be permitted to utilize the Educational Reservation in such locations served by the Clearwire National Platform on a full time basis as Licensee desires for its operations. Clearwire and Licensee shall at all times comply with applicable FCC Rules. Clearwire may not use the Educational Reservation. In the event that the Parties cannot agree on the application of any new rule or interpretation regarding the Educational Reservation in their circumstances, the Parties shall jointly approach the FCC for clarification in a timely fashion and, to the extent the matter remains unresolved thereafter, shall settle the matter by applying the Dispute Resolution Procedures.

b.    Initially, Clearwire shall provide Licensee one (1) Cost-Free Educational Account per Cell Site in the Market Area (each a **"Basic Cost-Free Education Account"**). The number of Cost-Free Educational Accounts provided pursuant to this Agreement shall be adjusted upward every five years proportionate to

the growth of the overall data capacity of Clearwire's network in the Market Area of the Channels. The growth (if any) in the overall data capacity shall be determined in such fashion as shall be agreed by the Parties in consultation with Clearwire engineers and other technical experts prior.

**(b)** **Additional Cost-Free Educational Accounts.** In addition to, and not in lieu of, the Cost-Free Educational Accounts provided to Licensee by Clearwire pursuant to the Educational Reservation as set forth in Section 7(a), Clearwire shall provide Licensee with additional Cost-Free Educational Accounts in the number computed in accordance with this Section 7(b) (the **"Additional Cost-Free Educational Accounts"**).

(i)    Number and Periodic Adjustment. Licensee will have access to additional spectrum capacity on Clearwire's National Platform in the form of Cost-Free Educational Accounts equal to the greater of (X) two (2) Cost-Free Educational Accounts per Sector in the Market Area of the Channels and (Y) the quantity of Cost-Free Educational Accounts determined by applying the Formula Quantity. The number of Additional Cost Free Educational Accounts that Clearwire is obligated to provide to Licensee shall be recalculated and revised annually as of January 31 of each calendar year.

a.    Educational End Users. Cost-Free Educational Accounts shall be exclusively for Educational End Users and not for resale, assignment or transfer by Licensee outside of its Educational End User environment or to persons who cease to be officially associated with such Educational End User. (By way of example, a university may resell the service to its students, faculty, administrators and staff, while such persons are involved with the university, but shall cease to provide the service if a member of the faculty terminates employment or a student graduates and ceases to be involved in university matters.)

b.    Time of Delivery. The Additional Cost-Free Educational Accounts shall be provided by Clearwire to Licensee pursuant to this Section 7(b) upon the commercial launch of Clearwire's broadband wireless service in the Market Area of the Channels, or the applicable Commencement Date thereof if later.

**(c)** **Licensee MVNO.**

(i)    In addition to the right to Cost-Free Educational Accounts, Licensee shall have the right to resell the Clearwire service in the form of MVNO Educational Accounts to Educational End Users in the Market Area. An **"MVNO Educational Account"** shall have the identical characteristics as a Cost-Free Educational Account, except that there shall be a charge to Licensee as determined pursuant to this Section 7(c). Clearwire shall sell to Licensee such services, at a cost equal to the lowest wholesale rate provided by Clearwire to an arms-length third party in the Market Area of the Channels or other comparable market pursuant to any applicable agreement. However, the number of MVNO Educational Accounts is limited in such Market Area to twice the number of Cost-Free Educational Accounts for such Market Area.

(ii)    <u>Mechanics.</u>    The resale of Clearwire's services pursuant to this Section 7(c) shall be accomplished pursuant to a standard Clearwire wholesale agreement form revised to be consistent with the terms of this Agreement, which will be provided to Licensee upon its request to resell an MVNO Educational Account to an Educational End User.    Such arrangement shall be executed not later than thirty (30) days after the availability of such services.

(d)    **Access to Educational End User Devices.**    Clearwire shall also make any end-user equipment used in the Clearwire National Platform available for purchase by Licensee at 10% above Clearwire's cost to acquire such end-user equipment.    Equipment provided to Licensee pursuant to this section shall be used solely by Educational End Users and not for resale.

(e)    **Sharing of Features and Service Sets.**    Licensee shall have access to, and full use of, system capabilities, services and feature sets that are generally provided to Clearwire's retail customers or wholesalers to mass-market customers.    Licensee shall have access to reasonably necessary support made available to Clearwire's commercial customers generally,  and that is reasonably necessary for Licensee to offer services to its Educational End Users as contemplated by their agreement.    Licensee shall have access to new capabilities, features and service sets within six months of the time that Clearwire makes them available to customers generally, but not earlier than the Commencement Date.

(f)    **Ordering Cost-Free Educational Accounts and Additional Cost-Free Educational Accounts; Delivery and Installation.**    Licensee may activate Cost-Free Educational Accounts and Additional Cost-Free Educational Accounts at no cost to Licensee, via submission of a standard Order Form or online ordering to Clearwire, to the extent consistent with the terms of this Agreement.    Clearwire will fill each such order within the standard delivery interval by which it activates new service requests for subscribers generally, and shall ship associated user units to Licensee's requested destination or complete installation of user equipment which normally is installed by Clearwire, its Affiliate or a contractor of either of them within the standard installation interval by which it makes new installations of user units. Licensee shall comply with all laws and obtain any necessary governmental permits or approvals, and third party approvals, which are necessary in order for Clearwire to undertake an installation.

(g)    **Terms of Use.**    To the extent not inconsistent with the terms of this Agreement, Licensee's ordering and use of Cost-Free Educational Accounts, the Additional Cost-Free Educational Accounts and MVNO Accounts, and the use of such services by Licensee's users and permitted users, shall be governed by the acceptable use policy and terms of service, and such other policies of general applicability which apply to such services, which are subject to amendment and may be found at http://www.clearwire.com or such other URL as may be designated; *provided, however,* that financial terms contained in the terms of service shall not apply to such services.    In addition to the foregoing policies, but only to the extent not inconsistent with the terms of this Agreement, Clearwire may specify from time to time, in its sole discretion, reasonable and non-discriminatory procedures for the activation, addition, deletion or substitution of services to Licensee, its users and permitted users that do not impose obligations on or detract from the services received by Licensee or its permitted users.

(h)     **Equipment and Software.**  For Licensee and any permitted users for whom Clearwire provides services pursuant to this Section 7, Clearwire shall make available any equipment, services or software, including upgrades, that Clearwire makes generally available to Clearwire's or its Affiliate's retail customers subscribing to the same tier of service in the market(s) where it is used over BRS or EBS facilities.  In the event that any equipment upgrade involves replacement of equipment, the replaced equipment shall be returned to Clearwire or its designee and title to the replacement equipment shall transfer to Licensee or its designee.

(i)     **Title.**  All equipment provided by Clearwire to Licensee shall be the property of Licensee or its designee(s), free and clear of all liens and encumbrances, when paid in full (if any payment is required). Licensee shall own, and be solely responsible for the maintenance and operation of, all facilities installed at Licensee's locations and receive sites, including the sites of its permitted users, subject to manufacturers' warranties.

(j)     **Preferred Content Provider.**

(i)     Scope.  In the event that Clearwire provides third party content to customers over its network in the Market Area of the Channels, Licensee may elect to become a **"Preferred Content Provider"** over such network in such Market Area for such duration as Licensee may select.  As a Preferred Content Provider, Licensee shall have the same degree of access to, and use of, any system capability, service or feature set that is provided to premium third party content providers.

(ii)     Service Sets and Features.  To the extent that Clearwire's or its Affiliates' most favored program suppliers pay for features and/or service sets, Licensee shall pay an equal amount for equal features and/or service sets to the extent that Licensee elects to utilize them.  Licensee agrees that the programming that Licensee supplies to customers through Clearwire's network will be educational in nature.  Licensee agrees not to resell Clearwire's network access, features and/or service sets to third parties, except in accordance with Sections 7(b)(i)a. and 7(c).

(iii)     Capacity Constraints.  Clearwire reserves the right to restrict the use of the capabilities and services made available to Licensee as a Preferred Content Provider under this Section 7(j) if such use is no longer commercially and technically feasible due to limitations in network capabilities.  Clearwire shall comply with the provisions of this Agreement to ensure timely access to information about capacity usage and permit Licensee a reasonable opportunity to secure alternative access.

(k)     **Definitions.**

(i)     "**Additional Cost-Free Educational Account**" is defined in Section 7(b).

(ii)     "**Cell Site**" means a tower, building or other outdoor structure equipped with one or more antennas to serve the surrounding area.

11

(iii)    "**Clearwire National Platform**" means all Market Areas and all other areas within the United States where Clearwire and its Affiliates provide comparable services.

(iv)    "**Cost-Free Educational Account**" means a wireless broadband connection that Clearwire or its affiliate provides to Licensee without charge or expense to Licensee. Cost-Free Educational Accounts shall have the same capacity and characteristics as the highest level of premium mass market retail service provided on Clearwire or its affiliate's network in the market where it is used. Multiple individuals that are associated with an Educational End-User may share the same Cost-Free Educational Account through Wi-Fi hotspots, local area networks, and other means. To the extent not inconsistent with the terms of this Agreement, the Cost-Free Educational Accounts shall be subject to the terms of Clearwire's then generally applicable Acceptable Use Policy. The Cost-Free Educational Accounts shall be fully portable anywhere within the Clearwire National Platform to the extent that Clearwire offers such portability to any customer.

(v)    "**Educational End Users**" or "**EEU**" shall be only non-profit and/or educational entities and/or Social Welfare Agencies that use the services for their own purposes, provided that Licensees shall not provide such services pursuant to an RFP or other substantially similar commercially competitive opportunities (unless the Basic Trading Area of this IUA is in Puerto Rico, in which case Licensee shall be permitted to provide such services pursuant to an RFP or other substantially similar commercially competitive opportunities), and Licensees shall not provide such services to any entity if such entity already has an existing business relationship with Clearwire. For this purpose, "**Social Welfare Agencies**" (for all locations other than Puerto Rico) includes only those governmental and quasi-governmental agencies and departments that provide as their primary service public welfare assistance services (such as low-income housing, food stamps, or domestic violence services) to the public. If the Basic Trading Area of this IUA is in Puerto Rico, "Social Welfare Agencies" shall include any local and Puerto Rico Territorial governmental sector agency. "Social Welfare Agencies" shall specifically exclude treasury and revenue services departments, law enforcement agencies, legislatures, office of the mayor and the military.

(vi)    "**Formula Quantity**" as of any date, is the product, rounded up or down to the nearest whole number, obtained by multiplying: (a) the Local Channel Ratio by (b) 0.05, and by (c) the number of subscribers served by Clearwire or any of its affiliates in the Market Area of the Channels as of the end of the previous calendar year. In the event that this product is a fraction, it shall be rounded up or down to the nearest whole number.

(vii)    "**Geographic Market**" means the larger of (A) the area covered by the GSA(s) of the Channels, as amended from time to time, without regard to any subsequent swap affecting the Channels after the Effective Date, and (B) such GSA(s) combined with the area(s) covered by the substantially overlapping GSA(s) of EBS and/or BRS systems which Clearwire or any of its Affiliates have the right to use in that same market.

12

(viii)  "**Local Channel Ratio**" is the fraction obtained by dividing the number of Channels as of the date of the calculation by the total number of EBS and BRS channels in the Market Area of the Channels with substantially overlapping GSAs then used to provide service in such Market Area licensed to or under a use agreement with Clearwire or any of its Affiliates (including those of Licensee) as of that date, in each case determined without multiplying a channel by the number of times it is deployed.

(ix)  "**Market Area**" means the network coverage footprint of the network of Clearwire and its Affiliates which includes all or part of the GSA(s) of the Channels in the Geographic Market, based on its build-out engineered for services from time to time once it has commenced commercial operation.

(x)  "**Market Area of the Channels**" is the Market Area of the Channels as of the Effective Date.

(xi)  "**MVNO Accounts**" means a broadband connection and related services that Clearwire or its affiliate provides, including such user equipment as Clearwire or its affiliate may provide for such connection services.

(xii)  "**Order Form**" is a form which elicits such information as is reasonably required by Clearwire to provide the service, and which does not contain any provision that modifies the service or any provision that is inconsistent with this Agreement.  It is agreed that Clearwire Order Forms will be in the form of its standard order forms.

(xiii)  "**Sector**" means a directional antenna located at a cell site that serves a portion of a Cell Site area.

## 8.    FCC FILINGS; INTERFERENCE CONSENTS

Upon Clearwire's reasonable request, and within five (5) days of Licensee's receipt, Licensee shall promptly review, execute and file (if necessary), and, together with Clearwire, prosecute, all notifications, applications, petitions, waivers, amendments, and other related documents, including, without limitation FCC Long Term Lease Applications, necessary to secure FCC approval for Licensee's and Clearwire's intended uses of the Channels, provided such filings are consistent with this Agreement and Licensee's legal obligations.  Licensee shall promptly file any requests for extension of construction periods or performance benchmarks reasonably requested by Clearwire.  Licensee shall promptly, within fifteen (15) business days of its receipt, review and, if consistent with this Agreement and Licensee's legal obligations, execute and provide Clearwire any "no objection" letters, interference consent agreements or retransmission consents that Clearwire may reasonably request, provided that the action requiring consent does not cause material degradation of Licensee's signal transmission capabilities.  As an illustration, without limiting the foregoing, interference consent agreements and "no objection letters" that (i) involve reciprocal limitations on the operations of Licensee's licensed facilities and other affected facilities, and (ii) waive FCC interference protection criteria subject to protection from actual harmful interference, taking into account topography, foliage, ground clutter and other real world factors limiting signal propagation, shall not be deemed to

13

cause material degradation of Licensee's signal transmission capabilities. During the Term, Licensee shall not make any filings with any governmental authority, including the FCC, without prior consultation or coordination with Clearwire, and Licensee shall not provide any "no objection" letters, interference consents and/or retransmission consents to any third party without Clearwire's prior written consent, such consent not to be unreasonably withheld.

## 9. OTHER APPLICATIONS, APPLICATION COSTS; FEES; *DE FACTO* TRANSFER AUTHORIZATION APPLICATION

(a) **Application Preparation.** Clearwire will prepare and submit in its name all applications, amendments, petitions, requests for waivers, and other documents necessary for the proper operation of Clearwire Capacity consistent with this Agreement and Licensee's responsibilities as a FCC licensee. Licensee will prepare and submit all applications, amendments, petitions, requests for waivers, and other documents necessary for the modification, maintenance and renewal of the FCC License that, under FCC Rules, may only be filed by Licensee, including any such filings reasonably requested by Clearwire that are consistent with this Agreement and Licensee's responsibilities as a FCC licensee. The Parties will cooperate in the preparation and submission of all applications, amendments, petitions, requests for waivers, and other documents necessary to secure any FCC approval, consent or other action required to effectuate this Agreement, including the substantial service showing required by May 1, 2011. In no event shall Licensee be required to make any filing or to take any position before the FCC or other Government Agency that is inconsistent with Licensee's interests or which Licensee believes in good faith may be construed by the FCC or other Government Agency as inconsistent with its responsibilities as a FCC licensee, not submitted in good faith or submitted for a purpose of delay in a proceeding.

(b) **Application Costs.** Clearwire will, at its own expense, prepare all applications, notices, certificates, exhibits, consent agreements, approvals or authorizations that Clearwire submits to the FCC or seeks to have Licensee submit to the FCC pursuant to the Agreement. Clearwire will also promptly pay or reimburse Licensee for its reasonable out-of-pocket expenses in connection with the activities requested or required of Licensee by Clearwire under this Agreement, including Licensee's expenses associated with the renewal of any FCC License and with any other filings with, or information requested by, the FCC, or required of Licensee to remain eligible under FCC Rules to provide Clearwire Capacity to Clearwire.

(c) **Fees and Taxes.** Clearwire will pay any Federal spectrum, federal regulatory, universal service, number portability fees, payphone fees, E911 fees and other fees, charges, assessments, impositions and taxes associated with the FCC License or imposed on Licensee as a result of the licensing, regulation or use of the capacity of the Channels by Licensee or Clearwire including, without limitation, any such fees, charges, assessments, impositions and taxes that may be imposed on or with respect to EBS spectrum or spectrum licenses in the future. Clearwire shall pay all such fees, charges, assessments, impositions and taxes upon receipt of notice from the FCC or taxing authority that such fees are due, or upon receipt of at least thirty (30) days advance written notice from Licensee that such fees or charges are due in the event that notice is not sent to Clearwire by the FCC or such taxing authority. Without limiting the generality of the foregoing, Clearwire shall be liable for and shall pay (and shall indemnify and hold harmless the Licensee Indemnified Parties against) all sales, use, stamp,

documentary, filing, recording, transfer, real estate transfer, registration, duty or similar fees or taxes or governmental charges (together with any interest or penalty, addition to tax or additional amount imposed) as levied by any taxing authority in connection with this Agreement.

(d)    **FCC Long Term *De facto* Transfer Lease and Extension Applications.** Within ten (10) business days following the execution of this Agreement and prior to consummating the transfer of *de facto* control of the Channels, the Parties shall cooperate as required to prepare and file with the FCC all forms and related exhibits, certifications and other documents necessary to obtain the FCC's authorization (the **"*De facto* Transfer Authorization"**) of the long term *de facto* transfer caused by this Agreement as set forth in FCC Rule 1.9030(e) as amended from time to time (the **"FCC Long Term Lease Application"**). Each Party shall fully cooperate with the other, and do all things reasonably necessary to timely submit, prosecute and defend the FCC Long Term Lease Application, and will promptly file or provide the other Party with all other information which is required to be provided to the FCC in furtherance of efforts to obtain or retain such grant. The Parties shall disclose in the FCC Long Term Lease Application the automatic extension of Clearwire's use rights upon the renewal of the FCC License. The Parties shall include in any FCC License renewal application, or separately request, as necessary, a request to permit Clearwire's use rights for the renewal term of the FCC License, if the Term will continue during any part of such FCC License renewal term. The Parties shall prosecute each such original or renewal application diligently and in good faith, including defending it and the grant thereof against all petitions to deny, informal objections, petitions for reconsideration, applications for review, appeals, writs, requests for stay filed against any such application or its grant, and shall file and prosecute petitions for reconsideration, applications for review, petitions for appeal, notices of appeal, writs of certiorari and associated pleadings challenging any denial of any such application or request. Any fees associated with the filing of the FCC Long Term Lease Application and applications or requests for renewal of the *De facto* Transfer Authorization, and all costs incurred in preparing, prosecuting or defending any and all petitions for reconsideration, applications for review, appeals, writs, requests for stay and remands of the grant or denial of any such original or renewal application and related pleadings, and for activity (such as oral argument and FCC staff visits) in support thereof, shall be paid by Clearwire. To the extent Licensee is required to file this Agreement with the FCC, the Licensee shall first notify and consult with Clearwire, and will to the extent permitted by the FCC redact all information from the Agreement which Clearwire reasonably designates as confidential including, but not limited to, all payment information.

## 10.    TRANSFERS OR ASSIGNMENTS

(a)    **Eligibility for Transfer or Assignment.** Licensee shall not assign its interest in this Agreement or the License to any person or entity that is not eligible or qualified to hold the License or lease the spectrum under applicable FCC Rules. Clearwire shall not assign its interest in this Agreement and will not enter into spectrum subleasing arrangements for the spectrum subject to the License with any person or entity that is not eligible or qualified to lease the spectrum under applicable FCC Rules.

(b)    **Clearwire Assignment.** Pursuant to Section 1.9030(g) of the FCC Rules, Clearwire may assign this Agreement to another entity, provided that (in the case of assignments that are not pro-forma) Licensee has consented to such assignment (such consent not to be

unreasonably withheld, delayed or conditioned), there is privity between Licensee and the assignee (i.e., the assignee agrees in writing to assume Clearwire's obligations under this Agreement), and the assignment of the Agreement is approved by the FCC after the Parties file an FCC Long Term Lease Application. Pursuant to Section 1.9030(h) of the FCC Rules, Clearwire may undergo a transfer of control (other than a pro forma transfer of control) during the Term of this Agreement, provided it first obtains FCC consent by filing an FCC Long Term Lease Application. Upon assignment or transfer of this Agreement by Clearwire pursuant to the foregoing, the assignee or transferee will be solely responsible for the obligations of Clearwire hereunder and Clearwire shall be relieved and discharged of all responsibilities, liabilities and obligations. Each party shall be entitled, without the consent of the other party, to undertake a pro forma assignment or transfer of this Agreement, or its rights hereunder, and shall provide notice to the other party and notice to the FCC as required by Sections 1.9030(g) and (h).

