IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEXTEL SPECTRUM ACQUISITION
CORPORATION,

    Plaintiff,

    v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,

    Defendant.

Civil Action No.: 1:07-CV-00543-RMC

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Plaintiff Nextel Spectrum Acquisition Corporation ("NAC") submits its Opposition to Defendant Hispanic Information and Telecommunications Network's ("HITN") Motion to Dismiss. NAC's Complaint alleges HITN has breached a lease agreement with NAC in at least two ways. First, HITN breached the lease by denying NAC the ability to exercise a valid Right of First Refusal ("ROFR"). Second, HITN entered into separate agreements with Clearwire Corporation ("Clearwire") that had the specific purpose and effect of preventing NAC from exercising the ROFR, something HITN promised it would not do in its lease with NAC. HITN's breaches are clearly explained and sufficiently pled in the Complaint.

In addition, NAC recently filed a Motion for Leave to File a First Amended Complaint (ECF Doc. # 4) which more fully reflects HITN's relationship with Clearwire. The First Amended Complaint alleges HITN is now contractually obligated to deal with Clearwire and only Clearwire, notwithstanding NAC's pre-existing, exclusive ROFR to the contrary. Although the First Amended Complaint, assuming leave to file it is granted, moots the pending Motion to Dismiss, NAC submits this Opposition to refute HITN's assertion that Clearwire and HITN are

free to enter into contracts in breach of NAC's ROFR rights. Whether the Court is evaluating the Complaint or First Amended Complaint, NAC states a claim for relief and HITN's Motion to Dismiss should be denied.

## I. BACKGROUND

This case involves NAC's bargained-for right to lease valuable spectrum in and around Washington, DC.[1] In early 2005, HITN acquired an FCC license for Educational Broadband Service Station WHG442 (the "License"). At that time, the License was subject to a lease agreement (the "Lease") that provides NAC with a valid right of first refusal ("ROFR") on any bona fide offer(s) that HITN receives for the underlying spectrum rights ("DC Spectrum").[2] A copy of the Lease is attached to the Amended Complaint as Exhibit A. Specifically, Section I.C.1 of the Lease states as follows:

> [NAC] shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B through two years thereafter.

The ROFR would continue for a period of two years following expiration of the Lease; up to February 21, 2007 (the "ROFR Term").

The Lease specified two circumstances that trigger the ROFR. First, if HITN wished "to enter into an agreement to lease excess capacity that would commence anytime within two years

---

[1] As used herein, "spectrum" refers to radio frequencies used for the transmission of sound, data and video. The FCC is responsible for administering and allocating spectrum rights used by the private sector, including individuals (e.g., cellular telephones, wireless Internet, garage door openers and computer modems), private organizations (e.g., radio and telephone broadcasters, including but not limited to not-for-profit entities), and public safety and health officials (e.g., police and emergency technicians).

[2] The DC Spectrum Rights at issue in this lawsuit involve the "D Group" channels within the 2.5 GHz band licensed for the Washington D.C. area and designated by call sign WHG442. The "2.5 GHz band" refers to licensed spectrum authorized by the FCC between the frequencies of 2495 MHz and 2690 MHz. The general practice of the FCC is to authorize a maximum of 33 channels in the 2.5 GHz band in any given market. In general, a license for a spectrum in the 2.5 GHz band consists of the right to use one of eight four channel groups, commonly known as the A Group, B Group, C Group, D Group, E Group, F Group and G Group. The remaining five channels are allocated to the H Group (three channels) and to two channels known as BRS1 and BRS2.

after the expiration of the automatic renewal term under Section I.B.," i.e., during the ROFR Term, HITN "must provide written notice to [NAC] at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of [NAC's] Right of First Refusal. Such notice must be given one year prior to expiration of the contract." Ex. A, § I.C.2.

In all other situations involving offers to lease the DC Spectrum Rights, HITN was obligated to give NAC written notice containing the material terms and conditions of any "bona fide offer to lease excess capacity," including the identity of the offeror. Ex. A, § I.C.2. This provision applies to any offer to lease the DC Spectrum, whenever such a lease would be effective, provided, however, that the offer was made during the ROFR Term.

Nevertheless, HITN committed the DC Spectrum to Clearwire without informing NAC of the offer, much less affording NAC its contractual right to match that offer. Through a series of agreements, most notably the Master Royalty and Use Agreement executed on or around October 4, 2006 ("MRUA"), HITN granted Clearwire first access to all of its spectrum holdings.[3/] As a "master" agreement, the MRUA formalized the longstanding relationship between HITN and Clearwire concerning HITN's spectrum, include the DC Spectrum. The MRUA specifically detailed the transactional mechanism and definitive terms for the acquisition of *all* such HITN spectrum by Clearwire.

From the first paragraphs of the MRUA, Clearwire's offer to take, and HITN's willingness to accept, Clearwire's offer is clear:

> Whereas, [HITN] desires to make available to Clearwire, and Clearwire desires to have access to, the Commercial Spectrum

---

[3/] Clearwire disclosed the MRUA, subject to heavy redactions, in the course of Form S-1 filings necessitated by Clearwire's public securities offering. NAC acquired Exhibit B from the SEC's Edgar database of public securities records. A copy of the disclosed version of the MRUA is attached to the Amended Complaint as Exhibit B.

> Capacity that is identified on Schedule A (the "Initial Spectrum Capacity"), ***and any additional Commercial Spectrum Capacity of Licensee*** that is accepted by Clearwire and made subject to an IUA [Individual Use Agreement] as provided in this Agreement.

Ex. B, "Recitals" at 4; § 1.01(a) (emphasis added). Akin to an "option" contract, the MRUA first required HITN to offer any and all subsequent "Available Spectrum" to Clearwire. Ex. B. § I. 1.02(b). Significantly, the Recitals make no other distinction between available and future spectrum, demonstrating that the parties' intention at the time they executed the MRUA was to create a single, unified process and terms for the acquisition of *all* HITN's EBS spectrum capacity. See Ex. B. §1.01 (a).

