IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEXTEL SPECTRUM ACQUISITION
CORPORATION,

     Plaintiff,

     v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,

     Defendant.

Civil Action No.: 1:07-CV-00543-RMC

## FIRST AMENDED COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE AND OTHER RELIEF

Plaintiff Nextel Spectrum Acquisition Corp. ("NAC") in support of its First Amended Complaint against Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN") states as follows:

### INTRODUCTION

1.    This case involves NAC's bargained-for contractual right to lease valuable spectrum rights in and around Washington, DC. In early 2005, HITN acquired a Federal Communications Commission ("FCC") license for Educational Broadband Service Station WHG442 (the "License"). At the time HITN acquired the License, the License was subject to a lease agreement (as described in more detail below, the "Existing Lease") that provides NAC with a valid right of first refusal ("ROFR") on any bona fide offer(s) the holder of the License receives for certain spectrum rights ("DC Spectrum Rights"). HITN knew of the ROFR when it acquired the License. Nevertheless, HITN committed the DC Spectrum Rights to a third party without informing NAC of the third party's offer, much less affording NAC its contractual right

to match that offer.  The DC Spectrum Rights are unique; therefore, if HITN is allowed to violate the ROFR and consummate a closing on the third party offer, NAC will suffer irreparable harm that cannot be adequately compensated through money damages.  NAC requests that the Court enforce the terms of the ROFR, and order injunctive relief and specific performance.

## PARTIES

2.      NAC is a Delaware corporation with its principal place of business in Reston, Virginia.

3.      Upon information and belief, HITN is a New York corporation with its principal place of business in Brooklyn, New York.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.  Venue is proper under 28 U.S.C. § 1441.

## FACTS

### A.      BACKGROUND

5.      As used herein, "spectrum" refers to radio frequencies used for the transmission of sound, data and video.  The FCC is responsible for administering and allocating spectrum rights used by the private sector, including individuals (e.g., cellular telephones, wireless Internet, garage door openers and computer modems), private organizations (e.g., radio and telephone broadcasters, including but not limited to not-for-profit entities), and public safety and health officials (e.g., police and emergency technicians).

6.      The FCC rules allow certain spectrum to be used by the general public on a non-exclusive basis pursuant to certain parameters without the need for obtaining a specific license.  Such spectrum rights are generally referred to as "unlicensed spectrum."

7.     With respect to other spectrum, the FCC grants a specific party the right to use that spectrum on an exclusive basis within a given geographic area pursuant to parameters established by the FCC. Such spectrum rights are generally referred to as "licensed spectrum."

8.     Providers of telecommunications services prefer to use licensed spectrum in deployment of wireless services because the accompanying exclusivity permits the use of licensed spectrum free from interference from other spectrum users, thereby promoting a reliable wireless service offering.

9.     The DC Spectrum Rights at issue in this lawsuit involve the "D Group" channels within the 2.5 GHz band licensed for the Washington D.C. area and designated by call sign WHG442. The "2.5 GHz band" refers to licensed spectrum authorized by the FCC between the frequencies of 2495 MHz and 2690 MHz. The general practice of the FCC is to authorize a maximum of 33 channels in the 2.5 GHz band in any given market. In general, a license for a spectrum in the 2.5 GHz band consists of the right to use one of eight four channel groups, commonly known as the A Group, B Group, C Group, D Group, E Group, F Group and G Group. The remaining five channels are allocated to the H Group (three channels) and to two channels known as BRS1 and BRS2.

10.     The FCC has allocated a portion of the 2.5 GHz band, known as Educational Broadband Service, or "EBS," for licenses issued to educational institutions and certain not-for-profit entities. The remaining portion of the 2.5 GHz band may be licensed to commercial enterprises and is referred to as Broadband Radio Service, or "BRS."

11.     Licensed spectrum is finite within the 2.5 GHz band and the FCC has already licensed nearly all available EBS and BRS spectrum in each market.

12.     Therefore, commercial operators must purchase or lease particular spectrum groupings in a given market to provide wireless services that will be free from interference and otherwise appropriate for commercial operations.

