UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| NEXTEL SPECTRUM ACQUISITION CORPORATION, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 07-543 (RMC) ) |
| HISPANIC INFORMATION AND TELECOMMUNICATIONS NETWORK, INC., | ) ) ) ) ) |
| Defendant. | ) ) |

MEMORANDUM OPINION

Nextel Spectrum Acquisition Corp. ("NAC") had a contract with Hispanic Information and Telecommunications Network, Inc. ("HITN") to lease radio spectrum rights in and around Washington, D.C. NAC complains that the lease gave it a valid right of first refusal ("ROFR") on any bona fide offer(s) HITN received for these spectrum rights. *See* First Am. Compl. for Specific Performance, Injunctive and Other Relief ("Am. Compl.") ¶ 1. NAC further complains that HITN has agreed to lease the relevant spectrum rights to Clearwire Corporation ("Clearwire") without affording NAC an opportunity to exercise its ROFR, thereby violating the lease. HITN moves to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that NAC mis-reads the plain language and meaning of the lease agreement and that HITN has not violated any of NAC's rights. *See* Defendant HITN's Motion to Dismiss ("Def.'s Mot.") [Dkt. #3].[1] The Court heard oral

---

[1] As an initial matter the Court thinks it appropriate to clear up some confusion regarding the Motion to Dismiss. After Nextel filed its initial Complaint in District of Columbia Superior Court, HITN filed a Notice of Removal to this Court. *See* [Dkt. #1]. Soon thereafter, HITN filed

argument on August 16, 2007, and will now grant the motion to dismiss.

## I. BACKGROUND FACTS

The lease in question was titled Airtime Royalty Agreement ("ARA") and was initially entered into on February 21, 1995, between The George Washington University ("GW") and Eastern Cable Networks Corp. ("ENET"). *See* Defendant HITN's Mem. in Supp. of Its Mot. to Dismiss ("Def.'s Mem."), Ex. B. At that time, GW had been issued a license by the Federal Communications Commission ("FCC") to construct and operate an instructional television fixed service station over the Educational Broadband Service ("EBS") for which the FCC had reserved certain spectrum on the 2.5 Ghz band.[2] The federal lease allowed GW to lease excess capacity to others, including commercial for-profit organizations. *Id.* at 1. Pursuant to the ARA, ENET leased excess capacity from GW for an initial term of 1995 to 1998, subject to automatic annual renewal for a ten-year period. *See id.* at 2 (Automatic Renewal Terms ¶ I.B.1). The ARA also contained the

---

its Motion to Dismiss the Complaint. *See* Motion to Dismiss [Dkt. #3] filed March 26, 2007. Nextel then filed a Motion for Leave to File its First Amended Complaint. *See* [Dkt. #4]. The Court informed NAC that this was unnecessary under Federal Rule of Civil Procedure 15(a) because a plaintiff may amend the Complaint as a matter of right anytime before the Defendant files a responsive pleading. The Amended Complaint was accepted for filing. *See* [Dkt. #9]. HITN subsequently notified the Court of its intention to stand on the original Motion to Dismiss with respect to the First Amended Complaint. *See* Def. HITN's Reply In Supp. of its Mot. to Stay Certain Discovery Pending J. on its Mot. to Dismiss at 2-3. HITN also filed a Motion for Hearing regarding the pending Motion to Dismiss. *See* [Dkt. #10] (specifically stating that the Defendant "stands on the papers in support of its now fully-briefed Motion to Dismiss with respect to the First Amended Complaint"). NAC did not oppose the HITN's motion so the Court treats it as conceded. As such, the motion is ripe.

[2] As used here, "spectrum" refers to radio frequencies used for the transmission of sound, data and video. Am. Compl. ¶ 5. The FCC allocated a portion of the 2.5 Ghz band for EBS; the remaining portion of the 2.5 Ghz band may be licensed to commercial enterprises and is referred to as Broadband Radio Service ("BRS"). Am. Compl. ¶ 10. "Licensed spectrum is finite within the 2.5 GHz band and the FCC has already licensed nearly all available EBS and BRS spectrum in each market." *Id.* ¶ 11.

following terms:

    C.  <u>Right of First Refusal</u>

      1.  ENET shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from the University during any or all of the period from the expiration of the automatic renewal term under Section I.B through two years thereafter (the "Right of First Refusal").

      2.  If the University desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B, the University must provide written notice to ENET at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of ENET's Right of First Refusal. Such notice must be given one year prior to expiration of the contract.

      3.  Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to the University, the University shall serve ENET with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating the University's intent to accept the offer in the event that ENET does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. The University shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing ENET from exercising its Right of First Refusal. Within thirty (30) days of ENET's receipt of the University's written notice, ENET shall notify the University in writing of its desire to exercise its Right of First Refusal. . .

