# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

NEXTEL SPECTRUM ACQUISITION CORP.,

    Plaintiff,

       v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,
INC.

    Defendant.

Civil Action No.: 1:07-CV-00543-RMC
ORAL ARGUMENT REQUESTED

## PLAINTIFF'S MOTION TO VACATE, ALTER OR AMEND JUDGMENT DISMISSING FIRST AMENDED COMPLAINT

Plaintiff Nextel Spectrum Acquisition Corp. ("NAC"), pursuant to Rules 59(e) and 15(a) and (d) of the Federal Rules of Civil Procedure, moves the Court to vacate, alter or amend its Memorandum Opinion and its Order issued August 29, 2007 (Dkt. #s18, 19), to deny Defendant's Motion to Dismiss and to grant NAC leave to file a Second Amended and Supplemental Complaint in the form attached hereto as Exhibit A. NAC states as follows in support of its Motion:

1.    The Memorandum Opinion and the Order granting Defendant's FED. R. CIV. P. 12(b)(6) Motion to Dismiss should be vacated, altered or amended because, among other things, the Court committed the following clear errors of law:

    (a)    The Memorandum Opinion and the Order do not address a separate and independent breach of contract claim that is raised and alleged with detail in the First Amended Complaint and, therefore, do not fully dispose of all claims in the First Amended Complaint.

    (b)    The Court erred in declaring the "unambiguous" meaning of the contract because the contract language is reasonably susceptible to multiple interpretations, thereby raising disputed fact issues.

(c)    The Court erred in converting the Motion to Dismiss to a Motion for Summary Judgment without providing NAC notice and an opportunity to present evidence, as required by Rule 12(b).

2.    Events subsequent to entry of the Order are relevant to the issues presented by this case and should be considered by the Court. They are set forth in the proposed Second Amended and Supplemental Complaint.

3.    For all of the above reasons, the Court should vacate, alter or amend its Memorandum Opinion and Order, deny the Motion to Dismiss, and grant NAC leave to file the Second Amended and Supplemental Complaint in the form attached as Exhibit A.[1]

4.    NAC has filed and submitted its Memorandum in Support of its Motion to Vacate, Alter or Amend Judgment contemporaneously with this Motion, which Memorandum is incorporated herein by reference.

5.    Pursuant to LCvR 7(f), NAC respectfully requests oral argument on its Motion.

WHEREFORE, for the reasons more fully set forth in its Memorandum in Support of its Motion to Vacate, Alter or Amend Judgment, NAC respectfully requests that the Court vacate, alter or amend its Memorandum Opinion and Order, deny Defendant's Motion to Dismiss, and grant NAC leave to file the Second Amended and Supplemental Complaint.

---

[1] The Exhibits referenced in the Second Amended and Supplemental Complaint retain the same alphabetical designations as the Exhibits to the First Amended Complaint that were previously filed with NAC's Motion for Leave to File Amended Complaint (Dkt. #4), and due to their volume are not attached to the Second Amended and Supplemental Complaint at Exhibit A. If the Court requires separate copies to be filed with the Second Amended and Supplemental Complaint, counsel will provide them at the time of filing.

Respectfully submitted,

BRYAN CAVE LLP

    s/ Rodney Page
Rodney F. Page (D.C. Bar #37994)
Stacey Terry Ormsby (D.C. Bar #490995)
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C. 20005-3960
Telephone: (202) 508-6000
Facsimile: (202) 508-6200

Craig S. O'Dear
James D. Lawrence
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone: (816) 374-3200
Facsimile: (816) 374-3300

ATTORNEYS FOR PLAINTIFF

## Certificate of Service

I hereby certify that a true and correct copy of the above was caused to be served by ECF, this 13th day of September, 2007, to:

Eunnice H. Eun
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C.  20005-5793

William H. Pratt
Joseph Sreino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

Rudolph J. Geist
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD  20910

ATTORNEYS FOR DEFENDANT

_____s/ Rodney Page_____
ATTORNEY FOR PLAINTIFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NEXTEL SPECTRUM ACQUISITION CORP.,

      Plaintiff,

          v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,
INC.,

Defendant.

Civil Action No.: 1:07-CV-00543-RMC

ORAL ARGUMENT REQUESTED

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS
MOTION TO VACATE, ALTER OR AMEND JUDGMENT
DISMISSING FIRST AMENDED COMPLAINT**

Plaintiff Nextel Spectrum Acquisition Corp. ("NAC") submits this Memorandum in Support of its Motion to Vacate, Alter or Amend Judgment pursuant to Rules 59(e), and 15(a) and (d) of the Federal Rules of Civil Procedure, to vacate, alter or amend the Order, deny the Motion to Dismiss, and to grant NAC leave to file the Second Amended and Supplemental Complaint.

The Court's Memorandum Opinion and its Order (collectively the "Order") granting Hispanic Information and Telecommunications Network, Inc.'s ("HITN") Motion to Dismiss should be vacated, altered or amended and the Motion to Dismiss denied because, among other things: (i) the Order failed to address a separate and independent breach of contract claim that is pleaded in detail in the First Amended Complaint; (ii) the Court erred in declaring the "unambiguous" meaning of the contract because NAC's proffered interpretation is reasonable from the contract language; (iii) NAC's interpretation of the contract is reasonable and, as between the two interpretations presented to the Court, is the only one which can be read in harmony with the other provisions of the contract; and (iv) the Court improperly converted

HITN's Motion to Dismiss to a Motion for Summary Judgment without complying with FED. R. CIV. P. 12(b). For these reasons, the Court should vacate, alter or amend the Order, deny the Motion to Dismiss, and grant NAC leave to file a Second Amended and Supplemental Complaint in the form attached to the Motion as Exhibit A.

## I. BACKGROUND

This case involves a lease agreement between NAC and HITN (the "Lease," attached to the First Amended Complaint, Dkt. #4, as Ex. A).[1] The Lease allowed NAC access to FCC-regulated spectrum in Washington, D.C. (the "DC Spectrum"). The original parties to the Lease were George Washington University ("GWU") and ENET. NAC succeeded to ENET's rights in or around 2004 and, in 2005, HITN acquired the underlying spectrum from GWU and took that spectrum subject to the surviving rights and obligations under the Lease. There is no dispute that NAC held a right of first refusal on any bona fide offers for the DC Spectrum when HITN acquired the Lease (the "ROFR").

The dispute is over the proper characterization of HITN's numerous agreements with Clearwire Corporation or its affiliates (collectively "Clearwire") that were effective during the ROFR period and that: (1) provided for the financing by Clearwire of the acquisition of the DC Spectrum From GWU; (2) provided compensation to HITN for the future use of the DC Spectrum; (3) prohibited HITN from leasing or allowing any party to use the DC Spectrum during the ROFR period, and (4) provided Clearwire the right to use the DC Spectrum subject only to the expiration of NAC's ROFR period. The First Amended Complaint specifically alleges the existence of many of these agreements, beginning at least as early as November 13,

---

[1] As filed by the Clerk, the First Amended Complaint (Dkt. # 9) does not include the Exhibits that were attached at the time NAC filed its Motion for Leave to File First Amended Complaint (Dkt. # 4). Therefore, references to exhibits attached to the First Amended Complaint are to the First Amended Complaint found at Dkt. # 4 and identified herein as "Dkt. # 4, Ex. __."

2003, and even alleges that HITN was bound by them to lease its excess spectrum capacity, including the DC Spectrum, exclusively to Clearwire. *See* Dkt. #9 at ¶¶ 22-41.

NAC asserts that, collectively, the HITN-Clearwire agreements alleged in paragraphs 22 through 41 of the First Amended Complaint, and maybe others,[2] constitute Clearwire's bona fide offer to lease HITN's excess spectrum capacity, including the DC Spectrum (the "Clearwire Offer"), during NAC's ROFR period. As such, the Clearwire Offer triggered NAC's rights under its ROFR. HITN asserts that it successfully contracted around NAC's ROFR, but fails to explain how its doing so did not violate its independent obligation under Section I.C.3 of the Lease to "not accept any offer to lease excess spectrum capacity that includes terms and conditions that have the purpose or effect of preventing [NAC] from exercising [the ROFR]." Dkt. #4, Ex. A, Section I.C.3.

The following timeline sets forth the allegations of the First Amended Complaint and the additional new developments relevant to this dispute:

- **2/21/95:** GWU and ENET enter into the Lease. Dkt. #9 at ¶ 42.
- **In or Around 2004:** NAC succeeds to ENET's rights under the Lease. *Id.*
- **2/21/05:** The Lease expires and the right of first refusal period begins (the "ROFR Period"). *Id.* at ¶ 45.
- **Spring of 2005:** NAC negotiates with GWU for a new spectrum lease.
- **5/05:** GWU and HITN negotiate HITN's acquisition of the DC Spectrum. *Id.* at ¶ 43.
- **5/24/05:** Clearwire and HITN enter into a Spectrum Access and Loan Facility Agreement which provides for Clearwire's financing of HITN's acquisition of spectrum and obligates HITN to make the spectrum exclusively available to Clearwire. *Id.* at ¶ 30.

---

[2] While NAC was able to allege some of the HITN-Clearwire agreements with some detail, many of them were not available to NAC until Clearwire's Form S-1 filing in January 2007, and even then some of them were only available in redacted form. *Id.* at ¶ 22 n. 1. In fact, in prior disputes between NAC and HITN, HITN refused to produce documents detailing its relationship with Clearwire. *Id.* Therefore, NAC cannot confirm that the agreements alleged in the First Amended Complaint constitute all relevant agreements between HITN and Clearwire. *Id.*

- **Prior to 6/8/05:** GWU and HITN enter into an agreement to assign the DC Spectrum to HITN subject to NAC's ROFR. *Id.* at ¶ 43.

- **7/8/05:** HITN forms a subsidiary, HITN-Washington D.C. D, L.L.C. *Id.* at ¶ 32.

- **10/20/05:** Clearwire files a UCC financing statement on all of HITN-Washington D.C. D, L.L.C.'s property. *Id.* at ¶ 33.

- **10/4/06:** HITN and Clearwire enter into a Master Royalty and Use Agreement ("MRUA"), the last alleged agreement constituting the Clearwire Offer, which constitutes a bona fide offer and/or agreement to lease excess spectrum capacity. *Id.* at ¶ 36.

- **Winter of 2006:** Clearwire tells NAC that it is going to "wait out" the ROFR Period before formalizing its agreement with HITN to lease the DC Spectrum. *Id.* at ¶ 55.

- **1/8/07:** NAC discovers the MRUA and many of the other agreements that constitute the Clearwire Offer, after Clearwire is required to disclose them to the SEC. *Id.* at ¶ 50.

- **2/19/07:** NAC asks HITN to comply with the Lease and provide all material terms of Clearwire's offer for the DC Spectrum. *Id.* at ¶ 53.

- **2/20/07:** HITN refuses to comply with the Lease and states that, "*there is no chance that the [DC Spectrum] can or would ever be leased to Clearwire under the MRUA ...*" This is later proven to be totally false by actions of HITN taken the day after this Court issued its Order granting HITN's motion to dismiss. *Id.* at ¶ 42; Ex. D.

- **2/21/07:** NAC files a lawsuit for damages and injunctive relief against HITN. Dkt. #1, Ex. A.

- **8/16/07:** HITN's lawyer, Rudy Geist, represents to the Court that HITN waited for the ROFR Period to expire before it "*could think about anything with the spectrum ...*" This statement, too, is later proven false by the actions taken by HITN on 8/30/07 and 8/31/07. Transcript of Hearing on Motion to Dismiss, attached as Exhibit A, at p. 32:6-9.

- **8/29/07:** The Court dismisses the First Amended Complaint without allowing NAC to take any discovery whatsoever. Dkt. #s 18 and 19.

- **8/30/07:** The DC Spectrum is assigned from HITN to HITN-Washington D.C. D, L.L.C. Lawrence Affidavit, attached as Exhibit B, at ¶ 4.

- **8/31/07:** Despite HITN's 2/20/07 assurances to NAC, HITN-Washington D.C. D, L.L.C. requests approval from the FCC to enter into a new long-term lease with Clearwire for the DC Spectrum. *Id.* at ¶ 5.

What this timeline reveals is that Clearwire financed the purchase of the spectrum through its not-for-profit proxy and business partner HITN during the ROFR Period. It strains credulity to believe anything other than when Clearwire funded HITN's acquisition of the DC Spectrum, it did so with the full expectation that it, not NAC, would have access to the DC

Spectrum down the road. HITN's and Clearwire's understanding was memorialized in the Clearwire Offer, including the MRUA, which HITN readily admits granted Clearwire an "option" to lease the DC Spectrum.[3/]

Despite these facts, the Court adopted HITN's interpretation of the Lease and found that the ROFR is triggered only if the third party lease of the DC Spectrum (as opposed to the future agreement to lease) commenced between February 21, 2005 and February 21, 2007. *See* Dkt. #18. Assuming the Lease is capable of only one reasonable interpretation—which it is not—the Order still comes to an unsupportable conclusion. The Lease does not say that NAC will have the exclusive right to match the material terms and conditions of any bona fide *agreement* to lease the DC Spectrum only if the *lease will commence* during the two year period. The Lease says:

> [NAC] shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter (the "Right of First Refusal").

Dkt. #4, Ex. A, Section I.C.1.

As detailed below, NAC's interpretation of the ROFR, in contrast to HITN's, can be read in harmony with the rest of the Lease and does not require the Court to ignore relevant language. If permitted to conduct discovery and address the parties' intentions with evidence and an opportunity to be heard, NAC can demonstrate that its proffered interpretation (which is fully consistent with the contract language) is the one the parties intended. NAC respectfully suggests

---

[3/] *See Rollins v. Stokes*, 123 Cal. App. 3d. 701 (1981)(explaining that the defendant owner's entry into an option contract for the transfer of property after the expiration of the plaintiff's ROFR, during the time in which that ROFR was binding, would not nullify the ROFR; and holding that the option "related back to the time of the giving of the option," that is, during the pendency of the plaintiff's ROFR, demonstrating defendant's intention to sell at the time the option was granted).

that the Court erred in finding the Lease unambiguous and in holding that the ROFR could only be triggered if HITN's agreement to lease these channels to Clearwire, which was concluded during the ROFR period, actually required the parties to enter into a specific lease on the DC Spectrum that commenced prior to February 21, 2007.

The Court also erred by granting the Motion to Dismiss without ruling on the alleged second, distinct breach of Section I.C.3 of the Lease wherein HITN promised that it would "not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal." The option contract which HITN granted to Clearwire to lease the DC Spectrum commencing only after the expiration of the ROFR Period was drafted that way for a reason—and the reason was to prevent NAC from exercising its ROFR. It was designed precisely for that purpose. NAC sufficiently pleaded this breach, but the Court granted the Motion to Dismiss without addressing that cause of action. The Court further erred by converting HITN's Motion to Dismiss to a Motion for Summary Judgment without giving NAC notice and an opportunity to present evidence. The Court should vacate, alter or amend the Order, deny the Motion to Dismiss, and grant NAC leave to file the Second Amended and Supplemental Complaint.

