IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

NEXTEL SPECTRUM ACQUISITION CORP.,

    Plaintiff,

      v.

HISPANIC INFORMATION
AND TELECOMMUNICATIONS NETWORK,
INC.,

Defendant.

Civil Action No.: 1:07-CV-00543-RMC

<u>ORAL ARGUMENT REQUESTED</u>

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF ITS
MOTION TO VACATE, ALTER OR AMEND JUDGMENT
<u>DISMISSING FIRST AMENDED COMPLAINT</u>**

In February 2007, HITN stated that "there is no chance that the [DC Spectrum] can or would ever be leased to Clearwire under the MRUA."[1] *See* Feb. 20, 2007, Letter From Rudolph J. Geist to Todd Marshall (attached to First Amended Complaint as Ex. D). But, on August 29, 2007, just 48 hours after the Court granted HITN's motion to dismiss NAC's First Amended Complaint ("Complaint"), HITN did in fact lease the DC Spectrum to Clearwire—on terms that were agreed to in the MRUA and other related documents. NAC's Complaint specifically alleged that HITN entered into a series of complex agreements with Clearwire, including the MRUA and Loan Agreement, as a means to both circumvent NAC's Right of First Refusal ("ROFR") and lease the DC Spectrum to Clearwire. But without discussing or even mentioning

---

[1]    "HITN" refers to Defendant Hispanic Information and Telecommunications Network, Inc. "Clearwire" refers collectively to Clearwire Corporation and Clearwire Spectrum Holdings II, LLC. "NAC" refers to Nextel Spectrum Acquisition Corporation. "Lease" refers to the Airtime Royalty Agreement, dated February 21, 1995, which is binding on NAC and HITN. "MRUA" refers to the Master Royalty and Use Agreement, dated October 4, 2006, which is between HITN and Clearwire. "DC Spectrum" refers to the spectrum rights encumbering the Lease in the Washington, D.C. area. "Loan Agreement" means the Spectrum Access and Loan Facility Agreement referenced in the Complaint.

that theory in the Order, the Court dismissed the Complaint and deprived NAC of the opportunity to prove its allegations that the Clearwire agreements were, in fact, offers to lease excess spectrum capacity that included "terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal."

The net result is that unless the Court's dismissal is vacated or reversed, HITN will have been permitted to negotiate terms, prepay funds, and contractually commit to a future spectrum lease all during the period of time when it was bound to offer NAC a right of first refusal on future spectrum leases. If this maneuvering is permitted, HITN will have gutted the whole purpose and effect of the ROFR. HITN will have eviscerated NAC's bargained-for right (i) to learn whether competitors believed the DC Spectrum had a value during the ROFR period, (ii) to have learned what that value was, and (iii) to have been given an opportunity to accept or reject like terms.

But NAC also bargained for and obtained HITN's contractual obligation not to enter into an agreement that has the "purpose or effect of preventing NAC from exercising its right of first refusal." So, if the Court's current order of dismissal is not vacated, NAC will have been precluded from conducting discovery and ultimately proving to a jury what is now fairly obvious: that the whole objective of the MRUA, the Loan Agreement, and other agreements between HITN and Clearwire was to avoid HITN's obligations to NAC and prevent NAC from exercising its ROFR, while still allowing HITN to commit the DC Spectrum to Clearwire on agreed terms. The Court erred by dismissing the Complaint.

The Court committed additional errors of law in dismissing NAC's Complaint including: (i) incorrectly concluding that NAC agreed that the contract language at issue is "unambiguous" and then making critical rulings based on that false premise; (ii) construing the meaning of

conflicting and unclear provisions of the contract without the aid of evidence or discovery, for that matter, to discern the parties' intent—which led to an incorrect interpretation, and; (iii) relying upon false or misleading factual claims made by HITN.

HITN's opposition would have the Court reject *any* argument for reconsideration if the argument was either (a) made previously or (b) not made previously. In other words, HITN thinks *all* arguments for reconsideration are improper either because they were made before or because they were not made before. HITN's position effectively would eliminate the purpose of Rule 59(e) altogether. But the Supreme Court has not chosen to do that. Rule 59(e) exists for a reason: to allow the Court to reevaluate and reverse its decision before the parties are put to the expense and burden of an appeal or to the costs of an unjust or erroneous ruling. The Court should do so.