(c) **Licensee Assignment.** Subject at all times to Clearwire's right to purchase the License if the FCC determines to open eligibility for EBS spectrum (as set forth in Section 21(a) hereof), Licensee may, during the Term, assign its License or individual Channels to a qualified EBS eligible, or discontinue EBS operations and surrender its License to the FCC, subject to the following: Licensee shall notify Clearwire immediately upon making such decision, Licensee shall not discuss such decision with any third parties without Clearwire's written consent, and Licensee shall assign any affected Channels or the License to an FCC-qualified entity designated by Clearwire who will assume the Channels or License and assume Licensee's obligations under this Agreement (a "Successor Licensee"). Licensee, Successor Licensee and Clearwire shall cooperate in filing with the FCC any and all paperwork necessary to assign the license to the Successor Licensee and receive continued FCC consent, if necessary, to the long term *de facto* spectrum leasing arrangement reflected in this Agreement.

(d) **Clearwire Sublease.** Clearwire shall have the right to sublease capacity on the Wireless System (but not sublease any of the Channels apart from its operation on the Wireless System) in accordance with FCC Rules after receiving FCC consent by filing an FCC Long Term Lease Application. Licensee shall provide its written consent to such subleasing which Clearwire may submit to the FCC, and Licensee will reasonably cooperate with Clearwire to effect any such sublease; provided however, that Clearwire shall bear all reasonable costs and expenses associated with any such sublease, and no such sublease shall relieve Clearwire of any responsibility for compliance with all of Clearwire's obligations under this Agreement.

(e) **Licensee Release.** Upon the valid consummation of the sale, assignment or transfer of the License to any third party as described in this Section, the execution by such third party of an assignment and assumption agreement with respect to this Agreement, and the expiration of any applicable FCC reconsideration periods for such assignment or transfer: (i) Licensee will be released and discharged from all obligations to Clearwire arising thereafter; and (ii) Licensee will not incur any penalties as a result of and will not be responsible for any of Clearwire's expenses associated with the sale, assignment or transfer, except that nothing shall release Licensee from any liabilities incurred prior to the execution of such assignment and assumption agreement.

## 11. TERMINATION OF AGREEMENT

**(a)**    This Agreement may be terminated prior to expiration of a Term under any of the following circumstances: (i) by mutual written agreement of the Parties; (ii) by Clearwire, upon giving written notice to Licensee in the Event of Default; provided that such Event of Default is not cured (if it is capable of being cured) within thirty (30) days following such notice; (iii) by Licensee, upon giving written notice to Clearwire in the Event of Default provided such Event of Default is not cured (if it is capable of being cured) within one hundred eighty (180) days thereof; (iv) by Clearwire upon giving written notice to Licensee within thirty (30) days of a Loss (as hereinafter defined); (v) by Clearwire upon written notice to Licensee and to the extent allowed under law, if Licensee files a petition pursuant to Title 7 or 11 of the United States Bankruptcy Code or is adjudged a debtor after the filing of an involuntary bankruptcy petition against Licensee, or if Licensee files a petition for relief pursuant to any state insolvency laws.  If the Agreement is terminated prior to the expected termination date which was disclosed to the FCC, Licensee shall file a notification with the FCC no later than ten (10) days after the early termination indicating the date the Agreement was terminated.

**(b)**    It shall be an "Event of Default" hereunder if either party fails to perform a material obligation or breaches a material representation and warranty contained in this Agreement in circumstances where such failure results in the inability of the other party to exercise its full rights under this Agreement.

**(c)**    The term "Loss" means:  (1) expiration of the License without renewal; (2) License termination or revocation by the FCC without reinstatement; or (3) the unavailability of the Channels for the provision of Clearwire's Advanced Wireless Services due to regulatory action, including, but not limited to, FCC denial of the FCC Long Term License Application related to this Agreement, or reallocation of the Channels for purposes incompatible with Clearwire's business, or adoption of rules or policies that substantially frustrate achievement of the purposes of this Agreement.  A Loss shall not be deemed a default by Licensee or Clearwire if the Loss was beyond the reasonable control of such party, and such party used its best efforts to preserve the License.  In the event of a Loss, the Parties shall cooperate in seeking special temporary authority from the FCC to allow Clearwire to continue operating on the Channels until such time as it can transition its users to other spectrum and minimize service disruption to its business and other activities.

**(d)**    Licensee may terminate this Agreement pursuant to Section 16(b).

**(e)**    If the Commencement Date does not occur by the first (1st) anniversary of the Effective Date, thereafter either Party may terminate this Agreement at any time before the Commencement Date by giving written notice of termination to the other Party.

**(f)**    In the event that the Commencement Date occurs, but the FCC's grant of the *De facto* Transfer Authorization is subsequently rescinded and such rescission has become a Final Order, this Agreement shall be deemed terminated on the date specified as the required termination date by any order in that proceeding (as that date may have been extended by stay or otherwise) or, in the absence of such specified date, the effective date of the last decision in that proceeding.

17

(g)     In the event of an FCC Final Order denying any application to allow the continuation or renewal of the *De facto* Transfer Authorization for a portion of the Term, this Agreement shall be deemed terminated on the date specified as the required termination date by any order in that proceeding (as that date may have been extended by stay or otherwise) or, in the absence of such specified date, the effective date of the last decision in that proceeding.

(h)     The Parties will notify the FCC of the termination of this Agreement with respect to the FCC License or any of the Channels within ten (10) calendar days following the termination.

(i)     Except as expressly set forth in this Agreement, upon the expiration or termination of this Agreement, each Party will pay its own fees and expenses related to this Agreement and the transactions contemplated herein, and the Parties will have no further liability to each other except by reason of any breach of this Agreement occurring prior to the date of expiration or termination or after such expiration or termination if the breach is of a provision that by its terms survives such expiration or termination. Any termination or expiration of this Agreement, regardless of cause, will not release either Licensee or Clearwire from any liability arising from any breach or violation by that Party of the terms of this Agreement prior to the expiration or termination. The general and procedural provisions of this Agreement, which may be relevant to enforcing the obligations or duties of the Parties, as well as any other provisions that by their terms obligate either party following expiration or termination, will survive the expiration or termination of this Agreement until the obligations or duties are performed or discharged in full.

(j)     The Parties recognize that, in the event that a Party fails or refuses to perform any provisions of this Agreement, monetary damages alone will not be adequate. The non-defaulting Party shall therefore be entitled, in addition to any other remedies which may be available, including money damages, to obtain specific performance of the terms of this Agreement. Except as expressly set forth in this Agreement no remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy, and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. Except as expressly set forth in this Agreement, the election of any one or more remedies by a Party shall not constitute a waiver of the right to pursue other available remedies at any time.

## 12.     EXPENSES AND REVENUES

All subsequent documents appended to this Agreement, and any FCC activity or activity to preserve, obtain or renew licenses shall be reimbursed by Clearwire, *provided* that (and except as specified otherwise in this Agreement) expenses in excess of $1,000 are approved as to reasonableness by Clearwire in advance, such approval not to be unreasonably withheld, conditioned or delayed; and *provided further* that Licensee shall not be required to take any action for which Licensee may request expense reimbursement from Clearwire until the Parties have reached agreement on reimbursement of expenses of Licensee related to such action in excess of $1,000. Except as otherwise provided in this Agreement, each Party will pay its own expenses incident to any amendments or modifications to the Agreement, including, but not limited to, all fees and expenses of their respective legal counsel and any engineering and

accounting expenses. Licensee is entitled to none of the revenue generated from the use of the Clearwire Capacity, but only the royalties provided for in this Agreement.


## 13.    COMPETITION

During the Term of this Agreement, Licensee shall not, either itself or with a third party other than Clearwire, engage in any commercial or for-profit activities utilizing any of the Channels that directly compete with Clearwire or its affiliates; provided, however, that any relationship between Licensee and any Permitted End User relating to the use by such Permitted End User of Advanced Wireless Services shall not be deemed to be in violation of the foregoing restriction. During the Term of this Agreement, and except as contemplated herein, Licensee shall not lease, sublease, pledge, encumber or otherwise permit or grant any current rights with respect to use of the Channels, in whole or in part. Without limiting the foregoing, Licensee shall not resell or otherwise provide services to any end user that is not a Permitted End User.

## 14.    CONFIDENTIALITY AND NON-DISCLOSURE

(a)    **Confidentiality of the Terms of this Agreement.**  The terms of this Agreement that are not otherwise required to be disclosed to the FCC in support of the *De facto* Transfer Application, requests for renewal thereof or notices submitted to the FCC, or as required to be disclosed in filings with the Securities and Exchange Commission or state securities agencies, will be kept strictly confidential by the Parties and their agents, which confidentiality obligation will survive the termination or expiration of this Agreement for a period of two (2) years. The Parties may make disclosures as required by law, and to employees, shareholders, agents, attorneys and accountants (collectively, **"Agents"**) as required to perform obligations under the Agreement, *provided, however,* that the Parties will cause all Agents to honor the provisions of this section. In addition, either Party may disclose this Agreement to its Affiliates, strategic partners, actual or potential investors, lenders, acquirers, merger partners, and others whom it deems in good faith to have a need to know such information for purposes of pursuing a transaction or business relationship with it, so long as it secures an enforceable obligation from such third party to limit the use and disclosure of this Agreement as provided herein. The Parties will submit a confidentiality request to the FCC in the event the FCC seeks from the Parties a copy of this Agreement or any other confidential information regarding its terms.

(b)    **Non-Disclosure of Shared Information.**  As used herein, the term "Confidential Information" shall mean all non-public information disclosed hereunder, whether written or oral, that is designated as confidential or that, given the nature of the information or the circumstances surrounding its disclosure, is plainly confidential or by the Parties' practices should be understood to be confidential. The term Confidential Information does not include information which: (1) has been or becomes published or is now, or in the future, in the public domain without breach of this Agreement or breach of a similar agreement by a third party; (2) prior to disclosure hereunder, is property within the legitimate possession of the receiving

Party; (3) is lawfully received from a third party having rights therein without restriction of third party's or the receiving Party's rights to disseminate the information and without notice of any restriction against its further disclosure; or (4) is independently developed by the receiving Party through persons who have not had, either directly or indirectly, access to or knowledge of such Confidential Information. During the Term, the Parties may supply and/or disclose to each other Confidential Information relating to the business of the other Party. Each item of Confidential Information will be kept confidential by the Parties during the Term and for a period of three (3) years thereafter, but may be disclosed in the enforcement or seeking of damages with respect to a Party's rights under this Agreement. The receiving Party will be responsible for any improper use of the Confidential Information by it or any of its Agents. Without the prior written consent of the disclosing Party, the receiving Party will not disclose to any entity or person the Confidential Information, or the fact that the Confidential Information has been made available to it, except for disclosures required by law, disclosures authorized by the Party owning the Confidential Information and disclosures made in the context of the enforcement or seeking of damages with respect to a Party's rights under this Agreement. Each person to whom Confidential Information is disclosed must be advised of its confidential nature and must agree to abide by the terms of this section.

## 15. ASSUMPTION OF LIABILITIES

Neither Party is assuming or will be responsible for any of the other's liabilities or obligations (including but not limited to customer obligations) except as required by the FCC or this Agreement.

## 16. FCC-MANDATED OBLIGATIONS

(a) Licensee and Clearwire are familiar with the FCC Rules affecting secondary markets for spectrum and the provision of EBS, the Communications Act of 1934, as amended ("**Communications Act**"), the Code of Federal Regulations, and all other applicable FCC Rules, and agree to comply with all such laws and regulations.

(b) Effective on the Commencement Date, Clearwire assumes primary responsibility for complying with the Communications Act, and any FCC Rules that apply to the Channels and FCC License, and this Agreement may be revoked, cancelled or terminated, in accordance with Section 11, by Licensee or by the FCC if Clearwire materially fails to comply with applicable laws and regulations.

(c) Neither Licensee nor Clearwire will represent itself as the legal representative of the other before the FCC or any party, but will cooperate with each other consistent with this Agreement with respect to FCC matters concerning the Licenses and the Channels.

(d) If the FCC License is revoked, cancelled, terminated or otherwise ceases to be in effect, Clearwire will have no continuing authority or right to use the Channels unless otherwise authorized by the FCC.

(e) This Agreement is not an assignment, sale or transfer of the FCC License itself.

(f)    This Agreement will not be assigned to any entity that is ineligible or unqualified to enter into a use agreement for the Channels under the FCC Rules.

(g)    Licensee will not consent to an assignment, subassignment or sublicensing of this secondary market arrangement unless such assignment, subassignment or sublicensing complies with applicable FCC Rules and this Agreement.

(h)    Licensee and Clearwire must each retain a copy of this Agreement and make it available upon request by the FCC, in accordance with the confidentiality provisions in Section 14.

## 17.    LICENSEE'S AUTHORIZATIONS

Licensee shall maintain all necessary qualifications to hold and to obtain renewal in the ordinary course of the FCC License subject to Clearwire's obligations under this Agreement, including, without limitation, Clearwire's obligation to cause Licensee's FCC License to timely meet the substantial service requirement, as such qualifications may be amended or modified from time to time (individually an **"FCC Qualification"** and collectively referred to as the **"FCC Qualifications"**), and shall not knowingly or negligently take any action, or fail to take any action, which action or failure to act creates a material risk that Licensee shall lose any FCC Qualification; *provided, that* in the event that the FCC or any other legal authority shall at any time specify new or different qualifications or conditions for the maintenance of any FCC Qualification or shall issue a pronouncement offering a new interpretation of a FCC Qualification, Clearwire shall reimburse on demand Licensee's reasonable expenses of taking such action as are required for Licensee to bring itself and its operations into compliance with such new or different qualifications or conditions and maintaining such compliance; *provided, further,* that it shall not be deemed a breach of this sentence if Licensee loses a FCC Qualification as a result, in whole or in part, of an act or omission of Clearwire or any failure of Clearwire to perform its obligations under this Agreement. If, at any time, Licensee fails, or it appears to Licensee more likely than not that it will fail, to maintain any one or more of its FCC Qualifications with respect to the License, Licensee shall give written notice to Clearwire within five (5) days after Licensee becomes actually aware that (i) it no longer maintains such FCC Qualifications or (ii) with the passage of time or upon the occurrence of a future event it will no longer maintain such FCC Qualifications (referred to as a **"Disqualification Event"**). Licensee shall cooperate with reasonable requests of Clearwire made from time to time for the purpose of verifying, at Clearwire' expense, that Licensee maintains its FCC Qualifications. Upon the occurrence of a Disqualification Event, Licensee shall, at Clearwire's expense, promptly undertake all reasonable actions to obtain, to the extent permitted by applicable law, a waiver from the FCC regarding the circumstances giving rise to such Disqualification Event or to cure the circumstances giving rise to such Disqualification Event.

## 18.    MUTUAL REPRESENTATIONS AND WARRANTIES

(a)    **By Licensee to Clearwire.**  Licensee hereby represents and warrants to Clearwire that:

(i)     <u>Organization and Good Standing</u>.  It is a nonprofit corporation duly organized, validly existing and in good standing under the laws of its state of organization and has all requisite corporate power and authority to own, lease and operate its properties and to carry on its business as now conducted and as proposed to be conducted.  It is duly qualified or authorized to do business as a foreign corporation and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing does not have and would not reasonably be expected to have a material adverse effect on the business, operations, properties, assets, condition (financial or other) or results of operations of Licensee, taken as a whole, other than changes affecting the broadband wireless business generally (**"Licensee Material Adverse Effect"**).

(ii)     <u>Authorization of Agreement</u>.  It has all requisite corporate power and authority to enter into, deliver and carry out the transactions contemplated by this Agreement.  This Agreement has been duly and validly executed and delivered by it and (assuming the due authorization, execution and delivery by the other Parties hereto) this Agreement constitutes the legal, valid and binding obligations of Licensee, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(iii)     <u>No Conflict</u>.  Except as set forth on the disclosure schedule attached hereto by Licensee (the **"Licensee Schedule"**):

**a.**     Neither the execution and delivery by Licensee of this Agreement, nor compliance by Licensee with any of the provisions hereof will (i) conflict with, or result in the breach of, any provision of Licensee's certificate or articles of incorporation or bylaws, (ii) conflict with, violate, result in the breach of, constitute (with or without due notice, lapse of time or both) a default under, result in the acceleration of, create in any party the rights to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any note, bond, mortgage, indenture, license, agreement or other obligation to which Licensee is a party or by which Licensee or any of its properties or assets is bound or (iii) violate any statute, rule, regulation, order or decree of any Federal, state or local government , or any governmental, regulatory, legislative, executive, or administrative authority, agency or commission, or any court, tribunal, or judicial body (**"Government Agency"**) by which Licensee is bound, except in the cases of clauses (ii) and (iii) for such conflicts, violations, breaches, accelerations or defaults as would not, individually or in the aggregate, have a Licensee Material Adverse Effect.

**b.**     No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any person, entity or Government Agency is required on the part of Licensee in connection with the execution and

delivery of this Agreement or the compliance by Licensee with any of the provisions hereof, except as contemplated herein.

(iv)    <u>FCC Licenses</u>.  Except as set forth on the disclosure schedule attached hereto by Licensee (the **"Licensee Schedule"**):

**a.**    To the best knowledge of Licensee, all information set forth in <u>Schedule A</u> regarding the License is complete and accurate in all material respects, although Licensee makes no representation as to the MHzPops associated with the License.  Licensee holds the License free and clear of all any lien, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, easement, servitude, transfer restriction, encumbrance or any other restriction or limitation whatsoever except for liens for taxes not then due and payable and generally applicable FCC-imposed restrictions ("Liens").

**b.**    Licensee is authorized, by final order, to hold the FCC License, subject to any pending renewal application listed on the Licensee Schedule.

**c.**    To the best knowledge of Licensee, the Licensee Schedule sets forth a true list of interference consents that have been granted by Licensee with respect to any FCC Licenses and that are germane under the two-way rules and would have a material impact on the use of the Channels (excluding routine consents customary in the industry).

(v)    <u>Litigation</u>.  Except as set forth in the Licensee Schedule and other than proceedings of general applicability and those related to market transitions, there is no action, suit, litigation, arbitration proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), hearing, inquiry, audit, examination or investigation commenced, brought, conducted or heard by or before, or otherwise involving any court or other Government Agency or any arbitrator or arbitration panel now in progress or pending or, to the knowledge of Licensee, threatened against Licensee or the assets (including the intellectual property rights) or the business of Licensee, nor to the knowledge of Licensee, does there exist any basis therefore, except for immaterial claims brought against Licensee in the ordinary course of business.  Other than orders issued in licensing proceedings which contain no continuing requirements or continuing unusual conditions and Orders which are set forth on the Licensee Schedule, Licensee is not subject to any order, writ, judgment, injunction, decree, stipulation, determination, or award entered by or with any Government Agency.

(vi)    <u>Compliance with Laws; Permits</u>.  To the best knowledge of the Licensee where and during the time access to the Channels currently subject to the FCC License has been governed by a third party agreement (and assuming that the third party agreement and normal conduct by parties pursuant to this type of agreement comply in all material respects with the Communications Act and FCC Rules) and except as provided in the Licensee Schedule, Licensee (a) has complied in all respects with all federal, state, local and foreign laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business with

the Channels other than where noncompliance would not reasonably be expected to have a Licensee Material Adverse Effect and (b) has all federal, state, and local governmental permits, authorizations, approvals, licenses, certificates and consents (**"Permits"**) necessary in the conduct of its business as currently conducted with the Channels and to own and use its assets used with the Channels in the manner in which such assets are currently owned and used other than where the failure to possess such Permits would not, individually or in the aggregate, reasonably be expected to have a Licensee Material Adverse Effect, such Permits are in full force and effect, and no violations have been recorded in respect of any such Permit, and no proceeding is pending or, to the best knowledge of Licensee, threatened to revoke or limit any such Permit.

(vii)   <u>Brokers</u>.    Neither Licensee nor any of its directors, officers, employees, or representatives has employed any broker or finder in connection with this Agreement.

(viii)   <u>Knowledge</u>.  Any representation, warranty, covenant, obligation, or part thereof that states that it is made to the best knowledge of Licensee is made to its best knowledge after commercially reasonable investigation and includes all facts which it knew or should have known as a result of such investigation, including the best knowledge of Licensee's executive officers and legal counsel after commercially reasonable investigation.

(b)    **By Clearwire to Licensee.**  Clearwire hereby represents and warrants to Licensee that:

(i)    <u>Organization and Good Standing</u>.  Clearwire is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Nevada.  Each has all requisite corporate or limited liability company power and authority to own, lease and operate its properties and to carry on its business as now conducted.  Clearwire is duly qualified or authorized to do business as a foreign organization and is in good standing under the laws of each jurisdiction in which it owns or leases real property and each other jurisdiction in which the conduct of its business or the ownership of its properties requires such qualification or authorization, except where the failure to be so qualified, authorized or in good standing does not have and would not reasonably be expected to have a material adverse effect on the business, operations, properties, assets, condition (financial or other) or results of operations of Clearwire, taken as a whole, other than changes affecting the broadband wireless business generally (**"Clearwire Material Adverse Effect"**).