In exchange for this commitment, Clearwire "pre-paid" certain economic royalties and agreed to make other payments to HITN in the future as Clearwire acquired and developed HITN's spectrum. The consideration paid to HITN by Clearwire – during the ROFR Term – exceeded "the value of the Initial Spectrum Capacity" Clearwire would immediately acquire because that payment included "***additional consideration*** for the value of the Option [for Future Spectrum Capacity] and constituted "***an advance payment*** toward future spectrum capacity." Ex. B, § I.1.01.(b) (emphasis added).

In exchange for this additional consideration, HITN gave Clearwire the option to enter into Individual Use Agreements ("IUA") on "***any and all Spectrum*** on FCC Licenses held by HITN that is Available or becomes Available during the Term, at prices to be negotiated in good faith based upon fair market value ("FMV") of such Spectrum at the time the Option is to be exercised; provided, however, that the negotiated price shall not exceed [REDACTED] per MHz POP." Exh. B at I.1.02 (b) (emphasis added).

Finally, and importantly, under the MRUA, HITN had no choice as to whether to offer spectrum to Clearwire:

> When Spectrum is acquired by [HITN] or its Affiliates, or becomes available for use by Clearwire under an IUA as Future Spectrum Capacity, Licensee ***shall immediately provide*** a written proposal (an "Option Notice") to Clearwire ***with the same information*** with respect to such proposed Commercial Spectrum Capacity as is set forth on Schedule A for the Initial Spectrum Capacity." Ex. B at § I.1.02 (b). (Emphasis added).

HITN's Motion conspicuously ignores Section I.C.3 of the Lease; which states:

> [HITN] ***shall not accept any offer*** to lease excess capacity that includes terms or conditions that have the ***purpose or the effect of preventing NAC from exercising its Right of First Refusal.***

Ex. A., § I.C.3. (Emphasis added). If anything, HITN's Motion confirms that HITN breached this specific provision of the Lease. HITN entered into the MRUA which, according to the Motion to Dismiss, only contemplates the transfer of "available" spectrum to Clearwire. Assuming this interpretation of the MRUA is correct (it is not), it is obvious that the MRUA is structured to nullify the ROFR. This is precisely what HITN promised that it would not do.

Contrary to HITN's Motion to Dismiss, the Complaint has stated a claim for relief based upon Clearwire's bona fide "offer" for the DC Spectrum in violation of the ROFR. Moreover, by entering into the MRUA, which has the purpose and effect of preventing NAC from exercising the ROFR, HITN breached the Lease and the Motion to Dismiss should be denied.

## II. ARGUMENT

Dismissal under Fed. R. Civ. P. 12(b)(6) is only appropriate in those cases where plaintiff has failed to "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In evaluating motions to dismiss for failure to state a claim, "the accepted rule in every type of case, is that a court should not dismiss a complaint for failure to state a claim unless the defendant can show beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Potts v. Howard Univ.* No. Civ. A 04-1856, 2007 WL 15925 *1, *2

(D.D.C. Jan. 4, 2007), *quoting Warren v. District of Columbia*, 353 F.3d 36, 37 (D.C.Cir. 2004). "Thus, in resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations — including mixed questions of law and fact — as true and draw all reasonable inferences therefrom in the plaintiff's favor." *Id. citing Macharia v. United States,* 334 F.3d 61, 64, 67 (D.C.Cir. 2003). "The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests." *Id.*, *citing Kingman Park Civic Ass'n v. Williams,* 348 F.3d 1033, 1040 (D.C. Cir. 2003). HITN has failed to satisfy this stringent standard.

Here, NAC pled the existence of a valid ROFR and alleged the ROFR was triggered by HITN's decision to transfer its spectrum to Clearwire pursuant to, among other things, the MRUA, which was executed during the ROFR Term. NAC has also stated a claim for breach of the Lease because the MRUA has the purpose and effect of denying NAC the opportunity to exercise the ROFR. HITN's Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6) should be denied.

HITN advances two arguments in support of its Motion. First, HITN argues that the MRUA "does not constitute an offer to lease" the DC Spectrum and therefore would not trigger the ROFR. As stated above and discussed in detail below, this is simply not true. Second, HITN argues that the DC Spectrum is not "Future Spectrum Capacity" which could be leased by Clearwire "unless and until" those channels were no longer encumbered by any right of first refusal owned by NAC. From this, HITN asks the Court to conclude that Clearwire's binding contract to purchase those leases for fair market value as they become "available," for which HITN accepted prepaid royalties, was not really even an "offer." HITN's motion is nothing more than a request to this Court to adopt HITN's unsupportable position as to how they would

like the lease language to be read, notwithstanding what the Lease actually says. This is not a proper purpose of a Motion to Dismiss, and the Motion should be denied.

> A.  **The MRUA Sets Forth An "Offer Capable Of Acceptance" for the DC Spectrum Triggering the ROFR.**

HITN argues that the MRUA does not constitute an "offer" for the DC Spectrum. Yet, we know the MRUA describes an "offer" capable of acceptance for all of HITN's spectrum as it became available for one simple reason: HITN has accepted it.

An "offer" creates in the offeree the power of acceptance, and must be made under circumstances evidencing the express or implied intent of the offeror that its acceptance shall constitute a binding contract. *See Maurice Elec. Supply Co., Inc. v. Anderson Safeway Guard Rail Corp.*, 632 F.Supp. 1082, 1087 (D.D.C. 1986). Moreover, a contract is sufficiently definite for enforcement which provides that one who has the right of first purchase shall pay the price set by a bona fide offer. *Sankin v. 5410 Connecticut Ave. Corp.*, 281 F. Supp. 524 (D.D.C. 1968) *citing* 5A Corbin, Contracts § 1174, at 289 (1964); 1A Corbin, Contracts § 261(5), at 470 (1963). Conversely, a contract is not made indefinite by an alternative provision such that the purchasing party would pay the reasonable value of the property at the time of purchase. *See id. citing*, 2 Corbin, Contracts § 99, at 444, (1963).