13.     As a consequence, licensed spectrum rights are unique and have significant value to commercial operators.

14.     Commercial operators go to great length and expense in acquiring particular spectrum rights in each market to obtain the optimal mix for providing commercially viable wireless services.

**B.     HITN'S PRIOR DISREGARD FOR SPECTRUM LEASE RIGHTS**

15.     The present dispute is not the first occasion upon which HITN has ignored and violated NAC's affiliates' contractual rights.  HITN has exhibited flagrant contempt and disregard for these contractual rights for a period of years.

16.     On May 14, 1999, HITN and various SpeedChoice entities (each a wholly owned subsidiary of Sprint Nextel and referred to collectively as "SpeedChoice") entered into five Airtime Lease Agreements (the "SpeedChoice Leases") pursuant to which SpeedChoice leased excess capacity of EBS channels licensed to HITN.  The SpeedChoice Leases provide for an automatic renewal of two additional terms of five years each (running through May 14, 2014).

17.     From May 14, 1999 through April 14, 2004, HITN readily accepted 60 consecutive monthly payments without any complaint regarding SpeedChoice's performance under the SpeedChoice Leases.  In fact, on at least two occasions, Rudolph J. Geist, HITN's attorney, and Jose Rodriguez, HITN's president, confirmed that there were no defaults under the subject leases.

18.     At or around the time of HITN's confirmation that SpeedChoice was performing under the SpeedChoice Leases such that no events of default existed, HITN and Clearwire entered into a predecessor agreement to the MRUA, defined *infra* ("Predecessor Agreement"). Within a few months of entering into the Predecessor Agreement, HITN sent SpeedChoice a notice alleging eight events of defaults ("Alleged Defaults") under the SpeedChoice Leases. The notice failed to delineate which of the Alleged Defaults applied to each specific or any one of the SpeedChoice Leases. This was the first and only default notice HITN ever made under the SpeedChoice Leases.

19.     SpeedChoice was forced to expend significant time and resources to contest the baseless allegations. In 2005, SpeedChoice demanded arbitration under one of the SpeedChoice Leases (the "Phoenix Lease"). After intensive discovery, HITN dropped five of the eight default allegations under the Phoenix Lease on the morning the arbitration hearing commenced.

20.     SpeedChoice prevailed decisively in the arbitration on the remaining default allegations. In fact, SpeedChoice was awarded in excess of $300,000 in attorneys fees and expenses for having to defend HITN's baseless default allegations.

21.     Upon information and belief, HITN attempted termination of the SpeedChoice Leases to enable it to lease the underlying spectrum rights to Clearwire under the Predecessor Agreement or the Clearwire Agreements. Upon further information and belief, HITN was indemnified by Clearwire for its expenses in attempting to destroy SpeedChoice's contractual rights and evade its contractual obligations to SpeedChoice.

## C.     **VAST REACH OF THE CLEARWIRE-HITN ET AL. RELATIONSHIP**

22.     HITN and/or certain affiliated entities and Clearwire Corporation and/or its affiliates ("Clearwire") have entered into an extensive web of agreements that requires HITN to tender exclusively to Clearwire use of any available spectrum HITN has or in which it acquires

an interest.[1/]   Under numerous Clearwire-HITN agreements (collectively, the "Clearwire Agreements"), HITN has received and continues to receive generous consideration in the form of cash, stock, warrants to purchase Clearwire stock, reimbursement of expenses, registration rights and, in certain circumstances, management rights.

23.   Additionally, ITFS Spectrum Advisors LLC and ITFS Spectrum Consultants LLC, two entities owned, upon information and belief, by HITN's President and Chief Executive Officer, have also received millions of dollars for directing spectrum to Clearwire.

24.   On or about November 13, 2003, Clearwire, under its former name, Flux U.S. Corporation, and HITN entered into a Master Spectrum Acquisition Agreement that designates HITN to act as Clearwire's agent when an EBS license becomes available for purchase and the FCC's rules and regulations require the license to be acquired through a non-profit entity.