*Id.* ¶¶ C.1-3.

      Over time, NAC succeeded to the interests of ENET and HITN assumed the rights and obligations of GW under the ARA. *See* Def.'s Mem. at 3. Pursuant to the ARA, HITN leased certain EBS D channels ("DC Spectrum") in the Washington, D.C. area to NAC. *Id.* The term of the ARA, with all automatic renewals, expired on February 21, 2005. Def.'s Mem., Ex. B ¶ I.B.1. The two-year period thereafter, during which NAC held a ROFR, ended on February 21, 2007.

      Allegedly beginning on or about November 2003, HITN developed a relationship

with Clearwire concerning leasing excess EBS capacity that HITN held in various markets. *See* Am. Compl. ¶¶ 22 - 41. That relationship led to a Master Royalty and Use Agreement ("MRUA") between Clearwire and HITN dated October 4, 2006. *See* Am. Compl. ¶ 36; Def.'s Mem., Ex. A.

The MRUA provides Clearwire with an "exclusive" right to all of HITN's licensed spectrum. *See* Am. Compl. ¶ 38; Def.'s Mem. Ex. A, Recitals at 4 (the parties agree that "in securing a source of spectrum capacity for the future and facilitating the branding of the Clearwire mark through the services provided by Licensee in the non-profit community; . . . [HITN] desires to make available to Clearwire, and Clearwire desires to have access to, . . . any additional Commercial Spectrum Capacity of [HITN] that is accepted by Clearwire and made subject to an IUA [Individual Use Agreement] as provided in this Agreement (the 'Future Spectrum Capacity'), all in accordance with the terms of this Agreement"). Most particularly, the MRUA states:

> (b) Option for Future Spectrum Capacity. Licensee grants Clearwire an option (the "Option") to enter into IUAs with Licensee in respect of any and all spectrum (including, but not limited to, the Commercial Spectrum Capacity, EBS and BRS ("Spectrum") on FCC Licenses held by Licensee that is Available or that becomes Available during the Term, at prices to be negotiated in good faith based on the fair market value ("FMV") of such Spectrum at the time the Option is to be exercised, provided, however, that the negotiated price shall not exceed . . . per MHZ POP. The Option shall be exercisable in Clearwire's sole discretion each time Spectrum of Licensee or its Affiliates becomes Available during the Term . . . .

*See* Am. Compl. ¶ 40; Def.'s Mem., Ex. A at 6-7. The term "Available" is defined in the MRUA as spectrum that "is not encumbered by any Lien, including, but not limited to, any purchase option, right of first refusal, or other contractual obligation of [HITN]." Def.'s Mem., Ex. A, Exhibit 1 subpart (b) "Definitions."

HITN explains that "[s]ince the Washington D Channels were subject to NAC's right

of first refusal under the [ARA], those channels, by definition, did not qualify as Future Spectrum Capacity under the [MRUA] between HITN and Clearwire when that Agreement was consummated." Def.'s Mem. at 5. From Clearwire's filings with the federal government, it appears that it has paid HITN $22.1 million in cash and 2,829,717 shares of Class A Common Stock valued at $12.3 million prior to Clearwire's recent initial public offering ("IPO"). Am. Compl. ¶ 41. "With Clearwire's stock now trading at approximately $20 per share, HITN has a post-IPO windfall of in excess of $75,000,000.00." *Id.*

At the argument on NAC's motion, the parties informed the Court that NAC has never used any of the contested spectrum for actual broadcasting and it lies fallow even yet. NAC's interest in leasing the spectrum from GW/HITN, and in negotiating the ROFR, was to control the asset in an extremely competitive market.

NAC brings a single-count breach of contract claim against HITN. *See* Am. Compl. at 13-14.

## II.  LEGAL STANDARDS

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the legal sufficiency of a complaint. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "While a complaint attacked by a rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' for 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise the right of relief above a speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007) (internal citations omitted). The Court must treat the complaint's factual allegations — including mixed questions of law and fact — as true, drawing

all reasonable inferences in the plaintiff's favor. *Macharia v. United States*, 334 F.3d 61, 64, 67 (D.C. Cir. 2003); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003). But the Court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions cast as factual allegations. *Browning,* 292 F.3d at 242. In deciding a 12(b)(6) motion, the Court "may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citation omitted).

### III. ANALYSIS

NAC argues that it had "valid right of first refusal ('ROFR') on any bona fide offer(s) [HITN] receives for certain spectrum rights" at any time during the two-year period after its formal leasehold had ended. *See* Am. Compl. ¶ 1. HITN argues, more persuasively, that only if it entered into an agreement to lease excess capacity *that would commence* within the two-year ROFR period would the ROFR become viable. *See* Def. HITN's Reply in Supp. of its Mot. to Dismiss ("Def.'s Reply") at 4-5. Inasmuch as HITN's MRUA with Clearwater, of whatever eventual scope, would not commence as to the DC Spectrum within the two-year period, HITN argues that it violated none of NAC's rights and the complaint should be dismissed.