## II. ARGUMENT

A motion to vacate, alter or amend a judgment pursuant to FED. R. CIV. P. 59(e) may be granted if: (1) there is a change in the controlling law; (2) newly discovered evidence is found; or (3) there was clear error or to prevent manifest injustice. *See Jung v. Ass'n of Am. Med. Colleges*, 184 Fed. Appx. 9, *13 (D.C. Cir. June 1, 2006)(unpublished). In this case, the Court committed clear error in adopting HITN's interpretation of the Lease and granting the Motion to Dismiss. As the Court accurately points out, the Lease is hardly the picture of clarity. *See*

Exhibit A at p. 30:9. However, "the threshold of sufficiency to which a complaint is held at the motion-to-dismiss stage is 'exceedingly low.'" *United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003); *Horne v. Russell Cty. Comm'rs*, 295 F.Supp.2d 1289, 1292 (M.D. Ala. 2003)("the threshold is 'exceedingly low' for a complaint to survive a motion to dismiss for failure to state a claim"). "The complaint need only set forth a short and plain statement of the claim, giving the defendant fair notice of the claim and the grounds upon which it rests." *Potts v. Howard Univ.*, No. Civ. A 04-1856, 2007 WL 15925, at *1, *2 (D.D.C. Jan. 4, 2007); *see also Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1964–65 (2007) ("Factual allegations must be enough to raise the right of relief above a speculative level"). "[A] complaint may contain alternative theories, and if one of the theories can survive a Rule 12(b)(6) motion, the district court cannot dismiss the complaint." *Croixland Properties Ltd. P'ship v. Corcoran*, 174 F.3d 213, 218 (D.C. Cir. 1999). At a minimum, the Lease, and its critical ROFR, is open to more than one reasonable interpretation and the Motion to Dismiss should have been denied.

**A.    The Court Erred by Dismissing the First Amended Complaint Without Ruling on NAC's Claim that HITN Breached the Lease by Accepting an Offer that had the Purpose or Effect of Preventing NAC from Exercising its ROFR, and Subsequent Events Support the Truth of Those Allegations.**

Although the First Amended Complaint contains a single "count" for breach of contract, it alleges at least two separate and independent breaches.[4/]  First, NAC alleges that HITN breached Section I.C.3 of the Lease by refusing to give NAC notice of the Clearwire offer. Second, the First Amended Complaint alleges the following breach:

**58.    The ROFR prohibits HITN from accepting any offer to lease excess spectrum capacity when such offer "includes terms or conditions that have the *purpose or the***

---

[4/]Although both independent breaches were alleged in the First Amended Complaint and, thus, pending at the time of the Order, NAC's Proposed Second Amended and Supplemental Complaint sets forth a separate count for each breach.

*effect of preventing [NAC] from exercising its Right of First Refusal.*" Ex. A, at 2 (emphasis added).

59.    The Clearwire Agreements constitute a breach of such provision.

*See* Dkt. #9 at ¶¶ 58-59.

The Memorandum Opinion does not mention, let alone analyze, the sufficiency of the allegations of HITN's second breach of Section I.C.3 even though HITN essentially concedes its liability. In its Memorandum in Support of its Motion to Dismiss, HITN stated that its offer to lease the DC Spectrum under the MRUA "expressly *excluded* the Washington D Channels so long as they were subject to Nextel's right of first refusal." *See* Dkt. #3 at p. 8 (emphasis in original). If, as NAC alleges and expects to prove, the purpose of excluding the DC Spectrum was to circumvent the ROFR while still allowing HITN to sell, and allowing Clearwire to buy, the rights to the DC Spectrum without giving NAC its bargained for right to match the offer, then HITN's actions are clearly an independent breach of Section I.C.3 of the Lease.

On August 29, 2007, the Court issued its Memorandum Opinion and its Order granting HITN's Motion to Dismiss. *See* Dkt. #s 18, 19. The following day, on August 30, 2007, HITN filed an application with the FCC to assign the DC Spectrum license from HITN to HITN-Washington D.C. D, L.L.C. *See* Exhibit B at ¶ 4. On August 31, 2007, two days after the Court issued the Order, HITN-Washington D.C. D, L.L.C. filed an application with the FCC to enter a lease for the DC Spectrum with Clearwire. *Id.* at ¶ 4. This is precisely what NAC predicted and alleged would happen. *See* Dkt. #9 at ¶¶ 48-59. These recent developments confirm that HITN was required to lease the DC Spectrum to Clearwire via the HITN-Washington D.C. D, L.L.C. entity as NAC pleaded, and NAC alleges the agreements related to HITN-Washington D.C. D, L.L.C. constitute an additional breach of the Lease.

8

Taking NAC's allegations as true and drawing all reasonable inferences in NAC's favor, as the Court must in ruling on a motion to dismiss, the First Amended Complaint clearly states a claim for breach of contract against HITN based upon Section I.C.3. "[A] complaint may contain alternative theories, and if one of the theories can survive a Rule 12(b)(6) motion, the district court cannot dismiss the complaint." *Croixland Properties Ltd. P'ship v. Corcoran*, 174 F.3d 213, 218 (D.C. Cir. 1999). The Court erred in dismissing the First Amended Complaint in its entirety without ruling on the second alleged breach of Section I.C.3. Accordingly, the Court should vacate, alter or amend the Order, deny the Motion to Dismiss, and grant NAC leave to file the Second Amended and Supplemental Complaint.[5]

**B.    The Court Erred in Declaring the Lease Unambiguous and Granting the Motion to Dismiss.**

"'[T]he judicial task in construing a contract is to give effect to the mutual intentions of the parties .... Where the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties.'" *Mesa Air Group, Inc. v. Dept. of Transportation*, 87 F.3d 498, 503 (D.C. Cir. 1996)(quoting *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985))(alteration in original). "However, when a court determines that a contract's language is ambiguous as a matter of law, it must consider other factors in determining the intentions of the parties in constructing the agreement." *Mesa Air*, 87 F.3d at 503. "Under the law of the District of Columbia, a contract is ambiguous when it is reasonably susceptible of different constructions or interpretations, or two or more different meanings." *Kass v. William Norwitz Co.*, 509 F.Supp. 618, 623–24 (D.D.C. 1980).

---

[5] In any event, the Court needs to dispose of this claim one way or another. As it stands, the Order is interlocutory regardless of the Court's statement that it is "final and appealable."

9

The D.C. Circuit has recognized that "courts should be reluctant to dispose summarily of claims involving the interpretation of contracts." *Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 170 (D.C. Cir. 1981). A dispositive motion should rarely be granted in a breach of contract dispute because the interpretation of the contract is generally a question of fact. *Id.* at 169 ("The meaning of a contract is, however, usually a question of fact … [and] discerning contractual intent is a factual question unless the terms of the contract are wholly unambiguous")(internal citations and quotations omitted). "Where a contract is not 'wholly unambiguous,' the parties have a right under principles of American contract law to present oral testimony and other extrinsic material to aid in its interpretation." *Id.* at 170.

The Memorandum Opinion declares that "the Court agrees with the parties that the plain meaning of the contract is unambiguous." Dkt. #18 at p. 7. The Court apparently seized on the self-serving statements of HITN's counsel that "the parties agree that the ROFR language is unambiguous," and that "the fact that the parties agree that it's unambiguous tells [counsel for HITN] that the Court can decide this as a matter of law." Exhibit A at 4:22-5:1. But NAC does not agree that the ROFR language is unambiguous.[6] Indeed, in Opposition to HITN's Motion to Stay Discovery, NAC stated as follows:

> **HITN claims that NAC has 'implicitly acknowledged that discovery is unnecessary to defend against HITN's Motion to Dismiss.' Nothing could be further from the truth.**

Dkt. #14 at p. 8. NAC has never agreed that the Lease is unambiguous.

This case is similar to *Cobalt Blue Corp. d/b/a Formerly Joe's v. 184 W. 10th Street Corp.*, 580 N.Y.S.2d 240 (N.Y. App. Div. 1992). In *Cobalt Blue*, the court interpreted a lease that provided the plaintiff the option to renew a lease for two additional terms. Due to the

---

[6] NAC's counsel argued that there were numerous areas of disagreement with respect to the interpretation of the ROFR. Exhibit A at pp. 16:11-16, 24:6-11, and 25:12-23.

existence of conflicting, yet reasonable, interpretations of the preemptive right, the appellate court reversed the grant of summary judgment. *Cobalt Blue* is relevant to this lawsuit because the ambiguity concerning the ROFR is a question of fact, and therefore not for the court to decide (even on summary judgment). The ROFR language in this case is reasonably susceptible to differing interpretations and cannot be interpreted as a matter of law.

> **i.    The Court's interpretation of Section I.C.1 was in error**.

Section I.C. of the Lease states as follows:

I.C.    <u>Right of First Refusal</u>.

1.    [NAC] shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter (the "Right of First Refusal").

2.    If [HITN] desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B., [HITN] must provide written notice to [NAC] at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of [NAC]'s Right of First Refusal. Such notice must be given one year prior to expiration of the contract.

3.    Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to [HITN], [HITN] shall serve [NAC] with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating [HITN]'s intent to accept the offer in the event that [NAC] does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. [HITN] shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal. Within thirty (30) days of [NAC]'s receipt of [HITN]'s written notice, [NAC] shall notify [HITN] in writing of its desire to exercise its Right of First Refusal.

4.    In the event that [NAC] refuses to exercise its Right of First Refusal with respect to any offer, and any material term of such offer is subsequently changed, before accepting such changed offer [HITN] must follow the procedures specified in the foregoing subsections, providing [NAC] with notice regarding the revised offer and giving [NAC] the opportunity to exercise its Right of First Refusal with regard thereto.

11

*See* Dkt. #4, Ex. A, Section I.C. at p. 2. HITN claims that the ROFR is only triggered if HITN reaches an agreement to lease the DC Spectrum, and only if the subsequent third party lease commences prior to February 21, 2007.

The most critical paragraph in the ROFR is Section I.C.1. In Section I.C.1, there are three alternative terms that the phrase "*during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter*" may reasonably be read to modify. The possibilities are: (i) "the right to match;" (ii) "any bona fide offer to lease;" or (iii) the word "lease." Each of these interpretations is objectively reasonable under the circumstances, thus rendering the language ambiguous and the Order grating the Motion to Dismiss improper. Instead of attempting to ascertain the intent of the parties, which it should have done first and foremost, HITN argues that the only reasonable interpretation is to ignore (i) and (ii) above based upon the last antecedent rule. *See* Dkt. #7 at p. 4.

The last antecedent rule provides that "a limiting clause or phrase ... should ordinarily be read as modifying only the noun or *phrase* that it immediately follows." *Jama v. Immigration and Customs Enforcement*, 543 U.S. 335 (2005)(emphasis added); *see also Perkins v. District of Columbia Bd. of Zoning Adjust.*, 813 A.2d 206, 211 (D.C. 2002). However, HITN's faulty application of the last antecedent rule requires that the Court insert nonexistent words into Section I.C.1, and otherwise alter its language as follows:

> [NAC] shall have the exclusive right to match the material terms and conditions of any ~~bona fide offer to~~ lease **of** excess capacity from [HITN] **that commences** during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter (the "Right of First Refusal").

The Court simply cannot delete the words "bona fide offer to" and add the words "of" and "that commences," as HITN's interpretation requires, in order to resolve the ambiguity.

Missing from HITN's analysis is the fact that the last antecedent rule allows for the limiting clause to be read as modifying the *phrase* it immediately follows. Under NAC's interpretation, the phrase that is modified by the limiting language is the whole phrase "bona fide offer to lease" rather than simply the word "lease." NAC's interpretation makes sense in this context and can be read in harmony with the rest of the ROFR and the Lease. The Court should recognize that NAC's interpretation is at least reasonable. As a result, the Lease is ambiguous and the claims cannot be decided without an evidentiary basis as to the parties' true intentions.

    ii.       **The Court's interpretation of Section I.C.2 was also in error**.

The Court granted the Motion to Dismiss based upon on an impermissible blending of Sections I.C.1 and I.C.2. Section I.C.2 cannot be read to justify the Court's interpretation of Section I.C.1. Section I.C.2 does not use the terms "offer to lease" and does not alter or amend the definition of "Right of First Refusal" found exclusively by its terms in Section I.C.1. Rather, Section I.C.2 concerns a different concept entirely.

Section I.C.2 concerns the limited circumstances when notice must be provided (a year before the end of the ROFR Period) if the spectrum changes hands during the ROFR Period. That is why Section I.C.2 contains the terms "agreement to lease" and "commence" and "[s]uch notice must be given one year prior to expiration of the contract" that simply do not appear anywhere else in the ROFR. For example, if HITN wanted to enter into a third party lease agreement that would commence during the ROFR Period, between February 21, 2005 and February 21, 2007, then HITN would have to provide notice to NAC on or before February 21, 2006. HITN convinced the Court that Section I.C.2 must be read to explain Section I.C.1. It cannot. It does not make any sense and would conflict with the other sections of the ROFR and the Lease in general.

NAC's interpretation of Sections I.C.1 and I.C.2, on the other hand, is consistent with other sections of the Lease. For example, Section XIII.B of the Lease states as follows:

> **During the Term of this Agreement or at anytime within two years after the expiration of the last automatic renewal term under Section I.B, [HITN] may return its license for the D Group Station to the FCC for cancellation or elect not to renew its license, provided that [HITN] gives one (1) year's prior written notice to [NAC]. Upon written request of [NAC] during such one (1) year period, [HITN] shall assign at no cost its license to such eligible entity as NAC shall designate …**

*See* Dkt. #4, Ex. A, Section XIII.B at p. 12. Section XIII.B is consistent with NAC's interpretation of Section I.C.2: if the DC Spectrum was to change hands during the two years following the last automatic renewal term of the lease, HITN had to provide NAC with notice one year prior to the expiration of the contract. To reach the conclusion advocated by HITN and accepted by this Court, Sections I.C.1 and I.C.2 must be fused together in a way that their plain language will not permit, because they deal with different circumstances.

NAC's interpretation of Section I.C.2 is likewise consistent with Section I.C.3, whereas the Court's and HITN's is not. Section I.C.3 describes *how* HITN is required to provide notice of a "bona fide offer" under Section I.C.1. Section I.C.2, on the other hand, describes *when* HITN must provide notice if it wishes to enter into an agreement that would commence within the two years after the last term. These are two different situations, which is why the notice provisions are unrelated. There is no other reason for the drafters to have included seemingly inconsistent notice provisions right next to each other. Section I.C.2 suffers from unfortunate placement because it is not a subset of Section I.C.1 and does not fit conceptually between Sections I.C.1 and I.C.3.

Regardless of the interpretation, neither Section I.C.1, I.C.3, nor I.C.4 mentions any requirement that the "bona fide offer" must be an agreement to lease excess spectrum capacity if

the *lease were to commence* within the two year ROFR period. Indeed, had the parties to the Lease intended that the ROFR would only apply to any leases *that commenced* within the ROFR Period, they would have said so. They did not and it is a cardinal principle of contract interpretation that the court "read a contract 'to give meaning to all of its provisions and to render them consistent with each other.'" *Beal Mortg. Inc. v. FDIC*, 132 F.3d 85, 88 (D.C. Cir. 1998).