The Court erred in entering its Order dismissing NAC's Complaint. Judicial economy and justice will both be served by the Court's reconsideration of the valid arguments showing that error. That is why Rule 59(e) exists at all. The correct result is that the Court's Order of dismissal should be vacated, and NAC should be permitted to proceed with its claims. Rule 59(e) allows that result—it most clearly does not stand in the way of it.

## ARGUMENT

**A.    NAC Should be Given the Opportunity to Prove that HITN's Contractual Relationship with Clearwire had the Purpose or Effect of Preventing NAC From Exercising Its ROFR; Subsequent Events Confirm Those Allegations.**

NAC alleged two distinct breaches against HITN in the Complaint: first, that HITN breached Section I.C.1 of the Lease by refusing to give NAC notice of the offer to lease the spectrum rights defined in the MRUA to Clearwire ("the Clearwire Offer") and second:

> 58.    The ROFR prohibits HITN from accepting any offer to lease excess spectrum capacity when such offer "includes terms or conditions that have the *purpose or the effect of preventing [NAC]*

3

*from exercising its Right of First Refusal.*" Ex. A, at 2 (emphasis added).

59.    The Clearwire Agreements constitute a breach of such provision.

*See* Dkt. #9 at ¶¶ 58-59.

HITN labels the second breach as a mere "practical effect" and dismisses it as only a "new" argument, not an independent claim in the Complaint, despite the fact that no fewer than 27 of the 74 paragraphs in the Complaint address allegations involving this distinct breach. *See* Dkt. #21 at 12. Yet, despite the fact that NAC devoted more than a third of the allegations in the Complaint to this claim, the Court's Memorandum Opinion does not mention, let alone analyze, the sufficiency of the allegations of HITN's second breach.

The Complaint states a claim for HITN's breach of the Lease because the complex financial and contractual arrangements between Clearwire and HITN have the purpose or effect of denying NAC the opportunity to exercise its ROFR. Beginning at paragraph 22 of the Complaint, NAC alleges a complex web of agreements that requires HITN to tender the use of any available spectrum in which it has or will acquire an interest exclusively to Clearwire. *See* Dkt. # 9 at ¶¶ 22-36. In addition, NAC alleges that the relationship memorialized by these agreements began at least as early as November 13, 2003, and continued through at least October 4, 2006. *Id.* at ¶¶ 24-36.

Through the agreements detailed in paragraphs 24 through 39 of the Complaint, HITN obligated itself to offer its excess spectrum rights, including its rights in the DC Spectrum, exclusively to Clearwire. *Id.* Consistent with these agreements, NAC alleges that the MRUA and Loan Agreement obligates HITN to provide all of its licensed spectrum, including the DC Spectrum, to Clearwire. *Id.* at ¶ 40. Further, NAC alleges that, either individually and/or collectively, the agreements between Clearwire and HITN constitute a bona fide offer for the DC

Spectrum. *Id.* at ¶ 49. NAC also alleges that the agreements between Clearwire and HITN demonstrate their attempt to circumvent NAC's ROFR. *Id.* at ¶ 48. Furthermore, NAC alleges that during the ROFR period, HITN and Clearwire contractually committed to close on their pending deal for the DC Spectrum. *Id.* at ¶ 56. Taken as true, and drawing all reasonable inferences in favor of NAC, these allegations state a claim for breach of contract against HITN, even under the pleading standard set out in *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007). But there is more.

Clearwire's own representative confirmed that Clearwire and HITN intended to close on their deal for the DC Spectrum only *after* NAC's ROFR expired. *See* Dkt. # 9 at ¶ 55. Clearwire's representative declared that Clearwire was "waiting out" NAC's ROFR before it closed on the lease agreement with HITN for the DC Spectrum. *See id.* This allegation at minimum supports a reasonable inference in NAC's favor that the purpose of the MRUA—as it relates to the DC Spectrum—was to defeat NAC's ROFR.