(ii)    <u>Authorization of Agreement</u>.  Clearwire has all requisite corporate or limited liability company power and authority (i) to enter into, deliver and carry out this Agreement, and (ii) to enter into and deliver all documents required or necessary to be executed by it in connection with the consummation of this Agreement.  This Agreement (assuming the due authorization, execution and delivery by Licensee) constitutes the legal, valid and binding obligations of Clearwire, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to

24

general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

(iii)    No Conflict.  Neither of the execution and delivery by Clearwire of this Agreement, nor the compliance by Clearwire with any of the provisions hereof will (i) conflict with, or result in the breach of, any provision of the certificate of limited liability company or operating agreement of Clearwire, (ii) conflict with, violate, result in the breach of, or constitute  (with or without due notice, lapse of time or both) a default under, result in the acceleration of, create in any party the rights to accelerate, terminate, modify or cancel, or require any notice, consent or waiver under, any note, bond, mortgage, indenture, license, agreement or other obligation to which Clearwire is a party or by which Clearwire or any of its respective properties or assets are bound or (iii) violate any statute, rule, regulation, order or decree of any Government Agency by which Clearwire is bound, except, in the case of clauses (ii) and (iii), for such conflicts, violations, breaches, accelerations or defaults as would not, individually or in the aggregate, have a Clearwire Material Adverse Effect.

(iv)    Consents.  No consent, waiver, approval, order, permit or authorization of, or declaration or filing with, or notification to, any person, entity or Government Agency is required on the part of Clearwire in connection with the execution and delivery of this Agreement or the compliance by Clearwire with any of the provisions hereof.

(v)    Litigation.  Except as would not reasonably be expected to have a materially adverse effect on the ability of Clearwire to execute, deliver and perform this Agreement, (a) there is no Proceeding now in progress or pending or, to the knowledge of Clearwire, threatened against Clearwire or the assets or the business of Clearwire and (b) neither Clearwire is not subject to any order, writ, injunction or decree of any court or other Government Agency other than orders issued in licensing proceedings.

(vi)    Compliance with Laws; Permits.  Clearwire (a) has complied in all respects with all federal, state, and local laws, rules, ordinances, codes, consents, authorizations, registrations, regulations, decrees, directives, judgments and orders applicable to it and its business other than where noncompliance would not, individually or in the aggregate, reasonably be expected to have a Clearwire Material Adverse Effect and (b) has all federal, state, and local governmental Permits necessary in the conduct of its business as currently conducted and to own and use its assets in the manner in which such assets are currently owned and used other than where the failure to possess such Permits would not, individually or in the aggregate, reasonably be expected to have a Clearwire Material Adverse Effect, such Permits are in full force and effect, and no violations have been recorded in respect of any such Permit, and no proceeding is pending or, to the best knowledge of Clearwire, threatened to revoke or limit any such Permit.

(vii)    Brokers.  Neither Clearwire nor any of its directors, officers, employees or representatives has employed any broker or finder in connection with this Agreement.

## 19.    INDEMNIFICATION

(a)    Licensee shall indemnify Clearwire, its Affiliates, and each of their respective stockholders, directors, officers, employees, agents, successors and assigns (collectively, the **"Clearwire Indemnified Parties"**) and hold each of the Clearwire Indemnified Parties harmless from and against any and all Damages based upon, attributable to or resulting from:

(i)    the failure of any representation or warranty of Licensee set forth herein, or any representation or warranty contained in any certificate delivered by or on behalf of Licensee pursuant to this Agreement, to be true and correct as of the dates made; or

(ii)    the breach of any covenant or other agreement on the part of the Licensee under this Agreement; or

(iii)    any Claim brought or threatened against Clearwire by a third party claiming one or more rights with respect to Clearwire, or by virtue of Clearwire entering into this Agreement, an alleged breach of a contractual right of first refusal ("ROFR") commitment or negotiation commitment of Licensee.

(b)    Clearwire shall indemnify the Licensee, its Affiliates, and each of their respective, agents, successors and assigns (collectively, the **"Licensee Indemnified Parties"**) and hold each of the Licensee Indemnified Parties harmless from and against any and all Damages based upon, attributable to or resulting from:

(i)    the failure of any representation or warranty of Clearwire set forth herein, or any representation or warranty contained in any certificate delivered by or on behalf of Clearwire pursuant to this Agreement, to be true and correct as of the dates made;

(ii)    the breach of any covenant or other agreement on the part of Clearwire under this Agreement;

(iii)    the operation of equipment by, the provision of service by or otherwise related to the activities of Clearwire, any of its Affiliates or any of its sublicensees or resellers including, without limitation, damage to health; or

(iv)    any forfeitures or fines levied by the FCC against Licensee, or loss or impairment of the FCC License, arising from Clearwire's act or omission.

(c)    **Determination of Damages.** As used herein, **"Damages"** means any and all losses, claims, demands, liabilities, obligations, actions, suits, orders, statutory or regulatory compliance requirements, or proceedings asserted by any Person, and all damages, costs, expenses, assessments, judgments, recoveries and deficiencies, including interest, penalties, investigatory expenses, consultants' fees, and reasonable attorneys' fees and costs, of every kind and description, contingent or otherwise. For purposes of the above, the amount of Damages in respect of any breach of a representation or warranty shall be determined without regard to any limitation or qualification as to materiality set forth in such representation or warranty. As used

in this Agreement, **"Person,"** whether or not such term is capitalized, means any individual, partnership, firm, corporation, limited liability licensee(s), association, trust, unincorporated organization, or other entity.

(d)    **Indemnification Procedures.**

(i)    In the event that any claim shall be asserted by any Person in respect of which payment may be sought under this Section 19 (each, a **"Claim"**), the indemnified party shall reasonably and promptly cause written notice (a **"Claim Notice"**) of the assertion of such Claim of which it has knowledge which is covered by this indemnity to be forwarded to the indemnifying party. The indemnifying party shall have the right, at its sole option and expense, to be represented by counsel of its choice, which must be reasonably satisfactory to the indemnified party, and to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder. If the indemnifying party elects to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder, it shall within five (5) days of delivery of the Claim Notice (or sooner, if the nature of the Claim so requires) notify the indemnified party of its intent to do so. If the indemnifying party elects not to defend against, negotiate, settle or otherwise deal with any Claim which relates to any Damages indemnified against hereunder, fails to notify the indemnified party of its election as herein provided or contests its obligation to indemnify the indemnified party for such Damages under this Agreement, the indemnified party may defend against, negotiate, settle or otherwise deal with such Claim. If the indemnified party defends any Claim, then the indemnifying party shall reimburse the indemnified party for the expenses of defending such Claim upon submission of periodic bills. If the indemnifying party shall assume the defense of any Claim, the indemnified party may participate, at his or its own expense, in the defense of such Claim; *provided, however*, that such indemnified party shall be entitled to participate in any such defense with separate counsel at the expense of the indemnifying party if, so requested by the indemnifying party to participate or (ii) in the reasonable opinion of counsel to the indemnified party, a conflict or potential conflict exists between the indemnified party and the indemnifying party that would make such separate representation advisable; and *provided, further*, that the indemnifying party shall not be required to pay for more than one such counsel for all indemnified parties in connection with any Claim. The Parties hereto agree to cooperate fully with each other in connection with the defense, negotiation, or settlement of any such Claim.

(ii)    After any final judgment or award shall have been rendered by a court, arbitration board or administrative agency of competent jurisdiction and the expiration of the time in which to appeal therefrom, or a settlement shall have been consummated, or the indemnified party and the indemnifying party shall have arrived at a mutually binding agreement with respect to a Claim hereunder, the indemnified party shall forward to the indemnifying party notice of any sums due and owing by the indemnifying party pursuant to this Agreement with respect to such matter.

(iii)    The failure of the indemnified party to give reasonably prompt notice of any Claim shall not release, waive or otherwise affect the indemnifying party's obligations with respect thereto except to the extent that the indemnifying party can demonstrate actual loss and prejudice as a result of such failure.

(e)     **Survival.**  Each Party's obligations under this section will survive the expiration or termination of this Agreement.

## 20.     MISCELLANEOUS

(a)     **Laws, Rules and Regulations.**  This Agreement is subject to all laws, rules, regulations and ordinances relative to, among other things, the subject matter addressed in this Agreement.

(b)     **Force Majeure.**  Other than the failure to pay money when required, neither Party will be liable for any nonperformance under this Agreement due to causes beyond its reasonable control that could not have been reasonably anticipated by the non-performing Party and that cannot be reasonably avoided or overcome; *provided* that the non-performing party gives the other Party prompt written notice of such cause, and in any event, within fifteen (15) calendar days of its discovery.

(c)     **Independent Parties.**  None of the provisions of this Agreement will be deemed to constitute a partnership, joint venture, or any other such relationship between the Parties, and neither Clearwire nor Licensee will have any authority to bind the other in any manner.  Neither Party will have or hold itself out as having any right, authority or agency to act on behalf of the other Party in any capacity or in any manner, except as may be specifically authorized in this Agreement.

(d)     **Dispute Resolution.**

(i)     <u>General</u>.  The Parties desire to resolve disputes arising out of this Agreement without litigation.  Accordingly, the Parties agree to use the dispute resolution procedures set forth in this Section 20(d) (the **"Dispute Resolution Procedures"**) as their sole means of adjudication with respect to any controversy or claim arising out of or relating to this Agreement or its breach.

(ii)     <u>Dispute Notice</u>.  At the written request of any Party (a **"Dispute Notice"**), the Parties to the dispute will within seven business days of the Dispute Notice, appoint knowledgeable, responsible representatives to meet and negotiate in good faith to resolve any dispute arising under this Agreement.  The Parties intend that these negotiations be conducted by business representatives, including at least one senior executive of each Party to the dispute.  The representatives shall meet and confer, in person or by teleconference, not later than such seventh business day after the date of the Dispute Notice.  The location, format, frequency, duration and conclusion of these discussions shall be left to the discretion of the representatives; *provided* that, the duration shall not exceed 45 days from the date of the Dispute Notice (an **"Action Date"**) unless extended by mutual written agreement of the Parties setting forth a new Action Date.  The Dispute Notice and any extension shall specify the Action Date.  The Dispute Notice shall set forth the nature of the dispute, in reasonable detail.  Discussion and correspondence among the representatives for purposes of these negotiations shall be treated as confidential information developed for purposes of settlement, exempt from discovery and production, and shall not be admissible in the arbitration described below.  Documents identified in or

provided with such communications, which are not prepared for purposes of the negotiations, are not so exempted and may, if otherwise admissible, be admitted in evidence in the arbitration. If the Parties are unable to resolve any disputes arising under or relating to this Agreement (each a **"Dispute"**) using the process described in this Section 20(d) within the time period provided, including without limitation disputes regarding a breach or default under this Agreement, the Parties shall arbitrate such dispute pursuant to the arbitration provisions set forth in Section 20(d)(iii).

(iii)     <u>Arbitration</u>.  Any Dispute that has not be resolved within the time period provided for in Section 20(d)(ii) shall be resolved by a panel of three Arbitrators. The Dispute Notice shall automatically serve as a written notice of a request to submit the Dispute for arbitration if there has not been a resolution of the Dispute by the Action Date, and the Parties agree to submit the Dispute to a panel of three arbitrators who shall be appointed within 30 days of the Action Date (the **"Submission Period"**).  During the Submission Period, the Parties shall appoint the arbitrators in accordance with the Commercial Arbitration Rules (then in effect) of the American Arbitration Association (**"AAA"**), as modified below.  No punitive damages (or any other amount awarded for the purpose of imposing a penalty) will be awarded for a breach of this Agreement.

(iv)     During the Submission Period, the Parties may submit a request for discovery to the arbitrators, who shall determine whether the scope of the requested discovery is appropriate or useful for the resolution of the Dispute and order the discovery in their discretion; provided that such discovery process shall be concluded not later than 30 days following the submission date (the **"Discovery Close Date"**).

(v)     The arbitration hearing shall be fixed by the arbitrators to be not sooner than 20 days nor later than 45 days after the Discovery Close Date (the **"Hearing Date"**).  The hearing shall be located at a neutral site as mutually agreed by the Parties, or if the Parties cannot so agree, then the location of the arbitration shall be Washington, D.C. The Federal Rules of Evidence shall apply to the arbitration hearing.  The Party bringing a particular claim or asserting an affirmative defense will have the burden of proof with respect thereto.  Each Party shall bear the burden of persuasion with respect to its proposal for resolution of the matter.  The arbitration proceedings and all testimony, filings, documents and information relating to or presented during the arbitration proceedings shall be deemed to be information subject to the confidentiality provisions of this Agreement. The arbitrators will have no power or authority, pursuant to the rules of the AAA or otherwise, to relieve the Parties from their agreement hereunder to arbitrate or otherwise to amend or disregard any provision of this Agreement, including without limitation the provisions of this Section.

(vi)     Each Party shall be permitted to submit a pre-hearing brief not to exceed 25 pages and such technical supporting material as is necessary or useful, to be submitted to the arbitrators and the other Party not later than 5 days before the Hearing Date, and each Party may issue a response thereto not later than 2 days before the Hearing Date.  Following the arbitration hearing, each Party shall be permitted to submit a post-hearing brief not to exceed 25 pages within 5 days following the Hearing Date and a reply brief within 2 days thereafter (the **"Pleading Close Date"**).  Should an arbitrator refuse or

be unable to proceed with arbitration proceedings as called for by this Section, the arbitrator shall be replaced pursuant to the rules of the AAA. If an arbitrator is replaced after the arbitration hearing has commenced, then a rehearing shall take place in accordance with this Section and the rules of the AAA.

(vii)    Within fifteen (15) days after the Pleading Close Date, the arbitrators will prepare and distribute to the Parties a writing setting forth the arbitration panel's reasons for its determination. The findings and conclusions and the award, if any, shall be deemed to be confidential information of the Parties. Neither Party may disclose such information to any third party other than their professional advisors or as required by law or regulations, except in connection with an action to enforce the award.

(viii)    The Arbitrators are instructed to schedule promptly all discovery and other procedural steps and otherwise to assume case management initiative and control to effect an efficient and expeditious resolution of the Dispute. The arbitrators are authorized to issue monetary sanctions against either Party if, upon a showing of good cause, such Party is unreasonably delaying the proceeding.

(ix)    Any award rendered by the arbitrators will be final, conclusive, and binding upon the Parties and any judgment thereon may be entered and enforced in any court of competent jurisdiction.

(x)    The non-prevailing Party to an arbitration shall pay its own expenses, the fees of each arbitrator, the administrative fee of the AAA, and the expenses, including without limitation, reasonable attorneys' fees and costs, and expert and witness fees and costs, incurred by the other Party to the arbitration. In the case of a decision that partially favors each Party, expenses shall be paid as determined by the arbitrators. In connection with any judicial proceeding to compel arbitration pursuant to this Agreement or to confirm, vacate or enforce any award rendered by the arbitrators, the prevailing Party in such a proceeding shall be entitled to recover reasonable attorney's fees and expenses incurred in connection with such proceedings, in addition to any other relief to which it may be entitled.

(xi)    Notwithstanding anything to the contrary, neither Party shall have any obligation to arbitrate claims for injunctive relief, specific performance, or other equitable relief or for the use or unauthorized disclosure of confidential information, as to which either Party shall be entitled to seek and obtain relief from a court of competent jurisdiction; *provided* that, any and all claims for damages shall remain subject to arbitration.

(e)    **Notices.**

All notices and other communications under this Agreement shall be in writing and shall be deemed given when delivered personally or by overnight courier, or mailed by certified mail, return receipt requested, to the Parties (and shall also be transmitted by facsimile to the Persons receiving copies thereof) at the following addresses (or to such other address as a Party may have specified by notice given to the other Party pursuant to this provision):

31

(i)    **Clearwire:**

Clearwire Spectrum Holdings II LLC
5808 Lake Washington Blvd. N.E.
Suite 300
Kirkland, WA 98033
Attn:  Hope Cochran, Vice President
Fax:  (425) 828-8061

With a Copy to:

Clearwire Spectrum Holdings II LLC
5808 Lake Washington Blvd. N.E.
Suite 300
Kirkland, WA 98033
Attn:  Legal Department
Fax:  (425) 828-8061

Davis Wright Tremaine, LLP
2600 Century Square
1501 Fourth Avenue
Seattle, WA 98101
Attn:  Julie Weston, Esq.
Fax:  (206) 628-7699

**Licensee**

Hispanic Information and Telecommunications Network, Inc.
63 Flushing Avenue
Unit 281
Brooklyn, New York  11205
Telecopy:  (212) 966-5725
Telephone:  (212) 966-5660
Attention: Jose Luis Rodriguez

With a copy to:

Day, Berry & Howard LLP
875 Third Avenue
New York, NY  10022
Attention:  Sabino Rodriguez
Fax:     (212) 829-3601

And a copy to:

RJGLaw LLC
1010 Wayne Avenue, Suite 950

Silver Spring, MD 20910
Attention: Rudolph J. Geist
Fax:    (301) 589-2644

Either Party may change its addresses for receipt of notice or payment by giving notice of such change to the other Party as provided in this Section.

(f)    **Applicable Law.**  The validity, construction and performance of this Agreement will be governed by and construed in accordance with the laws of the State of New York.

(g)    **Severability.**  If any provision of this Agreement is found to be illegal, invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the validity, legality and enforceability of the remaining provisions will not in any way be affected or impaired, unless continued enforcement of the provision frustrates the intent of the Parties.  To the extent that the Parties or the FCC determine that the provisions of this Agreement are not adequate to enable Licensee to comply with the regulatory requirements associated with the FCC License, the Parties will amend these provisions to ensure that the Licensee is in compliance with its FCC obligations with respect to the FCC License.  The Parties believe that the provisions of this Agreement comply with all current FCC Rules, and shall express that belief to regulatory agencies and the general public.

(h)    **Best Efforts.**  The Parties acknowledge that there will be many changes in the course of the Term, in technology, capabilities, and regulatory environment among other areas, and agree to act in a cooperative manner to preserve the intentions of the relationships reflected in the Agreements to their mutual advantage and to use their commercially reasonable best efforts to maintain that mutual advantage.

(i)    **No Waiver.**  No delay or failure by either Party in exercising any right under this Agreement, and no partial or single exercise of that right, will constitute a waiver of that or any other right.  Failure to enforce any right under this Agreement will not be deemed a waiver of future enforcement of that or any other right.

(j)    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but which collectively will constitute one and the same instrument.  Signatures transmitted by facsimile will be effective to create such counterparts.

(k)    **Headings.**  The headings and captions used in this Agreement are for convenience only and are not to be considered in construing or interpreting this Agreement.

(l)    **Construction.**  The Parties and their respective counsel have negotiated this Agreement.  This Agreement will be interpreted in accordance with its terms and without any strict construction in favor of or against either Party based on draftsmanship of the Agreement or otherwise.

(m)    **Complete Agreement.**  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter addressed, and supersedes and replaces all prior or contemporaneous understandings or agreements, written or oral, between the Parties or any of their affiliates regarding this subject matter.  No amendment to or modification of this Agreement will be binding unless in writing and signed by a duly authorized representative of each of the Parties.

(n)    **Cooperation.**  The Parties will take such further action and execute such further assurances, documents and certificates as either Party may reasonably request to effectuate the purposes of this Agreement.

(o)    **Insurance.**

(i)    Clearwire shall maintain and shall cause each Service Entity to maintain insurance coverage, and on all certificates for coverage under general liability, automobile liability, employer's liability, worker's compensation, and any other coverages required under local law, shall: (i) name Licensee as an "Additional Insured" on the liability policies, including without limitation, as an insured with respect to third-party claims or actions made or brought directly against Licensee or against Licensee, Clearwire and/or such Service Entity as co-defendants and arising out of or in connection with this Agreement or operations; (ii) be written as a primary policy not contributing with any other coverage which Licensee may carry for the acts and omissions of Clearwire or such Service Entity and for whom Clearwire or such Service Entity is responsible; and (iii) stipulate that Licensee shall receive thirty (30) days' prior written notice of any cancellation in coverage; *provided* that such cancellation shall not relieve Clearwire of its continuing obligation to maintain or to cause each such Service Entity to maintain insurance coverages in accordance with this Section.