The MRUA is sufficiently definite to establish that it is an "offer capable of acceptance." First, the MRUA sets out a definite price term – fair market value – for the leases. Ex. B. § 1.02(b). The provision that the price of future spectrum capacity would be set at fair market value is no less capable of acceptance than one which states a price certain. *See Sankin*, 281 F. Supp. 524 (noting that existence of "reasonable value" term does not prevent enforcement of right of first refusal where reasonable value could be determined.) Under the MRUA, it simply makes no practical difference whatsoever to HITN or Clearwire which of HITN's spectrum was

available at any given time, because all the material terms for purchase of all of HITN's spectrum were expressly stated, were definite and, moreover, would be the same throughout the MRUA term. Consequently, because the terms of the "offer" are the same for all HITN's spectrum, HITN's argument that the MRUA is only an offer to lease the "Initial Spectrum Capacity" is incorrect.

Second, as noted above, the mechanics of these transactions are fully articulated in the MRUA. See Exh. B. at I.1.02 (b); Exhibit II (Form of IUA). The terms of the IUAs under which all leases to "any and all" HITN spectrum – whether available now or in the future – would be transferred to Clearwire are specified in the MRUA. *Id.* Furthermore, the MRUA, construed as an offer to purchase spectrum "as it becomes available," remains open for a specified period of time, during which HITN's spectrum leases – including, in fact, leases for the DC Spectrum – become available. *See Maurice Elec.*, 632 F.Supp. at 1087.

Finally, a binding option contract, under which HITN received additional consideration for "future spectrum," is clearly an "offer". Whereas a right of first refusal, also known as a "right of preemption," (such as that between NAC and HITN) simply requires the grantor of the right to offer the holder the opportunity to purchase the interest upon receipt of a bona fide offer, an "option," like that between NAC and Clearwire, gives Clearwire the power ***to compel*** HITN to sell spectrum to it immediately as it becomes available. *See Holland v. Hannan*, 456 A.2d 807, 816, n. 12 (D.C. 1983) (describing difference between option and right of first refusal). This promise was binding upon HITN and could, without question, be enforced by Clearwire should HITN attempt to back out of a future transfer. There can be little serious argument, therefore, that before accepting payment for the grant of such an option to Clearwire during NAC's ROFR Term, HITN had a duty to notify NAC of Clearwire's offer.

### B. The MRUA Caused HITN's Present Transfer Of Rights For The DC Spectrum.

HITN contends that NAC cannot state a claim for breach because the DC Spectrum could not be "Future Spectrum Capacity" which could be leased by Clearwire "unless and until" that spectrum was no longer encumbered by the ROFR. Even if true, this argument is a red herring. HITN would have the court believe that, because the DC Spectrum was encumbered up to the expiration of the ROFR Term, HITN's execution of a valid and binding option contract stating the terms of the eventual and non-discretionary transfer of that same spectrum had no bearing on NAC's rights. This argument defies reality, the express terms of the MRUA, and Clearwire's representations to the contrary.

A principle question in determining whether NAC's ROFR was triggered by HITN's action is whether HITN manifested its intent to transfer the rights to the spectrum during the period in which NAC's ROFR was valid. 25 Williston on Contracts § 67:85 (4th ed.) ("right of first refusal ripens into an option upon the owner's intention to sell"). The District Columbia Court of Appeals, construing the phrase "determine to sell" in analyzing a right of first refusal, has held that such a determination to sell is "an unequivocal decision to transfer rights in property to another for consideration." *See Holland*, 456 A.2d at 816, n.13. In the absence of a formal contract for sale, however, the *Holland* Court also explained that such a "determination to sell" may be evinced by "express statements, agreements or other conduct by either tenants or landlords" which reveal such an intention. *See id.* at n. 13 (comparing different factual scenarios manifesting the intent to sell under alternate formulations of rights of first refusal).

In this case, HITN and Clearwire executed an express contract for the transfer of any or all spectrum, which clearly satisfies the criteria for triggering NAC's ROFR. *See id.* Even if the contract were not formalized with respect to each piece of future spectrum capacity, however, the

totality of the circumstances reveals the parties' intention to be bound to the ultimate transfer of all HITN spectrum for fair market value. In any case, the existence of the MRUA shows that this is not simply a situation, such as a listing of real property with a real estate agent discussed in *Holland*, in which HITN had no intent to transfer the leases but was merely testing the market. *See Holland*, 456 A.2d at 817. Rather, HITN consciously and expressly determined to transfer an option for all its spectrum for the present payment of economic royalties; once HITN executed the MRUA, it had no discretion to withhold any spectrum whatsoever from Clearwire. *See id.*

The fact that, in this case, the contract for sale was an option contract is irrelevant to evaluating this "intention." *See e.g., Rollins v. Stokes*, 123 Cal. App. 3d. 701 (1981) (A courtesy copy of this case is attached hereto). As the California Court of Appeals explained in *Rollins v. Stokes* in an analogous factual situation, the defendant owner's entry into an option contract for the transfer of property after the expiration of the plaintiff's ROFR, during the time in which that ROFR was binding, would not nullify the ROFR. *See id. Rollins* held that the option "related back to the time of the giving of the option," that is during the pendency of the plaintiff's ROFR, and thus demonstrated defendant's intention to sell at the time the option was granted. *See id.* In this case, HITN formed the present intent to transfer any and all of its spectrum to Clearwire while NAC's ROFR was in force. Put another way, HITN's strategy of trying to sidestep the ROFR by structuring its present transfer of rights to acquire spectrum as a future option violates the ROFR contract right.