25.   On or about November 13, 2003, Clearwire entered into a Warrant Agreement granting ITFS Spectrum Advisors LLC warrants to purchase shares of Clearwire Class A Common Stock after ITFS Spectrum Advisors LLC introduces Clearwire to a situation which results in Clearwire's acquisition of either EBS or BRS channels through a spectrum license purchase, lease or sublease.   Upon information and belief and according to publicly filed documents, ITFS Spectrum Advisors LLC is a for profit entity of which Jose Luis Rodriguez—HITN's Chairman, is an owner.

26.   A November 13, 2003 Registration Rights Agreement also gives HITN piggyback registration rights and limited demand registration rights.

---

[1/]   Certain HITN-Clearwire agreements are discussed in detail *infra* and are collectively referred to as the "Clearwire Agreements."   The subsequently described agreements were recently obtained by NAC, many in redacted format, from Clearwire's January 2007 Form S-1 filing.   In prior disputes between NAC and HITN, HITN has refused to produce documents detailing the HITN-Clearwire relationship.   NAC has no way of confirming that the described agreements constitute all relevant agreements between HITN and Clearwire.   For example, the schedule HITN references and attaches to its motion to dismiss was redacted from Clearwire's S-1 filing.

27.     On or about March 16, 2004, Clearwire's Amended and Restated Stockholders Agreement provided HITN, and certain other shareholders, with certain investor protections, as well as restrictions and requirements. Additionally, HITN was granted certain rights not granted to other stockholders, including the right to assign HITN's preemptive rights to another entity under certain circumstances, anti-dilution rights which preclude Clearwire from issuing shares to certain entities unless HITN and ITFS Spectrum Advisors LLC are issued a certain number of additional shares for no consideration. HITN also holds certain drag-along rights, tag-along rights, director designation rights under certain conditions, and board observation rights under other conditions. The Stockholders Agreement further contains restrictions on certain entities' changing the definition of "disinterred director approval" in Clearwire's Certificate of Incorporation without HITN's consent. The Stockholders Agreement terminated upon Clearwire's public offering in March 2007.

28.     On or about March 29, 2004, Clearwire and HITN entered into a Spectrum Option Agreement which provides that Clearwire may lease HITN's excess capacity on pending EBS applications if such FCC applications are granted.

29.     On or about February 1, 2005, ITFS Spectrum Consultants LLC and Clearwire entered into a Spectrum Acquisition Consulting Agreement which provides for ITFS Spectrum Consultants LLC to be paid consideration of cash and warrants to purchase Clearwire's Class A Common Stock in the event Clearwire acquires EBS or BRS channels through either a spectrum license purchase, lease or sublease as a result of ITFS Spectrum Consultants LLC introducing Clearwire to a third party identified by Clearwire, and consummating its execution of a definitive agreement and the closing of an acquisition. Upon information and belief and according to publicly filed documents, ITFS Spectrum Consultants LLC is a for profit entity of which Jose Rodriquez, HITN's Chairman, is an owner.

30.    On or about May 24, 2005, Clearwire, HITN and HITN Spectrum, LLC entered into a Spectrum Access and Loan Facility Agreement ("Loan Agreement") which provides for Clearwire's financing of the acquisition by either HITN Spectrum, LLC ("HITN Spectrum") or its subsidiaries of additional EBS licenses and for HITN to make the commercial capacity of such licenses exclusively available to Clearwire.

31.    Pursuant to the terms of the Loan Agreement, HITN agreed to grant Clearwire a blanket security interest in all assets of HITN Spectrum and/or its subsidiaries as security for any funds Clearwire loans under the Loan Agreement for acquisition of spectrum interests.

32.    On July 8, 2005, HITN formed a subsidiary, HITN-Washington D.C. D, L.L.C.

33.    On October 20, 2005, Clearwire filed a UCC financing statement and evidencing a blanket lien on all of HITN-Washington D.C. D, L.L.C.'s personal property and fixtures.