Although they read the agreement differently, both parties agree that the ARA is plain on its face and unambiguous. Whether a contract is ambiguous is a question of law for the court. *See Holland v. Hannan*, 456 A.2d 807, 815 (D.C. 1983). A contract is not rendered ambiguous merely because the parties disagree over its proper interpretation. *Id.* Instead, a contract is ambiguous when, and only when, it is, or the provisions in controversy are, reasonably or fairly

susceptible of different constructions or interpretations, or of two or more different meanings. *See Burbridge v. Howard Univ.*, 302 A.2d 245, 247 (D.C. 1973). If there is more than one interpretation that a reasonable person could ascribe to the contract, while viewing the contract in context of the circumstances surrounding its making, the contract is ambiguous. *See Morgan v. American Univ.*, 534 A.2d 323, 330 (D.C. 1987). The choice among reasonable interpretations of an ambiguous contract is for the fact-finder to make based on the evidence presented by the parties to support their respective interpretations. *Howard Univ. v. Best*, 484 A.2d 958, 966 (D.C. 1984). Examining the clause in question in light of the ARA as whole, the Court agrees with the parties that the plain meaning of the contract is unambiguous.

NAC offers that the ROFR is a defined term in paragraph 1 of section I.C. of the ARA means only what section I.C. says: NAC "shall have the exclusive right to match the terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all" of the two year period after the automatic renewal term, *i.e.*, "any bona fide *offer* to lease excess capacity" *received* by HITN during that two-year period. In furtherance of this "plain meaning" interpretation, NAC contends that paragraph 2 of the ROFR provision describes a subset of paragraph 1, that is, a situation in which HITN desires to lease excess capacity that would commence during the two-year period. Similarly, it contends that paragraph 3 of the ROFR provision describes a different subset, in which HITN received an offer to lease excess capacity. Thus, it argues that NAC was entitled to receive notice of *any* offer to lease DC Spectrum during the two-year period, regardless of when the lease under consideration would take effect.

HITN argues that the "plain meaning" of the entirety of the ROFR provision is that NAC held a ROFR over any lease of DC Spectrum during the two-year period but not thereafter.

It notes that its responsibility to notify NAC of its desire to lease any of the DC Spectrum was "one year prior to expiration of the contract" and covered only a lease "that would commence anytime within two years after the expiration of the automatic renewal term." *See* ARA, Def.'s Mem. Ex. B ¶ I.C.2. It also argues that NAC had no contract right to make, and insist that HITN consider, a matching offer for a spectrum lease after February 21, 2007, when its "grace" period expired.

The contract is clear that not every offer would necessarily trigger the right of first refusal. Rather, only an offer that met a certain standard would activate HITN's duty to give NAC the opportunity to match the offer. Carried to its logical conclusion, NAC's argument would lead to absurd results. It would mean that NAC had a contract right to counter an offer to lease DC Spectrum from HITN to take effect years after NAC's leasehold and two-year ROFR period had ended, as long as that offer were actually received within the two-year period after the expiration of the automatic renewal period. In other words, NAC argues that if HITN had received an offer to lease the DC Spectrum on February 20, 2007, for a lease period to begin in 2010, HITN would have had an obligation to notify NAC and allow NAC to make a counter-offer under its ROFR. But the ARA clearly indicates otherwise. NAC leased the DC Spectrum through a period of automatic annual renewals that ended on February 21, 2005, and further negotiated a ROFR for the two-year period ending February 21, 2007; it did not negotiate the right to encumber the DC Spectrum into perpetuity.

Under District of Columbia law, contracts are construed in accordance with the intention of the parties insofar as it can be discerned from the text of the instrument. *See Washington Metro. Area Transit Auth. v. Georgetown Univ.*, 347 F.3d 941, 945-46 (D.C. Cir. 2003); *Found. for the Pres. of Historic Georgetown v. Arnold*, 651 A.2d 794, 796 (D.C. 1994). Here the

parties signed a clear agreement for the lease of excess capacity in the DC Spectrum for a period to commence February 21, 1995, with all obligations terminating on February 21, 2007. HITN did not negotiate with a third party to lease excess capacity for any period between February 21, 2005, and February 21, 2007. Therefore, NAC's right of first refusal was never triggered. As a result, the Court will grant HITN's motion to dismiss NAC's Amended Complaint. A memorializing order accompanies this Memorandum Opinion.

                                                              _____/s/_____
                                                    ROSEMARY M. COLLYER
                                                    United States District Judge

DATE: August 29, 2007