> iii.  **Even if HITN's interpretation of the Lease is correct, the Clearwire Offer, including the MRUA, triggered the ROFR because it is an agreement to lease spectrum that commenced during the ROFR Period under Section I.C.2.**

As interpreted by HITN and the Court, Section I.C.2 modifies Section I.C.1 such that the ROFR is only triggered with an agreement to lease that commences during the ROFR Period. Even if HITN were correct, the reality is that the Clearwire Offer, including the MRUA, itself triggered the ROFR. The MRUA, one of several agreements that make up the Clearwire Offer, under which HITN is bound to lease its excess spectrum capacity exclusively to Clearwire, constitutes "an agreement to lease excess capacity," including the DC Spectrum, on very specific terms. The fact that the agreements the make up the Clearwire Offer, including the MRUA, were negotiated and entered into between November 13, 2003 and October 4, 2006, leaves no question that it "commence[d] … within two years after the expiration of the automatic renewal term under Section I.B."

HITN committed the spectrum and it committed the spectrum capacity in the time period during which, if it was to make such a commitment, it was obligated to give NAC a right of first refusal. If given the opportunity to conduct discovery, NAC expects to prove that HITN knew perfectly well that it was making, and intended to make, a future commitment of the DC Spectrum during the ROFR Period. Incidentally, HITN's recent transfer of the DC Spectrum

rights and the proposed lease of those rights to Clearwire shows that this is precisely what is now happening. *See* Second Amended and Supplemental Complaint attached to the Motion as Exhibit A.

iv.     **The Court relies upon impermissible findings of fact that either HITN or NAC intended a particular interpretation of the Lease.**

"[I]n resolving a Rule 12(b)(6) motion, the court must treat the complaint's factual allegations—including mixed questions of law and fact—as true and draw all reasonable inferences therefrom in the plaintiff's favor." *Potts v. Howard Univ.*, No. Civ. A 04-1856, 2007 WL 15925 *1, *2 (D.D.C. Jan. 4, 2007). In ruling on a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, "the truth of the allegations in the complaint is assumed Arguendo [sic], and the Court is to make no finding of fact upon any disputed issue of fact." *DeFrank v. Pawlosky*, 480, F.Supp. 115, 116 (D.C. Pa. 1979). It is impermissible for a court to make factual findings when deciding a Rule 12(b)(6) motion. *See Roth v. Jennings*, 489 F.3d 499, 515 (2nd Cir. 2007).

Here, the Court impermissibly found that "HITN did not negotiate with a third party to lease excess spectrum capacity for any period between February 21, 2005, and February 21, 2007." Dkt. #18 at p. 9. Based on this finding, the Court concluded that "NAC's right of first refusal was never triggered." *Id.* But the Court's finding ignores NAC's allegations that, at least as early as November 13, 2003, HITN and Clearwire began negotiating and entering into a complex series of agreements under which HITN became bound to lease its excess spectrum capacity, including the DC Spectrum, exclusively to Clearwire. The MRUA on its own constitutes "an agreement to lease excess capacity," including the DC Spectrum, on very specific terms. There is no doubt that HITN and Clearwire negotiated and entered into a series of lease

16

agreements that "commence[d] ... within two years after the expiration of the automatic renewal term under Section I.B."

In addition, implicit in the Order is the Court's finding that either HITN, GWU, ENET, or NAC intended a particular interpretation of the Lease. The only evidence regarding the parties' intent must be gleaned from the First Amended Complaint, and all reasonable inferences to be drawn from its allegations must be drawn in NAC's favor. Accordingly, the Court made an impermissible finding as to the parties' intent in granting HITN's Motion to Dismiss.

> v.  **The facts included in the Order and relied upon by the Court were taken from outside the pleadings, do not present a complete picture, and resulted in a fundamental misunderstanding of the subject matter and circumstances surrounding this dispute.**

Days before HITN purchased the spectrum license from GWU in 2005, Clearwire and HITN entered into a Spectrum Access and Loan Facility Agreement which provided for Clearwire's financing of the GWU spectrum acquisition. *See* Dkt. #9 at ¶¶ 30 and 43. This agreement also obligated HITN to make the DC Spectrum exclusively available to Clearwire. *Id.* at ¶ 34. Shortly thereafter, HITN formed HITN-Washington D.C. D, L.L.C. *Id.* at ¶ 32. Clearwire gained a security interest in all of HITN-Washington D.C. D, L.L.C.'s property. *Id.* at ¶ 33. There is little doubt that Clearwire paid HITN for the DC Spectrum on the front end so Clearwire would have exclusive access to the DC Spectrum later on. This is evidence of "an agreement to lease" the DC Spectrum occurring well within the ROFR period.

Additionally, less than 24 hours after this Court issued its Memorandum Opinion and its Order granting HITN's Motion to Dismiss, HITN transferred the spectrum license to HITN-Washington D.C. D, L.L.C. *See* Exhibit B at ¶ 4. The following day HITN-Washington D.C. D, L.L.C. sought permission from the FCC to enter into a long term lease with Clearwire for the DC

Spectrum. *Id.* at ¶ 5. This is precisely what NAC predicted and alleged would happen in the First Amended Complaint.

In granting HITN's motion to dismiss, the Court made a factual finding to the effect that NAC is motivated to either "control the spectrum" or tie it up for competitive reasons. *See* Dkt. # 18 at p. 5. NAC respectfully suggests this finding arose through a misunderstanding of the purpose of the ROFR in a spectrum lease. Stated simply, the purpose of the ROFR (and this lawsuit to enforce it) is to ensure that NAC gets the benefit of its bargain and the opportunity to match Clearwire's "under the table" deal with HITN.

The Memorandum Opinion states that "... NAC has never used any of the contested spectrum for actual broadcasting and it lies fallow even yet ... [and] NAC's interest in leasing the spectrum ... was to control the asset ...." Dkt. #18 at p. 5. This factual finding reveals a fundamental misunderstanding of the purpose and, indeed, need for preemptive rights in spectrum leases. The DC Spectrum is no more "lying fallow" than is development property in a central city that is planned for construction, but on which construction has not yet been completed. Careful long term planning is required to ensure that the foundation is stable and will support the subsequent development or build out. NAC's parent corporation has announced plans for the nationwide deployment of wireless services using the type of spectrum at issue here, which may include the DC Spectrum, if NAC has access to it.

ROFRs are critical in this context because they allow the telecommunications company an opportunity to continue its access to the subject property at the end of the lease term—at a price set by the market—which is necessary for long term strategic planning, be it real property or spectrum. The key purpose of the ROFRs in spectrum leases is that they allow the holder to let the market—in the form of other bidders—set the baseline price, as opposed to letting the

spectrum holder demand an exorbitant price bearing no relationship to market realities. The Clearwire Offer, including the MRUA, sets forth the current baseline price for the DC Spectrum, but the Clearwire Offer was never presented to NAC. NAC should have been afforded the opportunity to match or decide to pass on Clearwire's bona fide offer for the DC Spectrum during the ROFR Period. But NAC did not get the opportunity it bargained for.

The Court also mischaracterizes the practical effect of a limited spectrum ROFR. *See* Dkt. #18 at p. 8 ("Carried to its logical conclusion, NAC's argument would lead to absurd results"). NAC's interpretation of the ROFR does not provide NAC the ability to "tie up" the DC Spectrum into perpetuity as the Order suggests. Far from it. Rather, NAC simply has the right to match any offers received by HITN before the end of the ROFR Period on February 21, 2007.

In the hypothetical and highly unlikely event that HITN received an offer during the ROFR Period for a lease to commence in 2050, NAC would have the right to match that offer. NAC acknowledges that if HITN received the very same offer on February 22, 2007 (one day after the ROFR Period), NAC would not have the right to match the offer and HITN would be free to enter into the hypothetical deal without NAC's involvement. There is nothing absurd or even uncommon about the practical application of this common preemptive right embodied in the ROFR (and the commonness or absurdity of such a deal by industry standards is, at minimum, an issue NAC should be allowed to prove with evidence—not one the Court should assume without giving NAC an opportunity to take discovery and present evidence).

**C.    The Court Improperly Converted HITN's Motion to Dismiss to a Motion for Summary Judgment Without Giving NAC Notice and an Opportunity to Present Evidence.**

The Order demonstrates the inherent dangers of considering unsubstantiated facts outside of the Complaint in the Rule 12(b)(6) context.  Rather than treating the allegations in the Complaint as true and giving plaintiff all reasonable inferences, the Court considered and relied on the factual assertions contained in HITN's briefing and presented by HITN's counsel during the hearing.  For example, the Court specifically relies on HITN's counsel Rudy Geist's "factual" assertion at the hearing that HITN had sat by and allowed the spectrum to "lie fallow" waiting for the ROFR to lapse before it could think about anything with respect to the spectrum in the Order.  *See* Dkt. #18 at p. 5; Exibit B at p. 31:1-10.  NAC asserts that these factual assertions are untrue, and that HITN's actions show a very different set of facts.[7/]

Moreover, not only are HITN's "factual" assertions not facts (they are actually contested issues), but they are not contained in the First Amended Complaint – the only pleading filed in this case – and are, therefore "outside the pleadings."  Where the Court relies on matter outside the pleadings, FED. R. CIV. P. 12(b) requires that the motion be converted to one for summary judgment under FED. R. CIV. P. 56, entitling the parties to notice and an opportunity to supplement the record with evidence on those issues.  *See Butler v. Fairbanks*, No. Civ.A.04-0367 (RMU), 2005 WL 5108537, at *3 (D.D.C. Jan. 2, 2005)("To provide a meaningful opportunity to present additional material, the court must notify the parties of the conversion and allow them an opportunity to supplement the record").  But the Court did not provide NAC notice and an opportunity to present such evidence.  Accordingly, to the extent the Court did so,

---

[7/]*See also* Geist Ltr attached to First Amended Complaint, Dkt. #4, as Ex. D.  When NAC asked HITN to comply with the ROFR, Mr. Geist replied that, "*there is no chance that the [DC Spectrum] can or would ever be leased to Clearwire under the MRUA ....*"  Because of HITN's actions in the two days immediately following the issuance of the Order, we now know this is not true.

its conversion of the motion from a motion to dismiss to a motion for summary judgment was improper. *See Athridge v. Rivas*, 141 F.3d 357 (D.D.C. 1998)(a district court's authority to enter summary judgment *sua sponte* may only be exercised where the losing party was on notice that it had to come forward with all of its evidence).

**D.      The Court Should Vacate, Alter or Amend the Judgment and Grant NAC Leave to File the Second Amended and Supplemental Complaint.**

"[O]nce a final judgment has been entered, a court cannot permit an amendment unless the plaintiff 'first satisfy[ies] Rule 59(e)'s more stringent standard' for setting aside that judgment." *Ciralsky v. CIA*, 355 F.3d 661, 673 (D.C. Cir. 2004). After a district court dismisses a complaint, a plaintiff can only amend its complaint by filing a Rule 59(e) motion to alter or amend the judgment combined with a Rule 15(a) motion requesting leave of court to amend the complaint. *See Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996). Consistent with the liberal policies underlying FED. R. CIV. P. 15, the Court should vacate, alter or amend the Order, and grant NAC leave to file the Second Amended and Supplemental Complaint in the form attached to the Motion as Exhibit A.

Rule 15 of the Federal Rules of Civil Procedure provides, in relevant part, as follows:

> … [A] party may amend the party's pleading only by leave of court or by written consent of the adverse party; ***and leave shall be freely given when justice so requires.***

FED. R. CIV. P. 15(a)(emphasis added). "[T]he court may … permit the party so serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." FED. R. CIV. P. 15(d). "Under the law of this circuit, FED. R. CIV. P. 15 is "to be construed liberally." *Belizan v. Hershon*, 434 F.3d

579, 582, (D.C. Cir., 2006). In *Foman v. Davis,* 371 U.S. 178, 182 (1962), the Supreme Court stated:

> In the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party ... the leave sought should ... be freely given.

*Quoted in Belizan*, 43 F.2d at 582. The liberal standards allowing amended pleadings reflect the strong federal policy emphasizing the desirability of reducing multiplicity of litigation by submitting as many of the claims between parties as possible to be settled in one action. *See* 6A Charles Alan Wright et al., Federal Practice and Procedure, § 1506 (2d. Ed. 1990).

In *Foman v. Davis*, the Supreme Court identified four factors relevant to whether an amended pleading is appropriate: (1) futility of the amendment; (2) bad faith or dilatory motive; (3) prejudice to the opposing party; and (4) undue delay. 371 U.S. at 182. In this case, it is apparent that the Second Amended and Supplemental Complaint satisfies the *Foman* factors.

First, although, as demonstrated in Sections II.A. and II.B. above, the First Amended Complaint states a claim for breach of contract against HITN, the Second Amended and Supplemental Complaint sets out additional factual allegations that occurred since the filing of the First Amended Complaint, including HITN's post Order assignment of the DC Spectrum, and the subsequent lease of the DC Spectrum to Clearwire. In addition, the Second Amended and Supplemental Complaint sets out clearly defined, separate counts for each of HITN's alleged breaches of the Lease. These additional factual allegations and clearly defined separate counts support and advance NAC's claims. Therefore, the proposed amendment would not be futile.

Second, the Second Amended and Supplemental Complaint is not offered in bad faith or for dilatory motive. Third, the additional facts are highly relevant, and further support and clearly define NAC's allegations of HITN's breaches of contract, and will not unnecessarily delay these proceedings.

Finally, vacating, altering or amending the judgment to allow NAC leave to file the Second Amended and Supplemental Complaint will not subject HITN to undue prejudice. With the filing of the original Complaint, HITN became aware of NAC's allegations that HITN breached its contract with NAC and that HITN and Clearwire were engaged in questionable transactions, the purpose or effect of which was to avoid or frustrate NAC's contractual rights. The additional facts pleaded in the Second Amended and Supplemental Complaint simply present a more complete picture of those relations and the effect they had upon NAC's ability to exercise its bargained for rights.

### III.  CONCLUSION

For the above and foregoing reasons, the Court should vacate, alter or amend the Order, deny the Motion to Dismiss, and grant NAC leave to file the Second Amended and Supplemental Complaint.

Respectfully submitted,

BRYAN CAVE LLP

  s/ Rodney Page
Rodney F. Page (D.C. Bar #37994)
Stacey Terry Ormsby (D.C. Bar #490995)
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C.  20005-3960
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200

Craig S. O'Dear
James D. Lawrence
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone:  (816) 374-3200
Facsimile:  (816) 374-3300

ATTORNEYS FOR PLAINTIFF

24

## Certificate of Service

I hereby certify that a true and correct copy of the above was caused to be served by ECF, this 13th day of September, 2007, to:

Eunnice H. Eun
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C.  20005-5793

William H. Pratt
Joseph Sreino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

Rudolph J. Geist
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD  20910

ATTORNEYS FOR DEFENDANT


_____ s/ Rodney Page _____
ATTORNEY FOR PLAINTIFF

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NEXTEL SPECTRUM ACQUISITION CORP.,

      Plaintiff,

        v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,
INC.

      Defendant.