Although the Court's Memorandum Opinion did not discuss it—and HITN's Opposition ignores it—there are a number of agreements between HITN and Clearwire that are relevant to this dispute, including, but not limited to, the MRUA and the Loan Agreement. With respect to the Loan Agreement, the Complaint alleges that:

> 30.    On or about May 24, 2005, Clearwire, HITN and HITN Spectrum, LLC entered into [the Loan Agreement] which provides for Clearwire's financing of the acquisition by either HITN Spectrum, LLC ("HITN Spectrum") or its subsidiaries of additional EBS licenses and for HITN to make the commercial capacity of such licenses exclusively available to Clearwire.
>
> ***
>
> 34.    Pursuant to the Loan Agreement, Clearwire and HITN agreed that the DC Spectrum Rights would be offered exclusively to Clearwire upon certain agreed terms and conditions.

Dkt. # 9 at ¶¶ 30-34.  Under the express terms of the Loan Agreement:

> If any Acquired Channel is, at the time of the closing of the applicable Acquisition, subject to a Third-Party Lease which includes Subsequent Lease Rights [including any and all *rights of first refusal*] that survive the closing of the Acquisition, then HITN, Holdco and Newco agree that during the term of any such Third-Party Lease and/or during the period during which any Subsequent Lease Rights are in effect, that neither HITN, Holdco nor Newco will take any action that would trigger the Subsequent Lease Rights or application thereof to such Acquired Channel without the written consent of Clearwire.

Loan Agreement at § 2.5.3.[2/]  Under the Loan Agreement, HITN is obligated to not only lease the DC Spectrum exclusively to Clearwire, but HITN is also obligated not to trigger NAC's ROFR.  As alleged in the Complaint, HITN breached the Lease by accepting an offer (in this case the Loan Agreement) having the purpose and effect of preventing NAC of exercising the ROFR.  The Court erred by not addressing these claims and dismissing the Complaint.

In response to these arguments, HITN contends that NAC seeks "reconsideration in order to prove ... that ROFRs such as the one Nextel believes existed in the [Lease] are 'common' by 'industry standards'" and alleges that this constitutes "evidence that could have been presented before and should be rejected."  *See* Dkt. #21 at 12.  HITN explicates the point: *evidence* of industry standards would be useful in interpreting the Lease.  However, NAC was unable to present evidence because no discovery has yet taken place and HITN filed a Motion to Dismiss, not a Motion for Summary Judgment.  To the extent this Court converted HITN's motion to one for summary judgment, NAC should have been notified and been allowed an opportunity to gather and present evidence in support of its claims.  Moreover, the pleadings sufficiently state a

---

[2/]    The Loan Agreement, incorporated by reference in the Complaint, was attached as exhibit 10.16 to Clearwire's Form S-1 filed on December 19, 2006, and is located at:
http://www.sec.gov/Archives/edgar/data/1285551/000089102006000416/v25599exv10w16.txt.

cause of action for breach of Section I.C.3 of the Lease because NAC specifically alleges that negotiations that occurred between Clearwire and HITN include "terms or conditions that have the purpose or the effect of preventing [NAC] from exercising its Right of First Refusal." *See* Dkt. #9 at ¶¶ 58-59.

HITN also argues that the contract language "preventing [NAC] from exercising its Right of First Refusal" presupposes that the right of first refusal was triggered.  It is a perfectly reasonable and consistent interpretation to read the language to mean that HITN was not permitted to creatively structure a transaction with the purpose and effect of defeating the ROFR. If allowed discovery and an opportunity to be heard, this is exactly what NAC will prove the language was intended to do.  It makes complete sense in light of the purpose of the ROFR and its value to NAC.  The point is that NAC bargained for the right to know what competitors were willing to pay for the DC Spectrum and to test the strength of the market for the DC Spectrum while maintaining the right to match those terms.  That is the benefit HITN and Clearwire took from NAC by constructing a side deal that had the purpose and effect of preventing the exercise of the ROFR.  If permitted to provide evidence on this point, NAC will demonstrate to the Court why and how this was a valuable and important right, and why it is not just a matter of letting the DC Spectrum "lie fallow," as the Court's Order suggests.