(ii)    Clearwire shall maintain and shall cause each Service Entity to maintain with reputable insurers having a Best Rating of A or better:

a.    Commercial general liability insurance with at least $2,000,000 combined single limit bodily injury and property damage limits written on an occurrence basis.

b.    Full statutory coverage for Workers' Compensation and Employers' Liability with limits as required by law.  These policies will contain waivers of the insurer's subrogation rights against Licensee where permitted by law.

c.    Errors and omissions or professional liability coverage with a limit of at least $1,000,000 per each claim and $1,000,000 annual aggregate.  If Clearwire obtains a claims-made policy, Clearwire shall maintain continuous coverage in effect at least three (3) years beyond the expiration or termination of this Agreement through continuous renewal of the same policy or purchase of extended discovery period or retroactive insurance dated back to at least the date of the beginning of this Agreement.  This coverage should include infringement of copyright, trademark, title or slogan, piracy, plagiarism or unauthorized use of

34

materials. Clearwire may self-insure this provision as long as Clearwire maintains a minimum net worth of at least $100 million.

      **d.**      All risk property insurance policy coverage in amounts adequate to cover Licensee's property in Clearwire's care, custody and control.

      (iii)      Clearwire shall furnish Licensee with certificates of insurance evidencing all of the insurance referred to herein (including renewals of insurance). Clearwire's obligations under this Section shall in no way affect or limit the indemnification, remedy, or warranty provisions set forth in this Agreement.

      **(p)**      **Publicity.**  No public release, announcement or other form of publicity concerning this Agreement or the transactions described in this Agreement, shall be issued by either Party without the prior consent of the other Party, except as such release or announcement may be required by law, regulation or the rules or regulations of any securities exchange, in which case the Party required to make the release or announcement shall, to the extent possible, allow the other Party reasonable time to comment on such release or announcement in advance of such issuance. The Parties shall use reasonable efforts to consult in good faith with each other with a view to agreeing upon any press release or public announcement relating to the transactions contemplated hereby prior to the consummation thereof.

[remainder of page intentionally left blank]

AGREED TO:

**CLEARWIRE SPECTRUM HOLDINGS II LLC**

By:_____

Name:_____

Title:_____

**HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC.**

By:_____

Name:_____

Title:_____

**ATTACHMENTS:**

Licensee Schedule

**LICENSE SCHEDULE**

**SCHEDULE A**

71361919.3

**SCHEDULE B**

71361919.3

**EXHIBIT III**

## PLEDGE AGREEMENT

THIS PLEDGE AGREEMENT (this "Agreement") is made as of the 4th day of October, 2006, between Hispanic Information and Telecommunications Network, Inc. (the "Pledgor"), and Clearwire Corporation, a Delaware corporation (the "Pledgee").

## RECITALS

A.    The Pledgee is paying the Pledgor $23,000,000 pursuant to the terms of the Master Royalty and Use Agreement among the Pledgor and Clearwire Spectrum Holdings II LLC ("Operator"), a subsidiary of the Pledgee, dated as of the date of this Agreement (as amended, restated, modified, renewed, supplemented or extended from time to time, the "MRUA"). This payment will be available for application against upfront royalties for Initial Spectrum Capacity and Future Spectrum Capacity offered by the Pledgor to Operator from time to time

B.    The parties are entering into this Agreement for the purpose of the Pledgor granting security interests to the Pledgee to secure the obligation of the Pledgor to repay the Prepaid Royalties Balance as defined in the MRUA.

NOW, THEREFORE, in consideration of the foregoing, and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Pledgor hereby agrees as follows:

## AGREEMENT

1.    **Definitions; Interpretation.**

(a)    **Certain Defined Terms.**  As used in this Agreement, the following terms have the following meanings:

"Governmental Authority" means the government of the United States or any state or any foreign country or any political subdivision of any thereof or any branch, department, agency, instrumentality, court, tribunal or regulatory authority which constitutes a part or exercises any sovereign power of any of the foregoing.

"Lien" means, for any person, any security interest, pledge, mortgage, charge, assignment, hypothecation, encumbrance, attachment, garnishment, execution or other voluntary or involuntary lien upon or affecting the revenues of such person or any real or personal property in which such person has or hereafter acquires any interest.

"Pledged Collateral" has the meaning specified in Section 2.

"Secured Obligations" means:

(i) the obligation of the Pledgor to repay in full the Prepaid Royalties Balance as provided in the MRUA and all fees, costs, and expenses incurred by the Pledgee in connection therewith if not repaid in accordance with the terms of the MRUA;

(ii)    all obligations of the Pledgor to pay or reimburse the Pledgee or any affiliate of the Pledgee for all expenses including, without limitation, attorneys' fees incurred by the Pledgee or any affiliate of the Pledgee in connection with the enforcement, attempted enforcement, or preservation of any rights or remedies under this Agreement, including, without limitation, all such costs and expenses incurred during any "workout" or restructuring in respect of the MRUA and during any legal proceeding, including, without limitation, any proceeding under any applicable bankruptcy, insolvency or other similar debtor relief laws; and

(iii)    all interest and fees on any of the foregoing, whether accruing prior to or after the commencement by or against the Pledgor of any proceeding under any applicable bankruptcy, insolvency or other similar debtor relief laws naming the Pledgor as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"UCC" means the Uniform Commercial Code as the same may, from time to time, be in effect in the State of Washington; provided, however, in the event that any Pledged Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of Washington, the term "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof as they relate to such Pledged Collateral.

(b)    **Terms Defined in UCC.**  Terms used in this Agreement that are defined in the UCC have the meanings given to them in the UCC.

(c)    **Terms Defined in the MRUA.**  Terms used in this Agreement that are defined in the MRUA have the meanings given to them in the MRUA.

2.    **Pledge and Grant of Security Interest.**  As security for the payment or performance, as the case may be, in full of the Secured Obligations, the Pledgor hereby pledges, assigns, transfers, hypothecates and sets over to the Pledgee, its successors and assigns, and grants to the Pledgee, its successors and assigns, a security interest in all of the Pledgor's right, title and interest in, to and under the following, whether now existing or owned or hereafter acquired or arising (collectively, the "Pledged Collateral"):

(a)    **Pledged Shares.**  Not less than 2,833,334 shares of Class A Common Stock of Clearwire Corporation, as the number of such Shares may be reduced from time to time as provided in this Agreement (the "Shares"). The number of Shares pledged at any time shall have a value equal to, or greater than, the amount of the Prepaid Royalties Balance. As the Prepaid Royalties Balance decreases, Shares shall be released from the pledge established by this Agreement, provided, however, that Clearwire shall not be required to release Shares more than once per month. Shares shall be valued for all purposes under this Agreement at $6.00 per share; and

(b)    **Additional Interests, Etc.**  All certificates, instruments or other writings representing or evidencing the Pledged Collateral.

(c)    **Cash Proceeds.**  All cash and non-cash proceeds of the Pledged Collateral, however and whenever acquired and in whatever form (except for proceeds of a sale of Pledged

PAGE 2 – PLEDGE AGREEMENT
PDX 1514364v4 65187-645

Collateral that has been released by the Pledgee pursuant to Section 2(a)). Nothing in this Section 2(c) shall be deemed to imply that the Pledgor is permitted to sell, transfer or otherwise dispose of the Pledged Collateral, except for Pledged Collateral that has been released by the Pledgee pursuant to Section 2(a).

      **3.**     **Delivery of the Pledged Shares; Continuing Security Interest.** The Pledgor hereby agrees that:

      **(a)**     **Delivery of Certificates**. The Pledgor shall deliver to the Pledgee all certificates, instruments or other writings representing or evidencing Pledged Shares. All such certificates shall be delivered (i) simultaneously with or prior to the execution and delivery of this Agreement, and (ii) in suitable form for transfer by delivery or shall be accompanied by duly executed instruments of transfer or assignment satisfactory to the Pledgee.

      **(b)**     **Additional Pledged Collateral**. If the Pledgor shall receive by virtue of its being or having been the owner of any Pledged Collateral, any (i) certificate, including any certificate representing a non-cash dividend or distribution in connection with any increase or reduction of capital, reclassification, merger, consolidation, sale of assets, combination of membership or equity interests, spin-off or split-off, promissory notes or other instrument; (ii) warrant, option or other right, whether as an addition to, substitution for, or an exchange for, any Pledged Collateral or otherwise; (iii) distributions of securities or other equity interests, then the Pledgor shall forthwith deliver all of the foregoing to the Pledgee to hold as Pledged Collateral and shall, if received by the Pledgor, be received in trust for the benefit of the Pledgee, be segregated from the other property or funds of the Pledgor, and be forthwith delivered to the Pledgee as Pledged Collateral in the same form as so received, together with duly executed instruments of transfer or assignment satisfactory to the Pledgee, as further collateral security for the Secured Obligations ("Additional Pledged Collateral").

      **(c)**     **Continuing Security Interest**. The Pledgor acknowledges and agrees that the security interest of the Pledgee in the Pledged Collateral constitutes continuing collateral security for all of the Secured Obligations.

      **4.**     **Financing Statements**. The Pledgor hereby irrevocably authorizes the Pledgee at any time and from time to time to file in any relevant jurisdiction any initial financing statements and amendments thereto that contain the information required by Article 9 of the UCC or other applicable law of each applicable jurisdiction for the filing of any financing statement or amendment in order to perfect and protect the security interest of the Pledgee in the Pledged Collateral.

      **5.**     **Representations and Warranties of the Pledgor.** The Pledgor represents and warrants to the Pledgee that:

      **(a)**     **Ownership and Authority**. The Pledgor is the sole legal and beneficial owner of the Pledged Collateral and has the right, power and authority to pledge, assign, transfer, hypothecate and set over to the Pledgee and grant to the Pledgee a security interest in such Pledged Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement.

(b)     **Authorization of Pledged Shares**. All of the Pledged Shares are duly authorized and validly issued, are fully paid and nonassessable and are not subject to the preemptive first-refusal or other similar rights of any person. All interests hereafter constituting Pledged Collateral will be duly authorized and validly issued, fully paid and nonassessable and not subject to any preemptive, first-refusal or other similar rights of any person, except as may be provided under applicable law.

(c)     **Validity of Security Interest**. This Agreement creates a valid security interest in favor of the Pledgee, its successors and assigns, in all of the Pledged Collateral. Upon the taking possession by the Pledgee of the certificates representing the Pledged Shares and all other certificates and instruments constituting Pledged Collateral, the Pledgee will have a first priority perfected security interest in all certificated Pledged Shares and such certificates and instruments. Except as set forth in this subsection (c), no action is necessary to perfect or otherwise protect any security interest granted herein.

(d)     **Absence of Liens and Claims**. Except for the security interest of the Pledgee created hereby, the Pledged Collateral is free and clear of any Liens. There exists no "adverse claim" within the meaning of Section 8-102 of the UCC with respect to any of the Pledged Shares.

(e)     **No Transfer Restrictions**. Except for restrictions imposed by this Agreement, and other agreements to which the Pledgee is a party, the Pledged Collateral is free of contractual restrictions that might prohibit, impair, delay or otherwise affect the pledge of any Pledged Collateral hereunder or the sale or disposition thereof pursuant hereto.

(f)     **No Other Pledged Collateral**. As of the date of this Agreement, no other party has possession of any certificates, instruments or other writings representing or evidencing the Pledged Shares or has any warrants, options or other rights entitling such party to acquire any interest in the Pledged Shares.

(g)     **Delivery of Certificates**. The Pledgor has delivered or otherwise caused the transfer to the Pledgee of all certificates, instruments or other writings representing, evidencing or constituting Pledged Collateral. The Pledged Shares are not and shall not be represented or evidenced by any certificates, instruments or other writings other than those delivered hereunder.

(h)     **Margin Regulations**. The pledge of the Pledged Shares pursuant to this Agreement does not violate the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect. None of the Pledged Shares constitutes "margin stock" within the meaning of such term under Regulation U.

(i)     **Consents**. No consent or authorization of, filing with, or other act by or in respect of, any arbitrator or Governmental Authority and no consent of any other person is required (i) for the pledge made by the Pledgor or for the granting of the security interest by the Pledgor pursuant to this Agreement or for the execution, delivery or performance of this Agreement by the Pledgor or (ii) for the exercise by the Pledgee of the rights and remedies provided for in this Agreement.

(j)     **Power**.  The Pledgor has full power, authority and legal right to execute, deliver and perform this Agreement.

(k)     **Authorization.**  The execution, delivery and performance by the Pledgor of this Agreement have been duly authorized, do not require any approval or the consent of any third party, do not contravene any law, regulation, rule or order binding on it and do not contravene the provisions of or constitute a default under any material indenture, mortgage, contract or other agreement or instrument to which the Pledgor is a party or by which the Pledgor or any of its properties may be bound or affected.

(l)     **Government Approvals, Etc.**  No approval, authorization or consent of, or filing or registration with the United States or any state thereof or any other Governmental Authority or any agency, court or regulatory authority which constitutes a part of any of the foregoing, is required for the making and performance by the Pledgor of this Agreement or in connection with any of the transactions contemplated hereby.

(m)    **Binding Obligations, Etc.**  This Agreement has been duly executed and delivered by the Pledgor and constitutes the legal, valid and binding obligations of the Pledgor enforceable against the Pledgor in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, similar laws affecting creditors' rights generally or general principles of equity.

The foregoing representations and warranties shall survive the execution and delivery of this Agreement.

6.     **Covenants.**  So long as any of the Secured Obligations shall remain unpaid or unsatisfied, the Pledgor shall:

(a)     **Defense of Pledged Collateral**.  At the Pledgor's own cost and expense, take any and all actions necessary to defend title to the Pledged Collateral against all persons and to defend the Pledgee's security interest in the Pledged Collateral and the priority thereof against any Lien.

(b)     **Disposition of Pledged Collateral**.  Not make or permit to be made any sale, transfer or other disposition of any of the Pledged Collateral or grant any option, warrant or other right or interest with respect to, any of the Pledged Collateral, except with the prior written consent of the Pledgee.

(c)     **No Liens**.  Not make or permit to be made an assignment, pledge or hypothecation of any of the Pledged Collateral or create or permit to exist any Lien upon or with respect to any of the Pledged Collateral other than the security interest of the Pledgee created hereby.

(d)     **Compliance with Securities Laws**.  File all reports and other information now or hereafter required to be filed by the Pledgor with the Securities and Exchange Commission (including any Governmental Authority succeeding to any of its principal functions, the "SEC") and any other state, federal or foreign agency in connection with the Pledgor's ownership of the Pledged Shares.

7.    **Further Assurances.** The Pledgor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Pledgee may from time to time request to better assure, preserve, protect and perfect the security interest of the Pledgee in the Pledged Collateral and the rights and remedies of the Pledgee hereunder, including, without limitation, the payment of any fees and taxes required in connection with the execution and delivery of this Agreement, the granting of such security interest and the filing of any financing statements or other documents in connection herewith or therewith. Without limiting the generality of the foregoing, the Pledgor further agrees that it shall, concurrently with the execution of this Agreement and at any time and from time to time thereafter (a) procure, execute and deliver to the Pledgee all endorsements, financing statements, assignments and other instruments of transfer requested by the Pledgee, (b) deliver to the Pledgee immediately upon receipt the originals of all Pledged Shares and all certificates, instruments or other writings representing, evidencing or constituting Pledged Collateral, and (c) take all steps reasonably required to maintain the Pledgor's continued performance under the MRUA. The Pledgor agrees that it will use its best efforts to take such action as shall be necessary in order that all representations and warranties hereunder shall be true and correct with respect to such Pledged Shares within thirty (30) days after the date it has been notified by the Pledgee of the specific inaccuracy of a representation or warranty.

8.    **Registration in Nominee Name; Denominations.** The Pledgee shall have the right (in its sole and absolute discretion) to hold the Pledged Shares in its own name as pledgee, the name of its nominee (as pledgee or as sub-agent) or the name of the Pledgor, endorsed or assigned in blank or in favor of the Pledgee. The Pledgor will promptly give to the Pledgee copies of any material notices or other communications received by it with respect to Pledged Shares registered in the name of the Pledgor. The Pledgee shall at all times have the right to exchange the certificates representing Pledged Shares for certificates of smaller or larger denominations for any purpose consistent with this Agreement.

9.    **Voting Rights; Dividends.**

(a)    **Prior to the Occurrence of an Event of Default.** So long as no Event of Default shall exist or result therefrom (and, in the case of subparagraph (i) below, so long as written notice has not been given by the Pledgee to the Pledgor):

(i)    **Voting Rights.** The Pledgor shall be entitled to exercise any and all voting and other consensual rights pertaining to the Pledged Shares or any part thereof for any purpose not inconsistent with the terms of this Agreement; provided, however, that the Pledgor shall not exercise or shall refrain from exercising any such right if, in the judgment of the Pledgee, such action would have a material adverse effect on the value of the Pledged Collateral or any part thereof or the interest of the Pledgee therein; and, provided, further, that the Pledgor shall give the Pledgee at least five business days' prior written notice of the manner in which it intends to exercise, or the reasons for refraining from exercising, any such right.

(ii)    **Distributions.** The Pledgor shall be entitled to receive and retain any and all dividends or distributions paid in respect of the Pledged Shares, except the following: (A) distributions paid or payable other than in cash in respect of, and instruments and

other property received, receivable or otherwise distributed in respect of, or in exchange for, any Pledged Shares; (B) distributions paid or payable in cash in respect of any Pledged Shares in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus; and (C) cash paid, payable or otherwise distributed in redemption of, or in exchange for, any Pledged Shares; all of which shall be forthwith delivered to the Pledgee to hold as, Pledged Collateral and shall, if received by the Pledgor, be received in trust for the benefit of the Pledgee, be segregated from the other property or funds of the Pledgor, and be forthwith paid over or otherwise delivered to the Pledgee as Pledged Collateral in the same form as so received, together with duly executed instruments of transfer or assignment satisfactory to the Pledgee, as further collateral security for the Secured Obligations.

(iii)    **Proxies, Etc.**  The Pledgee shall execute and deliver (or cause to be executed and delivered) to the Pledgor all such proxies and other instruments as the Pledgor may request for the purpose of enabling the Pledgor to exercise the voting and other rights which it is entitled to exercise pursuant to subparagraph (i) above and to receive the dividends or distributions which it is authorized to receive and retain pursuant to subparagraph (ii) above.

(b)    **Upon the Occurrence of an Event of Default**.  Upon the occurrence and during the continuance of an Event of Default:

(i)    **Voting Rights**.  All rights of the Pledgor to exercise the voting and other consensual rights which it would otherwise be entitled to exercise pursuant to Section 9(a)(i) above shall cease upon written notice thereof from the Pledgee, and all such rights shall thereupon become vested in the Pledgee, who shall thereupon have the sole right to exercise such voting and other consensual rights.

(ii)    **Distributions**.  All rights of the Pledgor to receive the distributions which it would otherwise be authorized to receive and retain pursuant to Section 9(a)(ii) above shall cease, and all such rights shall thereupon become vested in the Pledgee, who shall thereupon have the sole right to receive and hold as Pledged Collateral such dividends. All dividends or distributions which are received by the Pledgor contrary to the provisions of this subparagraph (ii) shall be received in trust for the benefit of the Pledgee, shall be segregated from other funds of the Pledgor and shall be forthwith paid over or otherwise delivered to the Pledgee as Pledged Collateral in the same form as so received, together with duly executed instruments of transfer or assignment satisfactory to the Pledgee, as further collateral security for the Secured Obligations.

(iii)    **Proxies, Etc.**  In order to permit the Pledgee to exercise the voting and other rights which it may be entitled to exercise pursuant to subparagraph (i) above, and to receive all dividends and distributions which it may be entitled to receive under subparagraph (ii) above, the Pledgor shall, if necessary, upon written notice of the Pledgee, from time to time execute and deliver to the Pledgee appropriate proxies, dividend payment orders and other instruments as the Pledgee may request.

**10.   Appointment of Pledge.** So long as any Secured Obligation remains unpaid, the Pledgor does hereby designate and appoint the Pledgee its true and lawful attorney coupled with an interest and with power irrevocable, after an Event of Default has occurred and is continuing, for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Pledgee may deem necessary or advisable to accomplish the purposes hereof, including, without limitation, all of the following:  (i) receive, endorse and collect all instruments made payable to the Pledgor representing any principal or interest payment or other distribution in respect of the Pledged Collateral or any part thereof and to give full discharge for the same; (ii) perfect or continue perfected, maintain the priority of or provide notice of the Pledgee's security interest in the Pledged Collateral; (iii) execute any and all endorsements, assignments or other documents and instruments necessary to sell, lease, assign, convey or otherwise transfer title in or dispose of the Pledged Collateral; and (iv) execute any and all such other documents and instruments, and do any and all acts and things for and on behalf of the Pledgor, which the Pledgee may deem necessary or advisable to maintain, protect, realize upon and preserve the Pledged Collateral and the Pledgee's security interest therein and to accomplish the purposes of this Agreement.  The acceptance of this appointment by the Pledgee shall not obligate it to perform any duty, covenant or obligation required to be performed by the Pledgor under or by virtue of the Pledged Collateral or to take any action in connection therewith.  All expenses incurred by the Pledgee in connection with exercising any of its rights under this Section shall bear interest at a per annum rate equal to eighteen percent (18%) (the "Default Rate") from the date incurred until repaid by the Pledgor.  All amounts described in this Section shall be repayable by the Pledgor on demand and the Pledgor's obligation to make such repayment shall constitute an additional Secured Obligation.