As of October 2006 (if not earlier), HITN and Clearwire were contractually committed to convey all HITN spectrum, including the DC Spectrum, to Clearwire over the course of the term of the MRUA. Exh. B § 9.01. As noted above, the MRUA specifies that, when spectrum "becomes available," HITN "***shall immediately provide***" written notice to Clearwire. Exh. B at

§ I.1.02 (b) (emphasis added).  At that point, in accordance with the MRUA, the decision as to whether to accept the offered spectrum is entirely and solely Clearwire's.  Exh. B, § I. 1.02(d).  Indeed, Clearwire's own representative has confirmed as much stating that Clearwire was going to "wait out" the ROFR before exercising the option on the DC Spectrum.  See Amended Complaint at ¶ 25.  HITN may not withhold spectrum or transfer the lease rights to another party – at any time during the MRUA term – because the right to each and every piece of HITN spectrum *had already been transferred* to Clearwire upon the execution of the MRUA in October 2006.  In other words, through Clearwire's additional advance payment, the MRUA effectively embodies a *present* transfer of an option as to *all* HITN spectrum. The contention that this actual transfer did not equate to an "offer" for the spectrum defies common sense.

Finally, in its motion, HITN makes the remarkable assertion that "The Future Spectrum Capacity channels were not specified in the Master Royalty and Use Agreement, *or indeed even known* at the time the Agreement was consummated."  One wonders: known to whom?  HITN Memorandum at 5 (emphasis added).[4/]  As discussed above, the MRUA expressly contemplates the transfer of leases on "any and all" of HITN's spectrum to Clearwire, which would, of course, include the DC Spectrum.

HITN knew the DC Spectrum was subject to NAC's ROFR, and HITN knew it would "become available" for Clearwire in February 2007, so long as HITN did not give NAC the ROFR notice to which it was entitled.  HITN also knew that it was HITN's contractual duty to notify NAC of Clearwire's offer – ultimately embodied in, among other things, the MRUA – for the DC Spectrum.  HITN did not notify NAC and instead signed a binding contract with

---

[4/] Because of the heavy redactions of the MRUA, it is simply impossible to determine whether or not the Washington D Group Channels are expressly identified in the MRUA.  For example, an entire section of the MRUA, § I.1.02(c), concerns an option for the Commercial Spectrum Capacity of a licensee in a market the identity of which has been redacted.  If it were to be discovered that this section did, in fact, contemplate transactions for the HITN spectrum currently leased to NAC, there could be little question that HITN did in fact breach its duty to NAC to provide notice of Clearwire's offer.

Clearwire, the purpose and effect of which was to violate NAC's ROFR rights. It is this action that NAC contends constitutes breach of the Lease.

### III. CONCLUSION

Assuming NAC's motion to amend its Complaint is granted, HITN's Motion to Dismiss is moot. However, for the reason stated, whether the Court evaluates the motion on the basis of the Complaint or the First Amended Complaint, the Motion to Dismiss is without merit and should be denied.

Respectfully submitted,

BRYAN CAVE LLP

_____
Rodney F. Page (D.C. Bar #37994)
Stacey Ormsby (D.C. Bar # 490995)
700 Thirteenth Street, N.W.
Suite 700 Washington, D.C.
20005-3960
Telephone: (202) 508-6000
Facsimile: (202) 508-6200

Craig S. O'Dear
James D. Lawrence
Joshua C. Rowland
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone: (816) 374-3200
Facsimile: (816) 374-3300

ATTORNEYS FOR PLAINTIFF

Dated: April 6, 2007

Westlaw.

123 Cal.App.3d 701  
123 Cal.App.3d 701, 176 Cal.Rptr. 835  
**(Cite as: 123 Cal.App.3d 701)**

Page 1

▷

NORMAN ROLLINS, Plaintiff and Appellant,  
v.  
NORENE STOKES, et al., Defendants and Respondents.  
**Civ. No. 4699.**

Court of Appeal, Fifth District, California.

Sep 18, 1981.

SUMMARY

In an action by a real estate broker against a lessor and lessee for declaratory relief regarding the right to purchase the leased property, the trial court granted defendants' motion for summary judgment and entered judgment accordingly. Under the terms of the lease, the lessee had been granted an "option," in fact a preemptive right, to purchase the leased property within 15 days after the lessor's notification of any offer for the purchase of the property. During the lease term, the lessor granted the broker an option to purchase the property, exercisable after expiration of the lease term. The lessor notified the lessee of the option contract with the broker, and, within 15 days after such notice, the lessee expressed his desire to buy the property and tendered to the lessor the initial payment under an option to purchase the property to be executed by the lessor and the lessee upon the exact terms as set forth in the option to purchase granted to the broker. (Superior Court of Tulare County, No. 86183, Edward Kim, Judge.)

The Court of Appeal affirmed. The court held that, in light of both the theories of options and preemptive rights and the conduct of the parties, the lessee's preemptive right to purchase was triggered during the lease term. The court further held that the lessee complied with the lease provisions regarding exercise of his preemptive right to purchase, and, with respect to the requirements imposed by the lessor's notice to the lessee of the broker's option, the lessor waived any defective tender on the part of the lessee. (Opinion by Pettitt, J., [FN*] with Franson, Acting P. J., and Hanson (P. D.), J., concurring.) *702

FN* Assigned by the Chairperson of the Judicial Council.

HEADNOTES

Classified to California Digest of Official Reports

(1) Appellate Review § 145--Review--Questions of Law and Fact--Function of Appellate Court--Interpreting Written Instruments--Absence of Conflicting Extrinsic Evidence.  
In reviewing a trial court's interpretation of a written instrument where no conflicting extrinsic evidence is received, an appellate court is not bound by the trial court's ruling, but must give the writing its own independent interpretation.

(2) Real Estate Sales § 10--Options--Distinguished From Preemptive Rights.  
An option is not a sale of property, but rather a sale .