34.    Pursuant to the Loan Agreement, Clearwire and HITN agreed that the DC Spectrum Rights would be offered exclusively to Clearwire upon certain agreed terms and conditions.

35.    On May 11, 2006, Clearwire filed a Form S-1 preliminary prospectus with the SEC related to a planned initial public offering ("IPO"). Clearwire later withdrew that prospectus and filed a second Form S-1 preliminary prospectus on or about December 19, 2006 (the "Second Form S-1").

36.    On or about January 8, 2007, Clearwire filed an Amendment to the Second Form S-1 which disclosed a number of previously unavailable documents which are purportedly material to Clearwire's planned IPO. Among the newly disclosed agreements is a certain Master

Royalty and Use Agreement between Clearwire and HITN dated October 4, 2006 ("MRUA") (relevant portions of the MRUA are attached as Exhibit B).[2/]

37.     Clearwire's S-1 filings further detail how HITN acts as Clearwire's proxy for spectrum that Clearwire, as a for-profit entity, is unable to acquire directly.

38.     The MRUA provides Clearwire with an "exclusive" right to all of HITN's licensed spectrum, regardless of whether the spectrum is subject to existing lease rights of third parties. See, e.g., MRUA Recitals at 3 (the parties agree that "in securing a source of spectrum capacity for the future and facilitating the branding of the Clearwire mark through the services provided by Licensee in the non-profit community; ... [HITN] desires to make available to Clearwire, and Clearwire desires to have access to, ... any additional Commercial Spectrum Capacity of [HITN] that is accepted by Clearwire and made subject to an [Individual Use Agreement] as provided in this Agreement (the "Future Spectrum Capacity"), all in accordance with the terms of this Agreement.")

39.     The MRUA provides for HITN to grant Clearwire a lease for both its presently and future available spectrum upon particularly defined terms and conditions.

40.     Consistent with the Clearwire Agreements, HITN is contractually obligated under the MRUA to provide all of its licensed spectrum to Clearwire, including the DC Spectrum Rights.  The MRUA states in relevant part as follows:

> (b) Option for Future Spectrum Capacity. Licensee grants Clearwire an option (the "Option") to enter into IUAs with Licensee in respect of any and all spectrum (including, but not limited to, the Commercial Spectrum Capacity, EBS and BRS) ("Spectrum") on FCC Licenses held by Licensee that is Available or **that becomes Available during the Term, at prices to be negotiated in good faith based on the fair market value ("FMV") of such Spectrum at the time the Option is to be exercised, provided, however, that the negotiated price shall not exceed [***] per MHz POP.** The Option

---

[2/]     The entire redacted MRUA is located at
<http://www.sec.gov/Archives/edgar/data/1285551/000089102007000003/v25599a1exv10w60.txt>.

shall be exercisable in Clearwire's sole discretion each time Spectrum of Licensee or its Affiliates becomes Available during the Term. ...

See Ex. B (Large portions of the MRUA have been redacted by Clearwire in its S-1 filing, including the price term per MHz POP) (emphasis added).

41.    Upon information and belief obtained from Clearwire's S-1 filing, Clearwire has paid HITN $22.1 million in cash and 2,829,717 shares of Class A Common Stock valued pre-IPO at $12.3 million under the Master Spectrum Acquisition Agreement, the Spectrum Option Agreement, and the individual leases.  With Clearwire's stock now trading at approximately $20 per share, HITN has a post-IPO windfall of in excess of $75,000,000.00.

**D.    THE GWU AIRTIME LEASE AGREEMENT**

42.    On or about February 21, 1995, GWU and Eastern Cable Networks Corporation ("ECNC") entered into the Existing Lease pursuant to which ECNC leased the DC Spectrum Rights.  NAC eventually succeeded to ECNC's interest under the Existing Lease and in turn leased in the DC Spectrum Rights.

43.    During 2005 HITN acquired the License with full knowledge of, and subject to, the Existing Lease.

44.    Under Section I.C. of the Existing Lease, the License is subject to a ROFR in favor of NAC, which ROFR extends for two years after the expiration of the Existing Lease.