Civil Action No.: 1:07-CV-00543-RMC

## SECOND AMENDED COMPLAINT FOR SPECIFIC PERFORMANCE, INJUNCTIVE AND OTHER RELIEF

Plaintiff Nextel Spectrum Acquisition Corp. ("NAC") in support of its Second Amended Complaint against Defendant Hispanic Information and Telecommunications Network, Inc. ("HITN") states as follows:

### INTRODUCTION

1.    This case involves NAC's bargained for contractual right to lease valuable spectrum rights in and around Washington, DC. In early 2005, HITN acquired a Federal Communications Commission ("FCC") license for Educational Broadband Service Station WHG442 (the "License") from George Washington University ("GWU"). At the time HITN acquired the License, the License was subject to an Airtime Royalty Agreement – a lease agreement (as described in more detail below, the "Existing Lease") – that provides NAC with a valid right of first refusal ("ROFR") on any bona fide offer(s) the holder of the License receives for certain spectrum rights ("DC Spectrum Rights"). A true and correct copy of the Existing Lease is attached as Exhibit A. HITN knew of the ROFR when it acquired the License.

2

Nevertheless, HITN committed the DC Spectrum Rights to a third party without informing NAC of the third party's offer, much less affording NAC its contractual right to match that offer. The DC Spectrum Rights are unique; therefore, if HITN is allowed to violate the ROFR and consummate a closing on the third party offer, NAC will suffer irreparable harm that cannot be adequately compensated through money damages. NAC requests that the Court enforce the terms of the ROFR, and order injunctive relief and specific performance.

## PARTIES

2.      NAC is a Delaware corporation with its principal place of business in Reston, Virginia.

3.      Upon information and belief, HITN is a New York corporation with its principal place of business in Brooklyn, New York.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332. Venue is proper under 28 U.S.C. § 1441.

## FACTS

**A.      BACKGROUND**

5.      As used herein, "spectrum" refers to radio frequencies used for the transmission of sound, data and video. The FCC is responsible for administering and allocating spectrum rights used by the private sector, including individuals (e.g., cellular telephones, wireless Internet, garage door openers and computer modems), private organizations (e.g., radio and telephone broadcasters, including but not limited to not-for-profit entities), and public safety and health officials (e.g., police and emergency technicians).

6.     The FCC rules allow certain spectrum to be used by the general public on a non-exclusive basis pursuant to certain parameters without the need for obtaining a specific license. Such spectrum rights are generally referred to as "unlicensed spectrum."

7.     With respect to other spectrum, the FCC grants a specific party the right to use that spectrum on an exclusive basis within a given geographic area pursuant to parameters established by the FCC. Such spectrum rights are generally referred to as "licensed spectrum."

8.     Providers of telecommunications services prefer to use licensed spectrum in deployment of wireless services because the accompanying exclusivity permits the use of licensed spectrum free from interference from other spectrum users, thereby promoting a reliable wireless service offering.

9.     The DC Spectrum Rights at issue in this lawsuit involve the "D Group" channels within the 2.5 GHz band licensed for the Washington D.C. area and designated by call sign WHG442. The "2.5 GHz band" refers to licensed spectrum authorized by the FCC between the frequencies of 2495 MHz and 2690 MHz. The general practice of the FCC is to authorize a maximum of 33 channels in the 2.5 GHz band in any given market. In general, a license for a spectrum in the 2.5 GHz band consists of the right to use one of eight four channel groups, commonly known as the A Group, B Group, C Group, D Group, E Group, F Group and G Group. The remaining five channels are allocated to the H Group (three channels) and to two channels known as BRS1 and BRS2.

10.     The FCC has allocated a portion of the 2.5 GHz band, known as Educational Broadband Service, or "EBS," for licenses issued to educational institutions and certain not-for-profit entities. The remaining portion of the 2.5 GHz band may be licensed to commercial enterprises and is referred to as Broadband Radio Service, or "BRS."

11.     Licensed spectrum is finite within the 2.5 GHz band and the FCC has already licensed nearly all available EBS and BRS spectrum in each market.

12.     Therefore, commercial operators must purchase or lease particular spectrum groupings in a given market to provide wireless services that will be free from interference and otherwise appropriate for commercial operations.

13.     As a consequence, licensed spectrum rights are unique and have significant value to commercial operators.

14.     Commercial operators go to great length and expense in acquiring particular spectrum rights in each market to obtain the optimal mix for providing commercially viable wireless services.

**B.     HITN'S PRIOR DISREGARD FOR SPECTRUM LEASE RIGHTS**

15.     The present dispute is not the first occasion upon which HITN has ignored and violated NAC's affiliates' contractual rights.   HITN has exhibited flagrant contempt and disregard for these contractual rights for a period of years.

16.     On May 14, 1999, HITN and various SpeedChoice entities (each a wholly owned subsidiary of Sprint Nextel and referred to collectively as "SpeedChoice") entered into five Airtime Lease Agreements (the "SpeedChoice Leases") pursuant to which SpeedChoice leased excess capacity of EBS channels licensed to HITN.  The SpeedChoice Leases provide for an automatic renewal of two additional terms of five years each (running through May 14, 2014).

17.     From May 14, 1999 through April 14, 2004, HITN readily accepted 60 consecutive monthly payments without any complaint regarding SpeedChoice's performance under the SpeedChoice Leases.  In fact, on at least two occasions, Rudolph J. Geist, HITN's

attorney, and Jose Rodriguez, HITN's president, confirmed that there were no defaults under the subject leases.

18.     At or around the time of HITN's confirmation that SpeedChoice was performing under the SpeedChoice Leases such that no events of default existed, HITN and Clearwire entered into a predecessor agreement to the MRUA, defined *infra* ("Predecessor Agreement"). Within a few months of entering into the Predecessor Agreement, HITN sent SpeedChoice a notice alleging eight events of defaults ("Alleged Defaults") under the SpeedChoice Leases. The notice failed to delineate which of the Alleged Defaults applied to each specific or any one of the SpeedChoice Leases. This was the first and only default notice HITN ever made under the SpeedChoice Leases.

19.     SpeedChoice was forced to expend significant time and resources to contest the baseless allegations. In 2005, SpeedChoice demanded arbitration under one of the SpeedChoice Leases (the "Phoenix Lease"). After intensive discovery, HITN dropped five of the eight default allegations under the Phoenix Lease on the morning the arbitration hearing commenced.

20.     SpeedChoice prevailed decisively in the arbitration on the remaining default allegations. In fact, SpeedChoice was awarded in excess of $300,000 in attorneys fees and expenses for having to defend HITN's baseless default allegations.

21.     Upon information and belief, HITN attempted termination of the SpeedChoice Leases to enable it to lease the underlying spectrum rights to Clearwire under the Predecessor Agreement or the Clearwire Agreements. Upon further information and belief, HITN was indemnified by Clearwire for its expenses in attempting to destroy SpeedChoice's contractual rights and evade its contractual obligations to SpeedChoice.

**C.     VAST REACH OF THE CLEARWIRE-HITN ET AL. RELATIONSHIP**

22.     HITN and/or certain affiliated entities and Clearwire Corporation and/or its affiliates ("Clearwire") have entered into an extensive web of agreements that requires HITN to tender exclusively to Clearwire use of any available spectrum HITN has or in which it acquires an interest.[1/]   Under numerous Clearwire-HITN agreements (collectively, the "Clearwire Agreements"), HITN has received and continues to receive generous consideration in the form of cash, stock, warrants to purchase Clearwire stock, reimbursement of expenses, registration rights and, in certain circumstances, management rights.

23.     Additionally, ITFS Spectrum Advisors LLC and ITFS Spectrum Consultants LLC, two entities owned, upon information and belief, by HITN's President and Chief Executive Officer, have also received millions of dollars for directing spectrum to Clearwire.

24.     On or about November 13, 2003, Clearwire, under its former name, Flux U.S. Corporation, and HITN entered into a Master Spectrum Acquisition Agreement that designates HITN to act as Clearwire's agent when an EBS license becomes available for purchase and the FCC's rules and regulations require the license to be acquired through a non-profit entity.

25.     On or about November 13, 2003, Clearwire entered into a Warrant Agreement granting ITFS Spectrum Advisors LLC warrants to purchase shares of Clearwire Class A Common Stock after ITFS Spectrum Advisors LLC introduces Clearwire to a situation which results in Clearwire's acquisition of either EBS or BRS channels through a spectrum license purchase, lease or sublease.   Upon information and belief and according to publicly filed

---

[1/]     Certain HITN-Clearwire agreements are discussed in detail *infra* and are collectively referred to as the "Clearwire Agreements."   The subsequently described agreements were recently obtained by NAC, many in redacted format, from Clearwire's January 2007 Form S-1 filing.   In prior disputes between NAC and HITN, HITN has refused to produce documents detailing the HITN-Clearwire relationship. NAC has no way of confirming that the described agreements constitute all relevant agreements between HITN and Clearwire.

documents, ITFS Spectrum Advisors LLC is a for profit entity of which Jose Luis Rodriguez—HITN's Chairman, is an owner.

26.    A November 13, 2003 Registration Rights Agreement also gives HITN piggyback registration rights and limited demand registration rights.

27.    On or about March 16, 2004, Clearwire's Amended and Restated Stockholders Agreement provided HITN, and certain other shareholders, with certain investor protections, as well as restrictions and requirements. Additionally, HITN was granted certain rights not granted to other stockholders, including the right to assign HITN's preemptive rights to another entity under certain circumstances, anti-dilution rights which preclude Clearwire from issuing shares to certain entities unless HITN and ITFS Spectrum Advisors LLC are issued a certain number of additional shares for no consideration. HITN also holds certain drag-along rights, tag-along rights, director designation rights under certain conditions, and board observation rights under other conditions. The Stockholders Agreement further contains restrictions on certain entities' changing the definition of "disinterred director approval" in Clearwire's Certificate of Incorporation without HITN's consent. The Stockholders Agreement terminated upon Clearwire's public offering in March 2007.

28.    On or about March 29, 2004, Clearwire and HITN entered into a Spectrum Option Agreement which provides that Clearwire may lease HITN's excess capacity on pending EBS applications if such FCC applications are granted.

29.    On or about February 1, 2005, ITFS Spectrum Consultants LLC and Clearwire entered into a Spectrum Acquisition Consulting Agreement which provides for ITFS Spectrum Consultants LLC to be paid consideration of cash and warrants to purchase Clearwire's Class A Common Stock in the event Clearwire acquires EBS or BRS channels through either a spectrum license purchase, lease or sublease as a result of ITFS Spectrum Consultants LLC introducing

8

Clearwire to a third party identified by Clearwire, and consummating its execution of a definitive agreement and the closing of an acquisition. Upon information and belief and according to publicly filed documents, ITFS Spectrum Consultants LLC is a for profit entity of which Jose Rodriquez, HITN's Chairman, is an owner.

30.    On or about May 24, 2005, Clearwire, HITN and HITN Spectrum, LLC entered into a Spectrum Access and Loan Facility Agreement ("Loan Agreement") which provides for Clearwire's financing of the acquisition by either HITN Spectrum, LLC ("HITN Spectrum") or its subsidiaries of additional EBS licenses and for HITN to make the commercial capacity of such licenses exclusively available to Clearwire.

31.    Pursuant to the terms of the Loan Agreement, HITN agreed to grant Clearwire a blanket security interest in all assets of HITN Spectrum and/or its subsidiaries as security for any funds Clearwire loans under the Loan Agreement for acquisition of spectrum interests.

32.    On July 8, 2005, HITN formed a subsidiary, HITN-Washington D.C. D, L.L.C.

33.    On October 20, 2005, Clearwire filed a UCC financing statement and evidencing a blanket lien on all of HITN-Washington D.C. D, L.L.C.'s personal property and fixtures.

34.    Pursuant to the Loan Agreement, Clearwire and HITN agreed that the DC Spectrum Rights would be offered exclusively to Clearwire upon certain agreed terms and conditions.

35.    The Loan Agreement further provides that:

"If any Acquired Channel is, at the time of the closing of the applicable Acquisition, subject to a Third-Party Lease which includes Subsequent Lease Rights [including any and all rights of first refusal, rights of negotiation, rights of first offer, options to lease or purchase or other similar rights that may be in existence or come into existence upon the expiration of a Third-Party Lease or otherwise with respect to an Acquired Channel] that survive the closing of the Acquisition, then *HITN, Holdco and Newco agree that during the term of any such Third-Party Lease and/or during the period during which any such Subsequent Lease Rights are in*

> *effect, that neither HITN, Holdco nor Newco will take any action that would trigger the Subsequent Lease Rights or application thereof* to such Acquired Channel without the written consent of Clearwire."

36.    On May 11, 2006, Clearwire filed a Form S-1 preliminary prospectus with the SEC related to a planned initial public offering ("IPO"). Clearwire later withdrew that prospectus and filed a second Form S-1 preliminary prospectus on or about December 19, 2006 (the "Second Form S-1").

37.    On or about January 8, 2007, Clearwire filed an Amendment to the Second Form S-1 which disclosed a number of previously unavailable documents which are purportedly material to Clearwire's planned IPO. Among the newly disclosed agreements is a certain Master Royalty and Use Agreement between Clearwire and HITN dated October 4, 2006 ("MRUA"). A true and correct copy of the MRUA is attached as Exhibit B.

38.    Clearwire's S-1 filings further detail how HITN acts as Clearwire's proxy for spectrum that Clearwire, as a for-profit entity, is unable to acquire directly.

39.    The MRUA provides Clearwire with an "exclusive" right to all of HITN's licensed spectrum, regardless of whether the spectrum is subject to existing lease rights of third parties. See, e.g., MRUA Recitals at 3 (the parties agree that "in securing a source of spectrum capacity for the future and facilitating the branding of the Clearwire mark through the services provided by Licensee in the non-profit community; ... [HITN] desires to make available to Clearwire, and Clearwire desires to have access to, ... any additional Commercial Spectrum Capacity of [HITN] that is accepted by Clearwire and made subject to an [Individual Use Agreement] as provided in this Agreement (the "Future Spectrum Capacity"), all in accordance with the terms of this Agreement.")

40.     The MRUA provides for HITN to grant Clearwire a lease for both its presently and future available spectrum upon particularly defined terms and conditions.

41.     Consistent with the Clearwire Agreements, HITN is contractually obligated under the MRUA to provide all of its licensed spectrum to Clearwire, including the DC Spectrum Rights.  The MRUA states in relevant part as follows:

> (b) Option for Future Spectrum Capacity. Licensee grants Clearwire an option (the "Option") to enter into IUAs with Licensee in respect of any and all spectrum (including, but not limited to, the Commercial Spectrum Capacity, EBS and BRS) ("Spectrum") on FCC Licenses held by Licensee that is Available or **that becomes Available during the Term, at prices to be negotiated in good faith based on the fair market value ("FMV") of such Spectrum at the time the Option is to be exercised, provided, however, that the negotiated price shall not exceed [\*\*\*] per MHz POP.** The Option shall be exercisable in Clearwire's sole discretion each time Spectrum of Licensee or its Affiliates becomes Available during the Term. ...

See Exhibit B (emphasis added).

42.     Upon information and belief obtained from Clearwire's S-1 filing, Clearwire has paid HITN $22.1 million in cash and 2,829,717 shares of Class A Common Stock valued pre-IPO at $12.3 million under the Master Spectrum Acquisition Agreement, the Spectrum Option Agreement, and the individual leases.  With Clearwire's stock now trading at approximately $20 per share, HITN has a post-IPO windfall of in excess of $75,000,000.00.