**B.     The Court Erred in Concluding that the Parties Agreed the Lease was Unambiguous and in thus Granting the Motion to Dismiss.**

"[C]ourts should be reluctant to dispose summarily of claims involving the interpretation of contracts." *Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 170 (D.C. Cir. 1981).  A dispositive motion should rarely be granted in a breach of contract dispute because the interpretation of the contract is generally a question of fact.  *Id.* at 169 ("The meaning of a contract is, however, usually a question of fact ... [and] discerning contractual intent is a factual

question unless the terms of the contract are wholly unambiguous") (internal citations and quotations omitted). "Where a contract is not 'wholly unambiguous,' the parties have a right under principles of American contract law to present oral testimony and other extrinsic material to aid in its interpretation." *Id.* at 170.

The Memorandum Opinion declares that "the Court agrees with the parties that the plain meaning of the contract is unambiguous." Dkt. #18 at p. 7. *But NAC never agreed that the ROFR's language was unambiguous.* HITN just asserted that, without record support. Now, because the Court adopted HITN's inaccurate and unfair characterization of NAC's position, HITN claims it was *by silence* that NAC agreed the contract language was unambiguous. HITN's argument ignores the whole point of NAC's position. NAC has steadfastly argued that there is an alternative, reasonable interpretation of the contract language. That *is* an argument that the contract is susceptible to different interpretations, and it *is* an argument that the contract is ambiguous. NAC proffered a reasonable alternative interpretation of the contract language. That is the very definition of an ambiguous contract.

Implicitly, HITN would have the Court conclude that in order to argue a contract provision is ambiguous, NAC was obligated to concede that the interpretation HITN placed on the language was a reasonable interpretation. The claim that NAC somehow agreed the contract was unambiguous, while at the same time offering a completely different interpretation of the same contract language, is misguided at best. If the Court views NAC's interpretation of the contract as reasonable (and the Court need not necessarily agree with NAC's interpretation for it to be a reasonable interpretation) then the contract is ambiguous and dismissal was clearly improper. It is plainly inaccurate to say that NAC agreed that the contract language was unambiguous.

### i.    NAC's Proposed Interpretation of the Contract is Reasonable.

In response to NAC's arguments about the interpretation of section I.C.1, HITN largely ignores NAC's point that there are three possible interpretations of the ROFR clause and, without any real analysis, HITN concludes that the Rule of Last Antecedent makes only one interpretation of the section—the one HITN advances, of course—possible.  But the Rule of Last Antecedent, while sometimes helpful, is not a hard and fast rule without exceptions, and its application—whether it applies to the last word ("lease") or to the last phrase ("bona fide offer to lease")—is subject to reasonable argument.   The Supreme Court has explained that the last antecedent rule "is not an absolute and can assuredly be overcome by other indicia of meaning". *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003); *see also*, *Nobelman v. American Sav. Bank*, 508 U.S. 324, 330-31 (1993) (rejecting use of last antecedent rule explaining that using the rule produces a result that "is quite sensible as a matter of grammar. But it is not compelled."); *Merck & Co. v. United States*, 2007 U.S. App. LEXIS 22316, *15 (Fed. Cir. Sept. 19, 2007) ("the last antecedent rule is not an absolute rule", and "the last antecedent rule cannot be applied to render language inconsistent with that with which it is surrounded."), citing *Barnhart*, 540 U.S. at 26.

NAC demonstrated that its interpretation of the ROFR is reasonable, and it cited the Court to *Cobalt Blue Corp. d/b/a Formerly Joe's v. 184 W. 10th Street Corp.*, 580 N.Y.S.2d 240 (N.Y. App. Div. 1992) (reversing summary judgment due to the existence of conflicting, *reasonable* interpretations of a lease's preemptive right) to support this point.  But, rather than offer contrary authority or address NAC's arguments, HITN relies on its own interpretation of the ROFR, and on the fact that NAC's prior similar argument was rejected.  HITN dodges the issue.  Whether NAC's interpretation is more or less reasonable than HITN's or the Court's is not the point.  The point is that, just as it could read the ROFR to mean what HITN and the Court

say it means, a *reasonable* jury could also read the ROFR to mean what NAC says it means. This being the case, the ROFR is ambiguous by definition and it was error for the Court to find otherwise. It is the Court's clear error that compels the granting of NAC's Motion.