**11.   No Responsibility for Certain Actions.**  Notwithstanding any provision contained in this Agreement, the Pledgee shall have no responsibility for (a) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Pledged Collateral, whether or not the Pledgee has or is deemed to have knowledge of such matters, or (b) taking any necessary steps to preserve any rights against any third parties with respect to any Pledged Collateral.

**12.   Events of Default.**  The occurrence of any of the following events shall constitute an "Event of Default":

(a)   The Pledgor's failure to repay the Prepaid Royalties Balance as required under the terms of the MRUA;

(b)   any representation or warranty made or deemed made by the Pledgor under or in connection with this Agreement shall prove to have been incorrect in any material respect when made or deemed made; or

(c)   the Pledgor shall fail to perform or observe any other material covenant, obligation or term of this Agreement.

**13.   Remedies.**

(a)    **General Remedies**.  If an Event of Default shall occur, and upon the expiration of any applicable notice and cure period under the MRUA, the Pledgee shall have, in addition to all other rights and remedies granted to it in this Agreement, or the MRUA, all rights and remedies of a secured party under the UCC (whether or not the UCC is in effect in the jurisdiction where such rights and remedies are asserted) or other laws to the extent applicable, provided, however, that except for specific performance of its rights hereunder, and except for the Pledged Collateral, Clearwire shall not have recourse against the Pledgor or its assets in respect of the Prepaid Royalties Balance. Without limiting the generality of the foregoing, the Pledgor agrees that the Pledgee may:

(i)    require the Pledgor to assemble all or any part of the Pledged Collateral and make it available to the Pledgee at any place and time designated by the Pledgee; and

(ii)    subject to the requirements of laws affecting the offering and sale of securities, sell, resell, assign, transfer or otherwise dispose of any or all of the Pledged Collateral at public or private sale or at any broker's board or on any securities exchange, by one or more contracts, in one or more lots or parcels, at the same or different times, for cash or credit, or for future delivery without assumption of any credit risk, all as the Pledgee deems advisable; provided, however, that, except as otherwise required under Section 9A-608 and/or Section 9A-615 of the UCC, the Pledgor shall be credited with the net proceeds of sale only when such proceeds are finally collected by the Pledgee.

(b)    **Sale of Pledged Collateral**.  Each purchaser at any sale pursuant to this Agreement shall hold the property sold absolutely, free from any claim or right on the part of the Pledgor, and the Pledgor hereby waives, to the fullest extent permitted by applicable laws, all rights of redemption, stay and appraisal which the Pledgor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.  The Pledgee shall be authorized at any such sale to restrict the prospective bidders or purchasers to persons who will represent and agree that they are purchasing the Pledged Collateral for their own account for investment and not with a view to the distribution or sale thereof.  Neither the Pledgee's compliance with the UCC or any other applicable law, in the conduct of any sale made pursuant to this Agreement, nor its disclaimer of any warranties relating to the Pledged Collateral, shall be considered to adversely affect the commercial reasonableness of such sale.  The Pledgee shall give the Pledgor ten (10) days' written notice (which the Pledgor agrees is reasonable notice within the meaning of Section 9A-612 of the UCC) of the Pledgee's intention to make any sale of Pledged Collateral.  The Pledgee shall not be obligated to make any sale of any Pledged Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Pledged Collateral shall have been given.  The Pledgee may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned.  To the fullest extent permitted by applicable laws, the Pledgee may bid for or purchase the Pledged Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Pledgee from the Pledgor as a credit against the purchase price and the Pledgee, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Pledgor therefor.  For purposes hereof, a written agreement to purchase the Pledged Collateral or any portion thereof shall be treated as a sale thereof; the Pledgee shall be free to carry out such sale pursuant to such

agreement and the Pledgor shall not be entitled to the return of the Pledged Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Pledgee shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full. To the fullest extent permitted by applicable laws, any sale pursuant to the provisions of this subsection (b) shall be deemed to conform to the commercially reasonable standards as provided in Section 9A-610(b) of the UCC.

(c)     **Waiver of Rights to Purchase**. The Pledgor, for itself and its successors and assigns, does hereby irrevocably waive and release all preemptive, first-refusal and other similar rights of the Pledgor to purchase any or all of the Pledged Shares upon any sale thereof by the Pledgee under this Agreement, whether such right to purchase arises under any agreement, by operation of law or otherwise.

(d)     **Exempt Sales Transactions**. The Pledgor recognizes that, by reason of certain provisions contained in the Securities Act of 1933, as from time to time amended (the "Securities Act") and applicable state securities laws, the Pledgee may be compelled, with respect to any sale of all or any part of the Pledged Shares, to limit purchasers to those who will agree, among other things, to acquire such securities for their own account, for investment, and not with a view to the distribution or resale thereof. The Pledgor acknowledges and agrees that any such sale may result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions and notwithstanding such circumstances, agrees that any such sale shall be deemed to have been made in a commercially reasonable manner. The Pledgee shall be under no obligation to delay the sale of any of the Pledged Shares for the period of time necessary to permit the Pledgor to register such securities for public sale under the Securities Act, or under applicable state or foreign government securities laws, even if the Pledgor would agree to do so. If the Pledgee determines to exercise its right to sell any or all of the Pledged Shares, upon written request, the Pledgor shall and shall cause the Companies to, from time to time, furnish to the Pledgee all such information as the Pledgee may request in order to determine the number of shares and other instruments included in the Pledged Shares which may be sold by the Pledgee as exempt transactions under the Securities Act and rules of the SEC thereunder, as the same are from time to time in effect.

(e)     **Retention of Pledged Collateral**. The Pledgee may, after providing the notices required by Section 9A-505(2) of the UCC or otherwise complying with any requirement of applicable law, accept or retain the Pledged Collateral or any part thereof in satisfaction of the Secured Obligations. Unless and until the Pledgee shall have provided such notices, however, the Pledgee shall not be deemed to have retained any Pledged Collateral in satisfaction of any Secured Obligations for any reason.

(f)     **Duty of Care**. Except for the exercise of reasonable care in the custody of any Pledged Collateral in its possession and the accounting for moneys actually received by it hereunder, the Pledgee shall have no duty as to any Pledged Collateral or as to the taking of any necessary steps to preserve rights against prior parties or any other rights pertaining to any Pledged Collateral. The Pledgee shall be deemed to have exercised reasonable care in the custody and preservation of Pledged Collateral in its possession if such Pledged Collateral is accorded treatment substantially equal to that which the Pledgee accords its own similar property. Neither the Pledgee nor any of its affiliates, directors, officers, employees, counsel, agents and

attorneys-in-fact shall be liable for failure to demand, collect or realize upon all or any part of the Pledged Collateral or for any delay in doing so or shall be under any obligation to sell or otherwise dispose of any Pledged Collateral upon the request of the Pledgor or otherwise.

(g) **Application of Proceeds**. The cash proceeds actually received from the sale or other disposition or collection of the Pledged Collateral, and any other amounts received in respect of the Pledged Collateral the application of which is not otherwise provided for herein, shall be applied: first, to payment of any costs, expenses and fees, including, without limitation, attorneys' fees (including allocated costs of in-house counsel), incurred by the Pledgee in connection with sale or other disposition or collection of Pledged Collateral; second, to payment of any all costs, expenses and fees, including, without limitation, attorneys' fees (including allocated costs of in-house counsel), payable to the Pledgee under this Agreement; third, to payment in full of the Secured Obligations (to the extent not included in clause first or second above); and fourth, the balance, if any, after all of the Secured Obligations have been indefeasibly paid in full, to the Pledgor or as otherwise required by law. The Pledgee shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. The Pledgor shall remain liable to the Pledgee for any deficiency which exists after any sale or other disposition or collection of the Pledged Collateral.

14. **Certain Waivers.** The Pledgor waives, to the fullest extent permitted by applicable laws, (a) any right of redemption with respect to the Pledged Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling of the Pledged Collateral or other collateral or security for the Secured Obligations; (b) any right to require the Pledgee (i) to proceed against any person, (ii) to exhaust any other collateral or security for any of the Secured Obligations, (iii) to pursue any remedy in the Pledgee's power, or (iv) to make or give any presentments, demands for performance, notices of nonperformance, protests, notices of protests or notices of dishonor in connection with any of the Pledged Collateral; and (c) all claims, damages, and demands against the Pledgee arising out of the repossession, retention, sale or application of the proceeds of any sale of the Pledged Collateral.

15. **Amendments and Waivers.** Any provision of this Agreement may be amended or waived if, and only if, such amendment or waiver is in writing and signed (in the case of an amendment) by Pledgor and Pledgee or (in the case of a waiver) by the party against whom the waiver is to be effective. No failure or delay by either party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided herein are cumulative and not exclusive of any right or remedy provided by law.

16. **Notices.** All notices or other communications hereunder shall be in writing and shall be deemed to have been duly given or made upon delivery if delivered personally (by courier service or otherwise), as evidenced by written receipt or other written proof of delivery (which may be a printout of the tracking information of a courier service that made such delivery), in each case to the applicable addresses set forth below (or such other address which either party may from time to time specify):

| | |
|---|---|
| If to Pledgor: | Hispanic Information and Telecommunications Network, Inc. 63 Flushing Avenue, Unit 281 Brooklyn, NY 11205 Attention: Jose Luis Rodriguez Fax: (718) 797-2546 |
| With a copy to: | Day, Berry & Howard LLP 875 Third Avenue New York, NY 10022 Attention: Sabino Rodriguez Fax:(212) 829-3601 |
| | RJGLaw LLC 1010 Wayne Avenue, Suite 950 Silver Spring, MD 20910 Attention: Rudolph J. Geist Fax:    (301) 589-2644 |
| If to Pledgee: | Clearwire Corporation 5808 Lake Washington Blvd. NE, Suite 300 Kirkland, WA 98303 Attention: Legal Department Facsimile: 425-216-7900 |
| With a copy to: | Davis Wright Tremaine LLP 1501 Fourth Avenue 2600 Century Square Seattle, WA 98101 Attention: Julie A. Weston, Esq. Facsimile: 206-628-7699 |

Pledgor hereby agrees that such notice shall be deemed to meet any requirements of reasonable notice contained in the UCC or other applicable law.

   **17.    Costs and Expenses.** Pledgor and Pledgee shall pay their own costs and expenses incurred by them, including the fees and out-of-pocket expenses of their own legal counsel, in connection with the preparation, negotiation and filing of this Agreement. Pledgor shall pay to Pledgee or its agents on demand each cost and expense (including, but not limited to, the reasonable fees and disbursements of counsel to Pledgee or its agents, whether internal or external and whether retained for advice, for litigation or for any other purpose) incurred by Pledgee or its agents either directly or indirectly in connection with endeavoring to (a) collect any amount owing pursuant to this Agreement, or negotiate or document a workout or restructuring; (b) enforce or realize upon any guaranty, endorsement or other assurance, any collateral or other security, or any subordination, directly or indirectly securing or otherwise directly or indirectly applicable in any such amount; or (c) preserve or exercise any right or remedy of Pledgee or its agents pursuant to

PAGE 12 – PLEDGE AGREEMENT
PDX 1514364v4 65187-645

this Agreement. All such amounts shall be repayable by the Pledgor on demand and shall bear interest at the Default Rate until repaid, and the Pledgor's obligation to make such repayment shall constitute an additional Secured Obligation.

18.    **Survival of Covenants.** All covenants, agreements, representations and warranties made by Pledgor hereunder shall survive the execution and delivery of this Agreement and the Pledged Shares hereunder.

19.    **Severability.** The unenforceability or invalidity of any provision or provisions of this Agreement shall not render any other provision or provisions hereof or thereof unenforceable or invalid.

20.    **Additional Documents.** Pledgor shall at Pledgee's request, from time to time, at Pledgor's sole cost and expense, execute, re-execute, deliver and redeliver any and all documents, and do and perform such other and further acts, as may reasonably be required by Pledgee to enable Pledgee to perfect, preserve, and protect its security interest in the Pledged Collateral and its rights and remedies under this Agreement or granted by law and to carry out and effect the intents and purposes of this Agreement.

21.    **Assignment.** This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors heirs, executors and permitted assigns. This Agreement may not be assigned by Pledgor. Pledgee may transfer or assign the MRUA or this Agreement to any of its affiliates.

22.    **Counterparts.** This Agreement may be executed and delivered (including by facsimile transmission) in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

23.    **Governing Law.** This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Washington, without reference to the choice of law principles thereof. PLEDGOR IRREVOCABLY AGREES THAT, SUBJECT TO PLEDGEE'S SOLE AND ABSOLUTE DISCRETION, ALL ACTIONS OR PROCEEDINGS IN ANY WAY ARISING OUT OF OR RELATED TO THIS AGREEMENT, THE OTHER DOCUMENTS OR THE LOAN RELATED HERETO SHALL BE LITIGATED IN COURTS HAVING SITUS WITHIN THE COUNTY OF KING, STATE OF WASHINGTON. PLEDGOR HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURT LOCATED WITHIN SUCH COUNTY AND STATE. PLEDGOR HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST PLEDGOR BY PLEDGEE IN ACCORDANCE WITH THIS SECTION.

24.    **Waiver of Jury Trial.** PLEDGOR AND PLEDGEE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE ANY RIGHT TO TRIAL BY JURY PLEDGOR AND PLEDGEE MAY HAVE IN ANY ACTION OR PROCEEDING, IN LAW OR IN EQUITY, IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS RELATED HERETO. PLEDGOR REPRESENTS AND WARRANTS THAT NO REPRESENTATIVE OR AGENT OF PLEDGEE HAS REPRESENTED, EXPRESSLY OR

OTHERWISE, THAT PLEDGEE WILL NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THIS JURY TRIAL WAIVER. PLEDGOR ACKNOWLEDGES THAT PLEDGEE HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE PROVISIONS OF THIS SECTION.

**25.    No Inconsistent Requirements**. The Pledgor acknowledges that this Agreement and the other documents may contain covenants and other terms and provisions variously stated regarding the same or similar matters, and agrees that all such covenants, terms and provisions are cumulative and all shall be performed and satisfied in accordance with their respective terms.

**26.    Confidentiality.** This Agreement is confidential and is subject to the terms of the other written agreements between the Pledgor and the Pledgee relating to confidentiality.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the Pledgor and Pledgee have caused this Agreement to be executed by their respective officers or agents thereunto duly authorized as of the date first above written.

**PLEDGOR:**                              Hispanic Information and
                                          Telecommunications Network, Inc.


                                          By _____
                                          Name:
                                          Title:


**PLEDGEE:**                              Clearwire Corporation


                                          By _____
                                          Name:
                                          Title:

IN WITNESS WHEREOF, the Pledgor and Pledgee have caused this Agreement to be executed by their respective officers or agents thereunto duly authorized as of the date first above written.

PLEDGOR:                          Hispanic Information and
                                  Telecommunications Network, Inc.

                                  By
                                  Name: Jose Luis Rodriguez
                                  Title: President and CEO

PLEDGEE:                          Clearwire Corporation

                                  By _____
                                  Name:
                                  Title:

IN WITNESS WHEREOF, the Pledgor and Pledgee have caused this Agreement to be executed by their respective officers or agents thereunto duly authorized as of the date first above written.

**PLEDGOR:**                        Hispanic Information and
                                    Telecommunications Network, Inc.


                                    By _____
                                    Name:
                                    Title:


**PLEDGEE:**                        Clearwire Corporation


                                    By _____
                                    Name: ROBERTO SACEMTC
                                    Title: ELP.

**EXHIBIT IV**

**OFFICER'S CERTIFICATE**
**OF**
**CLEARWIRE SPECTRUM HOLDINGS II LLC**

This OFFICER'S CERTIFICATE (the "Certificate") is provided pursuant to the Master Royalty and Use Agreement (the "Agreement") dated as of September 20, 2006, by and between Clearwire Spectrum Holdings II LLC, a Nevada limited liability company ("Clearwire"), and Hispanic Information and Telecommunications Network, Inc.

The undersigned hereby certifies that he is duly authorized to execute and deliver this Certificate on behalf of Clearwire, and further certifies as follows:

Attached as Exhibit A is a true, complete and correct copy of the Resolutions of the Members of Clearwire authorizing the execution, delivery, and performance of the Agreement and other agreements referred to in the Agreement, which Resolutions have not been amended, superseded or otherwise modified as of the date of this Certificate.

The individual named below (i) is the officer duly authorized to execute the Agreement on behalf of Clearwire, (ii) has been duly elected to the office of Clearwire set forth opposite his name, (iii) is duly qualified and acting as such officer of Clearwire on the date hereof, and (iv) the signature appearing opposite his name is his genuine signature.

| Name | Office | Signature |
|------|--------|-----------|
|      |        |           |

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date set forth below.

**Clearwire Spectrum Holdings II LLC**

Date:                          By:_____
                               Name:
                               Title:

**EXHIBIT A**

**EXHIBIT V**

**OFFICER'S CERTIFICATE**
**OF**
**HISPANIC INFORMATION AND**
**TELECOMMUNICATIONS NETWORK, INC.**

This OFFICER'S CERTIFICATE (the "Certificate") is provided pursuant to the Master Royalty and Use Agreement (the "Agreement") dated as of September 20, 2006, by and between Clearwire Spectrum Holdings II LLC, a Nevada limited liability company and Hispanic Information and Telecommunications Network, Inc. ("HITN").

The undersigned hereby certifies that he is duly authorized to execute and deliver this Certificate on behalf of HITN, and further certifies as follows:

Attached as Exhibit A is a true, complete and correct copy of the Resolutions of the Board of Directors of HITN authorizing the execution, delivery, and performance of the Agreement and other agreements referred to in the Agreement, which Resolutions have not been amended, superseded or otherwise modified as of the date of this Certificate.

The individual named below (i) is the officer duly authorized to execute the Agreement on behalf of HITN, (ii) has been duly elected to the office of HITN set forth opposite his name, (iii) is duly qualified and acting as such officer of HITN on the date hereof, and (iv) the signature appearing opposite his name is his genuine signature.

| Name | Office | Signature |
|------|--------|-----------|
|      |        |           |

IN WITNESS WHEREOF, the undersigned has executed this Certificate as of the date set forth below.

**Hispanic Information and Telecommunications Network, Inc.**

Date:                                    By:_____
                                         Name:
                                         Title:

**EXHIBIT A**

**<u>SCHEDULE A</u>**

**SCHEDULE B**

**Schedule 5.01 to Master Royalty and Use Agreement**
**Disclosures Regarding Licensee Organization and Good Standing**

None.

**Schedule 5.03 to Master Royalty and Use Agreement**
**Disclosures Regarding "No Conflict"**

None.

**Schedule 5.04 to Master Royalty and Use Agreement**
**Disclosures Regarding "Litigation"**

None.

**Schedule 5.05 to Master Royalty and Use Agreement**
**Disclosures Regarding "Compliance with Laws; Permits"**

**None.**

**Schedule A to Master Royalty and Use Agreement**
**Initial Spectrum Capacity**

| Call Sign | Market | Channels | MHz-Pops | $$/MHzPOP |
|-----------|--------|----------|----------|-----------|
| WNC765 | Garden City, KS | A1,A2,A3,A4 | 1,181,289 | .07 |
| WND375 | Yuma, AZ | B1,B2,B3,B4 | 3,451,827 | .07 |
| WQAI668 | Islamorada, FL | B1,B2,B3,B4 | 947,939 | .065 |
| WND372 | San Diego, CA (N) | D1 | 8,641,110 | .18 |
| WND593 | San Diego, CA (S) | D1 | 6,359,285 | .18 |
| WND499 | Shaw Butte, AZ | G3,G4 | 19,177,253 | .15 |

## FIRST AMENDMENT TO SUBSCRIPTION AGREEMENT

THIS FIRST AMENDMENT TO SUBSCRIPTION AGREEMENT (this "First Amendment") is entered into and effective as of the 4th day of October, 2006 by and among Clearwire Corporation ("Clearwire"), Hispanic Information and Telecommunications Network, Inc., a New York not-for-profit corporation ("HITN"), and CW Wireless Investment LLC, a Delaware limited liability company and an entity wholly-owned by HITN ("CWWI LLC").

WHEREAS, pursuant to rights granted under that certain Amended and Restated Stockholders Agreement, dated as of March 16, 2004, the Company offered HITN the opportunity to purchase 6,920,730 shares of Clearwire's Class A Common Stock for a total purchase price of $41,524,380 (the "Purchase Right") on the terms and conditions set forth in that certain Subscription Agreement dated as of August 18, 2006 (the "Agreement").