(3) Landlord and Tenant § 29--Leases--Options to Purchase--Lessee's Preemptive Right to Purchase--When Right Is Activated.  
The right of a lessee to purchase the leased property was activated during the term of the lease, where the lessee had been granted by the terms of the lease an "option," in fact a preemptive right, to purchase the leased property, where, during the lease term, the owner of the property granted to a real estate broker an option to purchase exercisable after the expiration of the lease term, and where the owner notified the lessee of such option. It was evident from the conduct of the owner and the lessee that they treated the option contract executed between the owner and the broker as equivalent to an offer for the purchase of the subject property so as to trigger the lessee's preemptive right to purchase. Furthermore, under option contract theory, the option contract between the owner and the broker constituted a contract to sell, and once the broker exercised his option, the right to acquire the property related back to the time of the granting of the option.

[See Cal.Jur.3d, Landlord and Tenant, § 176 et seq.; Am.Jur.2d, Landlord and Tenant, § 368.] *703

(4a, 4b, 4c) Landlord and Tenant § 30--Leases--Options to Purchase-- Exercise of Option--Preemptive Right to Purchase--Lessee's Exercise After Notice of Option Granted to Another.  
Pursuant to a lease provision granting the lessee an "option," in fact a preemptive right, to purchase the leased property within 15 days after the lessor's notification of an offer for the purchase of the

123 Cal.App.3d 701                                                                                                          Page 2
123 Cal.App.3d 701, 176 Cal.Rptr. 835
**(Cite as: 123 Cal.App.3d 701)**

property, the lessee exercised such "option" so as to defeat the right to purchase of a broker, who, during the lease term, was granted an option to purchase the property exercisable after expiration of the lease term. Within 15 days after notification of the broker's option, the lessee expressed his desire to exercise his preemptive right and sent the lessor the initial payment under an option agreement to be executed by the lessor and lessee on the exact terms as the broker's option. Additionally, the lessee substantially complied with the requirements imposed by the lessor's notice of the broker's option, and the lessor waived any defective tender under such notice. Furthermore, the fact that the lease provided that the lessee had 15 days within which to "purchase" the property did not preclude the method used by the lessee to exercise his preemptive right.

(5) Real Estate Sales § 13--Options--Construction and Operation--Exercise of Option--As Determined by Provisions in Option Contract.
 When the provisions of an option contract prescribe the particular manner in which the option is to be exercised, such provisions must be strictly followed. However, when the option contract merely suggests, but does not positively require, a particular means of communicating the exercise of the option, another method of communication is not precluded.

(6) Real Estate Sales § 15--Options--Exercise or Acceptance--Waiver of Defects.
 With respect to the exercise of an option or of a preemptive right to purchase real property, although acceptance must be in the terms of the agreement, the person who granted the option or preemptive right can waive one or more of such terms. Thus, a waiver on the part of the person who granted the option or preemptive right results if such person does not, at the time of the tender by the optionee or holder of the preemptive right, specify the alleged defects in the tender. *704

COUNSEL

Houk, Hicks & Spain and Lloyd L. Hicks for Plaintiff and Appellant.

McCormick, Moock & McCormick, McCormick, Ide & Kalst, Walter K. McCormick, George L. Thurlow and Steven L. Kabot for Defendants and Respondents.

PETTITT, J. [FN*]

  FN* Assigned by the Chairperson of the Judicial Council.

 This case comes to this court on an appeal from an order granting respondents' motion for summary judgment and from the judgment entered thereon. The appeal involves the legal effect of respondent Joe J. Correia's (Correia) preemptory right, set out in a lease, to purchase real property owned by respondent Norene Stokes (Stokes). Stokes was lessor. All parties have agreed appellant's complaint presented issues of law only, and that a motion for summary judgment was the appropriate vehicle for resolution of the issues involved.

 Plaintiff and appellant, Norman Rollins (Rollins), filed a complaint for declaratory relief naming respondents, Stokes and Correia, as defendants.

 The complaint essentially prayed that respondent Correia should be declared to have no right to acquire ownership of the leased property in question.

 The lower court ruled that Correia's "option" under the lease between himself and Stokes was prior in time and superior to the rights of appellant to purchase (under the terms of a later option to purchase given by Stokes to appellant Rollins). In this connection the trial court made detailed findings of fact and conclusions of law. Among the findings and conclusions the court found and concluded that appellant was granted a valid option by Stokes but that it was subject to the prior rights of Correia. The court further found that at all relevant times appellant had full knowledge of the terms of the Correia lease including the so-called option provision. *705

Statement of Facts
 The facts in this case are taken from declarations and various documents filed with the court. The lease in question was of farm property in Tulare County and was entered into on January 1, 1975. The term ended on December 31, 1977. The critical clause in the lease provided:

 "Option: Should Lessors intend to sell the said real property during the term hereof, or any lawful extension hereof, they will first notify Lessee of any offer for the purchase of said property, and Lessee shall thereafter have the option for a period of 15 days within which to purchase the same upon the same terms and conditions as Lessor is willing to sell to any other persons."

 The following facts are set out in appellant's declaration. For a long period of time appellant

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 Cal.App.3d 701  
123 Cal.App.3d 701, 176 Cal.Rptr. 835  
**(Cite as: 123 Cal.App.3d 701)**

Page 3

Rollins, a licensed real estate broker whose principal business was buying and selling real estate for his own account, was advertising that he was interested in buying property. Stokes contacted appellant, who looked at the Stokes property in question. Stokes at that time showed appellant the Correia lease and Stokes read the lease. The two of them then discussed the "option" provision set out in the lease. Appellant asked Stokes if she knew Correia had a right to purchase the property if she offered it for sale and Stokes said she did. Appellant then stated "I am not interested in bidding against your tenant and we'll have to overcome that problem before I would purchase the property and that I was not interested in the property unless I could get around the lease." Appellant and Stokes then discussed the possibility of an option.