45.    The Existing Lease expired on February 21, 2005; therefore NAC held a valid and enforceable ROFR through February 21, 2007.

46.    The Existing Lease states in pertinent part as follows:

I.C.    Right of First Refusal.

1.    [NAC] shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter (the "Right of First Refusal").

2.    If [HITN] desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B., [HITN] must provide written notice to [NAC] at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of [NAC]'s Right of First Refusal. Such notice must be given one year prior to expiration of the contract.

3.    Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to [HITN], [HITN] shall serve [NAC] with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating [HITN]'s intent to accept the offer in the event that [NAC] does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. [HITN] shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal. Within thirty (30) days of [NAC]'s receipt of [HITN]'s written notice, [NAC] shall notify [HITN] in writing of its desire to exercise its Right of First Refusal.

4.    In the event that [NAC] refuses to exercise its Right of First Refusal with respect to any offer, and any material term of such offer is subsequently changed, before accepting such changed offer [HITN] must follow the procedures specified in the foregoing subsections, providing [NAC] with notice regarding the revised offer and giving [NAC] the opportunity to exercise its Right of First Refusal with regard thereto.

See Existing Lease, Section I.C., at 2 (Attached as Ex. A).

47.    The ROFR is a material term of the Existing Lease.

48.    The Clearwire Agreements constitute HITN's and Clearwire's attempt to circumvent NAC's ROFR.

49.    The Clearwire Agreements, individually and/or collectively, constitute a bona fide "offer" ("Clearwire Offer") for the DC Spectrum Rights and trigger NAC's ROFR. The price formula for determining the amount Clearwire will pay for the DC Spectrum Rights has been agreed upon by the parties, as have other material terms.

50.    NAC learned of the Clearwire Offer shortly after Clearwire filed its S-1 exhibits in mid-January 2007.

51.     NAC promptly reviewed all of the documents it could obtain regarding the Clearwire Offer (many of these documents are only available in redacted format) and determined that its ROFR was triggered.

52.     HITN has never provided NAC with notification of the Clearwire Offer.

53.     On or about February 19, 2007, NAC sent HITN a letter via electronic transmission requesting that HITN provide NAC with all of the terms, conditions and information HITN is required to deliver to NAC under the ROFR.  A copy of this letter is attached as Exhibit C.

54.     On or about February 20, 2007, HITN, through its counsel Rudolph J. Geist, declined to honor the ROFR, alleging that the ROFR had not been triggered and that HITN had not received any bona fide offer for the DC Spectrum Rights. A copy of this letter is attached as Exhibit D.

55.     Clearwire's own representative has confirmed Clearwire's and HITN's intention to close on their deal for the DC Spectrum Rights after NAC's ROFR expires, by declaring that Clearwire is "waiting out" NAC's ROFR before Clearwire and HITN were to close on a lease agreement for the DC Spectrum Rights.

56.     Whether by written agreement, oral agreement, or the parties' complex financial arrangements, HITN is obligated to offer all of its spectrum interests, including the DC Spectrum Rights, to Clearwire.  Specifically, upon information and belief, pursuant to the Clearwire Agreements, Clearwire and HITN had, during the ROFR period, contractually committed to close on their pending deal for the DC Spectrum Rights albeit at a later date.

57.     This obligation constitutes a violation of the ROFR.

58.     The ROFR prohibits HITN from accepting any offer to lease excess spectrum capacity when such offer "includes terms or conditions that have the *purpose or the effect of preventing [NAC] from exercising its Right of First Refusal*." Ex. A, at 2 (emphasis added).

59. The Clearwire Agreements constitute a breach of such provision.

60. To protect NAC's rights and to preserve the status quo, during the pendency of this lawsuit, but in no event longer than 30 days after HITN provides written notice of all material terms and conditions of the Clearwire Offer, HITN should be enjoined from closing on the Clearwire Offer or otherwise transferring the DC Spectrum Rights. This relief is necessary to allow NAC a reasonable amount of time to decide whether to match the Clearwire Offer.