**D.     THE GWU AIRTIME LEASE AGREEMENT**

43.     On or about February 21, 1995, GWU and Eastern Cable Networks Corporation ("ENET") entered into the Existing Lease pursuant to which ENET leased the DC Spectrum Rights from GWU.

44.     Under Section I.C. of the Existing Lease, the License, and thereby the DC Spectrum Rights, was subject to a ROFR in favor of ENET, which ROFR extended for two years after the expiration of the Existing Lease.

45.     Section I.C. of the Existing Lease states in pertinent part as follows:

11

I.C.     <u>Right of First Refusal</u>.

1.     [NAC] shall have the exclusive right to match the material terms and conditions of any bona fide offer to lease excess capacity from [HITN] during any or all of the period from the expiration of the automatic renewal term under Section I.B. through two years thereafter (the "Right of First Refusal").

2.     If [HITN] desires to enter into an agreement to lease excess capacity that would commence anytime within two years after the expiration of the automatic renewal term under Section I.B., [HITN] must provide written notice to [NAC] at the commencement of any negotiations regarding such lease and must provide written notice to the party with whom it is negotiating of [NAC]'s Right of First Refusal. Such notice must be given one year prior to expiration of the contract.

3.     Within seven (7) days of receiving a bona fide offer to lease excess capacity acceptable to [HITN], [HITN] shall serve [NAC] with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating [HITN]'s intent to accept the offer in the event that [NAC] does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice. [HITN] shall not accept any offer to lease excess capacity that includes terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal. Within thirty (30) days of [NAC]'s receipt of [HITN]'s written notice, [NAC] shall notify [HITN] in writing of its desire to exercise its Right of First Refusal.

4.     In the event that [NAC] refuses to exercise its Right of First Refusal with respect to any offer, and any material term of such offer is subsequently changed, before accepting such changed offer [HITN] must follow the procedures specified in the foregoing subsections, providing [NAC] with notice regarding the revised offer and giving [NAC] the opportunity to exercise its Right of First Refusal with regard thereto.

<u>See</u> Exhibit A, Section I.C.

46.     The ROFR is a material term of the Existing Lease.

47.     In or around 2004, NAC succeeded to ENET's interest in the DC Spectrum Rights under the Existing Lease, including the ROFR set forth in Section I.C.

48.     The Existing Lease expired on February 21, 2005; therefore NAC held a valid and enforceable ROFR through February 21, 2007.

49.     HITN began negotiations with GWU to acquire the DC Spectrum Rights under the License in May 2005.

50.     On June 8, 2005, GWU assigned the License to HITN and HITN thereby acquired the DC Spectrum Rights with full knowledge of, and subject to, the Existing Lease and NAC's ROFR.

51.     The Clearwire Agreements, individually and/or collectively, constitute a bona fide "offer" (the "Clearwire Offer") for the DC Spectrum Rights and triggered NAC's ROFR. The price formula for determining the amount Clearwire will pay for the DC Spectrum Rights has been agreed upon by Clearwire and HITN, as have other material terms.

52.     Under the terms of NAC's ROFR, "[w]ithin seven (7) days of receiving a bona fide offer to lease excess capacity," HITN was required to "serve [NAC] with a written notice containing the material terms and conditions of that offer, identifying the offeror and stating [HITN]'s intent to accept the offer in the event that [NAC] does not elect to match the offer on substantially the same material terms and conditions as those contained in the notice."

53.     HITN has never provided NAC with notification of the Clearwire Offer, in violation of NAC's ROFR.

54.     NAC learned of the Clearwire Offer shortly after Clearwire filed its S-1 exhibits in mid-January 2007.

55.     NAC promptly reviewed all of the documents it could obtain regarding the Clearwire Offer and determined that its ROFR was triggered.

56.     In a February 19, 2007 letter sent to HITN via electronic transmission, NAC requested that HITN provide NAC with all of the terms, conditions and information that HITN was required to deliver to NAC under the ROFR. A true and correct copy of NAC's February 19, 2007 letter is attached as Exhibit C.

57.     In a February 20, 2007 letter from its counsel Rudolph J. Geist, HITN refused to honor NAC's ROFR. HITN asserted that it had not received any bona fide offer for the DC

13

Spectrum Rights, and that NAC's ROFR had not been triggered. HITN further asserted that "[t]here is no chance that the [DC Spectrum Rights] can or would ever be leased to Clearwire under the MRUA." A true and correct copy of Mr. Geist's February 20, 2007 letter is attached as Exhibit D.

58.    Whether by written agreement, oral agreement, or the complex contractual and financial arrangements between and among them, HITN is obligated to offer all of its spectrum interests, including the DC Spectrum Rights, to Clearwire. Specifically, upon information and belief, pursuant to the Clearwire Agreements, Clearwire and HITN had, during the ROFR period, contractually committed to close on their pending deal for the DC Spectrum Rights albeit at a later date.

59.    In 2006, a Clearwire representative confirmed to NAC Clearwire's and HITN's intent to close their deal for the DC Spectrum Rights after NAC's ROFR expired, by declaring that Clearwire was "waiting out" NAC's ROFR before Clearwire and HITN closed on a lease agreement for the DC Spectrum Rights. This comment confirmed, if there was any doubt, that Clearwire already had, prior to that time, and during the ROFR period, an "agreement to lease" the DC Spectrum Rights from HITN.

60.    Pursuant to its obligation to offer all of its spectrum interests to Clearwire, and despite its February 20, 2007 assertions to the contrary, on or about August 30, 2007, HITN assigned the DC Spectrum Rights to HITN – Washington D.C. D, LLC, which requested FCC approval to enter into a new long-term lease of the DC Spectrum Rights to Clearwire on or about August 31, 2007 (the "Clearwire Lease").

61.    Section I.C.3 of the Existing Lease's ROFR prohibits HITN from accepting any offer to lease excess spectrum capacity when any such offer "includes terms or conditions that

have the *purpose or the effect of preventing [NAC] from exercising its Right of First Refusal.*" Exhibit A, Section I.C.3 (emphasis added).

62.     The Clearwire Offer, which – despite HITN's February 20, 2007 assertions that "[t]here is no chance that the [DC Spectrum Rights] can or would ever be leased to Clearwire under the MRU" – culminated in the Clearwire Lease, constitutes HITN's and Clearwire's attempt to circumvent NAC's ROFR, in violation of Section I.C.3 of the Existing Lease.

63.     HITN's obligation to offer all of its spectrum interests, including the DC Spectrum Rights, to Clearwire, which obligation led to the Clearwire Lease, constitutes a violation of NAC's ROFR.

64.     To protect NAC's rights and to preserve the status quo, during the pendency of this lawsuit, but in no event longer than 30 days after HITN provides written notice of all material terms and conditions of the Clearwire Offer, HITN should be enjoined from closing on the Clearwire Offer or otherwise transferring the DC Spectrum Rights. This relief is necessary to allow NAC a reasonable amount of time to decide whether to match the Clearwire Offer.

65.     This requested injunctive relief would not harm HITN. Under the Clearwire Agreements, including but not limited to the MRUA, HITN is obligated to provide the DC Spectrum Rights to Clearwire and only Clearwire. Enjoining this transaction for a brief period of time is quite reasonable under the circumstances. On the other hand, in the absence of an injunction, NAC would suffer irreparable harm because it would be denied access to a unique asset in violation of the Existing Lease. Furthermore, it would be much more difficult for the parties to unwind the Clearwire transaction after the fact.

## COUNT I—BREACH OF CONTRACT
### FAILURE TO NOTIFY

66.    NAC incorporates paragraphs 1 through 65 as if set forth fully herein.

67.    HITN and NAC are bound by the Existing Lease for the DC Spectrum Rights.

68.    NAC has performed in compliance with the Existing Lease.

69.    Under the Existing Lease, NAC has a ROFR on any bona fide offer HITN received for the DC Spectrum Rights on or prior to February 21, 2007.

70.    Under the terms of NAC's ROFR, HITN was required to serve NAC with written notice of the material terms and conditions of any bona fide offer for the DC Spectrum Rights.

71.    The Clearwire Offer constituted a bona fide offer for the DC Spectrum Rights that HITN accepted and that was received prior to February 21, 2007.

72.    HITN never provided NAC with notice of the Clearwire Offer.

73.    HITN breached and continues to breach the Existing Lease by, among other things, failing to provide NAC with written notice of all of the material terms and conditions of the Clearwire Offer for the DC Spectrum Rights.

74.    NAC has no adequate remedy at law to address HITN's ongoing and threatened future breaches of its obligations under the Existing Lease.

75.    The actual and threatened harm to NAC is immediate in that, upon FCC approval of the Clearwire Lease, HITN intends to transfer the DC Spectrum Rights to Clearwire in derogation of NAC's ROFR.

76.    Unless enjoined, the transfer of the DC Spectrum Rights to Clearwire will cause substantial, immediate and irreparable injury to NAC – including, but not limited to, the lost opportunity to acquire licensed spectrum rights that are unique, finite and have substantial value in the commercial market place.

77.    Many of the Clearwire Agreements are redacted and therefore set forth only some of the material terms and conditions of the Clearwire Offer.

78.    NAC is attempting to evaluate whether to match the Clearwire Offer based on the incomplete information presently available to it; however, the incomplete nature of the presently known information makes this task onerous.

79.    HITN should be required to specifically perform under Section I.C. of the Existing Lease by providing written notice of all of the material terms of the Clearwire Offer which would trigger the contractually provided 30 days for NAC to match the Clearwire Offer.

## COUNT II—BREACH OF CONTRACT
## WRONGFUL ACCEPTANCE OF OFFER TO LEASE

80.    NAC incorporates paragraphs 1 through 79 as if set forth fully herein.

81.    HITN and NAC are bound by the Existing Lease for the DC Spectrum Rights.

82.    NAC has performed in compliance with the Existing Lease.

83.    Under the Existing Lease, NAC has a ROFR on any bona fide offer HITN received for the DC Spectrum Rights on or prior to February 21, 2007 that, among other things, prohibits HITN from accepting any offer to lease excess spectrum capacity that contains terms or conditions that have the purpose or effect of preventing NAC from exercising its ROFR.

84.    The terms and conditions of the Clearwire Offer had the purpose and/or effect of preventing NAC from exercising its ROFR.

85.    HITN breached the Existing Lease by accepting the Clearwire Offer.

86.    Due to the unique nature of spectrum rights, NAC has no adequate remedy at law to address HITN's breach of the Existing Lease.

87.    The actual and threatened harm to NAC is immediate in that, upon FCC approval of the Clearwire Lease, HITN intends to transfer the DC Spectrum Rights to Clearwire in violation of NAC's ROFR.

88.    Unless enjoined, the transfer of the DC Spectrum Rights to Clearwire will cause substantial, immediate and irreparable injury to NAC – including, but not limited to, the lost opportunity to acquire licensed spectrum rights that are unique, finite and have substantial value in the commercial market place.

89.    HITN should be required to specifically perform under Section I.C. of the Existing Lease by providing written notice of all of the material terms of the Clearwire Offer which would trigger the contractually provided 30 days for NAC to match the Clearwire Offer.

## COUNT III—BREACH OF CONTRACT
## COVENANT OF GOOD FAITH AND FAIR DEALING

90.    NAC incorporates paragraphs 1 through 89 as if set forth fully herein.

91.    HITN and NAC are bound by the Existing Lease for the DC Spectrum Rights.

92.    NAC has performed in compliance with the Existing Lease.

93.    Under the Existing Lease, NAC possesses a bargained for contractual right to lease the DC Spectrum Rights, including its valid ROFR, which provided NAC, among other things, the right to be notified by HITN of any bona fide offer to lease its excess spectrum capacity, including the DC Spectrum Rights, made during the ROFR period, and the right to match the material terms and conditions of any such bona fide offer.

94.    NAC's bargained for ROFR further prohibits HITN from accepting any offer to lease its excess spectrum capacity, including the DC Spectrum Rights, that includes terms and conditions having the purpose or effect of preventing NAC from exercising its ROFR.

95.    Through the Clearwire Agreements, Clearwire Offer, and despite its February 20, 2007 assertions to the contrary, the Clearwire Lease, HITN engaged in subterfuge and bad faith conduct, the effect of which was to evade the spirit of, and interfere with NAC's ability to exercise its bargained for rights under, the Existing Lease and the ROFR.

96.    Through the Clearwire Agreements, Clearwire Offer, and and despite its February 20, 2007 assertions to the contrary, the Clearwire Lease, HITN engaged in conduct that had or will have the effect of destroying or injuring NAC's right to receive the benefits of its ROFR – the bargained for fruits of the Existing Lease.

97.    Through the Clearwire Agreements, Clearwire Offer, and despite its February 20, 2007 assertions to the contrary, the Clearwire Lease, HITN acted in a manner that is inconsistent with NAC's justified expectations under the Existing Lease and the ROFR.

98.    HITN breached the covenant of good faith and fair dealing implied in the Existing Lease.

99.    Due to the unique nature of spectrum rights, NAC has no adequate remedy at law to address HITN's breach.

100.    The actual and threatened harm to NAC is immediate in that, upon FCC approval of the Clearwire Lease, HITN intends to transfer the DC Spectrum Rights to Clearwire in violation of NAC's bargained for contractual rights.

101.    Unless enjoined, the transfer of the DC Spectrum Rights to Clearwire will cause substantial, immediate and irreparable injury to NAC – including, but not limited to, the lost opportunity to acquire licensed spectrum rights that are unique, finite and have substantial value in the commercial market place.

102.    HITN should be required to specifically perform under Section I.C. of the Existing Lease by providing written notice of all of the material terms of the Clearwire Offer which would trigger the contractually provided 30 days for NAC to match the Clearwire Offer.

WHEREFORE, NAC requests that the Court enter a judgment in its favor on Counts I, II, and III of the Second Amended Complaint and further requests an Order:

(a)    Enjoining, restraining and prohibiting HITN, together with its agents, servants, employees, and those persons in active concert or participation with it, from transferring, leasing, and/or assigning the DC Spectrum Rights and/or any interest in the DC Spectrum Rights during the pendency of this lawsuit, but in no event later than 30 days after HITN provides written notice of all material terms and conditions of the Clearwire Offer;

(b)    Requiring HITN to specifically perform under the Existing Lease by providing written notice to NAC of all of the material terms and conditions of the Clearwire Offer; and

(c)    Awarding NAC, as the prevailing party, all expenses incurred herein, including reasonable attorneys' fees.