Under HITN's interpretation of Section I.C.2, the ROFR only required that HITN notify NAC of its desire to lease any of the DC Spectrum up to "'one year prior to the expiration of the [Lease]'" and "covered only a lease 'that would commence anytime within two years after the expiration of the [Lease's] automatic renewal term.'" Dkt. # 18 at 8. Section I.C.1 and I.C.3, however, specifically incorporate the term "bona fide offer"—a term not found in Section I.C.2—into the ROFR's definition and set out HITN's obligations in the event it received an acceptable bona fide offer from a third-party. Section I.C.3 prohibits HITN from accepting any offer to lease the DC Spectrum having the purpose or effect of circumventing NAC's ROFR. Section I.C.3 does not contain the same one year notice and two year commencement restrictions for offers as Section I.C.2 contains for negotiations. Absent those restrictions, NAC's interpretation of Section I.C.3, that it contemplates any bona fide offer made during the two (2) year ROFR period, even if made *after* the unrelated notice period stated in Section I.C.2, is reasonable. *See Cobalt Blue, supra.* That there are at least 2 reasonable interpretations is all that NAC need demonstrate at this point. And it has.

That NAC's interpretation is reasonable is further supported by reading the provisions of the ROFR together and giving meaning to each. Accepting HITN's recurrent theme, that it did not breach Section I.C.3 because its lease with Clearwire did not commence between February 21, 2005 and February 21, 2007, renders Section I.C.3's prohibitions meaningless. If the two year commencement restriction negates Section I.C.3, HITN could, as it did, accept an offer to lease the DC Spectrum prior to the expiration of NAC's ROFR, so long as the lease did not

appear to commence until after February 21, 2007. If that is the case, there is literally no circumstance under which HITN could ever breach the provision that prohibits it from accepting an offer having the purpose or effect of stripping NAC of its ROFR. This is exactly why ROFRs are used in this context. But, NAC was not given the opportunity to present any evidence on this issue, despite the fact that there are at least 2 reasonable interpretations from which a jury could choose.

NAC's interpretation of the ROFR is reasonable. The ROFR is ambiguous, and the Court committed clear error by finding otherwise.

### ii.    The Clearwire Offer Triggered the ROFR.

HITN's only response to NAC's argument that the Clearwire Offer triggered the ROFR is its mantra that, because it did not commence between February 21, 2005 and February 21, 2007, its lease of the DC Spectrum to Clearwire did not trigger the ROFR. Even if true—and it is not—HITN's position is immaterial. HITN accepted the Clearwire Offer to lease the DC Spectrum during the ROFR period. By doing so, it bound itself to lease its excess spectrum capacity, including the DC Spectrum, exclusively to Clearwire. Clearwire's offer and HITN's acceptance constitutes "an agreement to lease excess capacity," including the DC Spectrum, on very specific terms. In fact, Clearwire prepaid for the DC Spectrum during the ROFR period. *See* Dkt. #9 at ¶ 41.

These agreements were all negotiated and executed between November 2003 and October 2006. There is no question that HITN's obligation to lease the DC Spectrum exclusively to Clearwire "commence[d] ... within two years after the expiration of the automatic renewal term under Section I.B."

The Complaint alleged "that the [MRUA] involves the same Washington, D.C. area spectrum that is the subject of the [Lease], and that the signing of the former agreement on October 4, 2006 triggered Nextel's right of first refusal under its [Lease] with HITN." *See* Dkt #3 at 2.  In its Motion to Dismiss, HITN vehemently denied that the MRUA involved the same Washington, D.C. area spectrum that is the subject of the Lease. *See id.*  HITN also represented to the Court through its Motion to Dismiss and memoranda in support that the MRUA "pointedly does not include the [spectrum inside] the Washington, D.C. area [and] the [MRUA] also specifically excludes spectrum in" Washington D.C., because it is encumbered by NAC's ROFR. *See id.*

We now know that this was false.  HITN—within 48 hours after this Court's order of dismissal—sought FCC approval for its lease of the DC Spectrum to Clearwire.  *See* Dkt. # 20, Mem. at Ex. B.  The irony is inescapable.  HITN now asks this Court to believe that, though "there is no chance that the [DC Spectrum] can or would ever be leased to Clearwire under the MRUA," within 48 hours of the Court's Order, HITN and Clearwire initiated, negotiated, finalized and executed a transfer of the DC Spectrum.  The Court cannot make this leap of faith.  The Complaint alleged that the MRUA was one of a series of contracts and agreements obligating HITN to lease the DC Spectrum to Clearwire.  Clearwire's offer was accepted by HITN, thus triggering NAC's ROFR.