WHEREAS, HITN assigned the Purchase Right to CWWI LLC pursuant to that certain Notice of Assignment and Preemptive Rights dated August 18, 2006 (the "Assignment Notice"), and CWWI LLC became a party to the Agreement and agreed to fully exercise the Purchase Right.

WHEREAS, pursuant to a request from HITN and CWWI LLC, Clearwire previously agreed to extend the closing date for the transactions under the Agreement.

WHEREAS, concurrently with entering into this Assignment and Assumption, HITN and a subsidiary of Clearwire, Clearwire Spectrum Holdings II, LLC ("Clearwire Sub"), are entering into that certain Master Royalty and Use Agreement (the "MRUA"), pursuant to which HITN will agree to make available to Clearwire and Clearwire Sub access rights to certain spectrum held by HITN and an option covering future spectrum that HITN acquires in exchange for prepaid royalties totaling $23,000,000 (the "Prepaid Royalties") and certain other obligations.

WHEREAS, HITN, through CWWI LLC, and using the Prepaid Royalties, desires to acquire 3,666,666 shares of Clearwire's Class A Common Stock pursuant to the Purchase Right for the purchase price of $21,999,996, and to release, and be released from, any right and obligation to acquire additional shares of Clearwire's Class A Common Stock that it holds pursuant to the Agreement, and to modify the obligations of the parties under the Agreement as set forth herein.

WHEREAS, Clearwire has agreed to consent to the modification of the Agreement on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    Reduction of Purchase Right; Issuance of Shares.  Clearwire, HITN and CWWI LLC agree to reduce the number of shares of Clearwire's Class A Common Stock to be sold by Clearwire to CWWI LLC under the Agreement to 3,666,666 (the "Shares").  The parties agree

that the aggregate purchase price for the Shares will be $21,999,996. Clearwire, HITN and CWWI LLC further agree that the closing of the transactions under the Agreement will occur upon the execution of the MRUA by HITN and Clearwire Sub. Except for the purchase of the Shares, Clearwire further hereby releases HITN and CWWI LLC from any obligation to purchase additional shares under the Agreement, and HITN and CWWI LLC further hereby release Clearwire from any obligation to sell additional shares under the Agreement.

2.      Satisfaction of Prepaid Royalties. Clearwire, HITN and CWWI LLC agree that, in lieu of paying HITN all of the Prepaid Royalties when due under the MRUA, Clearwire shall cause Clearwire Sub to pay (i) $21,999,996 of the Prepaid Royalties to Clearwire on HITN's and CWWI LLC's behalf, which payment shall be applied against the purchase price for the Shares under the Agreement, and (ii) the remaining $1,000,004 of the Prepaid Royalties to HITN in accordance with the payment instructions delivered by HITN to Clearwire Sub. Such payments by Clearwire Sub to Clearwire and HITN shall serve as full payment and satisfaction of any and all obligations owed by Clearwire and Clearwire Sub under the MRUA to pay the Prepaid Royalties to HITN, and, subject to such payments, HITN further agrees to release Clearwire and Clearwire Sub from any and all further obligations related to the payment of the Prepaid Royalties under the MRUA.

3.      Channel Swap. At Clearwire's written request ("Request"), HITN agrees to swap its EBS station WLX546, commonly known as the Seattle G Group, for BRS station WHT657, commonly known as the Seattle F Group, which is currently held by a subsidiary of Clearwire (the "Channel Swap"). Following the Channel Swap, Clearwire or its subsidiary would become the BRS licensee of the Seattle G Group and HITN would become the EBS licensee of the Seattle F Group. HITN and Clearwire agree to file applications with the FCC to effectuate the Channel Swap no later than 14 days after the date Clearwire requests the Channel Swap from HITN, and HITN agrees to cooperate with Clearwire by taking any other actions reasonably requested by Clearwire in connection therewith.

4.      Future Private Placement. In the event HITN, through CWWI LLC, wishes to transfer, sell and assign any of the Shares purchased by CWWI LLC, Clearwire shall timely request any opinion or other item permitted by Section 4.04 of the Amended and Restated Stockholders Agreement dated as of March 16, 2004 (the "Stockholders Agreement"). Clearwire shall waive, and agrees to undertake commcerially reasonable efforts to cause any other McCaw Entities (as defined in the Stockholders Agreement) to waive, any and all rights of first refusal and rights of first offer to which such transfer, sale and assignment (the "Sale") may be subject under the Stockholders Agreement, subject to each of the following conditions:

a.      the Sale is to a single purchaser who is a Qualified Transferee (as defined in the Stockholders Agreement);

b.      the Sale is at a price per share of not less than $7.00 per share and an aggregate purchase price of not more than $6,500,000;

c.      the Sale closes within nine months of the date of this First Amendment; and

       d.      the Sale otherwise complies with the terms of the Stockholders Agreement, including but not limited to Section 4 thereof.

5.    <u>Termination of Assignment Notice</u>. The parties agree that the Assignment Notice shall be null and void and of no further force or effect from and after the closing of the purchase and sale of the Shares under the Agreement.

6.    <u>Binding Effect</u>. This First Amendment shall be binding upon and shall inure to the benefit of the parties thereto and their respective successors and assigns.

7.    <u>Governing Law</u>. This First Amendment shall be governed by and interpreted in accordance with the laws of the State of Washington.

8.    <u>Headings</u>. The headings herein are included for ease of reference only and shall not control or affect the meaning or construction of the provisions of this First Amendment.

9.    <u>Amendments</u>. This First Amendment cannot be amended, supplemented or modified except by an Agreement in writing which makes specific reference to this First Amendment, and which is signed by the party against which enforcement of any such amendment, supplement or modification is sought.

10.    <u>Further Assurances</u>. HITN, CWWI LLC, and Clearwire will promptly execute and deliver all additional documents, and take all other action, that may be necessary, desirable or appropriate in order to (a) give any notice, make any filing, recording or registration, or obtain any consent, approval, authorization, license, permit, certification, waiver, exemption or novation required for the consummation of the transactions contemplated by this First Amendment, (b) vest effectively in HITN record title to the Agreement and (c) otherwise effectuate the intent and purposes of this First Amendment.

11.    <u>Entire Agreement; No Third-Party Beneficiaries</u>. This First Amendment, together with the Agreement and the MRUA, (including the Agreement, MRUA and other documents and instruments referred to therein) constitutes the entire agreement between the parties, and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter of this First Amendment. Except as expressly provided herein, the terms and conditions of the Agreement and the MRUA shall remain in full force and effect and are not amended or modified by the terms and conditions of this First Amendment.

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first written above.

HISPANIC INFORMATION AND
TELECOMMUNICATIONS NETWORK,
INC.

By: _____

Name: _Jose Luis Rodriguez_

Title: _President and CEO_

CLEARWIRE CORPORATION

By: _____

Name: _____

Title: _____

CW WIRELESS INVESTMENT LLC

By: _____
For Hispanic Information and Telecommunications, Inc. Network

Name: _Jose Luis Rodriguez_

Title: _For Hispanic Information and Telecommunications Network, Inc. as Manager_

- 4 -                                  FIRST AMENDMENT

IN WITNESS WHEREOF, the parties hereto have executed this First Amendment as of the date first written above.

HISPANIC INFORMATION AND
TELECOMMUNICATIONS NETWORK,
INC.

CW WIRELESS INVESTMENT LLC

By: _____

Name: _____

Title: _____

By: _____

Name: _____

Title: _____

CLEARWIRE CORPORATION

By: _____

Name: R. GERARD SALEMME

Title: E VP

- 4 -

FIRST AMENDMENT

# EXHIBIT B

## AIRTIME ROYALTY AGREEMENT

AGREEMENT entered into as of the 24 day of February 1995 by and between The George Washington University (the "University") and Eastern Cable Networks Corp. ("ENET").

*WHEREAS* the University has been issued a license (the "License") by the Federal Communications Commission (the "FCC") to construct and operate Instructional Television Fixed Service ("ITFS") station WHG442 (Washington, DC) utilizing the D Group channels (the "D Group Station"); and

*WHEREAS* the FCC has authorized licensees of Instructional Television Fixed Service ("ITFS") stations to lease excess capacity on their stations for the transmission of commercial programming by wireless cable system operators; and

*WHEREAS* the University and Hybrid Networks, Inc. ("Hybrid") entered into a Channel Lease Agreement (the "Hybrid Agreement") dated December 31, 1993 which granted Hybrid the right to utilize certain transmission capacity of channel D2; and

*WHEREAS* the FCC, by letter dated February 28, 1994, found that the 24 hours per day of the programming to be transmitted over channel D2 by Hybrid satisfies the ITFS programming requirements set forth in section 74.931(e) of the FCC's Rules; and

*WHEREAS* ENET owns and operates the sole wireless cable system providing video programming and other communications services within the Washington, DC metropolitan area and is agreeable to providing the University with access to transmission equipment, operational support and royalties in exchange for access to certain excess capacity on the University's system upon the issuance to the University of a license authorizing the University to relocate the D Group Station to ENET's wireless cable headend in Bethesda, MD with the same technical configuration as the other facilities comprising ENET's wireless cable system; and

*WHEREAS* the University has determined that excess capacity exists on the D Group Station and is desirous of providing ENET with access to such excess capacity in exchange for access to transmission equipment, operational support and royalties;

*NOW, THEREFORE*, in consideration of the mutual promises set forth herein, the University and ENET do hereby agree to the following terms and conditions:

I.    TERM.

     A.    <u>Initial Term</u>.  The initial term of this Agreement shall commence upon the date hereof and shall extend until August 29, 1998.

B.    Automatic Renewal Terms.

1.    Provided that this Agreement has not been otherwise terminated pursuant to Section XI and that the University shall have filed an application for renewal of the License, this Agreement shall automatically renew for an additional term ending upon the earlier of: (i) the date that is ten years from the date hereof; or (ii) such date, if any, that the FCC denies the application of the University for renewal of the License, unless ENET provides to the University at least ninety days notice prior to the expiration of the initial term that it does not intend to renew this Agreement.

C.    Right of First Refusal.

1.    ENET shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from the University during any or all of the period from the expiration of the automatic renewal term under Section I.B through two years thereafter (the "Right of First Refusal").

2.    If the University desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B, the University must provide written notice to ENET at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of ENET's Right of First Refusal.  Such notice must be given one year prior to expiration of the contract.

3.    Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to the University, the University shall serve ENET with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating the University's intent to accept the offer in the event that ENET does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. The University shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing ENET from exercising its Right of First Refusal.  Within thirty (30) days of ENET's receipt of the University's written notice, ENET shall notify the University in writing of its desire to exercise its Right of First Refusal.

4.    In the event that ENET refuses to exercise its Right of First Refusal with respect to any offer, and any material term of such offer is subsequently changed, before accepting such changed offer the University must follow the procedures specified in the foregoing subsections, providing ENET with notice regarding the revised offer and giving ENET the opportunity to exercise its Right of First Refusal with regard thereto.

II.    THE APPLICATIONS.

- 2 -

FEB-16-1995  12:45        SINDERBRAND + ALEXANDER              202 8358291    P.02

A.    Preparation and Filing.

1.  Within ninety (90) days from the date hereof, ENET shall provide the University with: (i) an application for modification of the License for the D Group Station that would permit the construction and operation by the University of the D Group Station at ENET's wireless cable headend site in Bethesda proposing the same system design as ENET employs for the other stations located at such headend site (the "Modification Application"); (ii) an application for authority to modify the University's existing E Group studio-to-transmitter link (the "STL Link") that would permit the relocation of the receive point of such link to ENET's wireless cable headend site in Bethesda and make such other changes (including changes in transmitter frequency and the addition of multiple hops) as ENET believes necessary (the "STL Modification Application"); and (iii) an application for authority to construct a one channel point-to-point link between the University and its Leesburg campus (the "PTP Link") designed for two-way capability, which PTP Link may consist of multiple hops, if necessary (the "PTP Application").  Upon grant by the FCC of the FCC Applications, the authorized facilities shall become the "D Group Station," the "STL Link" and the "PTP Link" for purposes of this Agreement.

2.  The facilities proposed in the Modification Application shall be designed by ENET to transmit signals of a quality and reliability at least equal to that of the University's current D Group Station.  The facilities proposed in the STL Modification Application shall be designed by ENET to transmit signals of a quality and reliability equal to that of the University's current E Group STL Link.  The facilities proposed in the PTP Application shall be designed by ENET to transmit signals of a quality and reliability at least equal to RS 250B.  Prior to such time as ENET submits the Modification Application, the STL Modification Application and the PTP Application (collectively, the "FCC Applications"), it will also submit to the University a written plan specifying such changes in the existing facilities of the University and the lessee of excess capacity of channel D2 as ENET believes necessary to accomplish such goals (the "Modification Plan").  The University shall promptly review the FCC Applications and the Modification Plan, and, within thirty (30) days of receipt, either file the FCC Applications with the FCC (which filing shall evidence agreement that implementation of the proposals set forth in the FCC Applications and the Modification Plan will accomplish the goals set forth in this paragraph) or commence good faith negotiations with ENET to make such revisions to the FCC Applications or the Modification Plan as the University shall reasonably require to accomplish the goals set forth in this paragraph.  If the parties are unable to reach agreement after good faith negotiations, this Agreement shall terminate and the University shall refund to ENET the Commitment Fee (as such term is defined in Paragraph V.A.), less the University's reasonable costs in negotiating this Agreement and complying with its obligations thereunder prior to such termination.

- 3 -

B.    Prosecution of Applications. The parties shall promptly and diligently file and expeditiously prosecute all necessary amendments to the FCC Applications, briefs, pleadings, waiver requests, requests for special temporary authority, documents and supporting data, and take all such actions and give all such notices as may be required or requested by the FCC or as may be appropriate in any effort to expedite the grant of the FCC Applications. The parties recognize that the FCC may return or dismiss the FCC Applications. In such event, the parties agree to utilize their best efforts, at ENET's reasonable cost and expense, to submit a replacement for the FCC Applications (along with any necessary requests for waiver or special temporary authority) at such time as ENET reasonably determines to be provident. Such replacement applications shall become the "FCC Applications" for purposes of this Agreement. In the event any person petitions the FCC to deny one or more of the FCC Applications or otherwise opposes one or more of the FCC Applications before the FCC, or in the event the FCC enters an order granting an FCC Application and any person petitions for reconsideration or review of such order before the FCC or appeals or applies for review in any judicial proceeding, then ENET and the University agree to oppose such petition before the FCC or defend such order of the FCC diligently and in absolute good faith, at ENET's cost and expense, to the end that the transactions contemplated by this Agreement may be finally consummated. Notwithstanding the foregoing sentence, if ENET's counsel provides a good faith written estimate that the legal fees associated with opposing any challenge to one or both of the FCC Applications or any order granting one or more of the FCC Applications will exceed Fifteen Thousand Dollars ($15,000), ENET may notify the University and afford the University a period of five (5) business days to agree to share jointly in all reasonable and necessary legal fees in excess of Fifteen Thousand Dollars ($15,000). The University may elect not to share jointly in such fees without incurring any liability to ENET hereunder whatsoever. If the University does not notify ENET within such period that it agrees to provide such funding, ENET shall not be obligated to expend more than such amount in opposing any challenge to one or both of the FCC Applications or any order granting one or more of the FCC Applications and may cease its opposition to the challenge or its defense of the FCC Applications without liability.

C.    Amendment of Applications.

1.    The University and ENET acknowledge the possibility that as a result of currently unforeseen events, advances in technology, filings by third parties or changes in the FCC's rules and policies, the technical configuration of the D Group Station and the STL Link may prevent ENET from optimizing its business throughout the term of this Agreement. The University therefore agrees that if at any time and from time to time ENET so requests, the University shall use its best efforts to further amend the FCC Applications as may be necessary to modify the proposed D Group Station, STL Link and PTP Link (including, without limiting the generality of the foregoing, to increase transmitted power, to increase antenna height, to modify the transmission and antenna systems, to utilize compression or frequency reuse technology, to change channel assignments, or to relocate the D Group

- 4 -

Station) to meet the reasonable requirements of ENET, provided that such modification (i) will not have an adverse effect on the ability of the University to serve its then-existing receive sites and any specific future receive sites which the University has notified ENET it intends to install and (ii) will not cause the University to breach its obligations under the Hybrid Agreement. ENET shall bear all reasonable costs associated with such amendment, including engineering and construction, and all reasonable costs associated with obtaining FCC approval thereof, provided that such costs are approved by ENET in advance in writing. Upon the filing of such amendment, the amended FCC Applications shall become the "FCC Applications" for purposes of this Agreement.

D.  Denial of Applications.

1.  The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order (as such term is defined in Paragraph XIII.T) denying the Modification Application. In such event, the University shall retain the commitment fee as such term is defined in Paragraph V.A, and this Service Agreement shall terminate without further liability between the parties.

2.  The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order denying the STL Modification Application or the PTP Application. In such event, ENET shall use its best efforts to seek an alternative transmission source. In the event that an alternative transmission source cannot be utilized by ENET, the University may terminate this Agreement without further liability between the parties in its sole discretion by giving notice to ENET within ten (10) days of such order becoming a Final Order. In the event the University does not give such notice, this Agreement shall continue in full force and effect except that ENET's obligations with respect to the STL Link and/or the PTP Link as the case may be, shall be excused.

E.  Grant of Applications with Conditions.

1.  The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order granting the Modification Application with conditions materially adverse to ENET. In such event, ENET may terminate this Agreement without further liability between the parties in its sole discretion by giving notice to the University within ten (10) days of such order becoming a Final Order.

2.  The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order granting the STL Modification Application or the PTP Application with conditions materially adverse to ENET. In such event, ENET may terminate this Agreement without further liability between the parties in its sole discretion by giving the University notice within ten (10) days of such order becoming a Final Order. Within ten (10) days of receipt of such notice, the University may rescind

such termination by providing ENET notice that the Agreement shall continue in full force and effect except that ENET's obligations with respect to the STL Link and/or the PTP Link, as the case may be, shall be excused.

3. The parties recognize that, despite their best efforts pursuant to Paragraph XII.A, the FCC may enter an order that becomes a Final Order granting one or more of the FCC Applications with conditions materially adverse to the University. Within ten (10) days of such event, the University may terminate this Agreement by notifying ENET, in which case ENET within ten (10) days may offer to provide the University with an indemnification against any and all losses, damages, injuries or other liabilities the University incurs or may during the term of this Agreement incur as a result of such conditions. The University may accept or reject such offer at its reasonable discretion.

F. Expenses. All reasonable costs and expenses, including legal and engineering, in connection with the preparation of this Agreement and the preparation, review, filing and prosecution of all of the University's applications required by this Agreement shall be borne by ENET.

III.    FACILITIES.

A.    Construction of Modified D Group Station, STL Link and PTP Link.. As soon as reasonably possible, and in no event more than three (3) months after the FCC shall have granted the Modification Application, the STL Modification Application, and the PTP Application and such grants shall have become Final Orders, ENET shall secure the requisite space (except for space for the PTP Link and the origination portion of the STL Link, which shall be supplied at no cost to ENET by the University) and order state-of-the-art equipment for the D Group Station, the PTP Link and, if necessary to accomplish the goals set forth in Paragraph II.A.2, the STL Link, consistent with the terms of the University's FCC authorizations, of the FCC's rules, of the Modification Plan and of this Agreement. Such equipment shall be installed by ENET subject to such supervision and control by the University as shall be required under the FCC's rules within ninety (90) days of receipt of all such equipment. Subsequently, throughout the term of this Agreement, ENET shall provide the University and Hybrid Networks, Inc. access to appropriate space (except for space for the PTP Link and the origination portion of the STL Link, which shall be supplied at no cost to ENET by the University), complete with utilities and necessary environmental controls, transmitters, waveguide, antennas and associated combiners, jumpers and connectors for the D Group Station and the STL Link (which equipment may be shared with other stations), in exchange for the University's faithful performance of its obligations hereunder. Upon expiration of this Agreement or nonrenewal of this Agreement for reasons other than the exercise by ENET of its rights under Section XI.B.(2), the University shall be afforded an opportunity for a period of thirty (30) days after such expiration or nonrenewal to purchase from ENET the transmission equipment referenced in the immediately preceding sentence

- 6 -

(other than that equipment which is shared with other stations) for an amount equal to the then-current market value of such used equipment. In the event that this Agreement is terminated pursuant to Paragraph XI.A: (i) the University shall be afforded an opportunity for a period of thirty (30) days after such termination to purchase from ENET the transmission equipment referenced above (other than that equipment which is shared with other stations) for ONE DOLLAR ($1.00); and (ii) ENET shall permit the University to utilize that equipment which is shared with other stations and maintain the D Group Station and the STL Link at the transmission site until the date that is ten years from the date hereon.