The next day, February 9th, appellant and Stokes signed an "Option To Purchase." The option described the subject property and provided in relevant part:

"... a Purchase Price of $36,000.00 (Thirty six thousand Dollars), upon the following Terms And Conditions:

"$18,000. cash down payment including the above $1,000. 18,000. by a note, secured by a deed of trust on the subject property, executed by Rollins in favor of Stokes. Note to be payable in annual installments of $1500. or more per year plus interest at 7-1/2% per annum on deferred balances. The first payment of principal & interest shall be due one *706 year from the recording of deed. Deed of trust shall not encumber the northwest 208' x 208' of the subject property.

"1. This option shall not be exercised prior to Jan. 5, 1978.

"2. All closing costs are to be charged according to normal Tulare County customers.

"3. Optionor is aware that optionee is a licensed real estate broker."

We note that the option could only be exercised after the lease had expired on December 31, 1977.

Appellant gave Stokes a $1,000 check.

In her declaration, Stokes agreed that prior to signing the option to purchase, she told appellant that Correia had an option to purchase and that she did not believe appellant "could set the date ahead," and she "would have to tell Mr. Correia about it." This angered appellant.

On February 11, 1977, Stokes and appellant signed a "Memorandum of Option" for recording purposes.

About five days later, appellant's attorney received a letter from Stokes' attorney stating in essence that respondent Correia had to be offered the property on the same terms.

According to the proof of service, on March 4, 1977, Stokes caused to be served a copy of the "Option Agreement" and the following notice on respondent Correia:

"Joe J. Correia, 6739 Ave. 290, Visalia, California

"You are hereby notified that I have had an offer to purchase the property now under lease to you under the Farm Lease dated January 1, 1975 as follows:

"For a total price of $36,000.00 payable $1,000.00 down payment at this time, the further sum of $17,000.00 cash not later than February 9, 1978, at which time I would give you a deed to the property and you would execute a note for the remaining $18,000.00 payable in installments *707 of $1500.00 or more per year together with interest at the rate of 7-1/2% on unpaid balances. First payment of principal to be due one year from delivery of deed to you. This note to be secured by a First Deed of Trust. Attached is a copy of the offer I now have.

"As you know, our lease provides that you will have first option to buy on above terms for a period of 15 days (from date this notice is delivered to you).

"If you do not evidence your matching the above offer within 15 days by delivering to me a check and your written agreement to purchase on these terms, your option shall have no further force or effect.

"DATED: March 2, 1977.

/s/ Nora Irene Stokes

NORA IRENE STOKES" [FN1]

> FN1 One of Stokes' attorneys sent a letter to appellant's attorney, dated March 3d, stating that Stokes had not cashed appellant's check upon his advice. Stokes' attorney also attached a copy of the "notice" that would be

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 Cal.App.3d 701  
123 Cal.App.3d 701, 176 Cal.Rptr. 835  
**(Cite as: 123 Cal.App.3d 701)**

Page 4

served on Correia.

On March 9th or 10th, 1977, Stokes' attorney received a letter from Correia's attorney stating:

"The purpose of this letter is to confirm ... Mr. Correia's desire to exercise his option to purchase as communicated to you in our telephone conversation of March 7, 1977."

On March 14, 1977, Stokes' attorney wrote to appellant's attorney that Correia desired to exercise his option to purchase the property owned by Stokes.

On March 18th, Stokes' attorney received a $1,000 check from Correia's attorney. (This was the 14th day after notice by Stokes to Correia.) According to Stokes' attorney's declaration, the attorney also received a letter from Correia's attorney indicating that the payment represented the initial payment under an option to purchase the property "to be executed by [Stokes] and [Correia] upon the exact terms as set forth in the Option to Purchase dated February 9, 1977, and signed by [appellant]." [FN2]
*708

> FN2 Correia stated in his declaration that he authorized the initial payment under the option and intended to purchase the property on the exact terms of the "Option to Purchase" signed by appellant. Correia also claimed he executed an "Option To Purchase" on February 9, 1977, and instructed his attorney to transmit it to Stokes.

On March 24, 1977, Stokes' attorney acknowledged receipt of the $1,000 check. Subsequently (apparently on or after March 31, 1977, the 27th day after the notice) Stokes' attorney received an "Option To Purchase" signed by Correia dated February 9, 1977. That document was practically identical to appellant's option to purchase.

Shortly after January 3, 1978, Stokes' attorney received a letter and check for $17,000 from Correia's attorney, which was the balance of the $18,000 down payment.

On February 6, 1978, appellant notified Stokes that he was exercising his option to purchase Stokes' property pursuant to the February 9, 1977 written option.

Discussion

The issues raised by appellant are first, whether the granting of the option to appellant triggered respondent Correia's preemptory right to purchase, and second, whether respondent Correia failed to exercise his preemptory right according to the applicable terms.

Appellant argues that Correia's preemptory right was only operative with respect to a *sale* during the lease term. Appellant interprets the clause in the lease to mean that the intended sale must be during the term of the lease. Further, the *intent to sell* which may be formulated during the lease does not trigger Correia's preemptory rights. Appellant hypothesizes that if Stokes had telephoned him the day after the lease expired and offered to sell the property, Correia should not be able to argue that Stokes had formulated the intent to sell during the lease term and that, therefore, he was entitled to notice and a preemptory right to purchase. Appellant also urges there was no intended sale during the lease term as appellant's option did not permit him to purchase the property until after the expiration of the lease term. Thus, again Correia's preemptory rights never came into being.

Appellant also relies on cases which hold that an option is not a sale of real property (see, e.g., *Hicks v. Christeson* (1917) 174 Cal. 712, 716 [164 P. 395]), so here the grant of the option to appellant did not constitute a sale of any interest in the property. Thus there is "again no *709 basis for holding that the preemptive [*sic*] purchase rights set forth in the lease became operative."