61. This requested injunctive relief would not harm HITN. Under the Clearwire Agreements, including but not limited to the MRUA, HITN is obligated to provide the DC Spectrum Rights to Clearwire and only Clearwire. Enjoining this transaction for a brief period of time is quite reasonable under the circumstances. On the other hand, in the absence of an injunction, NAC would suffer irreparable harm because it would be denied access to a unique asset in violation of the Existing Lease. Furthermore, it would be much more difficult for the parties to unwind the Clearwire transaction after the fact.

## COUNT I—BREACH OF CONTRACT

62. NAC incorporates paragraphs 1 through 53 as if set forth fully herein.

63. HITN and NAC are bound by the Existing Lease for the DC Spectrum Rights.

64. NAC has performed in compliance with the Existing Lease.

65. Under the Existing Lease, NAC has a ROFR on any bona fide offer HITN received for the DC Spectrum Rights on or prior to February 21, 2007.

66. The Clearwire Offer constituted a bona fide offer for the DC Spectrum Rights that HITN intended to accept and that was received prior to February 21, 2007.

67. HITN never provided NAC with notice of the Clearwire Offer.

68.     HITN breached and continues to breach the Existing Lease by, among other things, failing to provide NAC with written notice of all of the material terms and conditions of the Clearwire Offer for the DC Spectrum Rights.

69.     NAC has no adequate remedy at law to address HITN's ongoing and threatened future breaches of its obligations under the Existing Lease.

70.     The actual and threatened harm to NAC is immediate in that HITN intends to transfer the DC Spectrum Rights to Clearwire in derogation of NAC's ROFR upon the expiration of the ROFR period.

71.     Unless enjoined, the transfer of the DC Spectrum Rights to Clearwire will cause substantial, immediate and irreparable injury to NAC – including, but not limited to, the lost opportunity to acquire licensed spectrum rights that are unique, finite and have substantial value in the commercial market place.

72.     The Clearwire Agreements are in redacted form and therefore set forth only some of the material terms and conditions of the Clearwire Offer.

73.     NAC is attempting to evaluate whether to match the Clearwire Offer based on the incomplete information presently available to it; however, the incomplete nature of the presently known information makes this task onerous.

74.     HITN should be required to specifically perform under Section I.C. of the Existing Lease by providing written notice of all of the material terms of the Clearwire Offer which would trigger the contractually provided 30 days for NAC to match the Clearwire Offer.

WHEREFORE, NAC requests that the Court enter a judgment in its favor on Count I of the Complaint and further requests an Order:

(a)     During the pendency of this lawsuit, but in no event later than 30 days after HITN provides written notice of all material terms and conditions of the Clearwire

Offer, enjoining, restraining and prohibiting HITN, together with its agents, servants, employees, and those persons in active concert or participation with it, from transferring, leasing, and/or assigning the DC Spectrum Rights and/or any interest in the DC Spectrum Rights;

(b)     Requiring HITN to specifically perform under Existing Lease by providing written notice to NAC of all of the material terms and conditions of the Clearwire Offer; and

(c)     Awarding NAC, as the prevailing party, all expenses incurred herein, including reasonable attorneys' fees.

Respectfully submitted,

BRYAN CAVE LLP

Rodney F. Page (D.C. Bar #37994)
Stacey Ormsby (D.C. Bar #490995)
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C.  20005-3960
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200

Craig S. O'Dear
James D. Lawrence
Joshua C. Rowland
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone:  (816) 374-3200
Facsimile:  (816) 374-3300

ATTORNEYS FOR PLAINTIFF

## Certificate of Service

I hereby certify that a true and correct copy of the above was caused to be served by ECF, this _____ day of April, 2007, to:

Eunnice H. Eun
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C.  20005-5793

William H. Pratt
Joseph Sreino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

Rudolph J. Geist
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD  20910

ATTORNEYS FOR DEFENDANT

_____
ATTORNEY FOR PLAINTIFF