20

Respectfully submitted,

BRYAN CAVE LLP

  s/ Rodney Page
Rodney F. Page (D.C. Bar #37994)
Stacey Ormsby (D.C. Bar #490995)
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C.  20005-3960
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200

Craig S. O'Dear
James D. Lawrence
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone:  (816) 374-3200
Facsimile:  (816) 374-3300

ATTORNEYS FOR PLAINTIFF

21

**Certificate of Service**

I hereby certify that a true and correct copy of the above was caused to be served by ECF, this 13th day of September, 2007, to:

Eunnice H. Eun
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C.  20005-5793

William H. Pratt
Joseph Sreino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY  10022-4611

Rudolph J. Geist
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD  20910

ATTORNEYS FOR DEFENDANT


_____s/ Rodney Page_____
ATTORNEY FOR PLAINTIFF

# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
NEXTEL SPECTRUM ACQUISITION   :
CORPORATION                   :
              Plaintiff,      :
                              :
        vs.                   :        Docket No. CA 07-543
                              :
HISPANIC INFORMATION AND      :        Washington, D.C.
TELECOMMUNICATIONS NETWORK,   :        Thursday, August 16, 2007
INC.                          :              10:50 a.m.
              Defendants.     :
----------------------------x
```

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE ROSEMARY M. COLLYER
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          RODNEY PAGE, Esquire
                            700 13th St., NW
                            Washington, DC  20005

                            JAMES D. LAWRENCE, Esquire
                            Bryan Cave LLP
                            One Kansas City Place
                            1200 Main Street, Suite 3500
                            Kansas City, mO  64105


For the Defendants:         JOSEPH SERINO, Esquire
                            LAUREN O. CASAZZA, Esquire
                            DAVID R. DEMPSEY, Esquire
                            Kirkland & Ellis LLP
                            656 Fifteenth Street, NW
                            Washington, DC  20005

                            RUDOLPH J. GEIST, Esquire
                            RJGLAW LLC
                            1010 Wayne Avenue Suite 950
                            Silver Spring, MD  20910



Appearances continued:

Court Reporter:                    CRYSTAL M. PILGRIM, RPR
                                   United States District Court
                                   District of Columbia
                                   333 Constitution Avenue, N.W.
                                   Room 4806-A
                                   Washington, DC  20001
                                   (202) 589-1166


Proceedings recorded by machine shorthand, transcript produced
by computer-aided transcription.

1          THE DEPUTY CLERK:  Civil action 07-543, Nextel

2    Spectrum Acquisition Corporation versus Hispanic Information

3    and Telecommunications Network, Incorporated.

4          Rodney Page and James Lawrence for the plaintiff.  For

5    the defense Brian Dempsey, Joseph Serino, Rudolph Geist and

6    Lauren Casazza.

7          THE COURT:  Hi, how is everybody?

8          MR. PAGE:  Good morning, Your Honor.

9          MR. SERINO:  Good morning.

10          THE COURT:  Who is going to speak for Nextel?

11          MR. PAGE:  Your Honor, Rodney Page.

12          THE COURT:  Okay, and who is going to speak for HITN?

13          MR. SERINO:  Joe Serino, Your Honor.

14          THE COURT:  Thank you. It just helps me if I know who

15    the players are.

16          All right.  What we have is a motion to dismiss filed by

17    HITN.  So I guess since it's their motion, you get to speak

18    first.

19          MR. SERINO:  Thank you, Your Honor.  Just to repeat,

20    Your Honor, my name is Joe Serino.

21          I'm here on behalf of the defendant and movant HITN in

22    connection with the motion to dismiss plaintiff's one count

23    complaint for breach of contract.

24          This is a case where HITN leased to the plaintiff the

25    right to use excess spectrum capacity or radio frequencies here

 1    in the Washington D.C. area under a contract known as the Air

 2    Time Royalty Agreement.  Now the thrust of plaintiff's

 3    complaint is that HITN breached a right of first refusal or a

 4    so-called ROFR that the plaintiff had under the Air Time

 5    Royalty Agreement.

 6         Our main argument for dismissal, Your Honor, is that

 7    once the Court settles on the correct and correct proper

 8    interpretation of the ROFR, it becomes clear that the plaintiff

 9    has not and cannot point to any conduct on the part of HITN

10    that violates the contours of that ROFR.

11         And I'd like to begin if I may, Your Honor, with looking

12    at the language of the ROFR, it's in the Air Time Royalty

13    Agreement.

14         THE COURT:  I promise you I've actually read

15    everything.

16         MR. SERINO:  Okay.

17         THE COURT:  This isn't my first time through.

18         MR. SERINO:  Okay.  I had a little water mess up.

19    It's in the Airtime Royalty Agreement on page 2, Your Honor.  A

20    couple of things that I want to make before we delve into the

21    language and that is there is some good news here.

22         The good news is that the parties agree that the ROFR

23    language is unambiguous.  Nobody is arguing that it's

24    ambiguous.  The Court could find otherwise, but the fact that

25    the parties agree that it's unambiguous tells me that the Court

5

1  can decide this as a matter of law.

2       The second piece of good news is that the parties agree

3  that the Air Time Royalty Agreement renewal term expired on

4  February 21, 2005.  And that the ROFR period commenced on

5  February 21, 2005 and ran through February 21, 2007.  That's

6  not a dispute.  The ROFR period was two years ending

7  February 21, '07.

8       Now the dispute comes in as to the scope of the ROFR

9  during that two year period of time.  What kind of things does

10  the ROFR apply to during that two year period of time.  Our

11  position is that a straightforward read of the ROFR language

12  makes clear that the ROFR applies to leases that take place or

13  that occur during that two year period of time, actual leases,

14  that's the Litness test.

15       As I read the plaintiff's opposition paper, and I won't

16  purport to speak for them, but as I read their opposition

17  papers they seem to argue that the ROFR applies not only to

18  leases during that two year period, but also to any offer or

19  commitment that was made during that two year period even if

20  the lease doesn't commence for another 10, 15, 20, 50 years.

21  And I think I can show you, Your Honor, why there's absolutely

22  no support for that read in the Air Time Royalty Agreement.

23       Before I do, I think I should back up a little bit

24  because in some respects the tension between the two

25  interpretations here is irrelevant.  Because I think the fact

1  of the matter is there's no evidence that there was a lease for

2  the D.C. Spectrum during that two year period of time and

3  there's no evidence that there was an offer or commitment to

4  lease the D.C. Spectrum.

5        THE COURT:  Well, I saw that argument in your papers.

6  And I think you're probably safer making the other arguments

7  because it seemed to me that HITN entered into a lease, entered

8  into an agreement with -- is it Clear View?

9        MR. SERINO:  Clearwire.

10       THE COURT:  Clearwire, sorry, that it would lease to

11 Clearwire all of such spectrum as available.  And clearly this

12 spectrum would become available once it was no longer covered

13 by the ROFR.

14       So it seems to me that the argument really has to be

15 that it was, it would take effect outside of the temporal

16 period covered by the ROFR, not that HITN didn't engage in

17 conversations during the period of the ROFR to lease the D.C.

18 Spectrum.  I mean, I just think that's a little too nice.

19       MR. SERINO:  Okay, I can address that later, but I

20 will stick with the main argument.  I appreciate the guidance.

21       The main argument is that the ROFR applies to actual

22 leases that take place during the two year period.  Let me tell

23 you how I get there, Your Honor.

24       If you look at paragraph C 1 it sets forth the scope of

25 the ROFR and it makes clear that the ROFR applies to leases

1  during any or all of the two year period.  It does not say that

2  it applies to offers that are made during any or all of the two

3  year period.  The word made doesn't appear.  It says offers to

4  lease.

5        THE COURT:  Right.

6        MR. SERINO:  Excess capacity from the University

7  during any or all of the two year period.  There are two I

8  think common sense points that make clear that this is a proper

9  construction.

10       The first is that the word lease in C 1 appears after

11 the word offer and before the phrase during any or all of the

12 two year period.  So common sense in the rule of last

13 antecedent tells us that the phrase during any or all of the

14 two year period modifies the term closest to it, lease not

15 options.

16       And the second common sense construction point here is

17 that it makes no sense to talk about an offer being made quote

18 during all of the two year period.  You don't make offers

19 during a period of time.  You can have a lease.  For sure, they

20 could run during all of a two year period, but you don't make

21 offers during all of a two year period.

22       So I think it's clear that the parties intended the

23 scope of the ROFR to apply to leases that take place during the

24 two year period, not offers that are made during the two year

25 period.

1    Let's look at C 2 because C 2 tells the parties what to

2  do if HITN wants to enter into negotiations to lease the D.C.

3  Spectrum during the two year period of time and it supports the

4  interpretation that the ROFR applies to leases that take place

5  during that two year period of time.  The most obvious way is

6  it says, it says that the, this clause pertains to quote a

7  lease that would commence any time within the two years.

8  Couldn't be more clear.  It's talking about a lease that has to

9  start within the two years, not before, not after.  Commence

10 any time within the two years.

11    It also says that HITN must give the plaintiffs at the

12 commencement of any negotiations regarding such lease.  Not any

13 lease, but the kind of lease that commences within the two year

14 period of time.  Then it says that HITN must give notice to the

15 party it's negotiating with about the existence of the ROFR.

16    Then importantly, Your Honor, the last sentence of C 2

17 says that such notice must be given one year prior to the

18 expiration of the contract.

19    Now that supports the interpretation that the contract

20 is concerned with the timing of the lease.  Not the timing of

21 an offer.  Because it says that negotiations for the kinds of

22 leases that could trigger the ROFR; that is, leases that

23 commence in that two year period, those negotiations and the

24 notice that goes with it has to be done at least one year

25 before the contract expires on February 21, 2005, it has to be

1  done by February 21, 2004.

2       Stated differently, the negotiation and the notice that

3  goes with it can't take place during that two year period of

4  time from February of '05 to February of '07 because that's too

5  late under C 2.

6       The next section, Your Honor, C 3 again supports this

7  interpretation because it immediately follows C 2 and it tells

8  the parties what to do if the negotiations that are the subject

9  of C 2 result in or ripen into a bona fide offer that is

10 acceptable to HITN.

11      C 3 says if those negotiations yield a result in HITN

12 quote receiving a bona fide offer to lease that is acceptable

13 to the University or HITN, here's what you do.

14      The reason that's significant, Your Honor, is because we

15 just saw the subject of the negotiations under C 2 is leases

16 that can commence any time within the two year period.  So Your

17 Honor, I think it's clear that when you read --

18           THE COURT:  Can I ask a question?

19           MR. SERINO:  You may, of course.

20           THE COURT:  Does Nextel lease all of the excess

21 capacity that HITN has in the Washington D.C. area?

22           MR. SERINO:  I believe so, Your Honor.

23           THE COURT:  Okay, so there's none other?

24           MR. SERINO:  I believe that's right.

25      I don't know if they lease it right now but they

10

1 certainly did during the, under the Air Time Royalty Agreement.

2          THE COURT:  Well, during this period of time?

3          MR. SERINO:  Yes.

4          THE COURT:  And so what other excess capacity would

5 there have been?  Except to -- I mean, we're talking about the

6 HITN.  I mean, we have to transfer, substitute names as we

7 understand it.

8          MR. SERINO:  Yes.

9          THE COURT:  HITN engaging in negotiations to lease

10 excess capacity.

11          MR. SERINO:  Right.

12          THE COURT:  That excess capacity is the excess

13 capacity on which Nextel was operating?

14          MR. SERINO:  Yes.

15          THE COURT:  So in essence, Nextel had a contract of

16 whatever duration it was, then a two year grace period.  And

17 what it needed to do was reup the contract.

18          MR. SERINO:  Not exactly, not exactly.

19      What happened is that Nextel had the right to use the

20 excess capacity that is the subject of this contract through

21 February of 2005.

22          THE COURT:  Right.

23          MR. SERINO:  Then what the parties negotiated before

24 Nextel or before HITN got into picture.  What the parties

25 negotiated was that if HITN wants to lease to somebody else --

11

1          THE COURT:  Right.

2          MR. SERINO -- beginning on February 21, 2005 through

3    February 21, 2007, it wants to lease that same excess capacity

4    that's the subject of the Air Time Royalty Agreement, well

5    then, Nextel has a right of first refusal on that.

6          THE COURT:  Right.

7          MR. SERINO:  HITN has to carry that over to Nextel

8    and say look, we have got a deal here, you guys can match it.

9          THE COURT:  You can match it.

10         And then if Nextel wanted to continue with the lease

11   past 2007, it needed to use those two years to renegotiate?

12         MR. SERINO:  Correct.  And all bets were off, the

13   parties were free to do what they want.

14         THE COURT:  Were there any negotiations?

15         MR. SERINO:  I don't believe so, Your Honor.  I don't

16   believe so.

17         THE COURT:  Do you know whether Nextel ever

18   approached your client on extending the lease?

19         MR. SERINO:  That I don't know.

20         THE COURT:  Renegotiating the lease?

21         MR. SERINO:  That I don't know.  But I would suspect

22   that the reason there were no negotiations is because HITN

23   never believed that it had a bona fide acceptable offer that

24   triggered the right to go across the street and tell Nextel

25   here is an offer that we're otherwise inclined to accept.

12

1      THE COURT:  Well, except that the problem is, and I
2  have to hear from Nextel, the problem is that Nextel finds
3  itself where it is now.  The two years are gone, it didn't
4  negotiate for a new lease and now what's it suppose to do?
5  It's kind of evaporated.  It's a funny thing to say about radio
6  waives and frequencies.
7      MR. SERINO:  But that's exactly what the deal is,
8  Your Honor.  That's the deal that these big boys, these
9  sophisticated parties signed up for back in 1998 when they sat
10  down and negotiated the deal.  And that's why it is so
11  important that nobody is saying that the language is ambiguous.
12  It is what it is.  It says what it says.  Maybe it's not
13  perfect, maybe it's not ideal, but it's not ambiguous.
14      It pretty much makes it clear that Nextel gets to use
15  this through February 21, 2005.  If HITN gets a lease that's
16  acceptable to them during that two year period, then and only
17  then do they have an offer to match.  That's all the contract
18  gives them.
19      Our point is that event, that lease, an acceptable lease
20  during the period of February 21, '05 through February 21, '07
21  that hasn't happened.  There's no evidence that that's
22  happened.  And that's --
23      THE COURT:  Okay.
24  MR. SERINO:  That's really our point, Your Honor, that
25  the contract is clear, that the key is a lease during the two

1  year period of time, and the record is clear that HITN or

2  Nextel can't point to such a lease that occurred between

3  February 21, '05 and February 21, '07, so the ROFR was never

4  implicated, it was never triggered let alone breached.

5          THE COURT:  Okay, I got it.

6          MR. SERINO:  The only other point I'd like to make,

7  Your Honor, it's a small one, but I think it's worth noting.

8      I note in plaintiff's opposition papers which in all

9  fairness were submitted before the Supreme Court's decision in

10  Bell Atlantic versus Twombly, that the plaintiff relied on the

11  old standard for opposing motions to dismiss and that is that

12  it's HITN's burden to show beyond a doubt that the plaintiff

13  can prove no set of facts in support of its claim that would