### iii.    The Court's Order Relies Upon Impermissible Findings of Fact that HITN Did Not Negotiate with Clearwire During the ROFR Period.

The Court granted HITN's Motion to Dismiss holding that,

> **HITN did not negotiate with a third party to lease excess capacity for any period between February 21, 2005, and February 21, 2007.  Therefore, NAC's right of first refusal was never triggered.**

Dkt. # 18 at 9. Whether or not HITN "negotiated" with Clearwire is a question of fact. For the purposes of HITN's 12(b)(6) Motion, all facts must be determined from NAC's Complaint. *See United Roasters, Inc. v. Colgate-Palmolive Co.*, 485 F. Supp. 1041, 1043 (E.D.N.C. 1979) (The facts surrounding "what occurred during the negotiation ... of a contract" is an issue of fact for trial); *see also Taxin v. Food Fair Stores, Inc.*, 197 F. Supp. 827, 830 (E.D. Pa. 1961) (disagreement between the parties as to what happened during negotiations creates a genuine issue of material fact).

The Complaint, which must be treated as true with all reasonable inferences drawn in NAC's favor, <u>does not</u> state that HITN did not negotiate with a third party. The Complaint states the exact opposite:

> 31.     Pursuant to the terms of the Loan Agreement, HITN agreed to grant Clearwire a blanket security interest in all assets of HITN Spectrum and/or its subsidiaries as security for any funds Clearwire loans under the Loan Agreement for acquisition of spectrum interests.
>
> 32.     On July 8, 2005, HITN formed a subsidiary, HITN-Washington D.C. D, L.L.C.
>
> 33.     On October 20, 2005, Clearwire filed a UCC financing statement and evidencing a blanket lien on all of HITN-Washington D.C. D, L.L.C.'s personal property and fixtures.
>
> 34.     Pursuant to the Loan Agreement, Clearwire and HITN agreed that the DC Spectrum Rights would be offered exclusively to Clearwire upon certain agreed terms and conditions.

*See, e.g.,* Dkt. #9, ¶¶ 31-34. The Court's improper and incorrect finding of fact regarding whether or not HITN negotiated with Clearwire during the ROFR period constitutes clear error. NAC does not know exactly what terms or time periods were discussed in the negotiations between HITN and Clearwire, but the Court's determination of that factual issue, with no basis in discovery, is improper.

This issue was addressed in great detail in NAC's pending Motion and subsequently ignored in HITN's Opposition. *See* Dkt. #20 at 16-17. HITN did not, and cannot, refute the fact that the Complaint affirmatively alleges that HITN offered the DC Spectrum to Clearwire during the ROFR period. Rather than address NAC's sound basis for relief, HITN cites this critical section of the Order in an unrelated section of its Opposition and conveniently edits out the key impermissible findings. *See* Dkt. #21 at 11 ("It is for this reason that Nextel's assertion that the Court committed error by finding that HITN did not '***lease excess capacity for any period between February 21, 2005, and February 21, 2007***' is wrong") (emphasis added).

This was not oversight. Just as it did with the ROFR language, HITN selectively picks and chooses whatever language helps it avoid NAC's contractual rights. The Court improperly found, without basis, that HITN "did not negotiate" with Clearwire to lease excess capacity for any period between February 21, 2005, and February 21, 2007. NAC alleged the opposite.

Notwithstanding this fact, HITN argues that the Order is based entirely upon the four corners of the Complaint. *See* Dkt. #21 at 15. As set forth above, HITN is wrong. HITN's only other argument that the Court did not rely on facts outside of the Complaint is that spectrum leases are a matter of public record. This argument is wholly irrelevant as to whether or not NAC's Complaint alleged that HITN "negotiated" with Clearwire during the ROFR period. Because the Court relied on inaccurate and procedurally improper factual findings to dismiss the Complaint, NAC's Motion to Alter should be granted.