B.    Reception Equipment. Prior to the Start Date, ENET shall, at its sole cost, reorient all of the reception antennas mounted on the receive sites of the University and the lessee of excess capacity on channel D2 listed on Schedule A so as to optimize their ability to receive programming from the modified D Group Station in accordance with the Modification Plan. The University shall cooperate, and shall use its best efforts to cause the lessee of excess capacity on channel D2 to cooperate, in providing ENET access to such reception antennas.

C.    Start Date. For purposes of this Agreement, the Start Date shall be the first date of the calendar month after ENET shall have completed construction of the D Group Station, the STL Link and the PTP Link and implemented the Modification Plan in accordance with the provisions of Paragraph III.A and begun broadcasting the D Group.

D.    Operation and Maintenance. During the term of this Agreement, ENET, at its own cost and expense, shall retain technically qualified personnel to operate, repair, and maintain the D Group Station under the technical direction, supervision and control of the University to assure continued operation of the D Group Station in accordance with the License and the FCC's rules and regulations. Such personnel shall transmit over the D Group Station all programming submitted by the University for transmission during the University Capacity, provided that such programming is provided by the University in the form of a continuous feed (i.e. ENET shall not be responsible for playing individual tapes, video disks, or other discrete program sources, but shall be responsible for interconnecting the STL Link or any other terrestrial microwave receiver supplied by the University). Except for the repair of damages caused by the intentional actions or gross negligence of the University or as otherwise provided herein, ENET shall bear all costs and expenses associated with operating and maintaining the D Group Station, the STL Link and the PTP Link. ENET shall make available to the University upon reasonable request records of all services, repairs and maintenance activities.

E.    Modification of Transmission Facilities.

1.    The University and ENET acknowledge the possibility that as a result of currently unforeseen events, advances in technology or changes in the FCC's rules and

- 7 -

policies, the technical configuration of the D Group Station and the STL Link may prevent ENET from optimizing its business throughout the term of this Agreement. The University therefore agrees that if at any time and from time to time ENET so requests, the University shall use its best efforts to apply to the FCC for such authority as may be necessary to modify the transmission facilities (including, without limiting the generality of the foregoing, to increase transmitted power, to increase antenna height, to modify the transmission and antenna systems, to utilize digital compression or frequency reuse technology, to change channel assignment, or to relocate the D Group Station and the STL Link) to meet the reasonable requirements of ENET, provided that such modification (i) will not have an adverse effect on the ability of the University to serve its then-existing receive sites and any specific future receive sites which the University has notified ENET it intends to install and (ii) will not cause the University to breach its obligations under the Hybrid Agreement. ENET shall bear all reasonable costs associated with such modifications, including engineering and construction, and all reasonable costs associated with obtaining FCC approval thereof, provided that such costs are approved by ENET in advance in writing. Upon the completion of such modifications, the modified facilities shall become the "D Group Station" or the "STL Link" for purposes of this Agreement.

2.    Commencing no later than twelve (12) months after the FCC shall have adopted rules and policies to govern the use of digital compression technology in wireless cable systems and one or more equipment manufacturers have available for immediate purchase reliable and cost-effective digital compression and decompression equipment capable of providing a minimum of four video programs and associated audio signals over a 6 MHz channel with no material degradation in quality and at the University's request, ENET shall, if possible consistent with the FCC's then-existing rules and policies, prepare an application for modification of the License to permit the use of digital compression technology on channel D1. The University shall use its best efforts to secure such modifications to the FCC authorizations for the D Group Station and the STL Link as are necessary to implement digital compression technology. ENET shall bear all reasonable costs associated with such applications, including all reasonable costs associated with obtaining FCC approval thereof, and implementing the authorized modifications, provided that such costs are approved by ENET in advance in writing. However, in the event of an emergency, such costs may be approved verbally by an executive of ENET. Upon the completion of such modifications, the modified facilities shall become the "D Group Station" or the "STL Link" for purposes of this Agreement.

3.    Because the location and configuration of the D Group Station is critical to ENET's business, the University shall not attempt to amend the FCC Applications or modify any authorization issued by the FCC to relocate or reconfigure the D Group Station without the prior written consent of ENET, which consent shall not be unreasonably withheld.

- 8 -

IV.    USE OF EXCESS CAPACITY.  Consistent with the rules and policies adopted by the FCC in *Report and Order*, FCC 94-147, MM Docket No. 93-106 (rel. July 6, 1994), the University agrees to make available to ENET the entire 6 MHz transmission capacity of the channels designated as D3 and D4 ("ENET Capacity") for use by ENET for any legal purpose, without any restriction on the substance, format or type of information or signal to be transmitted thereover except as required by law or this Agreement.  The University shall also have the right to recapture, on six (6) months advance notice to ENET, simultaneous use of the channels comprising ENET Capacity from Monday through Friday between the hours of 9:00 am and 11:00 am and Saturday from 8:00 am to 6:00 p.m.  All capacity that is not ENET Capacity shall be deemed "University Capacity."  Implementation of digital technology pursuant to Paragraphs III.E.1 or III.E.2, shall not affect the allocation of the capacity of the D Group Station between the University and ENET, except that the capacity available for recapture by the University on channels D3 and D4 shall be reduced so that the University shall have available to it the ability to transmit the minimum number of video programs and associated audio signals permitted by the FCC's then-existing rules and policies.  Upon the implementation of digital technology, each party shall retain the ability to designate the compression ratio for its capacity if the equipment purchased and installed by ENET permits dynamic allocation.

V.    ROYALTIES.

    A.    Commitment Fee.  Concurrent with the execution of this agreement, ENET shall pay to the University a commitment fee (the "Commitment Fee") of Forty Thousand Dollars ($40,000).

    B.    Royalty.  In consideration of the airtime to be provided hereunder by the University, ENET agrees to pay to the University a monthly royalty equal to the greater of: Two Thousand Five Hundred Dollars ($2,500.00) or (ii) Twenty Cents ($0.20) for each subscriber to ENET's wireless cable service.

        1.    Computation of Royalty.  For purposes of computing the Royalty due for any month, the number of subscribers to ENET's wireless cable system shall be calculated as the number of such subscribers to ENET's wireless cable business as of the first day of the month.  In those situations where programming is sold in bulk for viewing at isolated locations in the same facility (that is, where a number of viewing units are grouped for billing purposes such as may be the case with hotels and condominiums) and ENET's rates therefore are less than its prevailing monthly rate for the sale of ENET's service to individual subscribers in the system, the number of subscribers from such bulk billing points shall be determined by dividing the total monthly revenues derived from the sale of ENET's programming in said bulk billing divided by ENET's then prevailing monthly rate for the sale of programming to individual subscribers.

- 9 -

C.    <u>Required Certificate and Payment Dates</u>.  The first Royalty payment shall be due on the twentieth day of the first full calendar month after the D Group Station has been constructed and is broadcasting at ENET's wireless cable headend and all following payments shall be paid to the University on twentieth day of each subsequent month.  ENET shall mail each Royalty payment to the University by first class United States mail, postage prepaid, together with a certificate signed by an employee or agent of ENET showing the number of subscribers served during each month of such period.

D.    <u>Right to Audit</u>.  ENET shall, for a period of eighteen (18) months after their creation, keep, maintain and preserve complete and accurate records and accounts, including all invoices, correspondence, ledgers, financial and other records pertaining to the University's royalties hereunder and such records and accounts shall be available for inspection and audit at ENET's office at any time or times during the time service is being provided to ENET hereunder or within ninety (90) days thereafter, during reasonable business hours, by the University or its nominee (who must be a Certified Public Accountant).  The University shall be entitled each calendar year to undertake one audit of ENET's records and accounts.  The University shall provide ENET with thirty (30) business days' advance written notice of its intent to audit said records and accounts prior to being allowed to do so.

E.    <u>Subscriber Contracts</u>.  The University shall not interfere with the right of ENET to lawfully modify, waive, rescind, terminate or cancel any and all services or contracts with subscribers.  In case any such services or contracts are modified, waived, rescinded, terminated or cancelled, the University shall not be entitled to any participation in revenues or claims whatsoever with respect to the unperformed portion of any such contract.

F.    <u>Proration of Fees</u>.  In the event that this Agreement shall be terminated on a date other than the last day of a calendar month, then the Royalty for such month shall be proportionately reduced.

G.    <u>Taxes</u>.  The Royalty provided for in this Agreement is the gross charge to ENET.  If federal, state, or local taxes or fees (other than taxes on the income of ENET) are applicable, or become applicable, it will be the responsibility of the University to pay such taxes or fees.

## VI.    INSURANCE

A.    <u>Policies Required</u>.  ENET shall, at its own cost, maintain with sound and financially reputable insurers, insurance with respect to the D Group Station and ENET's utilization of the D Group Station against casualty and other losses of the kinds customarily insured against by firms of established reputations engaged in the same or a similar line of business, of such types and in such amounts as are customarily carried under similar circumstances by such firms, including, without limitation:

- 10 -

1.     "All-risk" property insurance covering the D Group Station to the extent of one hundred percent (100%) of its full replacement value without deduction for depreciation; and

2.     Comprehensive general public liability insurance covering liability resulting from ENET's operation of the D Group Station on an occurrence basis having minimum limits of liability in an amount of not less than One Million Dollars ($1,000,000) for bodily injury, personal injury or death to any person or persons in any one occurrence, and not less than Two Million Dollars ($2,000,000) in the aggregate for all such losses during each policy year, and not less than One Million Dollars ($1,000,000) with respect to damage to property

B.     Insurance Policy Forms. All policies of insurance required by this Section shall, as appropriate, designate the University as either the insured party or as an additional insured, shall be written as primary policies, not contributory with and not in excess of any coverage which the University shall carry, and shall contain a provision that the issuer shall give to the University thirty (30) days prior written notice of any cancellation or lapse of such insurance or of any change in the coverage thereof. ENET shall provide the University with copies of all policies, riders and modifications necessary to demonstrate compliance with the requirements of this Section prior to commencing operation of the D Group Station, and shall provide the University with copies of any modifications to those documents prior to the effective date of such modifications.

VII.     CONTROL OVER PROGRAMMING. ENET may utilize ENET Capacity to transmit one or more of the programming networks identified on Schedule A hereto, to transmit any sports programming network, to retransmit the signal of any television broadcast station, to transmit any motion picture given a rating of G, PG, PG-13 or any similar rating by the Motion Picture Association of America, or an other programming agreed to by the University. No other programming or other service shall be transmitted by ENET over the D Group Station without the express prior approval of the University, which consent shall not be unreasonably withheld. Moreover, the University reserves the absolute right to deny ENET the right to transmit over the D Group Station any program which is obscene as defined by the laws of the United States, the District of Columbia, the State of Maryland, or the Commonwealth of Virginia or which would violate the rules and regulations of the FCC.

VIII.     MAINTENANCE OF FCC AUTHORIZATION.

A.     Through the term of this Agreement, the University shall utilize its best efforts to take all actions reasonably required to secure and preserve an authorization for the D Group Station and to permit ENET to use excess capacity thereon pursuant to the terms and conditions of this Agreement. The University shall obtain and maintain in force all licenses, permits and authorizations required or desired in connection with the use of the D Group

- 11 -

Station.  Except as set forth in Section VIII.B, the University shall take all necessary steps to renew the licenses for the D Group Station and shall not commit any act or engage in any activity which could reasonably be expected to cause the FCC to impair, restrict, revoke, cancel, suspend or refuse to renew the license for the D Group Station.  The University shall take all reasonable steps to comply with the Communications Act of 1934, as amended and the rules and regulations of the FCC, and shall timely file all reports, schedules and/or forms required by the FCC to be filed by the University.  All reasonable expenses, including attorneys fees and filing fees, incurred in preparing and filing such reports, schedules and/or forms required by the FCC shall be paid by ENET.

B.     During the Term of this Agreement or at anytime within two years after the expiration of the last automatic renewal term under Section I.B, the University may return its license for the D Group Station to the FCC for cancellation or elect not to renew its license, provided that the University gives one (1) year's prior written notice to ENET.  Upon written request of ENET during such one (1) year period, the University shall assign at no cost its license to such eligible entity as ENET shall designate that is willing to assume all remaining obligations and benefits of the University under this Agreement, subject to FCC consent.  The parties shall promptly and diligently prepare and file, and expeditiously prosecute any necessary assignment application (the "Assignment Application"), and take all such actions and give all such notices as may be required or requested by the FCC or as may be appropriate in any effort to expedite the authorization of such assignment.  Until such time as the FCC issues a Final Order disposing of the Assignment Application, the University shall take no action that would jeopardize ENET's rights under this Agreement.  In the event any person petitions the FCC to deny the Assignment Application or otherwise opposes the Assignment Application before the FCC, or in the event the FCC enters an order granting the Assignment Application and any person petitions for reconsideration or review of such order before the FCC or appeals or applies for review in any judicial proceeding, then ENET and the University agree to oppose such petition before the FCC or defend such order of the FCC diligently and in absolute good faith, at ENET's cost and expense, to the end that the transactions contemplated by this Agreement may be finally consummated.

IX.     INDEMNIFICATION.

A.     Indemnification by ENET.  ENET hereby covenants and agrees to, and shall, indemnify, defend and save harmless the University, its officers, employees and agents (the "Indemnitees") from and against and shall reimburse any Indemnitee on demand for any and all liabilities, losses, damages, claims, demands, actions, costs and expenses (including without limitations, reasonable court costs and attorneys' fees) of whatsoever kind or nature, which any of the Indemnitees may suffer, sustain, incur, pay, expend or lay out by reason, by virtue or as a result of (i) each and every breach or default by ENET of any of its covenants, agreements, duties or obligations hereunder, (ii) each and every breach or default of, or inaccuracy or omission in, any representation or warranty of ENET contained herein,

or (iii) the gross negligence or willful misconduct of ENET, its officers, directors, stockholders, employees or agents in connection with the performance of this Agreement. Moreover, ENET shall forever protect, save, defend and keep the University and its officers, employees and agents harmless and indemnify them against: (i) any and all claims, demands, losses, costs, damages, suits, judgements, penalties, expenses and liabilities resulting from claims of libel, slander or the infringement of copyright or the unauthorized use of any trademark, trade name, service mark or any other claimed harm or unlawfulness arising from the transmission of any programming; (ii) claims arising as a result of any transmission by ENET of programming or other material that is obscene, indecent, profane, or defamatory under 18 U.S.C. § 1464, as it may be amended from time to time, or under any other federal statute, regulation or rule, or which is obscene, indecent, profane or defamatory under the laws of the District of Columbia, Commonwealth of Virginia, or the State of Maryland.

B.    Indemnification by the University. The University hereby covenants and agrees to, and shall, indemnify, defend and save harmless ENET, its directors, officers, shareholders, employees and agents (the "Indemnitees") from and against and shall reimburse any Indemnitee on demand for any and all liabilities, losses, damages, claims, demands, actions, costs and expenses (including without limitations, reasonable court costs and attorneys' fees) of whatsoever kind or nature, which any of the Indemnitees may suffer, sustain, incur, pay, expend or lay out by reason, by virtue or as a result of (i) each and every breach or default by the University of any of its covenants, agreements, duties or obligations hereunder, (ii) each and every breach or default of, or inaccuracy or omission in, any representation or warranty of the University contained herein, or (iii) the gross negligence or willful misconduct of the University, its officers, employees or agents in connection with the performance of this Agreement.

C.    Claims for Indemnification. Where indemnification under this Section is sought by a party (the "Claiming Party"): (a) it shall notify in writing the other party (the "Indemnifying Party") promptly of any claim or litigation or threatened claim to which the indemnification relates; (b) upon the Indemnifying Party's written acknowledgement of its obligation to indemnify in such instance, in form and substance satisfactory to the Claiming Party, the Claiming Party shall afford the Indemnifying Party an opportunity to participate in and, at the option of the Indemnifying Party, control, compromise, settle, defend or otherwise resolve the claim or litigation (and the Claiming Party shall not effect any such compromise or settlement without prior written consent of the Indemnifying Party); and (c) the Claiming Party shall cooperate with the Indemnifying Party in its above-described participation in any compromise, settlement, defense or resolution of such claim or litigation. In the event that the Indemnifying Party does not so acknowledge its indemnification responsibility, the Claiming Party may proceed directly to enforce its indemnification rights.

X.   REPRESENTATIONS, WARRANTIES AND COVENANTS.

A.   <u>Representations, Warranties and Covenants of ENET</u>.

1.   <u>Organization</u>. ENET is a corporation duly organized and existing under the laws of the State of Delaware and has full power and authority to carry out all of the transactions contemplated hereby. Throughout the term of this Agreement, ENET shall remain duly organized and existing under the laws of the State of Delaware and qualified to do business and shall retain full power and authority to carry out all of the transactions contemplated hereby.

2.   <u>Compliance with Agreements and Law</u>. ENET has complied and throughout the term of this Agreement shall comply with all laws, rules and regulations governing its business and the ITFS facilities. Neither the execution and delivery of this Agreement nor the performance of the transactions contemplated hereby constitutes or will constitute a violation of, be in conflict with, constitute a default under, or be ultra vires as to, any term or provision of any agreement or commitment to which ENET is bound, or any statute, law, judgement, decree, order, regulation or rule of any court or governmental authority with jurisdiction over ENET. Except for the consent of the FCC, no consent, approval or authorization by or filing with any governmental authorities on the part of ENET is required in connection with the transactions contemplated herein.

3.   <u>Requisite Authority</u>. All requisite resolutions and other authorizations necessary for the execution, delivery, performance and satisfaction of this Agreement by ENET have been duly adopted and complied with.

4.   <u>Litigation</u>. There is no action, suit, proceeding or investigation pending or, to ENET's best knowledge, threatened against it before any court, administrative agency or other governmental body relating in any way to the transactions contemplated by this Agreement, and ENET does not know of any valid basis for the commencement of any such action, proceeding or investigation. ENET has not been charged with and, to its best knowledge, has not been under investigation with respect to any charge concerning any material violation of any provision of any federal, state, or local law or of any administrative regulation. No unsatisfied judgement, order, writ, injunction, decree or assessment of any court or of any federal, state, local or other governmental department, commission, board, bureau, agency or instrumentality relating in any way to this Agreement has been entered against and served upon it. There is no action, proceeding or investigation pending or, to its best knowledge, threatened against ENET, nor are there pending any inquiries or challenges that otherwise seek to prevent the consummation or performance of this Agreement.

5.   <u>Financial Ability</u>. ENET has reasonable assurance of the funding necessary to comply with its obligations to the University under this Agreement.

- 14 -

B.    Representations, Warranties and Covenants of the University.

1.    Organization. The University is duly organized and existing under the laws of the District of Columbia and has full power and authority and is eligible to hold the License for the D Group Station and to carry out all of the transactions contemplated hereby. Throughout the term of this Agreement, the University shall remain duly organized and existing under the laws of the District of Columbia and shall retain full power and authority and eligibility to hold the License for the D Group Station and to carry out all of the transactions contemplated hereby.

2.    Compliance with Agreements and Law. The University has complied and throughout the term of this Agreement shall comply in all material respects with all laws, rules and regulations governing the ownership and operation of the D Group Station, including those of the FCC. Neither the execution and delivery of this Agreement nor the performance of the transactions contemplated hereby constitutes or will constitute a violation of, be in conflict with, constitute a default under, or be ultra vires as to, any term or provision of any agreement or commitment to which it is bound, or any statute, law, judgement, decree, order, regulation or rule of any court or governmental authority with jurisdiction over the University. Except for the consent of the FCC, no consent, approval or authorization by or filing with any governmental authorities on the part of the University is required in connection with the transactions contemplated herein.

3.    Requisite Authority. All requisite resolutions and other authorizations necessary for the execution, delivery, performance and satisfaction of this Agreement by the University have been duly adopted and complied with.

4.    Litigation. There is no action, suit, proceeding or investigation pending or, to the University's best knowledge, threatened against it before any court, administrative agency or other governmental body relating in any way to the transactions contemplated by this Agreement, and the University does not know of any valid basis for the commencement of any such action, proceeding or investigation. The University has not been charged with and, to its best knowledge, has not been under investigation with respect to any charge concerning any material violation of any provision of any federal, state, or local law or of any administrative regulation which would have an adverse impact on the University's obligations under this Agreement. No unsatisfied judgement, order, writ, injunction, decree or assessment of any court or of any federal, state, local or other governmental department, commission, board, bureau, agency or instrumentality relating in any way to this Agreement has been entered against and served upon it. There is no action, proceeding or investigation pending or, to its best knowledge, threatened against the University nor are there pending any inquiries or challenges that otherwise seek to prevent the consummation or performance of this Agreement.