Respondents filed a joint brief. They argue that the formulation of an intent to sell during the lease period triggered Correia's option to purchase; that Correia had a preemptory right to purchase and the decision to sell is critical, not the actual sale. Furthermore, respondents argue Stokes agreed to sell to appellant during the lease term as the option with appellant created a unilateral contract binding on Stokes, and when appellant decided to exercise the option a bilateral contract was created. ( *Palo Alto Town & Country Village, Inc. v. BBTC Company* (1974) 11 Cal.3d 494 [113 Cal.Rptr. 705, 521 P.2d 1097].) Also, appellant's exercise or acceptance of the option related back to the giving of the option which was within the lease term. Thus under any of these theories Correia's preemptory right came into being.

Respondents also contend that appellant intended to circumvent the object of the parties to the lease which was to give Correia an option.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 Cal.App.3d 701                                                                                              Page 5
123 Cal.App.3d 701, 176 Cal.Rptr. 835
**(Cite as: 123 Cal.App.3d 701)**

(1)Neither party points to any extrinsic evidence to aid in interpreting the written instruments.

As a result, we apply the general rule restated in *Davies Machinery Co. v. Pine Mountain Club, Inc. (1974) 39 Cal.App.3d 18, 23* [113 Cal.Rptr. 784]: "In reviewing a trial court's interpretation of a written instrument where no conflicting extrinsic evidence is received, an appellate court is not bound by the trial court's ruling but must give the writing its own independent interpretation." (See also 6 Witkin, Cal. Procedure (2d ed. 1971) § § 257-260, pp. 4248-4251.)

(2)In *Anthony v. Enzler (1976) 61 Cal.App.3d 872, 876* [132 Cal.Rptr. 553], the court aptly described an option contract:

"It is well established that an option is not a sale of property, but rather a sale of a right to purchase. The option becomes a contract of sale binding on both parties only on acceptance of the option by the optionee. This does not mean, however, that a new contract is in fact made by and at the time of the acceptance. On the contrary, the contract has already been made as far as the optionor is concerned, but is merely subject to conditions which are removed by acceptance [citations omitted]." (See also *Palo Alto Town & Country Village, Inc. v. BBTC Company, supra., 11 Cal.3d 494, 503.) *710

On the other hand, a preemptive right gives the holder the first right to buy when and if the owner later wants to sell. If the holder does not buy, the owner of the property may sell to anyone. Conversely, an option gives the holder a power to compel a sale regardless of whether the owner then wants to sell. ( *Nelson v. Reisner (1958) 51 Cal.2d 161, 166* [331 P.2d 17]; *Mercer v. Lemmens (1964) 230 Cal.App.2d 167, 171* [40 Cal.Rptr. 803] [the preemptive right is "activated" when the owner has elected to sell]; see also 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 131, pp. 127-128.)

(3)At the outset, there does not seem to be any dispute by the parties that the lease granted respondent Correia a preemptive right. Although the term "option" was used in the subject clause, the label does not control. (See 1A Corbin, Contracts (1963) § 261A, pp. 483-491.)

It may also be noted that the lessee Correia's first right of refusal or preemptive right was part of the consideration for his covenants under the lease. (See *Nelson v. Reisner, supra., 51 Cal.2d 161, 165-166.*)

What then triggered Correia's preemptive right to purchase? The intent of the parties was that once a third party made an offer to Stokes that she was willing to accept, Stokes was required to notify Correia, whereupon Correia's preemptive right ripened into an option to purchase the property according to the terms and conditions of the third party's offer. The lease provision makes this clear as Correia had 15 days within which to purchase the property upon the same terms and conditions that Stokes was willing to sell to appellant.

Accordingly, when Stokes manifested her intent to sell the property by entering into the option contract with appellant and subsequently notified Correia, the preemptive right was activated. As stated in Corbin:

"An owner of land may receive 50 offers to buy it every single day, but if he does not care to sell the land, those 50 offers are not legally operative to give the holder of the right of first refusal the power to buy. It is the owner's selection of a particular offer as one he might be willing to accept, and his manifestation of that willingness by communicating the particular offer to the holder of the right which gives the holder a present power of buying the land on the terms of that offer." (1A Corbin, Contracts (1980 Pocket Supp.) § 261, p. 171.) *711

Such an interpretation is consistent with the conduct of the respondents, which is persuasive evidence in determining the meaning of written instruments. ( *Davies Machinery Co. v. Pine Mountain Club, Inc., supra., 39 Cal.App.3d at p. 26;* 1 Witkin, Summary of Cal. Law (8th ed. 1973) § 527, p. 449.)

Within a month after Stokes signed appellant's option contract, Stokes notified Correia pursuant to the lease so that Correia could make his election. Correia then communicated to Stokes his desire to exercise his preemptive right. Significantly respondents proceeded under the preemptive clause of the lease even though appellant's option could only be exercised after the lease had expired. It is evident from respondents' conduct that they treated appellant's option contract, regardless of the postlease exercise clause, as equivalent to an "offer for the purchase" of the subject property so as to trigger Stokes' lease obligations and Correia's preemptive right.

We note that we do not have the type of situation suggested by appellant wherein Stokes, the lessor,

123 Cal.App.3d 701                                                                                                                    Page 6
123 Cal.App.3d 701, 176 Cal.Rptr. 835
**(Cite as: 123 Cal.App.3d 701)**

merely entertained a subjective intent to sell the property (to no one in particular) and then after the lease expired, contacted a prospective buyer. If this were such a case, Correia would be hardpressed to assert his preemptive right.

Rather, the parties to the lease contemplated some objective manifestation of Stokes' intent to sell the property based on a third party's offer.