14  entitle them to relief.

15      And I would just point out that I'm sure Your Honor is

16  aware that since Twombly that standard has changed.

17          THE COURT:  Actually, you know that's really neat

18  because I already knew that.

19          MR. SERINO:  That's why I said as I'm sure Your Honor

20  is aware.  I would not presume that you didn't.

21      Our point would be that the new standard is plaintiffs

22  have to have sufficient facts to demonstrate the plausibility

23  of their claim.  We believe that HITN has met its burden.  That

24  plaintiff has not brought forth sufficient facts to demonstrate

25  that its claims are plausible and that plaintiff's action

1  should dismissed with prejudice and without leave to replete.

2          THE COURT:  Thank you, sir.

3          MR. SERINO:  Thank you, Your Honor.

4          THE COURT:  Mr. Page.

5          MR. PAGE:  Yes, Your Honor, Rodney Page for the

6  plaintiff.

7          Your Honor, we believe the motion to dismiss is not well

8  taken, it should be denied.  And I will start by pointing out

9  that in its motion to dismiss and in the oral argument the

10 defendant has studiously avoided dealing with a number of the

11 allegations of the first amended complaint itself and has

12 sought to recast the allegations in a manner that the defendant

13 thinks is more susceptible to the motion to dismiss.

14         I want to point out that the first amended complaint

15 actually deals with a number of documents, many of which the

16 plaintiff itself does not have possession of, does not know the

17 terms of but the existence of which have been disclosed by

18 public filings of Clearwire.

19         I call the Court's attention to paragraph 22 of our

20 complaint and to subsequent paragraphs that follow immediately

21 thereafter in which a series of documents are described and

22 there are documents that involve a number of apparently complex

23 financial relationships and contractual commitments between

24 Clearwire and HITN.

25         Now I mention this because in it's motion to dismiss the

1   defendant stated this case can really be decided by reference

2   to two documents only and the two documents were the Air Time

3   Royalty Agreement that has the right of first refusal in it and

4   the MRUA which is the subsequent agreement made by HITN.

5        But in fact, as our complaint alleges there are many

6   other documents that are relevant here.  And in paragraph 49 of

7   the first amended complaint we allege the Clearwire agreements,

8   that's a plural, which refers to a number of documents, more

9   than half dozen, not just these two, individually and/or

10  collectively constitute a bona fide offer for the D.C. Spectrum

11  rights and trigger a right of first refusal.

12       Subsequently in the complaint in paragraph 56 we state

13  and allege whether by written agreement, oral agreement or the

14  parties complex financial arrangements HITN is obligated to

15  offer all of its spectrum interests including the D.C. Spectrum

16  rights to Clearwire.

17       So the --

18       THE COURT:  I agree with that, but and I understand

19  your point which is why I interrupted Mr. Serino earlier.

20       But the question is and it's one of the temporal nature

21  of the right of first refusal and whether or not there's any

22  evidence that HITN leased any spectrum that was on the D.C.

23  Spectrum that your client was using to take effect during that

24  two year period.

25       MR. PAGE:  Right, I understand that that is the issue

16

1  that you focused on.  I do want to address it.  It is our

2  position that this right of first refusal does cover all offers

3  to lease and not merely leases which would commence within the

4  period of the right of first refusal.

5      My point in referring to the other documents is to point

6  out that it's in the context of a much more complicated

7  documentary and financial situation than merely the documents

8  that have been referred to by the defendant.

9      THE COURT:  I understand because you did make that

10  point both in your complaint and in your brief.

11      MR. PAGE:  In the right of first refusal we think

12  there are a series of obligations, and contrary to the argument

13  really of the defendant here, we think that the contractual

14  obligations are perfectly consistent with the theory that we

15  have under the complaint.  I will go through what I think those

16  different obligations are.

17      Paragraph C 1 of the right of first refusal, that's 1 C

18  1 states we think in paragraph one a right to match the

19  material terms and conditions of any bona fide offer to lease

20  and that is not a limited offer.  It is not by its language in

21  that paragraph limited to a lease that begins during the two

22  year period that we're referring to after the expiration of the

23  10 year agreement.

24      Paragraph 2 then deals with what we would consider a

25  subset of the factual variations that might occur.  It is a

1    situation where the University or the licensee, let's say the

2    licensee university then HITN desires to commence negotiations.

3    Note that paragraph two does not actually refer to an offer

4    itself.   It refers to the negotiations that might occur and it

5    envisions the circumstance where the licensee affirmatively

6    seeks to make or to solicit rather an offer.

7        Paragraph three in turn deals with receipt of offers.

8    And we do not know what happened in this circumstance.  We do

9    not know whether Clearwire made an offer or whether HITN

10   initiated and solicited offers but the circumstance covered by

11   paragraphs two and three are two different circumstances.

12       One in which the licensee initiates a solicitation for

13   an offer and then in the paragraph three the receipt of an

14   offer.  And obviously, it could be the case that offers would

15   be received without the University having previously determined

16   that it was seeking offers and soliciting them and commencing

17   negotiations for one.

18       I also want to call your attention, Your Honor, to a

19   sentence in paragraph three itself which in our complaint we

20   allege was an independent obligation of a licensee which has

21   been breached.  That is the next to the last sentence which

22   reads the University shall not accept any offer or -- excuse me

23   -- shall not accept any offer to lease excess capacity that

24   includes terms or conditions that have the purpose or effect of

25   preventing E Net from exercising its right of first refusal

1  unquote.

2      We believe that is yet another independent obligation.

3  It is our allegation in the first amended complaint, completely

4  ignored by the defendant in this motion to dismiss, that the

5  complex series of documents that have been entered into by

6  these parties Clearwire and HITN have done exactly what this

7  sentence prohibits.  I'll give you what we, this is a

8  hypothesis because we haven't seen the document.

9      It is not uncommon if financing is made from one entity

10 to another to acquire licenses that those, that that financing

11 would be secured by some form of collateral which would in

12 effect pledge the ownership of that license to the person

13 financing it.

14     We believe that the documents by their descriptions

15 appear to provide financing from Clearwire to HITN.  If in fact

16 they have done that, they have entered into a situation,

17 entered into contractual agreements which make it irrevocable

18 that Nextel could ever exercise its rights or even protect its

19 right of first refusal.  That is why our allegations go beyond

20 the mere MRUA which is the document of course focused on by the

21 defendant.

22     So it is our view, Your Honor, that our allegations are

23 sufficient even under the standards in the new Supreme Court

24 case which in our view in this circumstance do not require us

25 to plead evidence, nor do they require us to go beyond, you

1  know, what we know at this date which we have already pled.

2          THE COURT:  Well, let me ask you this sort of like

3  the question I asked Mr. Serino.

4      What is your perspective on how this document was

5  suppose to work out in the period between February 2005 and

6  February 2007?  Because February 2007 was coming.

7          MR. PAGE:  Right.

8          THE COURT:  And what did Nextel think was going to

9  happen in February 2007?

10          MR. PAGE:  Your Honor, we believe that first of all,

11  that there was as you suggested a possibility that Nextel

12  itself would in that time period attempt to renegotiate, that's

13  one possibility.  But this is an industry where as we allege in

14  the complaint there is limited spectrum.

15          THE COURT:  Right.

16          MR. PAGE:  It is a competitive environment and where

17  parties often enter into contractual arrangements which for

18  business purposes are designed to preserve access without

19  necessarily being there.  It is, in other words, it's a

20  question of business reasons versus competitors to have access

21  and rights to eventually get to if you want to access.

22      So it is a, this is a unique commodity, it is a

23  regulated commodity.  And because of that there are some

24  complex contractual agreements that the parties in the business

25  will enter into whereby they preserve rights to territories, if

1  you will.

2          THE COURT:  Right.

3          MR. PAGE:  Without necessarily being in those

4  territories, and they do it because they have competitors who

5  are ultimately competing with them for the same kind of

6  business that operates on this kind of spectrum.

7          THE COURT:  My point is that Nextel had full access

8  to the D.C. Spectrum from 1998 as a successor and everything we

9  understand.

10         MR. PAGE:  Yes.

11         THE COURT:  But from 1998 through February of 2007.

12 Now what does Nextel think was suppose to happen during the

13 last two of those years?  Was it just going to sit quietly and

14 not talk to HITN and HITN not talk to them and at the end of

15 2007 you just go your own ways?

16         MR. PAGE:  It had no obligation to initiate into

17 discussions.

18         THE COURT:  No, I understand.

19         MR. PAGE:  Neither did HITN, but what was bargained

20 for was a two year period during which Nextel would be in a

21 position to know about and to match if it had chose offers for

22 that spectrum so that from a competitive standpoint it would

23 know what was going to happen with that spectrum.

24         What happened here, Your Honor, is that apparently, and

25 let me say this, well before the end of this period, well

1  before February, going back apparently we allege the dates of

2  some of these documents going back to 2003, 2004 and 2005, HITN

3  began a series of transactions with Clearwire which we believe

4  have the effect even then of tying up that spectrum of making

5  it impossible for anyone else for example to come in and make

6  an offer during that two year period.  It was firmly committed

7  we think at an early stage.

8       Note that in the MRUA the price for this spectrum is set

9  at quote fair market value and with the procedure for

10 determining that, and an advance payment of $23 million was

11 made to HITN to cover the various spectrums not just the ones

12 in Washington under, that were covered by this MRUA.

13      So you have not only in our view an offer, you have an

14 acceptance.  You have a done deal that was actually wrapped up

15 and completed well before the end of this period and then

16 written so as to say well gee, it really doesn't come into

17 effect until after your right of first refusal has expired and

18 it's only an option on our part.  That's really what was argued

19 in the papers.  That really is, it is simply not true.

20      THE COURT:  Well, let's assume that it's not an

21 option and that it was all tied up.  But it was all tied up for

22 a period after Nextel had this two year right of first refusal.

23      Now if it had been all tied up and Nextel had wanted to

24 negotiate something further, and had run into this ceiling, you

25 can't get there because we've already, we've already leased it

1 out at the end of your two year period, would you have said

2 they violated the contract?

3       MR. PAGE: I think so, Your Honor. And I do think

4 what's at issue here is a right of first refusal which is

5 narrower than what you are addressing. You're addressing an

6 obligation or option for these two parties to have negotiated

7 during that two year period.

8       THE COURT: I'm just trying to figure out what you

9 think in the real world what was suppose to happen? And what

10 you're telling me is that Nextel relied on this language so

11 that it would know what it's competitors were doing in the

12 market place.

13       MR. PAGE: That's a reason, yes.

14       THE COURT: So it just wanted to know who was, who

15 was sniffling around where so-to-speak, forgive me.

16       MR. PAGE: Well, I think that is a reason, yes. And

17 I also think -- that makes it sound as if the right of first

18 refusal is merely a right to receive information.

19       THE COURT: No, no.

20       MR. PAGE: It isn't.

21       THE COURT: No, it's not, it's clearly more than

22 that, I agree with you. That if, if there were an offer either

23 solicited or unsolicited to lease the D.C. Spectrum to any

24 degree within that two year period clearly it would have

25 required HITN to bring that to, to Nextel.

1    So Nextel was continuing its lease by grace during that

2  two year period.  It seems to me that under this agreement,

3  under the fair rights agreement or whatever it's called, Air

4  Time Royalty Agreement, your client no longer had its right to

5  the D.C. Spectrum tied up.

6        MR. PAGE:  Right.

7        THE COURT:  So HITN could have in February of 2005

8  turned around and started talking to somebody at which point if

9  they wanted to shave off some of the spectrum, and you

10  understand the science of this better than I so forgive my

11  clumsy words.  But if they wanted to lease a portion of the

12  spectrum to somebody else during that two year period, you

13  clearly would have been entitled to notice.

14        MR. PAGE:  Yes.

15        THE COURT:  Okay.  So what if in February of 2005

16  they say well, you know, we really, we really can't lease this

17  because if we offer to lease it to somebody else Nextel will

18  just be able to come along and give us the same price and it

19  won't make any difference.  So we'll just let that lie.  But at

20  the end of the two years do they owe you any obligation?

21        MR. PAGE:  At the end of the two years?

22        THE COURT:  Right.

23        MR. PAGE:  After the two years is finished, they were

24  free to solicit offers, receive them and there would have been

25  no, nothing obligated them contractually.

24

1    THE COURT: But I'm still having a problem with the

2    concept that you think that they had to tell you about offers

3    received or solicited during the two year period that would not

4    take effect until afterwards. That's the critical issue I'm

5    struggling with.

6    MR. PAGE: I understand that. Let me address it this

7    way. I think there could be a right of first refusal written

8    in the manner that Mr. Serino suggested. That is, it could

9    have been written to say this only applies to offers to leases

10   that commence before this date. That's not what it says

11   though.

12   We think that the proper interpretation of 1 C 1 is that

13   it applies to offers. The Rollins case that we cited in

14   California is the one that is the closest to cases that we have

15   found of facts of this and it agrees with our interpretation,

16   the right of first refusal with respect to offers applies to

17   offers.

18   If it had been as he suggests more limited in scope,

19   then I think the parties would have said that. I think that

20   the fact that paragraph two contains the limitation of leases

21   that commence within two years actually is pretty good evidence

22   of the intent of the drafters within the scope of the four

23   corners of the document, that paragraph one is a broader

24   obligation.

25   In other words, the way I read this the fact that

1  paragraph two is more limited is support for our position

2  because if -- paragraph one clearly contains the basic

3  obligation of the right of first refusal.  Paragraph two and

4  three and four then deal with what I would say are the

5  mechanics of implementation and they deal with different

6  scenarios and different facts that might occur.

7        Paragraph two is the only place where it is explicit

8  that the coverage of that paragraph deals with leases to

9  commence within two years.  That is not a qualification with

10  respect to paragraph one.  I think it supports our argument as

11  a matter of contract interpretation.

12        THE COURT:  But I don't know, how do you read the

13  last sentence in paragraph two, the one that says such notice

14  must be given one year prior to expiration of the contract?

15        MR. PAGE:  Well, that's an interesting point.  I

16  don't know what it says other than what it says.

17        THE COURT:  Right.

18        MR. PAGE:  The University's negotiations if they're

19  going to start must be in that context.

20        Paragraph three then deals with circumstances of an