When the Court relied on evidence outside of the pleadings, it should have converted the Motion to Dismiss into a Motion for Summary Judgment and, with proper notice to all the parties, allowed NAC to present evidence in support of its claims. Had NAC been on notice that it could or should provide evidence, it certainly would have. The Court's failure in this regard

constitutes further error. *See Butler v. Fairbanks*, No. Civ.A.04-0367 (RMU), 2005 WL 5108537, at *3 (D.D.C. Jan. 2, 2005) ("To provide a meaningful opportunity to present additional material, the court must notify the parties of the conversion and allow them an opportunity to supplement the record"); *see also Athridge v. Rivas*, 141 F.3d 357 (D.D.C. 1998) (a district court's authority to enter summary judgment *sua sponte* may only be exercised where the losing party was on notice that it had to come forward with all of its evidence).

**C.    The Court Should Grant NAC Leave to File the Second Amended and Supplemental Complaint.**

If the Court grants the Motion to Vacate, Alter or Amend, NAC should also be granted leave to file the Second Amended and Supplemental Complaint. Except in a few very limited circumstances, the law generally favors amendment. "Although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason, such as 'undue delay, bad faith or dilatory motive … repeated failure to cure deficiencies by [previous] amendments … [or] futility of amendment.'" *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) (per curiam). HITN complains that the proposed amendment would be futile. Yet again, HITN is wrong.

Through its submissions in support of its Motion to Dismiss, HITN stated to the Court that the MRUA "pointedly does not include the [spectrum inside] the Washington, D.C. area [and] the [MRUA] also specifically excludes spectrum in" Washington D.C., because it is encumbered by NAC's ROFR. *See* Dkt. #3 at 2. Yet, despite its representations to the Court, within hours of the Order dismissing the Complaint, HITN demonstrated that its web of agreements with Clearwire did, in fact, contemplate the DC Spectrum. HITN readily admits, as it must, that it filed an application with the FCC to approve HITN's long term lease of the DC

Spectrum to Clearwire. *See* Dkt. # 20, Mem. at Ex. B. The evidence demonstrates that HITN misrepresented the DC Spectrum's status under Clearwire's option.

The Second Amended and Supplemental Complaint includes allegations of HITN's post Order conduct. HITN tries to casually downplay these new allegations, in two sentences, and simply concludes—without any factual or legal support—that "[r]egardless of the accuracy of these claims [based on HITN's post Order conduct], the lease entered into between Clearwire and HITN is not alleged to have, and could not possibly have, commenced within the period covered by the ROFR." Dkt. # 21 at 18. Even assuming this position is correct—and it is not— the purpose or effect of the Clearwire Offer was to prevent NAC from exercising its ROFR. This purpose or intent is evidenced by HITN's actions not 48 hours after the Court's Order. HITN accepted the Clearwire Offer, which is now a matter of public record. The Second Amended and Supplemental Complaint is far from futile. If the Court grants NAC's Motion to Vacate, Alter or Amend Judgment, it should also grant leave to file the Second Amended and Supplemental Complaint.

## CONCLUSION

For the above and foregoing reasons, and for the reasons more fully set forth in Plaintiff's Memorandum in Support its Motion to Vacate, Alter or Amend Judgment Dismissing First Amended Complaint, the Court should vacate, alter or amend the Order, deny the Motion to Dismiss, and grant NAC leave to file the Second Amended and Supplemental Complaint.

Respectfully submitted,

BRYAN CAVE LLP

  s/ Rodney Page
Rodney F. Page (D.C. Bar #37994)
Stacey Ormsby (D.C. Bar #490995)
700 Thirteenth Street, N.W.
Suite 700
Washington, D.C.  20005-3960
Telephone:  (202) 508-6000
Facsimile:  (202) 508-6200

Craig S. O'Dear
James D. Lawrence
3500 One Kansas City Place
1200 Main Street
Kansas City, Missouri 64105
Telephone:  (816) 374-3200
Facsimile:  (816) 374-3300

ATTORNEYS FOR PLAINTIFF

## Certificate of Service

I hereby certify that a true and correct copy of the above was caused to be served by ECF, this 9th day of October, 2007, to:

Eunnice H. Eun
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C. 20005-5793

William H. Pratt
Joseph Sreino, Jr.
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, NY 10022-4611

Rudolph J. Geist
RJGLAW LLC
1010 Wayne Avenue, Suite 950
Silver Spring, MD 20910

ATTORNEYS FOR DEFENDANT


_____s/ Rodney Page_____
ATTORNEY FOR PLAINTIFF