- 15 -

5.    Receive Sites.  Schedule B accurately identifies the site and receive antenna located at the current receive sites of the University and the lessee of channel D2.

C.    Survival of Representations and Warranties.  The representations and warranties contained in this Agreement shall not in any respect be limited or diminished by any past or future inspection, examination or possession on the part of the parties or their representatives of any records, documents, information or properties.  Such warranties and representations shall be deemed to be continuing during the term of this Agreement, and each party shall have the duty promptly to notify the other of any event or circumstance which might reasonably be deemed to constitute a breach of or lead to a breach of its warranties or representations hereunder.

XI.    TERMINATION.

A.    Termination by the University.  The University shall have the right to terminate this Agreement, without further liability to ENET, in the event: (1) the University's authority to operate the D Group Station in accordance herewith is terminated by the FCC (unless such termination is due to a breach by the University of its obligations hereunder); or (2) ENET breaches any of its material obligations hereunder, and either (a) ENET has not cured such breach within thirty (30) days of receiving notice thereof, or (b) (if the breach is other than for the payment of money) ENET has not undertaken material or substantive measures to cure such breach within thirty (30) days of receiving such notice.

B.    Termination by ENET.  ENET shall have the right to terminate this Agreement, without further liability to the University in the event: (1) the University's authority to operate the D Group Station in accordance herewith is terminated by the FCC (unless such termination is due to a breach by ENET of its obligations hereunder); (2) the University breaches any of its material obligations hereunder, and such breach either is not cured within thirty (30) days of receiving notice thereof or the University has not undertaken material or substantive measures to cure such breach within thirty (30) days of receiving such notice; or (3) if ENET ceases to provide wireless cable service within the Washington, DC metropolitan area.

C.    Effect of Termination  Termination by either party pursuant to the preceding Sections shall not affect the ability of the terminating party to seek damages in a court of law against the other arising out of any breach of this Agreement.

XII.    PROSECUTION OF APPLICATIONS AND PETITIONS.

A.    FCC Filings.  Both parties hereto shall diligently prepare, file and prosecute before the FCC all necessary or desirable petitions, waivers, applications and other related documents subject to the approval of the University, which approval shall not be unreasonably

- 16 -

withheld, conditioned or delayed, required to secure FCC approval of the matters addressed herein. Notwithstanding anything herein to the contrary, it is understood that no filing shall be made with the FCC with respect to the subject matter hereof unless both parties hereto shall have reviewed said document and the University shall have consented in advance to its submission.

B.   Further Efforts. While this Agreement is in effect, the University shall use its best reasonable efforts to obtain and maintain in force all licenses, permits and authorizations required in connection with ENET's use of the D Group Station hereunder. The University shall also file such reasonable protests or other petitions to deny against applications of third parties for licenses as may be requested by ENET. The University, if requested by ENET and to the extent requested, shall use its reasonable best efforts to prevent any unauthorized individual or entity from receiving the signals transmitted over the D Group Station, provided that all costs and expenses in connection therewith are paid by ENET. The University shall promptly notify ENET of any event which may affect the licenses, permits or authorizations for the D Group Station. The University shall fully cooperate with all reasonable requests of ENET for assistance in the construction, operation and maintenance of any additional facilities which ENET may desire in order to optimize its business within the Washington/Baltimore area, provided that ENET shall reimburse the University for all reasonable expenses incurred by the University in providing such assistance.

C.   Reimbursement of Expenses. In addition to any other obligations ENET may have under this Agreement, ENET shall reimburse all reasonable costs and expenses incurred by the University (including reasonable attorney and engineering fees) incurred by the University in satisfaction of its obligations under this Section XII.

XIII.  MISCELLANEOUS

A.   Assignments The University may assign any authorization it receives from the FCC for ITFS channels in the Washington, DC area during the term hereof, provided that the FCC grants its prior consent and that the assignee of such authorization assume all remaining obligations and benefits of the University under this Agreement. Subject to the foregoing provisions, the University may assign its authorization to an entity that does not agree to assume all remaining obligations and benefits of the University under this Agreement, provided that the University gives one (1) year's prior written notice to ENET. Upon written request of ENET during such one (1) year period, the University shall assign at no cost its license to such eligible entity as ENET shall designate that is willing to assume all remaining obligations and benefits of the University under this Agreement, subject to FCC consent. The parties shall promptly and diligently prepare and file, and expeditiously prosecute any necessary assignment application (the "Assignment Application"), and take all such actions and give all such notices as may be required or requested by the FCC or as may be appropriate in any effort to expedite the authorization of such assignment. Until such time

- 17 -

as the FCC issues a Final Order disposing of the Assignment Application, the University shall take no action that would jeopardize ENET's rights under this Agreement. In the event any person petitions the FCC to deny the Assignment Application or otherwise opposes the Assignment Application before the FCC, or in the event the FCC enters an order granting the Assignment Application and any person petitions for reconsideration or review of such order before the FCC or appeals or applies for review in any judicial proceeding, then ENET and the University agree to oppose such petition before the FCC or defend such order of the FCC diligently and in absolute good faith, at ENET's cost and expense, to the end that the transactions contemplated by this Agreement may be finally consummated. Notwithstanding the foregoing sentence, if ENET's counsel provides a good faith written estimate that the legal fees associated with opposing any challenge to the Assignment Application or any order granting the Assignment Application will exceed Fifteen Thousand Dollars ($15,000), ENET shall notify the University and afford the University a period of five (5) business days to agree to share jointly in all reasonable and necessary legal fees in excess of Fifteen Thousand Dollars ($15,000). The University may elect not to share jointly in such fees without incurring any liability to ENET hereunder whatsoever. If the University does not notify ENET within such period that it agrees to provide such funding, ENET shall not be obligated to expend more than such amount in opposing any challenge to the Assignment Application or any order granting the Assignment Application and may cease its opposition to the challenge or its defense of the Assignment Application without liability.

B.      Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument, and shall become effective when each of the parties hereto shall have duly executed this Agreement.

C.      Distance Learning Program. It is the intention of the University to develop a distance learning program through which the D Group Station will be used to transmit college courses to students at their residences. ENET shall assist in the development of such program and shall make its addressing facilities available to the University to control access to distance learning programs. In addition, at such time as ENET produces a local program guide for distribution to its subscribers in the Washington metropolitan area, ENET shall include a listing of the University's programming (which may be integrated with the listings of other educational programming), provided that the University shall provide ENET with its program schedule sufficiently in advance so as to permit inclusion in the program guide without alteration in ENET's production schedule for such guide.

D.      Entire Agreement. This Agreement states the entire agreement as of this date between the parties with respect to the subject matter and supersedes all pre-existing oral or written agreements or commitments with respect thereto. This Agreement may be modified only by an agreement in writing executed by all of the parties.

- 18 -

E.    Executory Agreement. Both parties acknowledge this Agreement is executory in nature, requiring the continuing performance of obligations by each party to the other.

F.    Force Majeure. Notwithstanding anything contained in this Agreement to the contrary, neither party shall be liable to the other for failure to perform any obligation under this Agreement (nor shall any charges or payments be made in respect thereof) if prevented from doing so by reason of fires, strikes, labor unrest, embargoes, civil commotion, rationing, or other orders or requirements, acts of civil or military authorities, acts of God or other contingencies beyond the reasonable control of the parties, and all requirements as to notice and other performance required hereunder within a specified period shall be automatically extended to accommodate the period of dependency of any such contingency which shall interfere with such performance.

G.    Further Action. From time to time after the date of execution, the parties shall utilize their best efforts to take such further action and execute such further documents, assurances and certificates as either party may reasonably request of the other in order to effectuate the purpose of this Agreement. In addition, each party agrees that it will not take any action which would adversely affect the rights granted by it to the other party hereunder.

H.    Governing Law. This Agreement shall be governed by, and construed and enforced in accordance with the Communications Act of 1934, as amended, the FCC's Rules and the laws of the District of Columbia.

I.    Headings. The headings herein are inserted for convenience only and shall not constitute a part hereof.

J.    Interpretation. In the event that this agreement requires interpretation or construction, this agreement shall not be interpreted or construed more strictly against any one party by reason of any rule of interpretation or construction under which a document is to be construed more strictly against the drafting party.

K.    Jurisdiction and Venue. In the event of any dispute between the parties regarding the rights and obligations of any party hereunder, any party shall have the right to sue the other party in District of Columbia courts. For any and all such purposes, the parties hereto hereby irrevocably submit to the jurisdiction of such courts, waive all objections thereto (on the grounds of improper venue, forum non conveniens or otherwise), and agree that service of process upon each as provided in the section concerning Notices herein shall be effective to establish personal jurisdiction over it in such courts.

L.    Notices. Except as set forth above concerning the payment of Royalties, all notices and documentation given under this Agreement shall be in writing and shall be deemed given the first weekday (excluding Federal holidays) after being sent by United States

- 19 -

Express Mail, return receipt requested, or by Federal Express, signature required, to the other party at the following address:

If to ENET:

Eastern Cable Networks Corp.
700 Canal Street, Third Floor
Stamford, CT 06902
Attn: Rick Perrone

With a copy to:

Paul J. Sinderbrand, Esq.
Sinderbrand & Alexander
888 Sixteenth Street, N.W.
Fifth Floor
Washington, DC 20006-4103

If to the University:

Mr. Ted Christensen
Assistant Vice President for GW Television
801 22nd Street, N.W., Suite T-306
Washington, DC 20052

or to such other address as any written notice to the other party designates.

M.    Option. If at any time during the term hereof the University's existing lease of the transmission capacity of channel D2 for data services shall terminate or expire, the University shall provide ENET notice within ten (10) days. ENET shall have the exclusive right to lease the capacity of channel D2 for the duration of this Agreement, which option ENET may exercise by providing the University with notice within twenty one (21) days of receiving notice of the availability of such channel. Should ENET exercise its option hereunder, channel D2 shall be added to ENET Capacity and ENET shall thereafter pay an additional monthly royalty equal to the greater of Two Thousand Five Hundred Dollars ($2,500) or Ten Cents ($.10) per each subscriber to ENET's wireless cable service.

N.    Reimbursement of Expenses. Notwithstanding anything to the contrary contained herein, ENET shall reimburse the University for all reasonable costs and expenses incurred by the University in negotiating this Agreement (including reasonable legal and engineering fees not to exceed $15,000.00), operating and maintaining the D Group Station, the STL Link and the PTP Link, and otherwise complying with the terms of this Agreement.

Reimbursement for a reimbursable expense shall be made by ENET within thirty (30) days of receiving an appropriate invoice from the University and such supporting documentation as ENET reasonably requires in order to establish that the University is entitled to reimbursement of such expense hereunder.

O.    Relationship of Parties.  The University and ENET by the provisions of this Agreement will enter into an airtime use relationship and not a joint venture and both parties will carry out this Agreement to preserve that intent.  Neither party shall present itself as the other party, nor as having any relationship with one another, except as set forth under the terms of this Agreement.

P.    Reformation.

1.    If Congress, the FCC, any court or any other governmental authority with jurisdiction over the subject matter hereof should amend, interpret or clarify the law, rules, regulations or policies applicable to this Agreement in a manner that would adversely affect the ability of the parties to perform their obligations under this Agreement, then the parties hereto shall promptly negotiate in good faith to reform and amend this Agreement so as to permit as nearly as reasonably possible the performance of their obligations hereunder.  Neither party shall take any action that contributes to such adverse amendment, clarification or interpretation without the prior written consent of the other party.

2.    The parties acknowledge pursuant to Paragraph 29 of the FCC's *Report and Order*, MM Docket No. 93-106 (rel. July 9, 1994) that the allocation of the capacity of the D Group Station is subject to future changes in the FCC's rule governing the leasing of excess ITFS capacity.

Q.    Rights of ENET Subordinate.  Notwithstanding anything to the contrary contained herein, ENET expressly recognizes that the University previously has granted rights to Hybrid to utilize certain capacity on channel D2, pursuant to the Hybrid Agreement, and that the obligation of the University to take any action required hereunder shall be read to conform to such other obligations that the University may owe to Hybrid under the Hybrid Agreement.  The University shall use its best efforts to negotiate with Hybrid and ENET to resolve any conflicts between the two agreements, provided, however, that no action shall be taken hereunder if the effect of such action, in the reasonable judgment of the University after consultation with Hybrid, would have an adverse effect on the rights of Hybrid under the Hybrid Agreement.

R.    Time of Essence.  Whenever this Agreement shall set forth any time for the performance of an act, such time shall be deemed of the essence.

- 21 -

S.  <u>Waiver</u>.  The express or implied waiver by either party of any breach of any representation or warranty or any failure to fulfill any condition, covenant or other obligation or liability under this Agreement shall not constitute a waiver of any other representation or warranty or of any other failure in the future or in the past by the other party to fulfill such representation, warranty, condition, covenant, obligation or liability hereunder.

T.  <u>Word Meanings</u>.  As used in this Agreement, the term "including" shall be deemed to mean "including, without limitation." All pronouns and any variations therefore shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the context may require. A "Final Order" means a written action or order issued by the FCC: (a) which has not been reversed, stayed, enjoined, set aside, annulled or suspended; and (b) with respect to which (i) no requests have been filed for administrative or judicial review, reconsideration, appeal or stay and the time for filing any such requests, and the time for the FCC to set aside the action on its own motion, has expired, or (ii) in the event of review, reconsideration or appeal, the action or order has been affirmed and the time for further review, reconsideration or appeal has expired.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

THE GEORGE WASHINGTON UNIVERSITY

An Officer

EASTERN CABLE NETWORKS CORP.

An Officer

g:\docs\eas01\dc\gwu.k5

- 22 -

SCHEDULE A

## REPRESENTATIVE PROGRAMMING SERVICE

The following are representative types of programming that Eastern intends to transmit over the leased channels, pursuant to Subparagraph 3 (C).

Home Box Office
Cinemax
Showtime
The Movie Channel
American Movie Classics
Bravo
Black Entertainment Network
MTV
USA
TNT
WWOR
WGN
CNN
CNN Headline News
CNBC
WTBS
Arts & Entertainment
ESPN
Nickelodeon
Family Channel
Nashville Network
Weather Channel
Disney Channel
Learning Channel
Lifetime Channel
Programming from broadcast television stations licensed to operate in the United States or Canada
Digital Radio
Sega Channel

LICENSED ITFS RECEIVE SITES

SCHEDULE B

R1        Omitted

R2        Computer Science Corp.
          8728 Colesville Road
          Silver Spring, MD  20910
          38-59-55N 77-01-39W EL:350' + Building @ 50'

R3        National Security Agency
          9800 Savage Road
          Ft. Meade, MD  20755
          39-06-30N 76-46-19W  EL:160

R4        Intelsat
          3400 International Drive, NW
          Washington, DC  20008
          38-56-32N 77-03-51W  EL:310' + Building @ 40'

R5        Pyramid Video
          14th & F Streets, NW
          Washington, DC  20045
          38-53-48N 77-01-54W  Building 100+'

R6        Omitted

R7        GWU - Rice Hall
          2121 I Street, NW
          Washington, DC  20052
          38-54-03N 77-02-50W  EL:70'

R8        GWU-TV
          801 - 22nd Street, NW
          Washington, DC  20052
          38-54-01N 77-02-55W  EL:157'

R9        Naval Research Laboratory #1
          4555 Overlook Ave., SW
          Washington, DC  20375
          38-49-23N 77-01-06W  EL:60'

R10       Omitted

R11       Office of Navy Civ. Pers. Mgt. and Mine
          Safety Offices
          4015 Wilson Blvd.
          Arlington, VA  22203
          38-52-48N 77-06-30W  EL:270' + 130'

Licensed ITFS Receive Sites
Page 2

Schedule B

R12    Media General
       4600 West Ox Road
       Fairfax, VA  22030
       38-51-17N 77-22-28W  EL:430' + 146' tower

R13    Mitre Corporation
       1820 Dolley Madison Blvd.
       McLean, VA  22102
       38-55-36N 77-12-21W  EL:390

R14    Omitted

R15    Watkins-Johnson Company
       700 Quince Orchard Road
       Gaithersburg, MD  20502
       39-08-34N 77-13-33W  EL:500'

R16    National Institutes of Health
       9000 Rockville Pike #1
       Rockville, MD
       38-59-53N 77-06-18W  EL:318' + 174'

R17    Naval Research Laboratory #2
       4555 Overlook Avenue, SW
       Washington, DC  20375
       38-49-23N 77-01-19W

       Antenna side-mounted on existing tower at 70'
       lev. + EL:27'

R18    Palmer Park Media Center
       8437 Landover Road
       Landover, MD  20785
       38-55-04N 76-51-47W

       Antenna side-mounted on new 49' guyed mast
       above building roof level.  EL:202' + 22' +
       49'

       Notification has been submitted to FAA

R19    GWU - No. Virginia Campus
       20101 Academic Way
       Ashburn, VA  22011
       39-03-44N 77-26-44W  EL:360' + 50' Building

Licensed ITFS Receive Sites
Page 3                                                                Schedule B


R20          The American University
             Mass. & Neb. Aves., NW
             Washington, DC  20016
             38-56-11N 77-05-33W  EL:365' + 20'

R21          The University of Maryland
             Hornbake Library
             College Park, MD  20742
             38-59-17N 76-56-31W  EL:471' + 4th Floor

R22          University of The District of Columbia
             4200 Connecticut Ave., NW
             Washington, DC  20008
             38-56-37N 77-03-59W  EL:290'

R23          The Catholic University of America
             620 Michigan Avenue, NE
             Washington, DC  20064
             38-56-05N 76-59-58W  EL:160' + 30'

R24          Trinity College
             125 Michigan Ave., NE
             Washington, DC  20017
             38-55-37N 77-00-16W  EL:180' + 30'

R25          Howard University
             2400 6th Street, NW
             Washington, DC  20059
             38-55-14N 77-01-11W  EL:120' + 4th Floor +
             50' tower

R26          Gallaudet University
             800 Florida Ave., NE
             Washington, DC  20002
             38-54-36N 76-59-26W EL:130' + 30' Building

R27          Georgetown University
             204 Healy Building
             37th and O St., NW
             Washington, DC  20057
             38-54-22N 77-04-20W  EL:120' + 40'

R28          Mount Vernon College
             2100 Foxhall Road, NW
             Washington, DC  20007
             38-55-05N 77-05-22W EL:275' + 50'

Licensed ITFS Receive Sites
Page 4                                                    Schedule B


R29        Marymount University
           2807 North Glebe Road
           Arlington, VA  22207
           38-54-23N 77-07-44W EL:410' + 901'


R30        George Mason University
           4400 University Drive
           Fairfax, VA  22030
           38-49-51N 77-18-25W  EL:440' + 615' Tower


R31        David Taylor Research Center DTNET
           Building 17W Carderock Lab
           Bethesda, MD  20084-5000
           38-58-25N 77-11-26W  EL:170'


R32        George Geesey Residence
           GW Television Chief Eng.
           3612 Faircastle Drive
           Chevy Chase, MD  20815
           39-00-18N 77-04-25W  EL:370'


R33        GWU-Crystal City Ed Center
           Buidling H
           2231 Crystal Drive
           Arlington, VA  22202
           38-51-16N 77-03-01W  EL:230'


R34        Fairfax County School Media Center
           VIA Media General Cable
           2917 Eskridge Road
           Fairfax, VA  22031
           38-52-22N 77-13-52W  EL:580'


R35        Defense Language Institute
           Suite 507
           1111 Jefferson Davis Hwy
           Arlington, VA  22202
           38-51-40N 77-03-03W  EL:90'


R36        DC Schools Gordon Center
           Room 302
           35th and T Streets, NW
           Washington, DC  20007
           38-54-56N 77-04-08W  EL:285'

Licensed ITFS Receive Sites
Page 5

Schedule B

R37    The World Bank
       801 19th Street, NW
       Washington, DC  20433
       38-54-02N 77-02-36W  EL:200'

R38    The Brookings Institute
       1775 Mass. Ave., NW
       Washington, DC  20036
       38-54-29N 77-02-25W  EL:140'

R39    Mont. County School Board of Education
       850 Hungerford Drive
       Rockville, MD 20850
       39-05-42N 77-09-27W  EL:480'

R40    U.S. Geological Survey
       12201 Sunrise Valley Drive
       Reston, VA  22092
       38-56-50N 77-22-04W  EL:510'

R41    Johns Hopkins Un. SAIS
       Room 330
       1619 Mass. Avenue, NW
       Washington, DC  20783
       38-54-28N 77-02-16W  EL:165'

R42    WNVC-TV
       8101A Lee Highway
       Falls Church, VA  22042
       38-52-28N 77-13-24W  EL:535'

R43    FBI Buzzard Point
       1900 Half Street, SW
       Washington, DC  20535
       38-51-59N 77-00-37W  EL:125'