As an additional grounds to uphold the judgment, we look to option contract theory. From the lessor's or optionor's point of view (i.e., Stokes), there was a contract to sell the property during the lease term. ( _Palo Alto Town & Country Village, Inc. v. BBTC Company, supra., 11 Cal.3d 494, 503-504._) When Stokes signed appellant's "option to purchase" she was contractually bound to sell the property to appellant if appellant exercised that option. Not only was there a contract to sell but once appellant exercised his option, the right to acquire the property related back to the time of the giving of the option ( _Seeburg v. El Royale Corp. (1942) 54 Cal.App.2d 1, 4 [128 P.2d 362]; Anthony v. Enzler, supra., 61 Cal.App.2d 872, 876),_ which in this case was during the term of the lease. On either of these two grounds Stokes, for purposes of activating the preemptive right, sold the property during the lease term. *712

Thus the trial court was correct in ruling that although appellant may have had a valid option contract, his rights were subject to those of Correia. Simply stated, Correia's preemptive right was triggered during the lease term when we look to the theories of option and preemptive rights and the conduct of the parties. [FN3]

> FN3 Appellant and respondents agree that there are no California cases dealing directly with the factual situation presented here. (But see _Richfield Oil v. Security First Nat. Bank_ (1958) 159 Cal.App.2d 184 [323 P.2d 834] [upholding a right to exercise preemptory right to purchase where property is sold at probate sale]; _Henderson v. Nitschke_ (1971) (Tex.Civ.App.) 470 S.W.2d 410 [where the court held the lessor had formed an intent to sell which activated the lessee's preemptory right even though the purchase offer the lessor received from a third party was revoked before the lessee exercised the right of first refusal]; _Anderson v. Armour and Company_ (1970) 205 Kan. 801 473 P.2d 84] [holding a trade/exchange of property was a sale].)

(4a)Appellant next argues Correia failed to exercise his preemptory right according to its terms.

The "option" clause in the lease did not specify a method for the exercise of the preemptive right. In this case we find it appropriate to analogize to the exercise of an option contract. (5)Hence, when the provisions of an option contract prescribe the particular manner in which the option is to be exercised, they must be strictly followed. ( _Palo Alto Town & Country Village, Inc. v. BBTC Company, supra., 11 Cal.3d 494, 498._) Nevertheless, when the option contract merely suggests but does not positively require a particular means of communicating the exercise of the option, another method of communication is not precluded. ( _Ibid.;_ see also _Erich v. Granoff_ (1980) 109 Cal.App.3d 920, 929 [167 Cal.Rptr. 538].)

(4b)The evidence reveals that Correia on two occasions notified Stokes' attorney that he intended to exercise his preemptive right to purchase the subject property. First, on March 9th or 10th Stokes attorney received a letter from Correia's attorney expressing Correia's desire to exercise his right. Second, on March 18th (the 14th day after Correia's receipt of the notice), Correia sent Stokes a $1,000 check representing the initial payment under an option to purchase to be executed by Stokes and Correia upon the exact terms as appellant's February 9 option.

Thus Correia validly exercised his preemptive right by way of his attorney's two letters and payment of $1,000, all of which were done within the 15 days specified in the lease clause. *713

Additionally, we hold that Stokes waived any defective performance in terms of Correia's compliance with the 15-day notice which required Correia to "... evidence [his] matching [appellant's] offer within 15 days by delivering to [Stokes] a check and [his] written agreement to purchase on [those] terms ...."

We have already pointed out that Stokes' attorney received Correia's $1,000 check before the 15th day after Stokes' notice to Correia concerning appellant's option. It has also been pointed out that Stokes did not receive Correia's written option agreement until after the 15th day. Nevertheless, we find Correia acted in a timely manner. His documentation was in substantial compliance with his right and the demand of Stokes. Furthermore, Stokes was satisfied. (6)Although acceptance must be in the terms of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

123 Cal.App.3d 701    Page 7
123 Cal.App.3d 701, 176 Cal.Rptr. 835
**(Cite as: 123 Cal.App.3d 701)**

option agreement, an optionor can waive one or more of the terms. ( *Riverside Fence Co. v. Novak* (1969) 273 Cal.App.2d 656, 660 [78 Cal.Rptr. 536].) If an optionor does not specify the alleged defects in the tender by the optionee, then a waiver results. ( *Layton v. West* (1969) 271 Cal.App.2d 508, 512 [76 Cal.Rptr. 507].) The reason for this rule is that an optionee should be able to remedy any defects in his tender and prevent the optionor from remaining silent at the time of the tender and later surprise the optionee with hidden objections. (*Ibid.*) This court believes the same rules should apply to the exercise of a preemptive right.

(4c)So although Correia did not deliver his matching offer within the 15- day period provided for in the notice, he substantially complied and Stokes waived any defective tender. (*Ibid.*)

Nonetheless, appellant seizes on the language that Correia had 15 days within which to "purchase" arguing that Correia had to purchase the property and not merely procure an option.

Read literally, appellant is correct. However, as we have stated, the intent of that clause was to grant Correia a preemptive right to enter into an agreement with Stokes on the same terms and conditions of an acceptable third-party offer. In this case the third-party's offer was an option contract.

Further, appellant's literal interpretation is without merit because it would frustrate Correia's preemptory right to purchase. For instance, by using an option contract, appellant could prevent a "purchase" from taking place within 15 days. The reason, of course, is that the option *714 under appellant's option contract could not be exercised until well after the 15th day from Correia's receipt of the notice. Despite Stokes' intent to sell the property during the lease term, appellant's use of an option contract with a delayed exercise clause was designed effectively to foreclose Correia from exercising his preemptive right.

Such a result is inconsistent with the intent and the conduct of the parties to the lease.

Respondent Stokes is satisfied with respondent Correia's performance. Appellant should not be heard to complain.

The judgment is affirmed.

Franson, Acting P. J., and Hanson (P. D.), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 25, 1981.

Cal.App.5.Dist.,1981.

Rollins v. Stokes

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.