21  unsolicited offer it seems to me or I should say it deals with

22  both the circumstance of paragraph two and of an unsolicited

23  offer.  It could deal with either one.

24        But it can't be the case that offers have to start with

25  a process where the University gives a notice.  I mean, offers

1 can be received over the transom and the University says this

2 looks acceptable and within seven days of making that

3 determination it has to give yet another written notice under

4 paragraph three.

5         THE COURT:  What if the HITN were to receive, let's

6 say it sat on its hands assuming that it was going to work out

7 some other deal with you guys, your client, let's assume that

8 very close to the end HITN received an offer from somebody else

9 that was acceptable.

10      Would you say that it needed to notify your client even

11 though within two weeks the period would be over?

12         MR. PAGE:  Yes.  The agreement applies to offers

13 received during the relevant time period.  And that's the

14 wording of paragraph one, that is the way it should be

15 interpreted.

16      So our position in summary, Your Honor, is that is a we

17 think a correct reading of the contract.  We think the scope of

18 the complaint is even a little broader than what's in this

19 first right of refusal because of the obligation of the

20 licensee not to agree to other agreements that prevent us from

21 exercising our right of first refusal.  Based on what we've

22 seen in public filings, we think they've done that.  And we

23 think that we meet the requirements.

24         THE COURT:  In what way did they do that?

25         MR. PAGE:  Well, I mentioned the hypothesis that we

1  read from these other agreements that are described from
2  paragraphs 22 through roughly 29, 30 in that area of the
3  complaint.
4        There a series of agreements between these two parties.
5  They are financial in nature.  They relate to principals of
6  HITN becoming shareholders of Clearwire, they relate to
7  financing by Clearwire.  As I say, a common way of financing
8  would be to tie up the licenses and in effect to put a lien on
9  them in some fashion.
10       We don't know what all of those things are but that goes
11 back a number of years.  We think that actually the MRUA is
12 only one of a number of relevant documents which would show
13 that a deal was made a long time ago, it was an offer, it was
14 accepted and it was paid for already and then the language was
15 written in this way.
16       We have an allegation in the complaint an executive of
17 Clearwire made the point to an executive of Sprint which is now
18 Nextel that, you know, we're simply waiting for the expiration
19 of the time period so that we can take that spectrum.
20       We are back to the question of the ROFR, I understand
21 that, but nonetheless, we think that the deal was made a long
22 time ago.  We have alleged everything that we know about that
23 and we think that meets the burden of the rule.
24       THE COURT:  Thank you.  Mr. Serino.
25       MR. SERINO:  Your Honor, if I may, just less than a

1    handful of rebuttal points.

2        The first one is we heard about all of these other

3    contracts and agreements out there, but with all due respect,

4    it's pure speculation.  We heard about if they may, if indeed

5    they do, but there's not an allegation in the first amended

6    complaint that says that any of those other arrangements

7    between Clearwire and HITN is in fact a lease for the excess

8    spectrum in D.C. that took place between February of '05 and

9    February of '07.

10        It's just not there and that's the kind of sine qua non

11   here to trigger the ROFR.

12        The second point I want to make is counsel talks about the

13   Rollins case from California.  I took a look at that last night

14   and it is interesting because that is a markedly different

15   case.  The language of the ROFR in that case expressly said it

16   triggers upon the lessor forming the intent to sell.  That's

17   how the people wrote that agreement in that case.

18        Here of course as I went through earlier, the people who

19   wrote the agreement said the triggering is a lease that will

20   take place between February of '05 and February of '07.  That's

21   why the Rollins case is so different.

22        The third point I'd like to make is the last sentence

23   in C 2 I think addresses a lot of the question or the primary

24   question Your Honor has been asking.  What did the parties

25   think was going to happen here?

1        The last sentence says if HITN wants to lease this

2   spectrum to somebody else after this agreement expires and

3   during that two year period of time, you got to give Nextel

4   notice at least one year before the agreement expires.  And I

5   think that is the fair warning.  That's the warning that says

6   hey, the agreement is going to expire in 12 months.

7        After 12 months we may do business with somebody else.

8   If you want to get into the game here or you want to try to tie

9   this up for another 15 years now is your time to act.  Now is

10  your time to act.  That's kind of the last free clear chance.

11       And the last point I wanted to make is counsel talks

12  about the language in C 3, about the University not accepting

13  any offer to lease excess capacity.  That would have the

14  purpose or effect of preventing E Net from exercising its right

15  of first refusal.  Again, that's not this case.  Because it

16  presupposes that there was an offer to, an accepted offer for a

17  lease that would otherwise trigger the ROFR.  The kind of lease

18  that would commence between February of '05 and February of

19  '07.  That's not this case.

20       That clause is put in place to say let's say HITN and

21  Clearwire really did do a lease that would commence between

22  February of '05 and February of '07.  It would be no defense to

23  HITN to come into this court and say yeah, we did the lease.

24  But we didn't have to give them notice because notice was

25  futile or they couldn't match or because we had all of these

1   particular terms in there that only Clearwire could deliver,

2   Nextel could never deliver.  That's the kind of conduct that

3   clause is intended to get at, but it presupposes first an

4   acceptable offer to lease during the period of the ROFR.

5          THE COURT:  Well, you know, it's interesting because

6   it seems to me that Nextel reads it as any bona fide offer

7   during any or all of the period.  And you read it as any bona

8   fide offer to lease during any and all of the period.

9          I'm not sure since this is such clear language, I am

10  not sure if you got, I mean, all of these offers would be

11  offers to lease.  Okay.  So why is Nextel not right that any

12  bona fide offer to lease that's received during that two year

13  period has to be shared?

14         MR. SERINO:  Nextel is not right because when you

15  interpret a contract, you can't ignore the body of the

16  contract, the rest of the contract.  You can't ignore C 1 and C

17  2 that make it clear when we're talking about offers to lease

18  excess capacity here, we are talking about leases that would

19  begin during the two year period of time.  That's what C 3

20  means.

21         We're talking about the type -- yeah, sure it talks

22  about an offer to lease.  But it's talking about the type of

23  lease that would begin during the two year period of time.

24  That's the kind of lease that triggers the ROFR.  You can't

25  ignore that and focus on one sentence in C 3 in isolation.

1        The well settled rules of contract construction says we

2  have to give meaning to the entire agreement.  You can't render

3  any terms superfluous or non-existent, so that would be my

4  answer to that, Your Honor.

5        THE COURT:  Thank you.

6       Thank you everybody.  I really appreciate the argument.

7       Did you want to say something else?

8        MR. PAGE:  Your Honor, if I could be allowed one

9  point.

10       THE COURT:  Yes.

11       MR. PAGE:  In the right of first refusal in paragraph

12  C 1, please note that the last part of that paragraph indicates

13  that the right of first refusal in quotation marks is a defined

14  term meaning it's defined in paragraph one.  When it is then

15  referred to in paragraphs two, three and four, it is obviously

16  with reference to paragraph one where the term has already been

17  defined and its not paragraph two that defines it.

18       THE COURT:  I got it.  Thank you.  Thank you

19  everybody.

20       We will be as prompt as we can be.  Could somebody tell

21  me in real life what's happening to the D.C. Spectrum?  Is

22  there -- I mean, do we need a decision within two minutes

23  because all of the Western world is waiting to see whether

24  Nextel has any phone lines?

25       MR. GEIST:  Hi, Your Honor, nothing.

32

1          THE COURT:  Nothing.

2          MR. GEIST:  Nextel neither made an offer nor proposed

3    anything for that spectrum in the two years of the right of

4    first refusal period and it's been sitting lying fallow.

5          THE COURT:  Okay.

6          MR. GEIST:  And HITN for its part has sat and allowed

7    the spectrum to lie fallow waiting for two year first right of

8    refusal period to expire before it could think about anything

9    with the spectrum which it still hasn't done anything.

10         THE COURT:  Okay.

11         MR. GEIST:  Thank you.

12         THE COURT:  Thank you.  Thank you everybody.

13         MR. SERINO:  Thank you, Your Honor.

14         THE COURT:  Nice to see you all.

15         MR. SERINO:  Likewise.

16                            -oOo-

17

18

19

20

21

22

23

24

25

33

CERTIFICATE

1

2        I certify that the foregoing is a true and correct

3  transcript, to the best of my ability, of the above pages, of

4  the stenographic notes provided to me by the United States

5  District Court, of the proceedings taken on the date and time

6  previously stated in the above matter.

7        I further certify that I am neither counsel for, related

8  to, nor employed by any of the parties to the action in which

9  this hearing was taken, and further that I am not financially

10  nor otherwise interested in the outcome of the action.

11

12

13  _____        ___9-4-07___
     Crystal M. Pilgrim, RPR                        Date

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEXTEL SPECTRUM ACQUISITION
CORPORATION,

     Plaintiff,

          v.                             Civil Action No.: 1:07-CV-00543-RMC

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,
INC.

Defendant.

## AFFIDAVIT OF JAMES D. LAWRENCE

STATE OF MISSOURI     )
                            )
COUNTY OF JACKSON    )

I, James D. Lawrence, being first duly sworn and under oath, state as follows:

1.    I am over the age of 18 years, competent to make this Affidavit and make this Affidavit based upon my own personal, first-hand knowledge.

2.    I am an attorney of record for Plaintiff Nextel Spectrum Acquisition Corporation in the above captioned action.

3.    Information about Educational Broadband Service Licenses is publicly available through the Federal Communications Commission's Uniform Licensing System ("ULS") at the FCC's Internet site.

4.    On August 30, 2007, Defendant Hispanic Information and Telecommunications Network, Inc., filed a application to assign Education Broadband Service License WHG442, the spectrum at issue in this action (the "DC Spectrum"), to HITN-Washington D.C. D, LLC.  A true

and correct copy of the ULS Internet page evidencing this application is attached hereto as Exhibit A.

      5.      On August 31, 2007, HITN-Washington D.C. D, LLC applied for FCC approval to enter into a new lease for the DC Spectrum to Clearwire Spectrum Holdings II, LLC, A true and correct copy of the ULS Internet page evidencing this lease application is attached hereto as Exhibit B.

      FURTHER AFFIANT SAYETH NAUGHT.

James D. Lawrence

    Subscribed and sworn to before me this 13th day of September, 2007.

MOLLY A. FORGE
Notary Public - Notary Seal
State of Missouri
Jackson County
My Commission Expires Jan. 21, 2011
Commission # 07451757

Notary Public

2

# EXHIBIT A

Case 1:07-cv-00543-RMC    Document 20-4    Filed 09/13/2007    Page 5 of 9

ULS Application

# 0003159039 - HITN - Washington D.C. D, LLC

| File Number | 0003159039 | Application Status | M - Consummated |
|---|---|---|---|

### General Information

| Application Purpose | AA - Assignment of Authorization | | |
|---|---|---|---|
| Receipt Date | 08/30/2007 | | |
| Entered Date | 08/30/2007 | Action Date | 09/06/2007 |
| Waiver | No | Number of Rules | |
| Attachments | Yes | | |
| Application Fee Exempt | Yes | Waiver/Deferral Fee | |

### Assignor Information

| FRN | 0006620348 | Type | Corporation |
|---|---|---|---|
| Name | Hispanic Information and Telecommunications Network, Inc. ATTN Jose Luis Rodriguez 63 Flushing Avenue, Unit 281 Brooklyn, NY 11205 | | P:(212)966-5660 F:(212)966-5725 E:jlrodriguez@hitn.org |
| Race | | Gender | |
| Ethnicity | | | |

### Assignor Contact Information

| Name | RJGLaw LLC ATTN Rudolph J. Geist 1010 Wayne Avenue, Suite 950 Silver Spring, MD 20910 | P:(301)589-2999 F:(301)589-2644 E:rgeist@rjglawllc.com |
|---|---|---|

### Assignee Information

| FRN | 0006620348 | Type | Limited Liability Company |
|---|---|---|---|
| Name | HITN - Washington D.C. D, LLC ATTN Jose Luis Rodriguez 63 Flushing Avenue, Unit 281 Brooklyn, NY 11205 | | P:(212)966-5660 F:(212)966-5725 E:jlrodriguez@hitn.org |
| Real Party In Interest | Hispanic Information and Telecommunications Network, Inc. | FRN of Real Party in Interest | 0006620348 |
| Race | | Gender | |

Case 1:07-cv-00543-RMC    Document 29-4    Filed 09/13/2007    Page 6 of 9

Ethnicity


**Assignee Contact Information**

| | | |
|---|---|---|
| Name | RJGLaw LLC | P:(301)589-2999 |
| | ATTN Rudolph J. Geist | F:(301)589-2644 |
| | 1010 Wayne Avenue, Suite 950 | E:rgeist@rjglawllc.com |
| | Silver Spring, MD 20910 | |


**Assignee Qualifications and Ownership Information**

**Alien Ownership**
The Applicant answered "No" to each of the Alien Ownership questions.

**Basic Qualifications**
The Applicant answered "No" to each of the Basic Qualification questions.

# EXHIBIT B

ULS Application

# 0003159731 - CLEARWIRE SPECTRUM HOLDINGS II, LLC

| | | | |
|---|---|---|---|
| File Number | 0003159731 | Application Status | 2 - Pending |
| Application Purpose | LN - New Lease | Classification of Lease | *De Facto* Transfer |

## General Information

| | | | |
|---|---|---|---|
| Application Purpose | LN - New Lease | | |
| Receipt Date | 08/31/2007 | | |
| Entered Date | 08/31/2007 | Action Date | 09/01/2007 |
| Waiver | No | Number of Rules | |
| Attachments | Yes | | |
| Application Fee Exempt | Yes | Waiver/Deferral Fee | |

## Licensee Information

| | | | |
|---|---|---|---|
| FRN | 0006620348 | Type | Limited Liability Company |
| Name | HITN - Washington D.C. D, LLC<br>ATTN Jose Luis Rodriguez<br>63 Flushing Avenue, Unit 281<br>Brooklyn, NY 11205 | | P:(212)966-5660<br>F:(212)966-5725<br>E:jlrodriguez@hitn.org |
| Race | | Gender | |
| Ethnicity | | | |

## Licensee Contact Information

| | | | |
|---|---|---|---|
| Name | RJGLaw LLC<br>Rudolph J Geist<br>1010 Wayne Avenue, Suite 950<br>Silver Spring, MD 20910 | | P:(301)589-2999<br>F:(301)589-2644<br>E:rgeist@rjglawllc.com |

## Lessee Information

| | | | |
|---|---|---|---|
| FRN | 0015316904 | Type | Limited Liability Company |
| Name | CLEARWIRE SPECTRUM HOLDINGS II, LLC<br>ATTN NADJA S SODOS-WALLACE<br>815 CONNECTICUT AVENUE, NW, SUITE 610<br>WASHINGTON, DC 20006 | | P:(202)330-4011<br>F:(202)330-4008<br>E:nadja.sodoswallace@clearwire.com |
| Real Party In Interest | Clearwire Corporation | FRN of Real Party in | 0011712635 |

|  | Interest |
| --- | --- |
| Race | Gender |
| Ethnicity |  |

**Lessee Contact Information**

| Name | | |
| --- | --- | --- |
|  | CLEARWIRE CORPORATION | P:(202)330-4011 |
|  | NADJA S SODOS-WALLACE | F:(202)330-4008 |
|  | 815 CONNECTICUT AVENUE, NW, SUITE 610 | E:nadja.sodoswallace@clearwire.com |
|  | WASHINGTON, DC 20006 |  |

**Lessee Qualifications and Ownership Information**

| Radio Service Type |  |
| --- | --- |
| Regulatory Status | Interconnected |

**Alien Ownership**

The Applicant answered "No" to each of the Alien Ownership questions.

**Basic Qualifications**

The Applicant answered "No" to each of the Basic Qualification questions.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NEXTEL SPECTRUM ACQUISITION CORP.,

      Plaintiff,

         v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,
INC.

      Defendant.

Civil Action No.: 1:07-CV-00543-RMC

Judge Rosemary M. Collyer

**[PROPOSED] ORDER ON PLAINTIFF'S MOTION TO VACATE,**
**ALTER OR AMEND JUDGMENT DISMISSING**
**FIRST AMENDED COMPLAINT**

Upon consideration of Plaintiff Nextel Spectrum Acquisition Corp.'s (NAC) Motion to Vacate, Alter or Amend Judgment Dismissing First Amended Complaint, and having duly considered the arguments of all parties concerned, it is hereby ORDERED that Plaintiff's Motion to Vacate, Alter or Amend Judgment Dismissing Plaintiff's First Amended Complaint is GRANTED.

FURTHERMORE, the Court will grant NAC leave to file the Second Amended and Supplemental Complaint in the form attached as Exhibit A to its Motion to Vacate, Alter or Amend Judgment Dismissing First Amended Complaint.

So Ordered this _____ day of _____, 2007.

                                        _____

                                        U.S. District Judge Rosemary M. Collyer